**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

STICHTING PENSIOENFONDS METAAL EN TECHNIEK; STICHTING PENSIOENFONDS VAN DE METALEKTRO; STICHTING MN SERVICES AANDELENFONDS NOORD-AMERIKA; AKADEMIKERPENSION, E. ÖHMAN J:OR FONDER AB; and STOREBRAND ASSET MANAGEMENT AS, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

VERIZON COMMUNICATIONS INC., HANS VESTBERG, MATTHEW ELLIS, KYLE MALADY, JAMES GOWEN and ANTHONY SKIADAS,

Defendants.

No.: 3:23-cv-05218-RK-RLS

Hon. Robert Kirsch
District Judge

Hon. Rukhsanah L. Singh
Magistrate Judge

CLASS ACTION

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 9

III. PARTIES ..... 9

A. PLAINTIFFS ..... 9

B. DEFENDANTS ..... 10

IV. RELEVANT NON-PARTIES ..... 13

V. FACTS ..... 20

A. BACKGROUND ON VERIZON ..... 20

1. Verizon's Corporate History ..... 20

2. Verizon's Current Operations ..... 21

B. VERIZON'S ENVIRONMENTAL AND SAFETY SYSTEMS ..... 22

1. Verizon's Code of Conduct ..... 22

2. Verizon's Environmental Health and Safety Policy ..... 23

3. Verizon's ESG and Sustainability Infrastructure ..... 24

4. Verizon's Recycling Initiatives ..... 25

C. VERIZON OWNS A MASSIVE NETWORK OF DECAYING LEAD CABLES ..... 26

1. Verizon Abandoned Its Decaying Lead Cables ..... 27

2. Verizon Kept Detailed Records of Its Cable Footprint via Proprietary Engineering Databases ..... 30

D. LEAD POSES SERIOUS HUMAN HEALTH CONCERNS ..... 32

E. VERIZON'S LEAD SHEATHED CABLES PRESENTED SIGNIFICANT AND KNOWN RISKS TO WORKER SAFETY, BUT VERIZON FAILED TO ENSURE WORKERS WERE PROTECTED ..... 35

1. Telecommunications Workers Working on Cable Lines Are Regularly Exposed to Lead and Face Health Consequences as a Result .......... 36

2. Empirical Evidence Has Long Established Lead Contamination in Telecommunications Workers .......... 40

3. In Light of Severe Health Hazards, OSHA Sets Stringent Lead Safety Regulations .......... 42

4. The CWA Has Long Raised Concerns of Lead Exposure in the Telecommunications Industry .......... 46

5. Verizon Regularly Violates OSHA Lead Regulations .......... 49

F. VERIZON'S LEAD SHEATHED CABLES PRESENTED SIGNIFICANT RISK OF ENVIRONMENTAL CONTAMINATION AND REGULATION .......... 50

1. Federal Law Closely Regulates Lead Contamination .......... 50

2. State Law Closely Regulates Lead Contamination .......... 52

G. NUMEROUS INDICATORS INFORMED VERIZON THAT ITS CABLES WERE HARMING THE ENVIRONMENT AND ITS EMPLOYEES .......... 55

1. The Risk of Lead Contamination Has Been Discussed at EHSCP Conferences for More Than a Decade .......... 56

a. Verizon Employees Have Been Deeply Involved in the EHSCP .......... 56

b. Lead Hazards Are Discussed Regularly at EHSCP Annual Meetings .......... 58

2. The CWA Reported that Verizon Was Causing the "Hazardous Exposure of Lead Cable to the Environment" .......... 63

3. Verizon Received Blood Sampling Data of Workers Showing Lead Exposure .......... 68

4. Verizon Employees Internally Raised Issues of Lead Exposure .......... 70

5. Verizon Was Subject to Repeated RCRA Notices for Lead Contamination. .......... 71

6. Verizon's Prospect of Environmental Litigation Is Heightened as AT&T Is Sued with Regard to Its Lead Cables .......... 75

7. Verizon Faces Community Pressure to Remove Mile-Long Lead Cables in Coal Center, PA ........ 79

H. The WSJ's Thorough Reporting Revealed that Verizon's Toxic Lead Cables Are Leaching Lead into the Environment ........ 80

I. The Fallout of the WSJ Exposé ........ 86

1. Verizon's Immediate Response to the WSJ Exposé ........ 87

2. Government Response to the WSJ Exposé ........ 91

3. Analysts Predict Verizon Faces Upwards of $8.5 Billion in Liability Associated with Its Lead Cable Network ........ 95

4. Verizon's Liability from Lead-Based Personal Injury and Toxic Tort Lawsuits ........ 98

5. After the Class Period, Verizon Finally Discloses Risk of Loss Related to Lead Sheathed Copper Infrastructure ........ 100

J. The Price of Verizon Stock Precipitously Declined in the Wake of the WSJ Exposé ........ 100

1. The July 9, 2023 Article ........ 101

2. The July 12, 2023 Article ........ 107

3. The July 14, 2023 Article ........ 112

4. The July 17, 2023 Article ........ 114

5. The July 26, 2023 Article ........ 116

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 118

A. Statements About Verizon's Loss Reserves for "Environmental Matters" ........ 118

B. Statements About Converting Legacy Copper Cables into Fiber and the Associated Cost Savings ........ 119

C. Statements About Employee Health and Safety ........ 125

D. Statements About Disposal of E-waste ........ 129

VII. DEFENDANTS VIOLATED GAAP BY FAILING TO DISCLOSE LOSS CONTINGENCIES ASSOCIATED WITH VERIZON'S LEAD CABLES ..... 133

VIII. ADDITIONAL ALLEGATIONS OF SCIENTER ..... 141

A. DEFENDANTS HAD ACTUAL KNOWLEDGE THAT VERIZON'S EXTENSIVE LEAD CABLE NETWORK POSED TOXIC RISKS TO THE ENVIRONMENT AND ITS WORKERS ..... 141

1. Facts Underlying Defendants' Scheme Outlined Above Demonstrate Their Knowledge ..... 141

2. Verizon Submitted Comments to the EPA in 2011 Evidencing Its Knowledge of Lead Cables and Resulting Dangers to Workers ..... 143

3. Verizon Is Required to Report Retirement of Copper Cables, Including Lead-Sheathed Cables, to the FCC ..... 144

4. Due Diligence Performed in Connection with Verizon's Corporate Reorganizations Revealed Its Extensive Lead Cable Network ..... 146

5. Defendants Claim to Be Tuned in to Sustainability, the Environment, and Employee and Community Health ..... 152

6. The Lead Cables Concerned Defendants' Core Operations ..... 154

B. THE INDIVIDUAL DEFENDANTS WERE VERIZON'S TOP EXECUTIVES ..... 155

1. Vestberg ..... 155

2. Ellis ..... 156

3. Malady ..... 156

4. Gowen ..... 157

5. Skiadas ..... 158

IX. LOSS CAUSATION ..... 158

X. CLASS ACTION ALLEGATIONS ..... 159

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..... 160

XII. PRESUMPTION OF RELIANCE ..... 162

XIII. CLAIMS FOR RELIEF ........ 163

COUNT I
For Violations of Section 10(b) of the Exchange Act and SEC Rule
10b-5 Promulgated Thereunder Against All Defendants........ 163

COUNT II
For Violations of Section 20(a) of the Exchange Act Against
the Individual Defendants ........ 165

XIV. PRAYER FOR RELIEF ........ 167

XV. JURY TRIAL DEMANDED........ 168

Lead Plaintiffs Stichting Pensioenfonds Metaal en Techniek, Stichting Pensioenfonds van de Metalektro, Stichting Mn Services Aandelenfonds Noord-Amerika AkademikerPension, E. Öhman J:or Fonder AB, and Storebrand Asset Management AS (collectively, "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their undersigned attorneys, allege the following information upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, *inter alia*, Lead Counsel's investigation which included review and analysis of: (a) regulatory filings made by Verizon Communications Inc. ("Verizon" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) regulatory filings made by Verizon with the Federal Communications Commission ("FCC"); (c) regulatory filings made by Verizon and its predecessor companies, including with the Department of Labor's ("DOL") Occupational Safety and Health Administration ("OSHA") department; (d) regulatory filings made by Verizon with the Environmental Protection Agency ("EPA"); (e) filings made by the Communications Workers of America ("CWA") with public utility commissions and government agencies; (f) press releases, presentations, and media reports issued and disseminated by the Company; (g) analyst and media reports concerning Verizon; (h) regulatory filings made by Verizon with New York State's Department of Public Service, Department of Environmental Conservation, and Department of Health; (i) other public information concerning the Company; and (j) investigative interviews with former Verizon employees who had first-hand knowledge of the Company's business operations regarding its lead-sheathed copper cable network.

## I. INTRODUCTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Verizon securities between October 30, 2018 and July 26, 2023, both dates inclusive (the "Class Period"). Lead Plaintiffs seek to recover compensable damages caused

by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Investors have long considered Verizon's securities to be safe investments that provide a steady income, as the Company has historically distributed its profits to shareholders in regular, robust dividend payouts, made possible by the fact that Verizon's business centers on one of the most fundamental human activities: communication. Today, Verizon services over 143 million customers and generates approximately $137 billion in annual revenue, second only to AT&T in the telecommunications industry. For years, Verizon did not appear to be saddled with environmental, regulatory, or market risks that many other high-yield investments face. But Verizon's deceptive conduct underlying this lawsuit had lulled investors into a false sense of security, which was shattered in July of 2023.

3. A series of *Wall Street Journal* ("WSJ") articles revealed in July of 2023 that Verizon has, since its inception in 2000, owned a vast network of tens of thousands of miles of toxic, lead-leaching abandoned telephone cables (comprised of copper wires), the original means of telephonic voice transmission. The lead-sheathed cables are buried underground and entrenched in manholes. They line riverbeds and lakes and dangle just feet above the ground, drooping from telephone poles. These lead-sheathed cables are, for the most part, no longer in use. As Verizon updated its network to fiber optic wires, it simply left the lead cables in place, abandoning them without a care for the environmental and human health dangers they create. Still, they are owned by Verizon, and therefore, any liability associated with environmental remediation, regulatory compliance, personal injuries or other consequences resulting from the lead cables belongs to Verizon.

4. This is no small matter. Verizon has admitted to owning at least 540,000 miles of copper cables, and the number is likely far higher because this excludes certain portions of Verizon's network. Consistent with its entire ostrich-like approach to its lead-sheathed cables, Verizon claims it is still investigating the amount of lead in its network. Verizon has already admitted, however, that its network includes at least 8,400 miles of lead-sheathed copper cable. Some analysts have put the figure as high as 15-20% of Verizon's entire copper cable network. Assuming this is correct, Verizon is responsible for over 81,000 miles of lead-sheathed cable mostly in the densely populated northeastern United States. Lead-sheathed copper cables require approximately 3.4 pounds of lead for each foot of cable. Assuming just 15% of Verizon's copper network is encased in lead, therefore, Verizon owns, and in many cases, has abandoned ***1,454,112,000 pounds (727,056 tons) of lead***, allowing it to poison lakes, streams, manholes, parks, sidewalks, backyards and playgrounds.

5. Verizon has publicly swept this issue under the rug, and misled investors. It has concealed its extensive lead cable network, while proclaiming its commitment to cost savings purportedly achieved by transitioning its customer base away from copper lines to fiber optic networks, to ensure employee safety and to further environmental goals. Without knowing the true sprawl, condition and extent of Verizon's lead cables, Verizon stockholders were materially misled about the enormous risks and financial exposure Verizon faced, which devalued its securities. To name a few examples of how Verizon has misled investors: Verizon proudly told investors in 2022 that it had reused or recycled 43.4 million pounds of electronic waste, which included 2.7 million pounds of lead-acid batteries. But it was silent about the 1.4 billion pounds of lead flung across the Northeast and mid-Atlantic region that it had largely abandoned. Verizon also told investors it was saving money as it was converting its "legacy" copper cables to fiber

optic cables, but never explained that it was often abandoning lead cables in place, which would inevitably result in a day of reckoning, as Verizon would be responsible for paying untold billions in environmental remediation, personal injury and regulatory compliance and other costs.

6. The bombshell revealing Verizon's toxic lead cables dropped on July 9, 2023, when the WSJ published the first in a series of investigative reports and articles, which revealed the following about Verizon's lead cables: (1) Verizon inherited the lead cables, some dating to the late 1800s, through a series of acquisitions of the former "Baby Bell" companies that gave rise to modern-day Verizon; (2) the lead cables are leaching lead into the environment, resulting in lead levels far in excess of the EPA's acceptable levels; (3) Verizon employees – particularly cable splicers and line workers who regularly come into contact with the lead cables – have elevated levels of lead in their bodies, and suffer from severely adverse health effects; (4) Verizon has long known about its lead cables and the potential harm they might cause; and (5) Verizon largely abandoned its network of lead cables, notwithstanding these known risks.

7. The first WSJ article, published on July 9, 2023, was titled, "America Is Wrapped in Miles of Toxic Lead Cables." The article reported, in part: "AT&T, Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead . . . . As the lead degrades, it is ending up in places where Americans live, work and play." The July 9, 2023 article also stated, "[f]or many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables."

8. The next WSJ article in the series was published on July 12, 2023, and titled, "What AT&T and Verizon Knew About Toxic Lead Cables." The article referred to "documents and interviews with former employees," which demonstrate that "[f]or decades, AT&T, Verizon and other firms dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment." For example, "Government agencies have conducted inspections, prompted by worker complaints that led to citations for violations involving lead exposure and other hazardous materials more than a dozen times over four decades, records show."

9. The WSJ's third article was published on July 14, 2023, and titled, "Workers Exposed to Toxic Lead Cables Wrestle with the Aftermath." This article reported that some telecom workers who regularly handled lead cables are suffering from "neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure."

10. In the wake of the WSJ articles, the value of Verizon's securities dropped steeply. The price of its stock fell from $35.90 at the market close on July 7, 2023 to $31.46 at the market close on July 17, 2023. This 12.4% decline wiped out approximately $18.6 billion in market capitalization. Additional articles were published on July 17, 2023 and July 26, 2023, which resulted in further declines in the price of Verizon's stock.

11. Verizon faces potentially exorbitant costs to clean up its lead-leaching cables. An analyst at New Street Research estimated it could cost $59 billion for the telecom industry to remove all the lead cables in the U.S. On July 18, 2023, the WSJ published another article titled, "Lead Cables Will Be a Dead Weight for Telecom Carriers." The article rejected the notion that the sharp sell-off of Verizon stock was an "overreaction," "considering how little is known about

the true extent of the problem, or what the ultimate financial exposure may be for telecom carriers holding legacy networks that are more than a century old in some cases. Wall Street is so far unanimous on one thing: No one really knows anything yet." The article continued, "[i]t seems unlikely that the matter will be resolved quickly – or cheaply."

12. Numerous government agencies are investigating the environmental and human health hazards resulting from Verizon's lead-sheathed cables. In particular, the Environmental Protection Agency ("EPA") has invoked its powers under the Superfund laws, and deemed its investigation into lead cables a "high priority." In December 2023, the EPA sent letters to Verizon and other telecom companies requesting a meeting about their lead-sheathed cables. According to a WSJ article dated January 11, 2024, the EPA has found "more than 100 soil and sediment readings with lead above the regulator's safety guideline for children at some phone lead-cable sites identified by The Wall Street Journal in three states." This represents 41% of the samples taken near lead cables. Congress, the DOJ, and several state agencies are also investigating.

13. Verizon's responses to the WSJ articles demonstrate that it has long known that its copper network includes lead-sheathed cables. For example, on July 25, 2023, Hans Vestberg, Verizon's CEO, stated that "lead infrastructure makes up a small percentage of our copper network," and Defendant Skiadas stated, "Here is what we currently know. We still have some lead-sheathed cable in our copper network." In a September 13, 2023 letter to New York State agencies investigating its lead cables, Verizon stated, "We have not deployed lead-sheathed cables for decades, ***but their existence, both in the telecommunications industry*** and in the transportation and power industries, ***has long been known***."[1]

[1] All emphases to quotations have been added.

14. Verizon has also acknowledged that it should have disclosed the risks associated with its toxic lead cables in post-Class Period revisions to its financial statements. In its Form 10-Q for the third quarter of 2023 dated October 26, 2023, Verizon included a new risk disclosure admitting that its lead-sheathed copper cables may "result in government investigations, legislative or regulatory actions, litigation, penalties and other liability, remediation and compliance costs or negative operational impacts," and that Verizon's "insurance policies may not cover or may not be sufficient to fully cover these costs," which "cannot be reasonably estimated at this time but could be material."

15. Verizon cannot defend its failure to disclose the extent of its lead-sheathed cables and related financial exposure from environmental, health and regulatory risks to investors. Its knowledge of the enormous risks at play is beyond dispute, as a few examples show.

- ***First***, regular mandated testing of the lead levels in Verizon's employees revealed that between 2007 and 2016, ***40%*** of its cable splicers had elevated levels of lead in their blood at or above the level at which the Centers for Disease Control and Prevention advises that one seeks medical treatment. Verizon provided this data to the CWA, the primary union serving communications workers, which has commissioned additional lead testing.

- ***Second***, the EPA has deemed Verizon a "large quantity generator" of hazardous waste, and Verizon itself has reported the existence of lead to the EPA in its manholes 227 times since 2001.

- ***Third***, Verizon has regularly participated in industry-wide employee safety programs that speak about the dangers of lead. Indeed, at annual meetings of telecom industry's Environmental Health and Safety of Communications Panel ("EHSCP"), entire presentations have been devoted to discussing lead as a hazard to workers, (e.g., "Managing Lead Exposure During Cable Removal Operations" in 2013).

- ***Fourth***, throughout the decades, Verizon or its predecessor companies have submitted public comments to government agencies in connection with new rules pertaining to lead. In 1978, several of the Bell Telephone Companies that now comprise Verizon submitted a comment to OSHA and stated that they "recognized the limited potential for lead-exposure in some telecommunications work places," and noted that their "use of lead products

has been primarily in the form of lead-sheathed cables." In 2011, Verizon submitted a public comment to the EPA which stated: "An even greater challenge would be posed by regulating lead-sheathed telecommunications cable. Such cable is removed from the ground . . . [and] brought back to a company or contractor facility."

- ***Fifth***, in connection with a 2015 complaint to the Pennsylvania Public Utility Commission, the president of the CWA testified that Verizon's abandoned lead cables pose health risks to Verizon employees and the public at large.

- ***Sixth***, AT&T (which owns identical lead-sheathed cables across the U.S.) has been sued in two federal actions, including a class action brought on behalf of Texas landowners for abandoned lead cables that are harming the environment. An expert in the Texas action estimated that the cost to remove the cables at issue would be $33.47 per foot. Applying this figure to Verizon's 81,000-mile lead cable network would result in a remediation cost of $14.3 billion. And on January 14, 2021, AT&T's subsidiary was sued by an environmental group for abandoning lead cables at the bottom of Lake Tahoe, which were alleged to be leaching lead. AT&T estimated the cost to remediate this lead cable (40,000 feet) at $1.5 million. Applying AT&Ts estimate Verizon's 81,000 miles of lead cable results in a cost of $16 billion to remediate all the lead cables in Verizon's network.

- ***Seventh***, the FCC requires Verizon to engage in a lengthy notice process when it seeks to retire its copper cable cables, thus focusing Verizon on its copper cable system. Verizon would have known which of these were lead-sheathed.

- ***Eighth***, Verizon regularly touts its commitment to ESG goals, and its Code of Conduct requires employees to report incidences of conduct that impede these goals. Further, Verizon's CEO – Hans Vestberg – is actively involved in the United Nations Sustainability initiatives and regularly speaks about Verizon's commitment to sustainable business practices and employee welfare.

- ***Ninth***, due diligence in connection with the many corporate reorganizations that gave rise to modern day Verizon would have required that its top executives become educated on the Company's lead cable network and related liabilities.

16. These facts and others detailed below demonstrate that Verizon knew, or at a minimum was extremely reckless for not knowing, about its extensive network of lead cables, the

dangers they were posing to people and to the environment, and the costs associated with cleaning up the cables and compensating for any human injuries.

## II. JURISDICTION AND VENUE

17. Lead Plaintiffs' claims arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as at least one of the Defendants, Mathew Ellis, resides in this judicial district, Defendant Verizon maintains its Operational Headquarters with executive leadership and corporate functions in this judicial district at One Verizon Way, Basking Ridge, NJ, and the alleged misstatements entered and the subsequent damages took place in this judicial district.

20. In connection with the conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

21. Lead Plaintiff Stichting Pensioenfonds Metaal en Techniek ("PMT") is the Netherland's third largest pension fund, covering 34,300 employers and 1.5 million plan participants. PMT currently has approximately $135.78 billion in assets under management ("AUM").

22. Lead Plaintiff Stichting Pensioenfonds van de Metalektro ("PME") is a pension fund based in the Netherlands that covers 1,527 employers and approximately 612,565 participants. PME has approximately $53.63 billion in AUM.

23. Lead Plaintiff Stichting Mn Services Aandelenfonds Noord-Amerika ("ANA") is a pension fund based in the Netherlands. ANA has approximately $99.12 billion in AUM.

24. Lead Plaintiff AkademikerPension, E. Öhman J:or Fonder AB ("Fonder AB") is the largest independent fund manager in Sweden. Fonder AB has approximately $12.36 billion in AUM.

25. Lead Plaintiff Storebrand Asset Management AS ("Storebrand") is a leading asset manager in the Nordic region with $101.42 billion in AUM.

26. PMT, PME, ANA, Fonder AB, and Storebrand are referred to collectively herein as "Lead Plaintiffs." Lead Plaintiffs purchased Verizon securities during the Class Period and were economically harmed thereby.

B. **DEFENDANTS**

27. Defendant Verizon Communications, Inc. ("Verizon" or the "Company") is a telecommunications company that offers both wireless and wireline telecom services. Throughout the Class Period, Verizon common stock traded on the New York Stock Exchange ("NYSE") and the NASDAQ under the ticker symbol "VZ." Verizon's headquarters are located at 1095 Avenue of the Americas in New York, NY. Verizon's principal place of business is the Verizon Center in Basking Ridge, New Jersey. Verizon's fiscal year begins on January 1 and ends on December 31.

28. Defendant Hans Vestberg ("Vestberg") has served as the Company's Chief Executive Officer ("CEO") since August 2018 and as the Chairman of the Board of Directors (the "Board") since March 2019. Defendant Vestberg first joined Verizon in April 2017 as the Executive Vice President and President of Global Networks and Technology. Prior to joining Verizon, Defendant Vestberg worked at Ericsson, a multinational networking and telecommunications equipment and

services company for 26 years in various capacities. Between 2009 and 2017, Vestberg was Ericsson's President and CEO; between 2007 and 2009, its CFO; and between 1991 and 2007, Vestberg served in other roles. Defendant Vestberg currently serves on the UN's Leadership Council for the UN Sustainable Development Solutions Network and claims to have helped write the UN Sustainable Development Goals ("SDGs"). Defendant Vestberg certified the Company's financial statements pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX"), stating that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods referred to in the Report" for each of the Company's Forms 10-Q and Forms 10-K filed with the SEC during the Class Period.

29. Defendant Matthew Ellis ("Ellis") served as Verizon's Chief Financial Officer ("CFO") from November 1, 2016 through May 1, 2023. Between 2013 (when Defendant Ellis first joined Verizon) and his promotion to CFO, Defendant Ellis was the Senior Vice President and CFO of Operations Finance. While serving as the CFO of Verizon, Defendant Ellis was an active participant in the UN Global Compact's CFO Taskforce for the SDGs. Defendant Ellis suddenly left Verizon on May 1, 2023 to "pursue other interests" after working at the company for 10 years. Prior to joining Verizon in 2013, Defendant Ellis worked at Tyson Foods, Inc., where he served in various capacities including Vice President and Treasurer, and other positions within finance and accounting. Defendant Ellis certified the Company's financial statements pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, stating that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods referred to in the Report" for each of the Company's Forms 10-Q and Forms 10-K filed with the SEC during the Class Period.

30. Defendant Kyle Malady ("Malady") served as Verizon's Executive Vice President and Chief Technology Officer ("CTO") in its Global Networks & Technology group from 2019 through March 2, 2023, at which point he was appointed Executive Vice President and CEO of Verizon Business Group. Malady also served as Verizon's interim CTO between July 10, 2018 and his official promotion to CTO in 2019. Defendant Malady has worked in the telecommunications industry for decades. Malady started his telecommunications career as a cell site technician for NYNEX Mobile Communications which later became Bell Atlantic Mobile, which eventually became Verizon Wireless. Defendant Malady is currently a member of the President's National Security Telecommunications Advisory Committee (NSTAC), which advises the White House on reliability, security, and preparedness of communications and information infrastructure.

31. Defendant James Gowen ("Gowen") is the Senior Vice President ("SVP") of Verizon's Global Supply Chain and Verizon's Chief Sustainability Officer, responsible for Verizon's sustainability initiatives including recycling and waste reduction goals and the management of end-of-life-cycle material recovery. Defendant Gowen has worked at Verizon for over 25 years in various sustainability and operations roles. Defendant Gowen is the current Chairman of GESI (Global eSustainability Advisory Board), a member of Penn State University's Smeal Sustainability Advisory Board, and a board member of the MIT Climate and Sustainability Consortium.

32. Defendant Anthony Skiadas ("Skiadas") served as Verizon's Senior Vice President and Controller as well as its Principal Accounting Officer, responsible for Verizon's accounting and finance operations, compliance, financial policies, and SEC reporting during the Class Period. On May 1, 2023, Defendant Skiadas replaced Defendant Ellis as the EVP and CFO of Verizon, responsible for Verizon's Finance Operations. Defendant Skiadas has worked at Verizon for 28 years

in various financial and accounting roles. Defendants Vestberg, Ellis, Malady, Gowen, and Skiadas, are collectively referred to herein as the "Individual Defendants."

33. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements concerning the Company were being issued; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

34. Verizon and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. RELEVANT NON-PARTIES

35. CW1 worked at Verizon for nearly three decades in various roles, including Field Technician/Lineman and finally as a Field Operations Manager, a role he[2] worked until he

[2] For ease and convenience, the pronouns "he/him/his" are used herein in connection with all CW allegations. However, not all CWs are male or would otherwise use these pronouns.

departed the Company in 2019. In the Field Operations Manager role, CW1 managed 22 direct reports and many times, as many as 40 to 60 other men working on projects. CW1 reported that he worked with lead-sheathed cables his entire career.

36. CW2 worked at Verizon from mid-2000 through early 2023 as a lineman and later a foreman in Massachusetts. As a lineman and foreman, CW2 was responsible for removing lead cables and performing underground work in Massachusetts.

37. CW3 worked at Verizon from Q1 2019 through Q2 2021 as a technician. While employed at Verizon, CW3 was affiliated with the CWA Union's Local 2100 chapter. CW3 worked in the Maryland area and reported to a copper splicing manager. As a technician, CW3 was responsible for splicing and replacing lead cables used for telephone lines with plastic cables. In particular, CW3 removed lead cables from defective copper telephone lines and spliced them with plastic cables. CW3 also worked in manholes and with aerial lead cables throughout his entire tenure with the Company.

38. CW4 worked at Verizon between late 2021 and mid-2022 as a construction site manager.

39. CW5 worked at Verizon for several decades as a cable splicer in the mid-Atlantic region of the U.S. As a cable splicer, CW5 worked on and around lead-sheathed cables and, in particular, spliced cables while in manholes and removed lead patches of cables.

40. CW6 worked at Verizon and its predecessor companies for 30 years in various roles. CW6's employment history at Verizon is as follows: cable splicer and outside plant technician in Brooklyn, New York (July 1989 through 1995); cable maintenance (1995 through September 2001); Ground Zero remediation and clean-up following 9/11 (September 2001 through 2002); cable technician in Westchester, New York (2002 through 2003); Local Manager (June

2005 through July 2007); Area Operations Manager (2007 through 2015). In 2015, CW6 transitioned into Verizon's sales and marketing department where he worked as a sales account manager until September 2017, at which point CW6 resumed working in the operations department as the Manager of National Operations Support until April 2019, at which point CW6 departed from the Company.

41. CW7 worked at Verizon from the mid-1990s until Q2 2016 and from 2017 until 2020. From the mid-1990s until 2004, CW7 worked as a technician handling lead-covered cables. During this time period, CW7 reported to a local supervisor.

42. CW8 worked at Verizon (and its predecessor companies) from 1987 through 2015 in various roles, including: Special Technician, Cable Maintenance, and Cable Locator.

43. CW9 was a lineman at Verizon from Q2 2010 until Q2 2021. As a lineman, CW9 worked primarily with fiber cables in the Philadelphia area and also removed lead cables from manholes.

44. CW10 was a field technician cable splicer at Verizon from mid-2000 until early 2016. In this role, CW10 worked in New York City's manhole systems. CW10 worked with lead cables throughout his entire employment at Verizon.

45. CW11 was a lineman from 2018 through Q2 2023. CW11 worked in Staten Island, New York. CW11 reported working around lead-sheathed cables and stated that most of the time he was removing them.

46. CW12 was a lineman in the Northeastern area of New York from early 2018 through the summer of 2021.

47. CW13 was a lineman and outside plant technician at Verizon from the fall of 1999 through early 2017. In this role, CW13 removed lead cables in Southern Massachusetts.

48. CW14 worked at Verizon from May 2011 through November 2022. While at Verizon, CW14 held various roles including Network Operations Manager from September 2016 through November 2022; Installation and Maintenance Manager from May 2014 through September 2016; FiOS Troubleshooter from January 2014 through May 2014; and Field Technician from May 2011 through January 2014. As a Network Operations Manager, CW14 supervised a team of over 100 field technicians in Plattsburgh and Albany, New York. CW14 worked in the field during his entire course of employment with Verizon and personally handled lead "whenever there was a cable repair that needed it."

49. CW15 worked at Verizon's Basking Ridge, New Jersey office from 1999 through 2007 as the Director of Program Management. CW15 was involved in the Network Transformation at Verizon, i.e., migrating its network of cables from copper to fiber. CW15 recalled discussing the Network Transformation project with John Stratton, the senior vice president who oversaw the wireline.

50. CW16 worked at Verizon from 2005 through 2016 first as the West Coast Market Area President of Network Operations from approximately 2005 through 2010 and later as the President of Verizon California from 2010 through 2016. As President of Verizon California, CW16 reported to Bob Mudge, the former Executive Vice President of Network Operations. As the Vice President of Operations for the West Coast (which included Montana, Oregon, Idaho, Washington, and California), CW16 worked on the physical aspects of the business. As President of Verizon California, CW16 also worked in sales and marketing.

51. CW17 worked at Verizon from May 1997 through December 2018. Most recently, CW17 was a senior manager of network engineering and operations at Verizon between July 2014 and December 2018. Prior to that, CW17 worked in various roles at Verizon including: Lean Six

Sigma Black Belt between July 2012 and July 2014; Senior Manager of Network Engineering and Operations between October 2011 and December 2012; Manager, Network Field Operations (August 2008 – October 2011), Team Lead Manager (March 2006 – August 2008), Network Engineer (July 2000 – March 2006), and Field Technician (May 1997 – July 2000).

52. CW18 worked at ASG, a major Verizon subcontractor, from February 2017 through February 2019 as Project Manager, New York Survey Team. In this role, CW18 traveled throughout the five boroughs of New York to identify pathways to bring Verizon services into buildings. In particular, CW18 would survey, document, and measure the spaces and conduits and then make recommendations as to what should be removed and how the pathways for new fiber lines should be designed.

53. CW19 was a Verizon lineman from Q1 2018 through Q4 2020 in the Schenectady, New York area.

54. CW20 was a construction cable splicer at Verizon from Q2 2004 through Q2 2016 throughout the state of Texas. CW20's main reporting location was Georgetown, Texas, where CW20 received work assignments in the form of work prints which contained schematics of the work location, manholes, and four-letter cable identification codes, cable direction, and cable sizes to be worked on. In this role, CW20 worked primarily on repairing air pressure copper and lead-sheathed cables. Accordingly, CW20 worked with and handled Verizon's lead-sheathed cables and, in particular, was responsible for cutting and soldering lead-based cable sleeves and welding joints.

55. CW21 worked at Verizon between Q4 2011 and Q3 2021 as a lineman in the Philadelphia, PA area. In this role, CW21 worked on fiber cables in manholes with lead-sheathed cables.

56. CW22 worked at Verizon for over two decades – from the early 2000s until Q2 2022 in various roles in the Westchester and Duchess Counties of New York. From the early 2000s through 2017, CW22 worked as a technician, and from 2017 until the end of CW22's employment, he worked as a field manager. As a field manager, CW22 oversaw employees who occasionally worked on lead-covered cables.

57. CW23 worked at Verizon from September 2013 through December 2021. During his tenure at Verizon, CW23 worked in various capacities, including: Manager, Strategy, Development & Planning, Verizon Ventures, from September 2013 through December 2015; Business Intelligence Manager from January 2017 through May 2019; and Manager, Planning and Forecasting, Verizon Business Markets, from May 2019 through December 2021.

58. CW24 worked at Verizon from Q2 2000 through Q1 2016 as a cable splicer in the University, Kenwood, Melbourne, and High Park areas of Florida. Between approximately 2009 and 2015, he was involved in removing lead place closures and transitioning to stainless steel closures.

59. CW25 worked at Verizon between 2000 and August 2017. Prior to working at Verizon, CW25 had worked at Bell Atlantic since 1972. In CW25's 46-year career with Verizon and its predecessor companies, CW25 worked in Network Technology and Planning as an engineer and designer of outside plant networks primarily in offices in Allentown, Pennsylvania. In CW25's most recent role, he reported to director Vincent O'Byrne.

60. CW26 worked at Verizon in Los Angeles, CA from 2008 through 2009 and again in Portland, OR from 2018 through 2019. Prior to working at Verizon, CW26 worked as an engineer at Pacific Bell in 1999. CW26 has 25 years of experience working with cable networks.

61. CW27 worked at Verizon between August 1999 and July 2017 in various capacities. In particular, between August 1999 and March 2006, CW27 was an Area Manager/Local Manager/Team Leaders of Customer & Business Operations; between March 2006 and June 2007, CW27 was Area Manager, FiOS Western Pennsylvania Office; between June 2007 and July 2010, CW27 was Manager, FiOS Program Management Office (Best Practices, Technology & Service Rollouts); from July 2010 to March 2011, CW27 was Manager, FiOS Regional Operations Support (Multistate East Coast Region); and between March 2011 and July 2017, CW27 was Associate Director, Wireline Network Operations and Engineering for FiOS Products & Services. CW27 also served in Verizon Lean Six Sigma Team from April 2012 through March 2013. In CW27's first role, he was a construction supervisor, i.e., managed the technicians that worked on the cables. In CW27's last role at Verizon, he reported to Erik Sheehan, then-Director of Strategic Initiatives who, in turn, reported to Vice President Paul Sullivan.

62. CW28 worked at Verizon between 2000 through December 2018, in various capacities. Between 2000 and 2010, CW28 was an area operations manager; between January 2014 and May 2016, CW28 was a senior consultant, process engineering; and between June 2016 and December 2018, CW28 was a senior manager of operations for Empire City Subway. CW28 primarily worked in Verizon's Staten Island, NY location. CW28 began working in the telecommunications industry in 1990 when he joined NYNEX as a cable splicing technician.

63. CW29 worked at Verizon between August 1996 and November 2019 in various roles. In particular, CW29 worked as a field technician, cable splicer, and fiber install and repair technician. CW29 began his career as a cable splicer at NYNEX in 1996, then worked at Bell Atlantic, and finally Verizon. CW29 worked in New York City for 22 years and later transferred to Virginia.

## V. FACTS

### A. Background on Verizon

#### 1. Verizon's Corporate History

64. Verizon traces its corporate roots back to 1885 when Alexander Graham Bell's American Bell Telephone Company formed the American Telephone and Telegraph Company ("AT&T"). In 1984, AT&T's nationwide operation was broken up into seven independent companies: BellSouth, Ameritech, Pacific Telesis, Southwestern Bell, Bell Atlantic, NYNEX, and US West. These companies exist today in some form within one of the present-day major telecom companies: AT&T, Verizon, and Lumen Technologies, Inc.

65. Legacy companies Bell Atlantic and NYNEX are the principal backbone of modern-day Verizon. As of 1984, Bell Atlantic operated in Pennsylvania, New Jersey and Virginia. It expanded into New York and New England when it merged with NYNEX in 1996. In 1999, Bell Atlantic reported revenues of $33 billion. Its domestic telecom operations served 43 million access lines including 22 million households and 2 million business customers. Verizon expanded its operations further in 2000 by merging with General Telephone & Electronics Corporation ("GTE") for a reported value of more than $64 billion. The deal marked one of the largest mergers in U.S. business history at the time. GTE, which was founded in 1926, provided local and wireless phone services in 29 states.

66. After the GTE merger, Verizon became the largest local telephone company in the United States, operating 63 million phone lines and serving 25 million mobile phone customers across 40 states. It changed its name at this point to "Verizon," a combination of "veritas" (Latin for "truth") and "horizon." On July 3, 2000, Verizon began trading on the NYSE under the ticker symbol "VZ." In 2004, Verizon was added to the Dow Jones Industrial Average. On March 10, 2010, Verizon began trading on the NASDAQ.

67. In 2004, Verizon launched its fiber-optic-based Internet and video services, popularly known as "Fios." In an effort to expand this fiber-optic network, the Company acquired MCI Communications Corporations ("MCI") on January 6, 2006 for $8.5 billion and XO Communications ("XO") in February 2016 for $1.8 billion.

68. In 2015 and 2016, Verizon sold certain GTE assets to Frontier Communications ("Frontier"), including the territories in California, Florida and Texas. On July 1, 2020, Verizon sold additional former GTE assets to Frontier. Once these spin-offs were complete, Verizon's landline operations were confined to the original Bell Atlantic footprint, as well as in certain areas of Pennsylvania, Virginia and North Carolina.

**2. Verizon's Current Operations**

69. Today, Verizon is a holding company. Through its subsidiaries, it provides "communications, information and entertainment products and services to consumers, businesses and government entities," according to its 2022 Form 10-K.

70. Up until 2019, Verizon's reportable segments were Wireless and Wireline. Now, Verizon is organized around Verizon Consumer Group ("Consumer Group") and Verizon Business Group ("Business" or "VBG").

71. The Consumer Group provides consumer-focused wireless and wireline communications services and products. Verizon provides wireline services in nine states in the Mid-Atlantic and Northeastern United States, in addition to Washington D.C., over: (a) its fiber-optic network which is provided through its Verizon Fios product portfolio; or (b) its traditional copper-based network to customers not served by Fios. The lead-sheathed cables at the heart of this action are a part of Verizon's Consumer Group. In fiscal year 2022, the Consumer Group reported revenues of $103.5 billion, accounting for approximately 76% of Verizon's consolidated revenues. This came from Verizon's 115 million wireless and wireline retail connections, its 8

million broadband (which includes Fios internet, and digital subscriber line) connections, and its 3 million Fios video connections.

72. VBG provides wireless and wireline communications services and products such as data, video, conferencing services, corporate network solutions, among other offerings to business enterprises including global enterprises, small and medium businesses, the public sector, and wholesale businesses. VBG reported revenues of approximately $31.1 billion for FY 2022, accounting for approximately 23% of Verizon's consolidated revenues.

## B. Verizon's Environmental and Safety Systems

73. Verizon and its executives, including Defendant Vestberg, have long touted their commitment to environmental stewardship and employee safety, as evidenced by the following structural safeguards and public statements.

### 1. Verizon's Code of Conduct

74. On September 1, 2010, Verizon issued Corporate Policy No. CPS-115, implementing company-wide Environmental, Health and Safety standards.

75. Specifically, CPS-115 required Verizon and its subsidiaries to "conduct business in an environmentally responsible manner, and provide employees with a safe and healthy workplace." The policy further required all Verizon employees and contractors to "comply with all applicable company programs, laws and requirements, globally, relating to protection of the environment and human health and safety."

76. On September 1, 2015, Verizon reiterated this policy, and also added several other directives, *viz* (emphases added):

> Verizon is committed to the safety of its employees and protecting the environment. Our EHS programs and practices have been developed to comply with U.S. and international EHS laws and guidelines and the Verizon Code of Conduct. Our Code of Conduct is a statement of the principles and expectations that define ethical business conduct at Verizon, requiring that all employees be accountable for their

> actions and conduct business with integrity. Our Code addresses our EHS responsibilities:
>
> Verizon is committed to providing a safe workplace for all employees and meeting its environmental responsibilities. You must perform your job in a safe and environmentally responsible manner in compliance with applicable Verizon policies and practices and the law.
>
> ***If you believe that a safety, health or environmental hazard exists, that there has been a release of any hazardous substance, or that safety, health or environmental guidelines are not being followed, you must immediately report the situation to your supervisor. Where you are unable to reach your supervisor directly or there has been a release or imminent release of any hazardous substance, you must also immediately contact the safety and environmental management organization at 800.386.9639.***

77. Appendix A to CPS-115 incorporates the foregoing policy in the Company's Code of Conduct. The Code of Conduct is applicable to all Verizon employees, and is made available to the public and is regularly updated.

**2. Verizon's Environmental Health and Safety Policy**

78. More recently, Verizon has enacted stricter standards to ensure stewardship of the environment and promote employee health and safety. For example, on February 4, 2020, Verizon issued its Environmental, Health and Safety Policy (the "EHS Policy") which provides as follows:

- Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our commitment goes beyond maintaining compliance with laws, regulations and policies. Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareowners, and society.

- Verizon will conduct business in an environmentally and socially responsible manner and provide employees with a safe and healthful workplace. We are committed, through our environmental, health and safety (EHS) management system and supporting programs, to eliminate hazards and reduce EHS risks.

- Verizon employees and everyone who conducts business on our behalf must perform their jobs in a safe and environmentally responsible manner and

must comply with all laws, regulatory requirements, and company programs for protecting the environment and human health and safety. Verizon will seek employees' participation and consultation to identify concerns and opportunities for improvement.

**3. Verizon's ESG and Sustainability Infrastructure**

79. Verizon maintains an "ESG Resources Hub," and employs a "Chief Sustainability Officer," a "Chief ESG Officer" and an entire ESG department.

80. Until March 2023, Beth Sasfai ("Sasfai") served as Verizon's "Chief ESG Officer." Sasfai described her role as Verizon's Chief ESG Officer as follows on her LinkedIn page:

> I partner throughout the organization with business units and functional areas to ensure engagement and alignment of ESG initiatives companywide. I oversee the effectiveness of Verizon's ESG commitments and develop appropriate reporting and disclosures to share progress with shareholders. I head a cross-functional team that focuses in strategic areas including governance, reporting, human rights, environmental sustainability, and digital trust and safety. My team is responsible for Verizon's ESG-related investor, customer, employee and broader stakeholder engagement. ***I support Verizon's Deputy General Counsel & Corporate Secretary, and serve as a liaison to the Corporate Governance & Policy Committee of the Board of Directors, the Committee charged with overseeing sustainability, governance and reputational risk.***

81. Defendant Gowen is Verizon's Chief Sustainability Officer, a position he has held since 2009. Defendant Gowen describes his position as follows on his LinkedIn page:

> I have been deeply involved in the advancement of innovative and sustainable technologies and recently spearheaded the launch of Verizon's flagship $137 million green energy initiative which enabled Verizon to eliminate 20,000 metric tons of CO2. I also oversee other green initiatives being implemented across Verizon including the introduction of a carbon intensity metric, paper suppression, ***waste reduction and recycling, and management of end-of-life-cycle material recovery***.

82. Since 2019, Verizon has published annual ESG Reports. On April 19, 2021, Verizon published its annual ESG report for FY 2020 (the "2020 ESG Report"), which stated that Verizon "regularly update[s] its employee health and safety programs." Topics include splicing

fiber, climbing poles and installing fiber. Verizon's 2022 ESG Report contained a subsection entitled "Safety Culture," where the Company made similar claims.

83. In addition, Verizon stated in its proxy statements for FY 2022 and 2023 that it was "committed to maintaining a safe workplace and environmentally sustainable work practices." Similarly, in its Form 10-Q for the first quarter of 2023, filed on April 27, 2023 (less than 3 months before the WSJ articles were published), Verizon stated that it is "limiting [its] environmental impact."

**4. Verizon's Recycling Initiatives**

84. As part of its purported sustainability initiatives, Verizon has also, for years, touted its electronic waste or "e-waste" recycling. For instance, in 2010 Verizon set a goal to collect 2 million pounds of electronic waste by the end of 2015. In 2015, Verizon published an article on its website titled "How to Dispose of Electronic Waste on Earth Day." And in 2022, Verizon reused or recycled 43.4 million pounds of e-waste including 1.6 million pounds of plastic and 2.7 million pounds of lead-acid batteries.

85. In Verizon's FY 2018 Proxy Statement filed on March 18, 2019, Verizon touted that it was "reducing waste and supporting recycling" by, among other things, "[r]ecycling, refurbishing and/or reusing our products, including the responsible management of out-of-service lead batteries." It did not mention its massive out-of-service lead cable network.

86. According to several former Verizon employees, Verizon often did not recycle or ensure the responsible management of obsolete lead cables, let alone ensure their proper disposal. In particular, CW14, CW20, and CW8 all reported that Verizon would just dispose of lead cables by placing them into non-lead specific that contained other materials. CW29, who worked at Verizon for 23 years, reported that "sometimes we'd take it [lead] back to the garage and put it in the dumpster" but "***sometimes we'd just go to the street corner and throw it away. There were***

***always garbage cans on the corner***." Further, CW19 recounted one winter day in New York during which a lead cable had been cut and left in the street. CW19 stated that kids were handling the cable and using pieces of it for their snowmen.

### C. VERIZON OWNS A MASSIVE NETWORK OF DECAYING LEAD CABLES

87. Despite its professed robust commitments to environmental stewardship, Verizon has long – largely outside the public view – maintained a massive, decaying web of cables sheathed with lead, a toxic contaminant that presents significant health and environmental protection risks.

88. Verizon's ownership of legacy lead-sheathed cables is traceable through the numerous corporate reorganizations detailed above. Lead was pervasively used in the telecommunications industry from the late 1800s through the 1950s as a protective sheathing and thus used by many of Verizon's predecessor entities, including Bell Atlantic, NYNEX, and GTE. As of the 1950s, roughly 90% of all telecommunications wiring was sheathed with lead. As the WSJ reported, in the 1950s and 1960s, "[w]hen technology advanced and companies turned to plastic sheathing and later fiber optics," telecommunications companies (including Verizon's predecessors) "often left the old lines in place."

89. Following the publication of the WSJ articles in July 2023, Verizon estimated that it owned copper cables at least spanning 540,000 miles. This figure excludes certain copper wireline assets Verizon inherited when it acquired MCI and XO, and so the actual amount is greater. According to Wall Street analysts, approximately 15% to 20% of all copper cables are sheathed in lead. Crediting these estimates, Verizon still owns ***at least 81,000 miles of lead*** in its wireline infrastructure. As indicated above, each ***foot*** of copper cable requires approximately 3.4 pounds of lead sheathing. Thus, Verizon owns approximately 1.5 billion pounds of lead strewn across communities in the U.S. Verizon itself has stated that approximately 3% of its 280,000 miles of aerial copper cables (excluding underground and underwater copper cables, and any

cables acquired via MCI and XO) are lead-sheathed. Thus, at an absolute minimum, Verizon owns 8,400 miles of above-ground lead cable, which equates to more than 146 million pounds of lead. But as noted, the figures are likely much higher.

### 1. Verizon Abandoned Its Decaying Lead Cables

90. In the late 1990s, as use of the internet was spreading, Verizon's predecessor companies began to transition from their copper cable networks to fiber cables. Verizon refers to its copper cable network as "legacy cables." The transition continued under Verizon's direction once it was formed in 2000. Between 2004 and 2015, Verizon invested more than $25 billion to deploy its fiber network.

91. As the copper cables – many of which were encased in lead – became increasingly obsolete, it became imperative for Verizon to properly retire those that were no longer being used. It failed to do so, however, opting instead to simply convert its customers to fiber, while leaving the old copper cables, including those sheathed in lead, in place. Because many of these cables no longer served a useful purpose, Verizon ceased to maintain them, allowing them to decay in place.

92. Verizon's lead cables currently hang aerially on utility poles or remain buried in the ground either directly, in conduits, or under water. They run under people's homes and properties, languish in the water that people swim in and drink, and hang above parks where children play.

93. Verizon admitted to its practice of leaving its copper cables (including those that are lead-sheathed) in place. In a submission to the New York State Public Service Commission dated August 21, 2023, Verizon stated that while it has "deployed roughly 81,750 total miles of fiber-optic cable" in New York State, it had removed only 230 miles of copper cables since November 2020.

94. Numerous former Verizon employees have confirmed that Verizon's lead cable footprint is expansive, and includes many abandoned lead cables. For example, CW1, a Verizon employee who worked with lead-sheathed cables throughout his decades-long career, reported that Verizon has a large number of lead cable lines in the New York State area, and that Westchester County, New York, in particular, has lead cables "all over the place." Further, CW6, who worked as a cable splicer and in operations at Verizon and its predecessor companies for 30 years throughout the entire state of New York reported that approximately ***51% of the cables he encountered between 1989 and 2002 were sheathed in lead***. CW6 recalled: "pretty much every job I worked had lead cables." CW12 also reported observing many lead cables, that the lead cables were everywhere, and the vast majority of them were abandoned. CW12 further reported that a number of lead cables were in visible disrepair; in particular, CW12 stated that he could plainly see that lead cables on poles were falling apart and were a hazard.

95. CW23 reported that it is incredible how many lead-sheathed cables Verizon has left, noting: "You can't miss it; if you drive down the street, you see cross boxes. It's astonishing there's so much plant that's out there."

96. CW18 reported that "there was definitely lead out there."

97. Former Verizon field technicians who regularly handled lead cables – in particular, CW2, CW6, CW7, CW12, CW22, and CW24 – have all confirmed that "retiring" lead cables or "abandoning [them] in place" was a ***routine practice*** at the Company. CW1 stated that it was Verizon's ***preference*** to leave the lead cables in place. In these cases, Verizon workers would cap the cables and notate on engineering prints that the cables were "retired" or "abandoned" in place, and leave the inoperable cables to decay in the community. Specifically, former employees have stated as follows:

- CW1 reported that Verizon's preference was not to disturb the cables, but rather to leave them in place. CW1 further stated that there are aerial lead cables still in place that have just been "overlaid" with fiber-optic cables. CW1 referred to these cables as "dead lead cables," "dead plant" or "lead plant cables."

- CW2 reported that Verizon would just leave the cables in place because they were stuck, crushed, or massive and difficult to pull out.

- CW6 began working with fiber around 1993 which entailed putting fiber on a new strand (the wire that goes from one telephone pole to another), but he reported that, beginning in 2004, in some cases, they would just put the fiber on top of existing cables that had lead sheath. CW6 also reported that Verizon would remove the lead-encased cables except in two instances: (i) when the cable duct was blocked because of decayed or broken wood or clay in which case they were unable to pull the cable out resulting in a "cable failure," at which point Verizon would tag the cable as "duct obstruction RIP" (RIP is short for retired in place); or (ii) the lead cable was inaccessible for removal because it was located on private property or a non-Verizon friendly location.

- CW7 stated that Verizon's lead cables had a limited life-span and would fail over time. According to CW7, certain lead cables could not be replaced and were therefore "abandoned in place." For instance, at times, road work or other types of infrastructure would cause the area in which the cables were laid to collapse; to recover lead cables under collapsed infrastructure would have required Verizon to dig up the street which, according to CW7, Verizon would not do. As a result, Verizon just abandoned its lead cables in place.

- CW12 reported observing many lead cables while employed at Verizon, noting that the ***lead cables were everywhere***, and the ***vast majority of them were abandoned***. CW12 further reported that a number of lead cables were in visible disrepair; in particular, CW12 stated that you could see that lead cables on poles were falling apart and were a hazard.

- CW21 reported that although some lead cables were removed, many others were simply left in place "for dead" where they had been laid, and Verizon laid newer fiber optic cable over the dead cables.

- CW22 reported that Verizon left its old lead cables in place even when the cables were migrated over to fiber optic cables. CW22 further recalled that fiber optic cables would be placed ***on top of and secured to*** the lead covered cables.

- CW24 stated that Verizon left lead cables in place at which point the Company would refer to them as "AIPs," or "airborne in place."

98. Despite the vast scope of its lead-sheathed copper cable network, Verizon never reported anything to the public, including its investors, about the lead-sheathed copper cables it had retired or abandoned in place. To the contrary, Verizon misleadingly told investors that it was "pulling out the copper [lines] that are expensive to operate" and sold investors on the idea that the transition to fiber was providing "cost benefits and green benefits from removing some of the copper network."

**2. Verizon Kept Detailed Records of Its Cable Footprint via Proprietary Engineering Databases**

99. Verizon housed a proprietary network of engineering blueprints or "schematics" that tracked, in granular detail, its wireline network. It knows where most if not all of its lead sheathed cables are.

100. According to CW1, CW3, CW6, CW12, CW17, CW19, CW26 and CW28, these "blueprints" or "schematics" which were prepared by Verizon's engineering department, were given to Verizon's field workers such as linemen and cable splicer technicians prior to beginning a job in the field so that they would know the location of the cables (i.e., whether it was in a manhole, or an aerial cable, and the exact address of the cable). According to CW6, the blueprints were essentially a service order which would instruct his team on what to do.

101. In particular, according to CW1, CW3, CW6, CW10, CW12, CW17, CW22, CW26 and CW28, the Company's "blueprints" or "schematics" contained the following detailed information:

- The location of every telephone cable and pole in Verizon's network;

- the year each pole or cable was installed[3];
- unique alphanumeric codes accompanying each cable signifying the type of cable and its sheathing (e.g., aluminum, lead, or plastic); and
- how many wire pairs were in each cable.[4]

102. CW1, CW3, CW6, CW10, CW12, CW17, CW22, CW26 and CW28 further reported that these engineering prints were provided to field technicians either digitally or via print-outs. In particular, CW6 reported that the schematics were accessible digitally via a database referred to as ICGS, and CW12 reported that schematics could be accessed via Verizon Build. The following former Verizon employees further reported the below regarding the schematics, and how they indicated which cables were lead-sheathed:

- CW3 stated that the schematics were originally stored on computers in the York Road, Monrovia and Annapolis offices, among others, but at some point, these schematics also became accessible on the phone via mobile app. CW3 and others at Verizon accessed the digital schematics by logging in with a Verizon ID and password. CW3 stated that the engineers knew how to read the schematics or prints in order to find the lead cables. CW3 reported that one could infer whether the cable was sheathed in lead or not based on the installation date; for example, if you saw a cable with an installation date in the 1930s with a 200 pair count, it was likely a lead-sheathed cable.

- CW6 reported that every cable contained on the print had its own four-letter alphanumeric code which would indicate exactly what type of cable it was; for example, CW6 said a code might be BKTA-6 which would indicate a 600-pair terra cable, and that the letters "B," "K," and "A" indicated what kind of sheath the cable had. According to CW6, ***you could determine whether the cable was sheathed in lead simply by looking at the cable's alphanumeric code.*** CW6 further stated that the prints had a section stating what year the cable was installed. these blueprints were housed in Verizon's proprietary database called "ICGS" or its "Intelligent Computer Graphics System." CW6 stated that prior to using ICGS, there were several different systems used because companies that preceded Verizon or that Verizon had acquired such as

[3] CW10 did not provide this information.

[4] CWs 10 and 12 did not provide this information.

NYNEX, Bell Atlantic, and MCI, all had their own systems for tracking their wireline network. Once these companies all merged, the prints showing the wireline network were eventually shared on ICGS.

- CW10 reported that the manholes had numbers which would identify the cables he would be working with. CW10 recounted that Verizon's engineering department would have a central database of the manholes and cables.

- CW12 stated that after engineers wrote up the jobs, Verizon would obtain permits from the town within which the job was located. CW12 further reported that employees could digitally access the schematics and information about the poles and cables via a Verizon website called "Verizon Build" by entering a username and password for access.

- CW17 recounted that the blueprints were important work tools because they displayed the cable junctions, what manholes cables went to, and where cables went when they entered a building. According to CW17, "they were essentially really big wiring diagrams, and you couldn't do the job without them."

- CW19 reported that he would receive his work assignments from a foreman in the form of engineering prints that contained locations, specs, map keys to the cables, and work to be performed. CW19 stated that these prints could be as long as 30-40 pages depending on the size of the job. CW19 stated that they received these work assignments on tablets.

- CW22 reported that Verizon had both electronic and physical plans of where its cables – including its lead cables – were located. The physical engineering plans were located in large books called "Cable Platts." CW22 stated that every Verizon office in every town serviced by Verizon had a Cable Platt. According to CW22, technicians were provided with electronic tablets that gave them access to the engineering plans which revealed where Verizon's lead cables were located. CW22 reported that Verizon did not have a maintenance schedule for the lead-covered cables and described Verizon's business model as "reactive."

## D. LEAD POSES SERIOUS HUMAN HEALTH CONCERNS

103. Lead exposure can cause catastrophic health effects to humans, and no aspect of the human body is immune from potential lead toxicity. The severe health defects caused by lead exposures range from intellectual and behavioral deficits in children, such as hyperactivity, deficits in fine motor function, hand-eye coordination and reaction time, lowered performance on

intelligence tests, hypertension, cardiovascular problems, and renal disease. Chronic lead exposure in adults can result in decreased fertility, cataracts, nerve disorders, muscle and joint pain, and memory or concentration problems. According to the United States Department of Health and Human Services, lead poisoning in humans cannot be reversed or undone. And with regard to children, those who are exposed to lead may not develop new skills at the same speed as other children, and may suffer drastic physical deformities, inhibited growth, and various mental disorders.

104. The EPA, U.S. Food and Drug Administration ("FDA"), World Health Organization ("WHO"), Centers for Disease Control and Prevention ("CDC"), American Medical Association ("AMA"), and National Institute of Environmental Health Sciences have all independently verified that there is ***no safe level of lead in a human body.*** And high levels of lead exposures, according to the WHO, can cause coma, convulsions and even death.

105. Indeed, the WHO published a 2021 update regarding the public health impact of chemicals, which reported that in 2019, two million people died due to chemical exposure, and approximately ***one million of those deaths were attributed to lead exposure.*** Worldwide, lead exposure accounts for 21.7 million years lost to disability and death (disability-adjusted life years) due to long-term effects on health, with 30% of the global burden of idiopathic intellectual disability, 4.6% of the global burden of cardiovascular disease and 3% of the global burden of chronic kidney diseases.

106. A person may be exposed to lead in three distinct ways: (i) by breathing in its dust or fumes; (ii) by ingesting it orally, and (iii) by absorbing it through the skin.

107. ***First***, lead may be ingested through lead fumes or lead dust. Lead fumes are created when lead is heated or soldered, and then inhaled. Lead dust can also be inhaled. However, lead

fume particles are smaller than lead dust particles, and lead fumes can therefore penetrate the lungs far deeper and result in greater overall exposure. Inhaling lead does more damage to the body than ingesting or absorbing it. Up to 70% of the lead dust or fumes that one breathes in is absorbed into the body whereas just 30% of the lead that one swallows is absorbed into the body.

108. Inhaling lead fumes and dust is particularly problematic for Verizon's workers, as discussed further below.

109. ***Second***, lead can be absorbed by the human body through ingestion, i.e., drinking lead-contaminated water, eating food with lead dust particles on it, or placing contaminated hands and fingers near the mouth. Some of the lead-sheathed cables at issue here are placed underwater, and are leaching lead into public drinking water sources. Lead cables above ground can also cause lead to be ingested, particularly by children who may play in or near lead contaminated playgrounds. The EPA has explained that: "babies and young children are particularly susceptible to being exposed to lead "because they often put their hands and other objects that can have lead from dust or soil on them into their mouths."

110. ***Third***, lead can be absorbed through the skin. According to a 1988 article published by the National Institutes of Health ("NIH"), "finely-powdered lead metal or lead nitrate solution placed on the skin results in rapid absorption of lead, and transport of the metal around the body." Additionally, "[t]he rate of lead absorption through the skin increases with increased sweating of the skin." The exposure through skin is also a health risk to the public and to Verizon splicers and other frontline technicians, as further discussed below.

111. Lead initially contaminates the blood, which then deposits the lead throughout the body, causing problems for the entirety of the body's systems and organs. Lead remains in the

body for a long time, as the body does not have natural methods of clearing the toxin quickly. It can stay in the blood for months and be stored in the bones for decades.

112. Because lead in the body is stored for so long, the symptoms of lead poisoning can take years or even decades to manifest. Thus, individuals who have been exposed to lead must undergo regular medical monitoring of the body's systems.

### E. Verizon's Lead Sheathed Cables Presented Significant and Known Risks to Worker Safety, but Verizon Failed to Ensure Workers Were Protected

113. Verizon employs thousands of workers who come into regular contact with its network of lead cables. This exposure has resulted in levels of lead in the body that exceed regulatory guidelines, putting the workers at risk of the myriad health problems that lead is known to cause. Verizon and its predecessors have tested employees' blood levels, and consistently, its workers who are exposed to lead have exhibited heightened levels of lead in their blood.

114. Because lead is so toxic and exposures may occur in the workplace, employers are subject to exacting regulatory guidelines. In particular, OSHA sets baseline acceptable levels of lead, and requires employers to test employees who may be exposed regularly. The OSHA standards have been shaped and influenced by workers' unions, including the CWA, who have advocated for testing and safety measures for their employees, and raise concerns when employees are not being properly protected or are showing heightened levels of lead in the blood. The CWA is the largest communications and media labor union in the U.S., representing about 700,000 members in public and private sectors. Presently, the CWA represents approximately 30,000 Verizon workers including cable splicers and linemen. As of December 31, 2022, the CWA represented approximately 20% of Verizon's employees.

115. Despite the known risks presented to Verizon employees, binding OSHA regulations, and protections advocated by the CWA, Verizon has largely failed to abide by the OSHA standards and thus have largely failed to properly protect its workers from lead exposure.

**1. Telecommunications Workers Working on Cable Lines Are Regularly Exposed to Lead and Face Health Consequences as a Result**

116. On July 14, 2023, the WSJ published an article titled, "I Was Really Sick, and I Didn't Know From What." The article spotlighted Tim Killeen, a 74-year old retired cable splicer who had worked for Verizon's predecessor, Bell Atlantic, and Verizon, among other telecom companies. The article reported that "Killeen has chronic headaches, memory loss and difficulty breathing," conditions which can be linked to lead exposure. Killeen reported that his wife had two miscarriages and that his daughter suffered from childhood heart problems and has ADHD, which can also be linked to lead exposure. Reflecting on this, Killeen stated: "I was coming home every day and holding the baby, not thinking ***there is lead dust all over you***."

117. Tommy Steed, the current chairman of the Association of BellTel Retirees, an organization that advocates for former telecom workers, was also profiled in the July 14 WSJ article. Steed is a former cable splicer and lineman who worked for various telecom companies including Verizon. As a cable splicer and lineman, Steed worked on removing lead underground cables in the Bronx throughout the 1980s. The article states: "Steed's blood-lead level was 43 micrograms per deciliter in May 1988 and 39 micrograms two months later, according to New York Health department records." Steed reported that he often vomited after eating breakfast and that "***[a]t the height of my lead poisoning, I was really sick, and I didn't know from what***." Steed further stated that he repeatedly requested his blood test results from NYNEX, which is now part of Verizon, but never received them. Eventually the state health department provided him with

his results, which revealed high levels of lead, yet NYNEX "didn't try to get me any remedial help."

118. On July 14, 2023, the WSJ also released a podcast about the telecom industry's lead cables. In the podcast, Steed told the WSJ*:* "The removal of these cables that were now porous from being out in the weather for 50 years, hot and cold, snow, rain, sun, that's when they really started deteriorating. It was the removal of these lead cables that I feel was the most dangerous part of our jobs because it created dust that we had to breathe."

119. The July 14 WSJ article also discussed James Innes's experience working as a cable splicer for Verizon. Innes is a 73-year-old retired cable splicer who worked at The Bell Telephone Co. of Pennsylvania, Bell Atlantic, and Verizon. The article states that Innes has had "[d]ecades of gastrointestinal problems." Innes stated: "***[y]ou were creating a kind of powder from shaving the lead sheath, and every now and then you'd get a sweet taste in your mouth from inhaling the lead***." Innes further reported that his taste has changed, which is a sign of lead exposure.

120. More than 20 former Verizon field technicians, including cable splicers and linemen, reported that they frequently came into contact with lead while working for Verizon and its predecessor entities:

- CW3 reported that he worked in manholes with aerial lead cables suspended in the air. The crew used air quality spectrometers referred to as "sniffers" which sounded an alarm if the air in the manholes was toxic. CW3 stated that ***the sniffers were "always sounding the alarm***." CW3 also stated that after working with lead cables, his body, tools, tool bag, and inside of his work truck would be covered with lead dust. CW3 also described eating lunch with colleagues while wearing Tyvek suits which were covered with lead dust. CW3 has been experiencing health problems that began around the time his tenure with Verizon ended. His mouth and esophagus feel "raw" and he has severe heartburn and back pain.

- CW6 worked as a cable splicer and outside plant technician in Brooklyn, New York. CW6 reported that in these roles, he worked with lead

cables. CW6 reported that he was provided with training on how to handle lead, however, ***was not provided a mask, so resorted to wearing rags over his face to protect himself from the toxic lead dust.***

- CW7 worked directly with Verizon's lead-covered cables from the mid-1990s until 2004 and between 2004 and 2016 as well as between 2017 through 2020, CW7 oversaw a work crew that performed maintenance work on Verizon's lead cables.

- CW9 reported using toxic gas meters to test manholes for toxic gas, but the workers were not provided with proper training on lead safety protocols. CW9 reported that he just wore gloves and Tyvek white suits when working in a dirty location, but not necessarily when working with lead.

- CW10 reported that ***during his 16 years as a field technician cable splicer, lead dust would go into his face when he opened up lead cables. He was not provided with ventilation, masks, or other respiratory protective gear.***

- CW11 reported that while working as a lineman at Verizon between 2018 and Q3 2023, he removed lead-sheathed cables.

- CW12, a Verizon lineman in upstate New York, reported ***observing many lead cables, noting that they were everywhere***.

- CW13, a Verizon lineman and outside plant technician from the fall of 1999 through early 2017, removed lead cables throughout his career.

- CW14 worked at Verizon from May 2011 through November 2022 and reported that he personally handled and repaired lead cables with "***zero safety equipment to protect from lead***."

- CW17 reported performing ***a lot of "rehab work" on lead cables.*** In particular, CW17 ripped out telephone equipment and lead cables. CW17 performed "pot-wiping" or the process of opening up a lead cable and re-sealing it with molten lead.

- CW19 reported that he worked with old lead sheathed cables. CW19 stated that the lead cables were easy to identify. CW19 further stated that manholes were ventilated and that they used gas testers prior to working in the manholes. CW19 reported that he never wore any personal protective equipment ("PPE") when working with lead cables and never saw other employees wearing any PPE either.

- CW20 worked with and handled lead-sheathed cables throughout his career as a Verizon cable splicer in San Antonio, Texas. CW20 reported that ***he would remove sections of old lead cables, cut them, manually roll them up, and then place the cable on the back of his work truck.***

- CW21, a Verizon lineman between Q4 2021 and Q3 2021 in the Philadelphia, PA area, worked in manholes containing lead-sheathed cables.

- CW22 worked at Verizon from the early 2000s through Q2 2022. From the early 2000s through 2009, CW22 performed a lot of maintenance work on Verizon's lead-covered cables including repairing underground and aerial lead cables.

- CW24, worked at Verizon from Q2 2000 through Q1 2016 as a cable splicer throughout Florida. CW24 reported that between 2009 and 2015, he was involved in removing lead closures and transitioning to stainless steel closures.

- CW25 worked at Verizon and its predecessor companies for 46 years and reported that ***he often encountered lead in the course of his employment.***

- CW26 worked at Verizon from 2008 through 2019. While working in the field, CW26 reported that he ran into lead when "opening old intersections or old manholes."

- CW27 reported that he "***of course" encountered lead-sheathed cables*** while employed at Verizon.

- CW28 reported ***often encountering lead in underground cable systems throughout New York City*** and noted that lead was found "more often in Manhattan than in the outer boroughs." CW28 further recounted that he tried to remove lead cables anytime he came across them in the ground.

- CW29 ***worked with Verizon's lead-sheathed cables throughout his 23-year career***. CW29 recalled: "***Of course there's lead! I was doing lead wiping all the way back in 1996; I did it all through my career***." In particular, CW29 handled lead and performed lead wiping during his tenure in NYC. CW29 stated that more senior technicians taught him how to do lead wiping in 1996 at NYNEX; the older technicians would always say, "Let the kid do it." CW29 described the process by which lead wiping is done: "You put the lead in the pot and heat it up, then you pour it in to seal up the cables, once they'd been pulled through the manholes." CW29 stated that at that time, the only PPE provided by

NYNEX (now owned by Verizon) were gloves and a mask. CW29 reported that at this time he worked at the NYNEX/Bell Atlantic "garage" at 1221 Redfern Avenue in Queens where splicers often handled lead. CW29 reported that people he worked with "were getting sick left and right."

- CW8, who worked at Verizon and its predecessor companies including NYNEX and Bell Atlantic for ***28 years***, reported that he "***worked on lead every goddamn day***, right on Main Street in Plattsburgh, New York." CW8 further reported: "***I was chipping off lead all the time*** . . . what they used to have, back in the day, were lead spliced. It was half an inch thick, so it takes a long time." CW8 stated that he would have to "cut the wires off, drop it down, scrape [the lead] off with a chiseling tool to get to the wire, then sit there and do that on both ends."

**2. Empirical Evidence Has Long Established Lead Contamination in Telecommunications Workers**

121. Empirical evidence has existed for decades showing telecom workers have increased levels of lead in their bodies.

122. ***First***, in 1977, Bell Telephone Company – one of Verizon's predecessors – conducted a study which revealed high levels of lead in female lead-soldering workers. Specifically, the testing revealed that the female workers had blood-lead levels ranging from 24 to 45 micrograms per deciliter – triple the average level of the population at that time. Currently, lead levels exceeding 10 micrograms per deciliter of blood is considered harmful.

123. ***Second***, in the 1970s, Mount Sinai Hospital, Bell Labs, and the New York City Health Department, conducted a cross-sectional clinical field survey of 90 telephone cable splicers. The study revealed that the splicers' average blood-lead levels were greater than 27 micrograms per deciliter. Further, ***29% of the splicers had lead-associated central nervous system symptoms and 21% had gastrointestinal symptoms***. The study further revealed that the 90 Bell System cable splicers had "a high lead content in their blood," with 10 of them "in danger of suffering medical and/or physical deterioration if they continue on their jobs," as noted in a letter to union officials.

124. ***Third***, on October 10, 1980, Dr Richard W. Stone, a medical director of research at AT&T publicly filed a statement with the FCC of AT&T's "Sickness Absence Summary System" or "SASS" which "stores discrete information on all sickness absence cases in the Bell System." Dr. Stone's memo stated that AT&T had "examined the file of all cases [more than 446,000] for the period 1975 through 1979 for the specific code of lead poisoning." The memo explained that certain AT&T jobs resulted in lead exposure. For instance, AT&T's "Outside Plant Technicians" (which the company had 12,000 of, at the time), "contact and work with lead sheath cable." The memo explained that for the "Outside Plant Technician" job, "special training will be required for the handling, removal, and placing of lead cable." The memo also cited as workers who are exposed to lead "Cable Splicing Technicians[s]" and Outside Plant Repair Technician[s]" of which AT&T had 40,000 at the time. In these roles, these workers have to perform "sheath preparation prior to splicing" which "requires the use of special techniques and materials to minimize airborne lead concentrations." Like the special training required for the Outside Plant technician, so too did these jobs require special training for the "handling and splicing of lead sheathed cables."

125. ***Fourth***, Verizon's own testing of its employees, which spans decades, revealed elevated blood levels in its lead-exposed employees. In the Spring of 1980, New England Telephone Company (now owned by Verizon) published an initial survey of lead particle exposure as part of its medical surveillance program. The study comprised 1,843 employees of New England Telephone who worked in the outside plant and materials management. The study used a zinc protoporphyrin ("ZPP") test on capillary blood to determine blood lead levels. Blood lead testing was performed on employees who had a ZPP reading of 40 micrograms or higher. The results are as follows:

- 27 had a blood lead level of 30 micrograms or over
- 13 had a blood lead level of 40 microgram or over
- 1 had a blood lead of 50 micrograms or over

126. In other words, 1.41% of the sampled New England Telephone Company employees had blood lead levels greater than 30 micrograms. Further, the study detailed the procedure used to medically surveil the employees who had been exposed to lead particles, defining as the "exposed population" those "employees who handle lead sheathed cable and lead sleeves, (especially after being in place and oxidized to the oxides of lead)."

127. ***Fifth***, in June 1992, the Environmental Defense Fund published an article titled "The Hour of Lead: A Brief History of Lead Poisoning in the United States Over the Past Century and of Efforts by the Lead Industry to Delay Regulation." According to research carried out by the CDC and NIH in the 1990s, wire strippers had complained to OSHA about elevated blood-lead levels. In 1993, the National Academy of Sciences confirmed that lead even at low doses can result in neurobehavioral deficits.

### 3. In Light of Severe Health Hazards, OSHA Sets Stringent Lead Safety Regulations

128. In 1970, Congress passed the Occupational Safety and Health Act, which resulted in the establishment of OSHA on April 28, 1971. OSHA also created the National Institute for Occupational Safety & Health ("NIOSH"), as a research agency focused on the study of worker safety and health.

129. OSHA regulations include detailed rules about employee exposure to lead; regular testing of lead in the body for employees; provision of personal protective equipment; and training on the safe handling of lead. Verizon knew about these regulations, and in some instances did abide by them, but its commitment to fulfilling its OSHA obligations was inconsistent at best.

130. On November 14, 1978, OSHA promulgated a rule addressing lead in the workplace called: Final Standard on Occupational Exposure to Lead, 29 C.F.R. § 1910.1025 ("OSHA Lead Standard"). The OSHA Lead Standard requires, among other things, that blood lead level ("BLL") of workers should be limited to 30 micrograms per deciliter. It also set forth a permissible exposure limit ("PEL") of 50 $\mu g/m^3$ (micrograms per cubic meter of air) over an eight-hour time weighted average. This PEL has remained in effect to today, but the standard has been heightened so that 30 $\mu g/m^3$, averaged over an 8-hour period, constitutes the maximum exposure. 29 C.F.R. § 1910.1025(c)(1).

131. OSHA also implemented rules for monitoring and testing for lead at workplace sites. Specifically, its regulations include a section entitled "Exposure monitoring," which states, with certain exceptions, "the employer shall collect full shift (for at least 7 continuous hours) personal samples including at least one sample for each shift for each job classification in each work area." (29 C.F.R. § 1910.1025(d)(1)(ii)).

132. If the testing shows "the possibility of any employee exposure at or above the action level, the employer shall conduct monitoring which is representative of the exposure for each employee in the workplace who is exposed to lead." (29 C.F.R. § 1910.1025(d)(4)(i)). The testing must be repeated at least once every three or six months, depending on if the exposure is above the "action" level or the PEL. (29 C.F.R. § 1910.1025(d)(6)(ii)-(iii)).

133. In addition, employers must make blood sampling and analysis available to employees: (i) at least every six months to every employee; (ii) at least every two months for each employee whose last sample and analysis indicated blood lead levels at or above 40 µg/100 g of whole blood; or (iii) at least monthly during the removal period of each employee removed from exposure to lead due to an elevated blood level. 29 C.F.R. § 1910.1025(j)(2)(i)(A)-(C).

134. Employers also must make medical examinations and consultations available to employees whose blood lead levels exceeded 40 µg/100 g in the prior 12 months, and prior to assignment for each employee being assigned for the first time to an area in which airborne concentrations of lead are at or above the action level; and "as soon as possible, upon notification by an employee either that the employee has developed signs or symptoms commonly associated with lead intoxication, that the employee desires medical advice concerning the effects of current or past exposure to lead on the employee's ability to procreate a healthy child." (29 C.F.R. § 1910.1025(j)(3)(i)(A)-(C)).

135. OSHA also requires that employers provide protective gear to employees who are exposed to lead. Section 1926.62(g) deals with protective work clothing and equipment. It applies:

> Where an employee is exposed to lead above the PEL without regard to the use of respirators, where employees are exposed to lead compounds which may cause skin or eye irritation . . . and as interim protection for employees performing tasks as specified . . . the employer shall provide at no cost to the employee and assure that the employee uses appropriate protective work clothing and equipment that prevents contamination of the employee and the employee's garments such as, but not limited to:
>
> Coveralls or similar full body work clothing;
>
> Gloves, hats, and shoes or disposable shoe coverlets; and
>
> Face shields, vented goggles or other appropriate protective equipment.

136. Section 1926.62(g) also contains detailed instructions requiring employers to clean and launder employees' garments that have come into contact with lead. Further, containers of contaminated protective clothing and equipment must be labeled as follows: "DANGER: CLOTHING AND EQUIPMENT CONTAMINATED WITH LEAD. MAY DAMAGE FERTILITY OR THE UNBORN CHILD. CAUSES DAMAGE TO THE CENTRAL NERVOUS

SYSTEM. DO NOT EAT, DRINK OR SMOKE WHEN HANDLING. DO NOT REMOVE DUST BY BLOWING OR SHAKING."

137. On December 29, 1978, AT&T and associated Bell System Companies (including several of Verizon's predecessors: Bell Telephone Company of Pennsylvania; The Chesapeake and Potomac Telephone Companies; New Jersey Bell Telephone Company; New York Telephone Company; and Bell Telephone Laboratories, Inc.) petitioned OSHA to reconsider regulations setting acceptable standards and testing for workers exposed to lead (described below). This "Petition for Reconsideration" was submitted in an OSHA proceeding styled, "*In the Matter of Promulgation of Final Standard on Occupational Exposure to Lead (29 CFR S 1910.1025)*" and was directed to the Assistant Secretary of Labor for Occupational Safety and Health. It was signed by James A. DeBois, Charles G. Hollis and Frank R. Saunders, of AT&T.

138. The OSHA Petition for Reconsideration acknowledged the harms associated with lead exposure in the workplace:

> At the outset, it should be recognized that Petitioners support the principle that workers exposed to a potentially lead-hazardous environment should be protected from adverse effects from such exposure. Indeed, Petitioners themselves have recognized the limited potential for lead-exposure in some telecommunications work places and have taken decisive action against any adverse effect from such exposure.
>
> ***Petitioners' use of lead products has been primarily in the form of lead-sheathed cables and the various lead sleeves and solders necessary to make moisture and airtight the entire cable from end-to-end.*** Very little new lead-sheathed cable is placed in service today. However, the existing lead-sheathed cables must be maintained. ***Ultimately, these cables will be removed and the metals recycled. The maintenance and on-going removal of these facilities require that technicians work with the lead from time to time as well as work in the vicinity of lead at other times even though the lead-sheathed cable is not actually involved.***

(Emphases added.)

139. The OSHA Petition for Reconsideration also acknowledged AT&T's ownership of lead cables which affect workers: "***There are millions of poles carrying lead cable***, and often cable is accessed in the span between poles, hence signs posted at each pole would not even address the cable in these locations. There are some ***700,000 manholes in the Bell System many of which house lead cable***."

140. On August 29, 1989, one of Verizon's predecessor companies – GTE Corporation – submitted a comment to OSHA titled "Feasible Exposure Assessment Strategy for the Telecommunications Industry." Under the subsection called "Air Monitoring," GTE inquired: "How many employees should be monitored for each operation chosen? Nationwide operations are similar but not exactly the same (e.g., ***some of the variables in exposures during lead cable wrecking are climate, age of the cable and minor differences in the equipment used***)."

**4. The CWA Has Long Raised Concerns of Lead Exposure in the Telecommunications Industry**

141. Lead's toxicity to telephone workers handling lead sheathed cables is a universally accepted fact that has been recognized for nearly a century, if not longer. For instance, in 1925, Alice Hamilton, a pioneer in the industrial medicine, cited telephone workers as those facing dangers associated with lead in her book titled "Industrial Poisons in the United States."

142. The CWA explains on its website that:

> Working with and around lead-sheathed cables and other telecom plant, such as old lead splice cases, without proper protections can expose you to lead. The lead-sheathed cables in the telecommunications network are all old. Any handling, touching, or disturbance of those cables can create lead-containing dust. The use of lead solders can be a source of exposure. Residual lead dust contamination in workspaces such as manholes, cable vaults, or areas where lead sleeves may be stored and cut for use can also be a source of exposure even if you are not working directly on a lead sheathed cable.

143. On December 9, 1980, the CWA submitted a comment in connection with OSHA's lead standard regulations. The comment explained that 42,000 CWA members were employed in

occupations in which they were regularly exposed to lead, including in roles such as cable splicers and outside plant technicians. The CWA noted that until "such cables can be replaced by polyurethane-encased cable or fiber optics," "the cable splicer will continue to be exposed to hazardous lead dust and fumes produced while performing splicing operations with lead-encased cable." The CWA's comment further discussed that lead cable removal is yet another hazardous source of lead exposure for its members. In so doing, the CWA cited a study carried out by the Bell System demonstrating that employees who removed underground lead cables were exposed to lead ranging from 5 to 51 $\mu g/m^3$ of air even after control measures had been implemented.

144. The CWA's comment further noted the importance of implementing safety measures for jobs where workers may come into contact with lead. In particular, the CWA noted that employers should provide workers with local exhaust ventilation including hoods, ducts, fans, and filters to eliminate lead fumes and dust where they are produced, in addition to personal protective equipment like gloves, goggles, clothing protection, and air respirators. The CWA further urged the importance of personal hygiene and comprehensive training regarding the toxicity of lead.

145. On October 23, 1989, the CWA submitted a public comment on the OSHA's Rule on "Permit Required Confined Spaces." The public comment stated, in pertinent part: "Safety and health hazards are encountered by workers both outside of and within the confined space. Hazards associated with work outside of the confined space include … as a result of pulling and removing lead cable, lead dust." The CWA further stated:

> As the primary representatives of affected workers, CWA contends that the OSHA Telecommunications Standard provides inadequate protections. Our occupational safety and health office receives numerous complaints from the union's locals regarding member confined space health problems and the inadequacy of the Confined Spaces Section of the Telecommunications Standard.

> The same is true when members perform cable splicing work with lead and polyurethane encased telecommunications cables. Exposure to lead fumes occurs when the metal is heated and lead dust is produced when performing grinding, filing, and carding tasks.
>
> Exposure to lead hazards is more likely in a confined space due to its design and limited ventilation. Exposure can lead to nervous system and kidney damage, sterility and birth defects, anemia, and interference with the body's blood-forming mechanism.

146. Accordingly, the CWA requested that OSHA revise its Confined Spaces Entry Rule by revising the definition of "Hazardous Atmosphere" to include chronic health risks given that CWA members frequently "report health symptoms that have occurred after being exposed to low-levels of contaminants, e.g., lead, solvents, and isocyanates, while performing confined space work."

147. The CWA and other unions continue to advocate for safer working conditions for employees who regularly come into contact with lead. For instance, CW1 reported that he believes that the Lineman's Union may have raised concerns with Verizon that the lead training and protective equipment provided to Verizon employees were inadequate. CW10 recounted that in or around 2014 or 2015, CWA Local 1109 stated that workers should not work with lead cables without a proper mask and ventilation.

148. Similarly, CW12, a member of the CWA, reported that in May or June 2021, he and his coworkers voiced concerns to a Verizon safety representative who came to speak with them at their site location regarding a job that would require the removal of thousands of pieces of lead cable in the Glenn Falls area of New York. In particular, CW12 stated that he and his coworkers informed the representative that they refused to do the lead cable removal without the proper conditions; in particular, they wanted better training and to be fitted for respirators before

completing the job. CW12 stated that the Verizon safety representative was "not okay" with the linemen refusing to remove the lead cables.

149. CW22 reported that his union informed Verizon that it needed to provide workers who handled lead cables with safety training.

**5. Verizon Regularly Violates OSHA Lead Regulations**

150. Despite these OSHA regulations, and consistent with the reports of multiple Verizon former employees, Verizon was often derelict in its obligation to screen its workers who regularly came into contact with lead and in providing the appropriate protective gear. Indeed, CW10, a Verizon cable splicer for ***16 years***, worked with lead cables in manholes throughout his ***entire 16-year tenure***. CW10 reported that ***lead dust would go into his face*** when he opened lead cables and that he was ***not provided with ventilation, masks, or other respiratory protective gear***. CW10 reported that Verizon ***never tested him for lead exposure.*** Similarly, CW22, worked at Verizon for 22 years; 17 of which he was a field technician and worked with lead cables. CW22 reported that Verizon ***did not provide him with a mask***, and ***never offered him health screening for lead exposure.*** CW8 who worked at Verizon and its predecessor companies for 28 years and regularly worked with lead cables throughout his tenure reported that Verizon never offered him or any of his coworkers medical screening for lead exposure.

151. CW2, CW6, CW7, CW8, CW9, CW10, CW14, CW20, CW21, CW22, CW26, and CW29 all worked with lead cables, and reported that ***Verizon did not provide them with adequate PPE to protect against lead's toxic properties.*** Further, CW2, CW3, CW4, CW8, CW9, CW20, CW21, CW26 and CW27 all recounted that ***Verizon did not provide any training specific to safely working with or handling lead cables.*** CW11 recalled not receiving any safety training concerning lead until 2021 when an outside third party provided some safety training on lead cables in response to the publication of a news article about hazardous lead cables. Notably, CW8

who regularly worked on lead cables throughout his 28-year career at Verizon and its predecessor companies NYNEX and Bell Atlantic, reported: "***They never taught me anything about lead in all my time***."

152. As a result of Verizon's failure to provide adequate PPE or safety training to field technicians including linemen and cable splicers, many Verizon employees found themselves coated in lead while handling the toxic metal and some even reported subsequent health problems. For instance, CW3 reported that after working with lead cables, his body, tools, tool bag, and inside of his work truck, would be covered with lead dust. CW3 now reports that his esophagus feels "raw," and is intending to seek medical treatment. Further, CW10, who was never provided with a mask or other ventilation to protect against lead dust, reported that upon opening the lead cables, ***lead dust would go into his face***.

### F. VERIZON'S LEAD SHEATHED CABLES PRESENTED SIGNIFICANT RISK OF ENVIRONMENTAL CONTAMINATION AND REGULATION

153. While Verizon's employees interacted with lead cables on a regular and systemic basis, members of the public also may have unwittingly come into contact with lead due to Verizon's sprawling and decaying lead cable network. Because of this, and as addressed below, Verizon faces significant risk of being forced to clean up and remediate lead sheathed cables by federal and state regulators who – working in tandem – carry substantial authority to regulate hazardous substances, including lead contamination. The authority of these federal and state regulators is described below.

#### 1. Federal Law Closely Regulates Lead Contamination

154. Multiple federal and state statutes authorize actions to investigate lead and other types of contamination and to remediate potential risks if warranted. At the federal level, for example, lead is a hazardous substance under the Comprehensive Environmental Response,

Compensation, and Liability Act ("CERCLA") of 1980, as amended. The EPA may take CERCLA response actions to investigate and remediate the release, or substantial threat of a release, of lead into the environment under the Superfund program at sites on nonfederal lands. The state in which an individual site is located also has a role in such actions through a coordinated framework under CERCLA.

155. CERCLA establishes categories of potentially responsible parties ("PRPs"), who may be liable for response costs and natural resource damages.

156. While determination of liability under CERCLA depends on various factors, in a response action to address risks of lead from a telecommunications cable, PRPs could include the company that installed and operated the cable, current and some past owners of the site on which the cable is located. *See* CRS In Focus IF11790, *Liability Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)*.

157. Lead is also listed as a hazardous waste under the Solid Waste Disposal Act (often referred to as the Resource Conservation and Recovery Act or RCRA). Section 7003 of RCRA authorizes EPA to issue enforcement orders for abating an imminent and substantial endangerment to human health or the environment resulting from the past or present handling, storage, treatment, transportation, or disposal of a solid or hazardous waste. This authority applies only to a discarded substance, pursuant to the definitions under Section 1004 of RCRA.

158. Additionally, two other federal statutes may be implicated where lead from telecommunications cables enters ground or surface water. For example, Section 1431 of the Safe Drinking Water Act grants EPA "emergency powers" to issue orders for abating an imminent and substantial endangerment to public health when (1) a contaminant "is present in or is likely to enter a public water system or an underground source of drinking water" and (2) the appropriate state

and local authorities have not acted to protect public health. Section 504 of the Clean Water Act also grants EPA "emergency powers" to issue orders for mitigating a discharge of a pollutant into U.S. waters, if warranted, to abate an imminent and substantial endangerment to human health or the welfare of persons where such endangerment is to their "livelihood" (including the "inability to market shellfish").

159. The EPA has already invoked its authority under CERCLA to investigate the lead-sheathed cables. As reported by the WSJ on January 11, 2024, the EPA has been testing sites located by the July 2023 WSJ articles and determined that 41% of samples taken near lead cables exceeded the EPA's lead-safety guideline for children. The EPA is engaging in a "multi-step Superfund review process" that will "examine[] whether any other longer-term remedies should be remediation." The EPA is collecting data and reviewing documents, and in December 2023, wrote to Verizon and other telecom companies requesting a meeting in late January to discuss Verizon's soil data and testing methods.

**2. State Law Closely Regulates Lead Contamination**

160. Each of the states in which Verizon presently owns wireline assets (i.e., Delaware, Maryland, Massachusetts, New York, New Jersey, Pennsylvania, Rhode Island, and Virginia) also closely regulates lead contamination in the environment through a state department of environmental protection. These state departments work with the EPA to regulate lead contamination, including through enforcing state and federal environmental protection laws relating to water pollution, conservation, and solid and hazardous waste management. Numerous of these state laws import from and expand upon federal hazardous waste and pollution laws such as CERCLA, RCRA, the Safe Drinking Water Act, and the Clean Water Act.

161. For example, under New Jersey law, the New Jersey Department of Environmental Protection ("NJDEP") is authorized to define "hazardous substances" and regulate their discharge

into the environment under its power to "[e]nforce the State air pollution, water pollution, conservation, environmental protection, solid and hazardous waste management laws, rules and regulations[.]" *See* N.J. Stat. Ann. §§ 13:1D-9, 58:10-23.11b. NJDEP includes lead on its hazardous substance list. *See* https://www.nj.gov/dep/enforcement/opppc/crtk/ehscasno.pdf.

162. NJDEP's authority to regulate lead contamination is specifically provided under several state laws, including: the Water Pollution Control Act (N.J. Stat. Ann. §§ 58:10A-1 to -20), the Solid Waste Management Act (N.J. Stat. Ann. §§ 13:1E-1, et seq.), and the Spill Compensation and Control Act (N.J. Stat. Ann. §§ 58:10-23.11 to -23.24).

163. The New Jersey Water Pollution Control Act regulates the "intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying, or dumping of a pollutant into the waters of the State, onto land or into wells from which it might flow or drain into said waters or into waters or onto lands outside the jurisdiction of the State, which pollutant enters the waters of the State." N. J. Stat. Ann. § 58:10A-3. Under this law, among other things, a polluting entity may be subject to "a civil administrative penalty" of up to "$50,000.00 for each violation and each day during which such violation continues shall constitute an additional, separate, and distinct offense." N.J. Stat. Ann. § 58:10A-10.

164. In addition, New Jersey's Solid Waste Management Act regulates the "disposal" of waste, which is defined as the "storage, treatment, utilization, processing, resource recovery of, or the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid or hazardous waste into or on any land or water, so that the solid or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters." N.J. Stat. Ann. § 13:1E-3. The Solid Waste Management Act prohibits

"engag[ing] in the . . . disposal" of waste without state approval. N.J. Stat. Ann. § 13:1E-5. Any person convicted of a violation of the Solid Waste Management Act is "subject to a fine of not less than $5,000 for a first offense, not more than $10,000 for a second offense and not more than $20,000 for a third and every subsequent offense. Each day during which the violation continues constitutes an additional, separate and distinct offense." N.J. Stat. Ann. § 13:1E-9.4.

165. New Jersey's Spill Compensation and Control Act further provides NJDEP with authority to order the cleanup of the discharge of hazardous substances, such as lead. For example, this act provides: "Whenever any hazardous substance is discharged, the department may, in its discretion, act to clean up and remove or arrange for the cleanup and removal of such discharge or may direct the discharger to clean up and remove, or arrange for the cleanup and removal of, the discharge." *See* N. J. Stat. Ann. § 58:10-23.11f.

166. Similarly, the New York Department of Environmental Conservation ("NYDEC") is given widespread authority to regulate and mitigate lead contamination under New York's Environmental Conservation Law ("NYECL"). *See* N.Y. Env't Conserv. Law § 1-0303. The NYECL gives the NYDEC enforcement powers to investigate violations of environmental laws, initiate and prosecute lawsuits, and levy penalties and fines. *See* N.Y. Env't Conserv. Law §§ 71-0501-0525.

167. Article 17 of the NYECL relates to "Water Pollution Control," and prohibits the discharge of any contaminant, including lead, into the waters of the state without a permit. Violating this article can be considered a felony, punishable by imprisonment for up to four years and fines of up to $25,000 per day.

168. Article 71 of the NYECL relates to "Solid Waste Management," and prohibits the disposal of hazardous waste, which includes lead, in any unauthorized location. The NYDEC may seek cleanup remediation costs and fines of up to $10,000 per violation.

169. The other states in which Verizon primarily operates – Delaware, Maryland, Massachusetts, Pennsylvania, Rhode Island, and Virginia – have likewise codified laws that prohibit lead contamination through water contamination or illegal discharge of hazardous substances, and authorize extensive penalties for lead-related violations. These water contamination laws resemble the regulatory schemes provided by New Jersey and New York, including those of Delaware (Del. C. 7 § 7704, 7714), Maryland (Md. Code Ann., Env't, §§ 5-101, et seq.), Massachusetts (Mass. Gen. Laws ch. 21C, §§ 8(c), 27), Pennsylvania (25 Pa. Code §§ 91.1, et. seq., 92a.1, et. seq.), Rhode Island (R.I. Gen. L. § 23-19), and Virginia (Va. Code §§ 62.1-44.1, et. seq.). These states' laws regulating the unlawful disposal of hazardous waste also resemble the regulatory schemes of New Jersey and New York, including those of Delaware (Del. C. 7 §§ 6104, 6112-14), Maryland (Md. Env't Code Ann. §§ 7-201, 7-206, 7-210-11), Massachusetts (Mass. Gen. Laws ch. 91, §§ 1, 3), Pennsylvania (25 Pa. Code §§ 260a.1-260a.10), Rhode Island (R.I. Gen. L. § 23-19.1, 23-19.14), and Virginia (Va. Code §§ 10.4-1426 - 10.4-1429, 10.1-1433 – 10.1-1454, 10.1-1455 – 10.1-1458).

### G. NUMEROUS INDICATORS INFORMED VERIZON THAT ITS CABLES WERE HARMING THE ENVIRONMENT AND ITS EMPLOYEES

170. As alleged above, lead presents significant dangers to employees and the public. Accordingly, companies that expose their employees and/or the public to lead are subject to significant risks and regulators, employees and citizens will hold them accountable for such exposures. Leading up to and throughout the Class Period, Verizon faced increasing signs and pressure that its lead sheathed cables were endangering its employees and the public, and that the

true extent of its sprawling lead-sheathed cable network and related potential financial liabilities would come to light. These indicators, which are described below, were raised by industry specialists, workers and their union representatives, environmental and community groups, medical researchers, and Verizon itself. These groups and individuals made abundantly clear to Verizon that it faced significant risks of liability, costs, operational challenges, future litigation, and reputational harm related to its ownership and handling of lead sheathed copper cables.

### 1. The Risk of Lead Contamination Has Been Discussed at EHSCP Conferences for More Than a Decade

171. Far from being a novel challenge wrought by the WSJ's reporting, high-ranking industry officials recognized and discussed risks related to lead exposure and contamination during industry conferences throughout the period leading up to and during the Class Period.

#### a. Verizon Employees Have Been Deeply Involved in the EHSCP

172. The EHSCP is "a consortium of communications environmental, health and safety professionals dedicated to promoting employee safety and health and preventing accidents throughout the communications industry." The organization's purpose is "[t]o encourage consistent and coordinated safety policies throughout the telecommunications industry, and to present a unified voice for the industry in response to government regulatory actions." To carry out its mission, the EHSCP has organized four committees: (i) Benchmarking Committee; (ii) Environmental Committee; (iii) Industrial Hygiene Committee; and (iv) Occupational Safety Committee.

173. Verizon has been deeply involved with EHSCP. Verizon employees have attended its annual symposiums, and its employees have served on the board of EHSCP every year since Verizon's formation in 2000. Many high-ranking Verizon managers are EHSCP members and

have chaired EHSCP committees. Verizon itself hosted the annual telecommunications safety conference in 2001 (Providence, RI), 2007 (Niagara Falls, NY), and 2011 (Portland, ME).

174. From 2015 to 2017, Gary Schongar, a Health and Safety Consultant in Verizon's Corporate Safety & Environmental Compliance Department, was the Chairperson for the EHSCP. Since at least as early as 2015, Kyle Madden – Verizon's EHS Industrial Hygienist since August 2008 and consultant to Verizon's Director of EHS in matters regarding the assessment and control of workplace exposure – has served as a member on the EHSCP's Industrial Hygiene Committee. Madden became co-chair of the Industrial Hygiene Committee with John Malone, former Senior Manager of EHS at AT&T. The Industrial Hygiene Committee's objectives include sharing resources and solutions to promote environmental health and safety; benchmarking technical processes, procedures, and equipment used in industrial hygiene, and preparing responses to proposed regulations pertaining to industrial hygiene on behalf of the EHSCP. The Industrial Hygiene Committee included in its "ground rules" meeting bi-monthly or more frequently; discussing "improving the working environment or work procedures of the employees of our companies by sharing knowledge experience and judgment"; and circulating agendas before each meeting and minutes after each meeting. "Proposed committee topics" included "Lead Safety – (cable & battery straps)", as detailed in ¶ 187.

175. Further, the presentation given at the 2015 EHSCP conference states that Verizon employees Greg Myka, Kathy Tobin, and Paul Hausman were all members of the Environmental Committee. The EHSCP's Ergonomic Committee consisted of Verizon's Madden and Don Becker, a Safety Consultant for Verizon. Finally, the EHSCP's 2015 Safety Committee consisted of a total of 17 telecom representatives, five of whom worked at Verizon: Steve Reichenauer, George Kerstetter, Floyd Williams, Gina Mannino, and Schongar.

176. Between September 13-15, 2016, the EHSCP held its annual conference in Pittsburgh, Pennsylvania. The event was carried out under Schongar's leadership, with assistance from Greg Myka, Verizon's EHS Leader and Manager of the EHS Compliance Team and Co-Chair of the EHSCP's Environmental Committee. Myka attended for the conference and discussed various matters pertaining to occupational hygiene, and environmental matters. In particular, Myka led an environmental auditing roundtable and provided the opening and closing remarks at the conference.

177. Between September 18-20, 2018, EHSCP held its annual symposium in Arlington, Texas, which was attended by Verizon's Madden and Todd Harris.

178. From September 22 through 23, 2020, EHSCP held a virtual version of its symposium which was, according to a public agenda, attended by Verizon's Neal Maloney and Madden

179. Between September 13 and 15, 2022, EHSCP held its annual symposium in Seattle, Washington. On the EHSCP symposium program committee was Implementation and Program Manager of Verizon's EHS Department, Chrissy Chapman.

**b. Lead Hazards Are Discussed Regularly at EHSCP Annual Meetings**

180. A recurring topic of discussion at past EHSCP annual meetings has been lead; its hazards to workers; training workers in safe handling of lead; and monitoring employees for lead exposure.

181. When Verizon hosted the EHSCP annual symposium in 2007, AT&T Senior Manager of EHS, John Malone, presented on various industrial hygiene-related issues including lead. In a slide show, Malone classified "lead" as a "common telecommunications hazard[] requiring sampling." Malone also discussed the risk assessment process for handling lead:




182. In 2010, Malone cautioned the group about lead-covered cables. One of Malone's slides emphasized that "[s]ome older metropolitan areas may still have over 50% lead cable," according to the WSJ. Malone further concluded, according to the WSJ, that the lead-sheathed cables posed risks for phone-company workers and the surrounding environment in some places. In this presentation, Malone acknowledged specific details regarding the environmental impact, stating that "***soils retained between 83 and 98 percent of the released lead within 2 inches***" from the cables.

183. A few years later, at the 2013 EHSCP annual symposium held in Kansas City, Missouri, Malone presented on "Managing Lead Exposure During Cable Removal Operations." This presentation specifically addressed the dangers of working with ***lead-encased cables***. Again, Verizon representatives were present and thus aware of the presentation given by Malone. In his presentation, Malone discussed exactly how working with lead can severely harm employee health, including in the below slides addressing how workers may be exposed to lead:







184. Malone also discussed the PPE telecom employees must wear while handling lead cables, as mandated by OSHA regulations:




185. Malone's 2013 presentation further stated that workers who handle lead should be protected by putting up visible signs that say "POISON" and that workers who handle lead should wear respirator masks and disposable Tyvek coveralls.

186. At the annual EHSCP symposium in September 2014, which was attended by Verizon, CenturyLink (now Lumen Technologies, Inc.) gave a presentation called "Working with Lead," which discussed, among other things: regulatory requirements, issues, and implementation of controls. The presentation further discussed the necessary engineering controls required to reduce or limit exposure to lead including mechanical ventilation and recirculation of air using HEPA filters and monitoring the concentration of lead in the air, and the statutorily required PPE necessary for handling lead, including coveralls or full-body work clothing, gloves, hats, shoes, disposable shoe coverlets, face shields or vented goggles and Tyvek. Additionally, the presentation contained examples of various OSHA citations, including one issued to an employer who "had not monitored employee exposure to lead when a lead sleeve, used to protect spliced connections, was removed in an underground vault." It further discussed that the "employer must conduct initial monitoring of lead."

187. Between September 22 and 24, 2015, the EHSCP held its 2015 Environmental, Health & Safety International Communications Conference in Universal City, California. During the conference, the EHSCP Industrial Hygiene Committee – of which Verizon's Kyle Madden was a member – shared a presentation with the symposium attendees. In the presentation deck, one of the topics for discussion was "***lead safety***" in particular "cable & battery straps, OSP cable:"




188. Another slide touted "lead-sheathed cable" as an accomplishment for 2014-2015. In this slide, the EHSCP Industrial Hygiene Committee stated, "***This is an issue for most member companies*** and we are attempting to consolidate our knowledge database and share best practices."



189. During the 2018 conference, which was held on September 18 and 19, 2018, Madden and his co-chair, John Malone, led a breakout session called: "Lead in the Communication Industry." The contents of this presentation are not publicly available.

190. In 2020, EHSCP released its newsletter called *The Wire* which contained a section on the Industrial Hygiene Committee (of which Kyle Madden remained Co-Chair). The newsletter noted that the Committee was "still closely following the proposed CA Lead ruling" and that the ruling "is going to have a huge impact on work with lead sheathed cable in California":

Committee News

**Industrial Hygiene Committee**

The Industrial Hygiene Committee has been focusing on COVID-19 so far in 2020. We are meeting weekly and reviewing issues like:

- Face coverings, masks, N95s and other PPE
- Methods for cleaning surfaces and equipment
- Work practices such as social distancing and when to require employees to quarantine
- How to conduct 2 person operations
- Engineering Controls, Administrative Controls, and PPE necessary to re-open company offices that are currently closed

We still continue to follow Non-COVID-19 related issues as well:

- Implication of small 5G units on safety of technicians working in aerial plant.
- We are also still closely following the proposed CA Lead ruling. The Lead PEL in California will be reduce from 50 $\mu g/m^3$ to 10 $\mu g/m^3$. This is going to have a huge impact on work with lead-sheathed cable in California.
- Respiratory Protection and wildfire smoke. We are continuing to follow the CA Wildfire Smoke regulation as it moves from an emergency order to a permanent regulation.

**2. The CWA Reported that Verizon Was Causing the "Hazardous Exposure of Lead Cable to the Environment"**

191. At the same time that high-ranking industry officials openly discussed the dangers of lead exposure, in 2015, the CWA filed letters with state regulators in *six states* – New York, New Jersey, Pennsylvania, Maryland, Virginia, Delaware – as well as the District of Columbia, demanding an investigation into Verizon's deteriorating copper landline network. The CWA accused Verizon of failing to maintain its wireline copper network in violation of the respective

public utility codes of each state which generally mandated that telecom companies maintain the safety and reliability of their networks. For example, in Pennsylvania, the CWA argued to the Pennsylvania Public Utility Commission (the "P-PUC") that Verizon had failed to comply with 66 Pa. C.S. § 1501, which requires that "every public utility" provide "adequate, efficient, safe, and reasonable service and facilities" and to "make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public." The CWA asked these state commissions to publicly and formally investigate the "actual investment policies and practices of Verizon as they pertain to the copper network." In particular, in a letter addressed to the New York Public Service Commission, Dennis Trainor, the Vice President of District 1 of the CWA requested the investigation include "a financial analysis of copper network revenue and expenditures over the past ten years; the current state of the copper infrastructure; staffing levels dedicated to preventative maintenance, repair, installation, and customer service over the past ten years; policies and procedures that impact the quality of service that customers receive." Further, the CWA stated that Verizon conceded in a July 2015 letter it had sent the FCC that it had spent only $200 million over the *prior seven years* to maintain its copper wireline network in *11 states and Washington, D.C.*

192. On October 21, 2015, the CWA petitioned the P-PUC to investigate the safety, adequacy, and reasonableness of service provided by Verizon Pennsylvania LLC. Verizon was a party to the petition.

193. In its petition, the CWA stated that it had investigated the conditions at Verizon-Pennsylvania, where its union members work, and discovered that throughout Pennsylvania,

Verizon's plant equipment including, among other things, its cables and wires were in an "***appalling state of disrepair that pose a safety hazard to utility employees and the public***."

194. In connection with the CWA's efforts to have the P-PUC launch an investigation into Verizon's neglect of its legacy copper cables, CWA President of Local 13000, James Gardler, testified on September 29, 2016. When asked about the "general condition of Verizon's copper network" Gardler stated: "Verizon is doing a poor job of maintaining its copper network . . . ***Verizon's neglect of its copper network is also resulting in unsafe conditions for CWA members and the public*** who come into contact with those facilities . . . Verizon has allowed the copper network to deteriorate to the point where we are sad to work for a company that cares so little about the condition of its plant and equipment . . ." When asked about the types of concerns that CWA's members have expressed with respect to Verizon's physical plant, Gardler reported as a concern "***the hazardous exposure of lead cable to the environment***." Critically, when asked "Does Verizon's neglect of its copper plant cause any safety concerns?" Gardler replied: "Yes. Damaged poles, sagging wires, corroding batteries, animal and insect infestations, and ***exposed lead cable all create hazards both for CWA members working on the facilities and for the general public.***" Gardler continued:

> Verizon is unwilling to put money into copper service areas. It won't properly repair or replace damaged or worn out plant. It won't hire enough people to do the work properly. It won't upgrade the areas to its highly reliable fiber-to-the-home service, FiOS. Basically, when you get outside of Pennsylvania's high-density urban and suburban areas, Verizon has no interest in spending money to repair, maintain, or improve its service to customers. ***As a result, Verizon's poles, cables, batteries, and other facilities are in a sorry state of disrepair.*** Service quality continues to decline, customers leave (if they have alternatives)***, public and worker safety are threatened, and Verizon does nothing***.

195. Gardler further stated, as has been corroborated by many former Verizon employees: "What Verizon really does is put a band-aid on [neglected copper cables] because the

real fix would require an investment of time and money." Further, CWA's "members [we]re being told that if they actually try to repair copper plant instead of using VoiceLink, they will be subject to disciplinary action by Verizon." Finally, when asked what the CWA was asking the P-PUC to do, Gardler stated the following:

> Finally, ***the PUC should order Verizon to maintain, repair, and replace (as needed) the air pressure system that is vitally important to protect the integrity of certain types of cable, especially lead cable***. I showed an example of exposed lead cable that is supposed to be enclosed in an air pressure system to ensure that moisture does not penetrate the paper cable wrapping. ***A wet lead cable not only impairs the quality of service to customers, it also risks environmental exposure to lead as the water reacts with the lead in the cable.***

196. Similarly, in 2017, the CWA submitted comments to the FCC in connection with *In the Matter of Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84. This proceeding arose in connection with the FCC's regulation of the transition from legacy copper wires to fiber wires. In particular, the FCC sought to ensure that customers who still communicated via the copper wires were not ignored by telecom companies, and so it set regulations requiring that a telecom company publicly notify an intent to retire copper wires. The CWA noted that in many instances, telecom companies were not properly maintaining the copper cables and wires.

197. In particular, the CWA's comments discussed Gardler's testimony referenced above, in particular, stating:

> CWA submitted extensive testimony – including analysis of confidential Verizon documents, photographs of deteriorating Verizon outside plant (see Attachment A-2), and testimony from James Gardler, the CWA president representing Verizon technicians in Pennsylvania, who summarizes the condition of Verizon's copper infrastructure this way: "[P]oles that are deteriorating, including unsafe poles that remain in service; ***lines sagging dangerously below minimum clearance levels; cables that are not properly repaired and replaced; ungrounded, exposed wires used as a work-around because Verizon will not spend the money to replace damaged cables***; damaged cabinets and splice boxes that are not repaired or replaced, allowing animals and insects to nest inside; air pressure systems that are

> not tested and maintained, ***resulting in customer outages and the hazardous exposure of lead cable to the environment***; batteries in remote terminals, controlled environment vaults, and high-capacity optical cable installations that are corroding and that are not being tested and replaced, resulting in preventable telephone outages during power outages."

198. The CWA's comments further stated that Verizon was required to remove a lead cable in Beacon, NY more than thirty years prior, but left it in place. Specifically, the CWA stated, "This picture below from Beacon, NY shows lead cable that is over 70 years old (the grey cable). Verizon was supposed to get rid of lead cable over 30 years ago. The black 'squirrel guard' that is above the lead cable should enclose it, but it doesn't." This statement was accompanied by the following picture:



199. On June 2, 2017, Verizon Pennsylvania LLC ("Verizon PA"), the CWA, the PA Office of Consumer Advocate, and the Pennsylvania Offices of Small Business Advocate entered into a Settlement Agreement providing that, among other things, Verizon PA would "conduct an engineering review of all cable replacement requests for 2015 and 2016," i.e., all locations where the CWA requested that Verizon PA investigate and replace any copper cables deemed too damaged to remain in place. Verizon PA was also required to complete all cable replacement jobs within 18 months.

### 3. Verizon Received Blood Sampling Data of Workers Showing Lead Exposure

200. In addition to historical indicators of elevated lead levels in telecommunications workers described *supra* at Section (V)(E)(2), more recently, Verizon has reviewed data showing its workers have elevated blood-lead levels. Between 2007 and 2016, Verizon tested 208 of its employees for lead exposure. Of those tested, 85 of them, or approximately ***40%***, had blood-lead levels above 3.5 micrograms per deciliter – the level at which the Centers for Disease Control and Prevention advises that one seeks medical treatment.

201. There are two primary medical indicators of lead exposure: blood-lead levels and bone-lead levels. Blood level testing reveals lead exposure just days after the exposure but typically does not reveal exposures from more than approximately 30 days prior because red blood cells regenerate during this time. Bone-lead levels reveal a longer-term, exposure to lead. Higher and/or more persistent lead exposures can become so concentrated that the body deposits lead in the bones. Once in the bones, it is almost impossible for the body to eliminate that lead. Thus, ***any*** lead in the bones indicates long-term, chronic lead exposure. According to Dr. Philip Landrigan, Director of the Program for Global Public Health at Boston College, lead can be stored in organs longer than blood, and in ***bones for decades***.

202. Verizon provided the CWA with the data showing that 85 of 208 of its workers had heightened levels of lead in their blood. In or around late 2019 or very early 2020, the CWA contacted Mount Sinai medical researchers, including Dr. Rabeea Khan, an expert in occupational environmental medicine, doctor at the Mount Sinai Selikoff Centers for Occupational Health, and professor in the Department of Environmental Medicine and Public Health at Mount Sinai's Icahn School of Medicine, regarding the troubling news that its union members employed by Verizon had elevated levels of lead in their blood. The CWA informed Dr. Khan that through the years, it

had conducted non-systematic sampling of worksite and air quality at Verizon sites where its union members worked. The sampling data from the CWA's non-systematic study revealed that these Verizon employees had elevated blood lead levels and further, that the air quality in which they worked was tainted with lead. According to Dr. Khan, the CWA study consisted of data from 2007 through 2016 of 208 Verizon employees who had significant blood lead levels, i.e., greater than 40 micrograms of lead in their blood.

203. Dr. Khan and her colleagues had planned to conduct the study soon after being contacted by the CWA in or around 2019 or 2020. However, their study was delayed until 2022 because of COVID.

204. In 2022, Dr. Khan and her colleagues conducted their study, which consisted of 20 Verizon employees who were also members of the CWA 1101 - Manhattan chapter. According to Dr. Khan, these 20 study participants included the following:

- 19 cable splicers;
- 17 men, 3 women;
- the average age of the splicers was 50;
- all 20 participants worked in manholes while employed at Verizon;
- 16 participants never used a respirator or adequate PPE; and
- the average tenure of the 20 participants was 23 years at Verizon.

205. Dr. Khan and her colleagues ruled out other activities associated with lead exposure such as handling bullets, home renovations, or ceramics through standard testing procedures such as questionnaires.

206. Dr. Khan and her colleagues tested both the blood-lead and bone-lead levels of the workers. Upon testing the blood-lead levels of the 20 Verizon employees, one worker revealed elevated blood-lead levels, indicating recent exposure to lead.

207. Dr. Khan and her colleagues measured the Verizon employees' bone-lead levels using x-ray fluoresce, which measures long-term cumulative lead exposure. The bone-lead test revealed that 12 out of 20, or ***60%*** of the workers had measurable levels of lead in their tibias. As Dr. Khan stated in the July 12, 2023 *Wall Street Journal* article titled "What AT&T and Verizon knew about toxic lead cables:" "the fact that we can detect it in your bones suggests you have had long-term exposure." Further, ***half*** of the workers tested had lead concentrations of 10 micrograms per gram of bone which indicates an ***increased risk of neurological or biological problems***.

208. Dr. Khan presented her research findings at the American Occupational Health Conference in April 2023.

**4. Verizon Employees Internally Raised Issues of Lead Exposure**

209. According to the WSJ investigative series and the reports of many former linemen, technicians, and network operations employees, numerous Verizon utility workers have complained to Verizon about its lead-sheathed cables, voicing their fears about long-term exposure, and health issues that may be connected. Despite decades of complaints voiced by concerned employees, Verizon has either ignored or, in some cases, actively silenced workers' concerns, as further alleged below.

210. The July 12, 2023 WSJ article, "What AT&T and Verizon knew about toxic lead cables," featured an interview with Rob Prokopowicz, a former Verizon employee who retired from Verizon in 2021 after working with lead for 40 years. Prokopowicz disclosed that when he voiced concerns to his managers about pumping water from manholes that were possibly contaminated with lead, Verizon just told him: "If you don't feel safe, we'll send someone else."

Propokowicz further stated: "When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust."

211. Several CWs corroborate that Verizon was notified of worker lead exposure. For instance, CW2, who worked at Verizon for 23 years as a head lineman in the Framingham, Massachusetts area, reported that leadership ***did not care about safety hazards*** and that if an employee pushed back, management made it seem like "***you were just a jerk that didn't want to work***" and "***would try to suspend you***."

212. Further, in May or June 2021, CW12, a member of the CWA, reported that he, along with his coworkers, voiced concerns to a Verizon safety representative who came to speak with him and 20 of their coworkers at their "shop" in New York regarding a job in Glen Falls, NY that would require the removal of thousands of pieces of lead cables. CW12 stated that he and his coworkers informed the Verizon safety representative that they refused to do the lead cable removal without the proper conditions; in particular, they wanted better training and to be fitted for respirators before completing the job. CW12 stated that the Verizon safety representative was "not okay" with the linemen refusing to remove the lead cables. According to CW12, the Verizon safety representative was informed of the scope of the lead in Glen Falls, NY.

213. Further, CW16, the former President of Verizon California, noted that "any time lead was involved – when there was a cut or an outage – it was a big deal." He further noted that lead is "a significant issue in New York City and the old, big metropolitan areas."

**5. Verizon Was Subject to Repeated RCRA Notices for Lead Contamination.**

214. Verizon also knew first-hand of its significant liability risks associated with hazardous lead based on the Company's EPA-reporting requirements. As noted above, RCRA is one of the principal federal laws governing the management of hazardous waste. Lead is among

the hazardous wastes regulated under RCRA. Under RCRA, the EPA has authority to implement regulations for managing hazardous waste from generation through disposal (i.e., "cradle to grave"). RCRA requires facilities that treat, store, or dispose of lead and other hazardous wastes to investigate and clean up contaminated soil, groundwater, and surface water. The EPA uses a coding system to identify and track hazardous waste. The code for lead toxicity is "D008."

215. The EPA identifies generators of hazardous waste based on the quantity of hazardous material the entity produces or stores. *See* 40 CFR §260.10. The EPA identifies Verizon as a Large Quantity Generator ("LQG"). This means that Verizon generates more than 1,000 kilograms of hazardous material per month or more than 1 kilogram of acutely toxic hazardous waste. As an LQG, Verizon is subject to heightened regulations under RCRA, including mandatory biennial hazardous waste reporting. Verizon is also required to self-report and submit a report by March 1 of every even-numbered year on "the nature, quantities, and disposition of hazardous waste generated" at each hazardous waste facility. Verizon must register each hazardous waste site with the EPA.

216. According to the EPA's database of RCRA hazardous waste facilities, Verizon and its subsidiaries operate over 350 active hazardous waste sites subject to reporting and environmental management under RCRA, including its active LQG sites. Verizon has submitted biennial reports for over 200 unique LQG sites since 2001 that include the code "D008 – Lead," including dozens of unique lead-related sites since 2015 in New York, Massachusetts, and Rhode Island. A significant number of these sites relate to Verizon manhole locations containing segments of its lead cable network.

217. During the Class Period, Verizon reported generating hazardous lead waste at the below 16 sites.

| *Year* | *Site ID* | *Site Name* | *Site Location (Street)* | *Site City* | *Site State* | *Site Zip* |
|---|---|---|---|---|---|---|
| 2021 | MAC300013141 | VERIZON NEW ENGLAND | 2 HAMPSHIRE ST | LAWRENCE | MA | 01840 |
| 2021 | RIP000038477 | VERIZON - MH #N48-1 | BROAD ST. ANN & HOPE WAY | CUMBERLAND | RI | 02864 |
| 2021 | RIP000038692 | VERIZON - MH#52/52-1 | LAPRE ROAD | NORTH SMITHFIELD | RI | 02896 |
| 2019 | MAC300013141 | VERIZON NEW ENGLAND | 2 HAMPSHIRE ST | LAWRENCE | MA | 01840 |
| 2019 | RIP000038142 | VERIZON MH - CRANSTON ST & PHENIX AVE | CRANSTON ST PHENIX AVE | CRANSTON | RI | 02910 |
| 2019 | RIP000038158 | VERIZON - MH SPRING ST & HOZIER ST | SPRING STREET HOZIER STREET | NEWPORT | RI | 02840 |
| 2019 | RIP000038163 | VERIZON MH - SPRING ST & STONE ST | SPRING STREET STONE STREET | NEWPORT | RI | 02840 |
| 2019 | RIP000038168 | VERIZON MH - MINERAL SPRING & HICKS ST | MINERAL SPRING AVE HICKS ST | PAWTUCKET | RI | 02860 |
| 2019 | RIP000038202 | VERIZON MH - VEAZIE ST. POLE #21 | VEAZIE ST DOUGLAS AVE | PROVIDENCE | RI | 02908 |

| *Year* | *Site ID* | *Site Name* | *Site Location (Street)* | *Site City* | *Site State* | *Site Zip* |
|---|---|---|---|---|---|---|
| 2019 | RIP000038236 | VERIZON MH - CANAL ST & PARK ROW | CANAL ST PARK ROW | PROVIDENCE | RI | 02908 |
| 2019 | RIP000038243 | VERIZON MH - WEBSTER & OCHRE POINT AVE | WEBSTER ST OCHRE POINT AVE | NEWPORT | RI | 02841 |
| 2019 | RIP000038278 | VERIZON MH - POST ROAD & AIRPORT RD | POST RD AIRPORT RD | WARWICK | RI | 02886 |
| 2019 | RIP000038286 | VERIZON MH - WEST RIVER ST & CHARLES ST | WEST RIVER ST CHARLES ST. | PROVIDENCE | RI | 02908 |
| 2019 | RIP000038303 | VERIZON MH - 5 DUKE STREET | 5 DUKE ST | NEWPORT | RI | 02840 |
| 2019 | RIP000038304 | VERIZON NEW ENGLAND | VALLEY ST AND EAGLE ST | PROVIDENCE | RI | 02908 |
| 2019 | RIP000038335 | VERIZON MANHOLE POWER ST & BENEFIT ST | MH #T6-5 POWER ST | PROVIDENCE | RI | 02908 |

218. As indicated in the above table, Verizon's notices include sites in densely populated urban centers such as Providence, RI. For example, the below depicts the site of one of Verizon's sites, which is located by a park in downtown Providence.




#### 6. Verizon's Prospect of Environmental Litigation Is Heightened as AT&T Is Sued with Regard to Its Lead Cables

219. The risks that Verizon could be called upon to remediate and remove its crumbling lead cable infrastructure became even more concrete when AT&T was hit with two lawsuits concerning its abandoned lead cables.

220. ***First***, on March 1, 2016, AT&T was sued in the class action, *Kenneth Cook, et al. v. AT&T Corp.*, 4:16-cv-00542 (S.D. Tex.) (the "Texas Action") by six Texas landowners seeking "damages for pollution of their land," among other things. This class action lawsuit alleged that in the 1950s, AT&T's predecessor had been granted an easement to lay its lead cables along their property, among many other landowners' properties. After being granted the easement, AT&T's predecessor "buried a six-inch cable within the easement." The plaintiffs in the Texas Action alleged that:

> The buried cable "contains lead . . . The type of cable on [p]laintiffs' property has been used in the United States for decades. Corrosion of the lead sheath on this type of cable is a mechanism that can result in lead being released to the environment. Such corrosion is a common occurrence with older cables, especially when the cable is cut or damaged. Cables of the type used on [p]laintiffs' property require routine inspection and maintenance. If the cover surrounding the lead is damaged, the lead will contaminate the immediate area. The Environmental Protection Agency has stringent rules for the storage and disposal of lead.

221. The Texas Action further alleged that the lead remained under each of the plaintiffs' land, and had "been cut in multiple places and is in disrepair." The plaintiffs alleged that the lead cable coverings were "badly damaged", and that lead was "directly contacting the soil" under their land. The plaintiffs further alleged that the lead cable, and specifically the plastic surrounding the lead, was continuing to deteriorate and "contaminate the subsurface of the [p]laintiffs' real property."

222. The plaintiffs in the Texas Action engaged an expert, David Howell, who has extensive experience on the subject of abandonment of rights of way, and easements. His company, Pipeline Equities, has removed over 12 million feet of retired, abandoned or out of use pipelines and cables. In Mr. Howell's report submitted in the case, he opined that the cost to remove the cables buried under the plaintiffs' land was approximately $33.43 per foot. Mr. Howell reached this conclusion by considering the following factors: mobilization equipment and labor to prepare for removal; excavation, removal, cut and load 3-inch cable; land and title work for right of way; damages to landowners; transportation of hazardous waste to a certified land fill; disposal of hazardous waste at a licensed land fill; removal of underground vaults, soil remediation and replacement. *Cook v. AT&T Corp.*, 4:16-cv-542 (S.D. Tex.) (ECF No. 64-3).

223. AT&T sought to have Mr. Howell excluded as an expert in the Texas Action. *Id.* (ECF No. 51). The court denied the motion to exclude. *Id.* (ECF No. 75). The Court also denied AT&T's motion for summary judgment. *Id.* (ECF No. 95). The case was proceeding to trial when the plaintiffs abruptly dismissed their claims. *Id.* (ECF Nos. 99-102).

224. Applying Mr. Howell's estimates to the lead cables in Verizon's lead cable network yields the following costs to remove and remediate. Crediting the analysts' estimates that 15% of Verizon's copper cables were encased in lead, i.e., 81,000 miles, the cost to remove and remediate

would be $14.3 billion. Even taking just the 8,400 miles of lead cables that Verizon has already admitted to owning (which only include aerial cables, and which exclude any cables obtained via MCI), the cost to remove and remediate would be $1.48 billion.

225. ***Second***, on January 14, 2021, an environmental group called California Sportfishing Protection Alliance filed a lawsuit in the United States District Court for the Eastern District of California against Pac Bell, an AT&T subsidiary. *See California Sportfishing Protection Alliance v. Pacific Bell Telephone Company*, 2:21-cv-00073 (E.D. Cal.) (the "Lake Tahoe Action").

226. In the Lake Tahoe Action, the environmental group asserted claims under RCRA and the California State Drinking Water and Toxic Enforcement Act of 1986 ("Prop 65"). The environmental group alleged that approximately 41,600 feet of cables (approximately 7.9 miles) owned by Pac Bell were located at the bottom of Lake Tahoe. "The inner portion of each cable consists of a lead jacket with walls approximately 0.25 inches thick. . . . Each foot in length of the cables contains approximately 3.3 pounds of lead." The plaintiff alleged that the total amount of lead was 137,280 pounds, more than 68 tons. *Id.* (ECF No. 1 at p. 5.) The Lake Tahoe Action further alleged that these lead-sheathed cables have been abandoned. (Note that a "Lead Cable Investigation" prepared by Marine Taxonomic Services, Ltd. on June 30, 2023 for the Environmental Defense Fund in Washington, DC, estimated that each foot of cable actually requires 3.39 pounds of lead, which was used for the estimates in ¶¶ 4, 89.)

227. The Lake Tahoe Action alleged that a portion of the lead cables were removed and tested to determine if the cables were likely to leach lead into the Lake Tahoe water. Based on this testing, "[a] reasonable inference . . . can be drawn . . . that lead in the [c]ables is being

disseminated into the aquatic environment of Lake Tahoe, and that humans and wildlife who make contact with, or who drink, Lake Tahoe water are exposed to the toxic heavy metal, lead."

228. On September 13, 2021, the plaintiff in the Lake Tahoe Action filed a motion to "Approve Settlement and for Entry of Consent Decree." *Id.* (ECF No. 16). The supporting papers explained that the parties had reached an agreement to settle the claims, in the form of a consent decree. Pac Bell agreed to "pursue any necessary approvals required for the removal of the Cables and to remove them so long as the removal costs do not exceed $1.5 million." *Id.* (ECF No. 16-1 at 1.) Pac Bell was required to secure all authorizations within six months. *Id.* (ECF No. 16-1 at 5.) With the court's supervision, Pac Bell worked for approximately two years to remove the lead cables in Lake Tahoe. The parties agreed to certain extensions, but it appeared that Pac Bell was working to secure the necessary approvals to remove the lead cables. On May 19, 2023, Pac Bell submitted a status update stating that it was "in the process of seeking" further approvals necessary from state parks "so the cables can be removed promptly after the peak recreation season ends. To inform the Court as to when removal of the Cables is expected, [Pac Bell] will file a further status report after State Parks acts on the written request." *Id.* (ECF No. 29 at 3.)

229. On June 15, 2023 – less than a month before the WSJ exposé was published – Pac Bell filed another status update claiming that the parties were at an impasse as to when Pac Bell would be permitted to remove the cables per the directives of the applicable local agencies. In June 2023, it is likely that Pac Bell knew of the impending WSJ exposé because, as reflected in the WSJ's reporting, the WSJ had asked AT&T to comment on the litigation and AT&T's ownership of lead-sheathed cables more generally.

230. On July 19, 2023, Pac Bell filed another status update with the court. It attached a "meet and confer" letter that it had sent to the environmental group plaintiffs. The letter stated

that "in 2021, AT&T agreed to remove [the lead cables in Lake Tahoe] simply to avoid the expense of litigation." It further stated that it no longer wished to abide by the Consent Decree it had agreed to two years prior. Instead, "the parties should agree to maintain these cables in place to permit further analysis by any qualified and independent interested party, including the EPA, and allow the safety of these cables to be litigated with objective scientific evidence rather than sensationalized media coverage." In other words, in the wake of the WSJ reporting, Pac Bell (AT&T) was reneging on its agreement to remove its abandoned lead cables from Lake Tahoe.

### 7. Verizon Faces Community Pressure to Remove Mile-Long Lead Cables in Coal Center, PA

231. Coal Center, PA is home to a mile-long aerial telecom cable owned by Verizon. The cable runs across entrances to apartment buildings, near a school bus stop and playground, and near people's properties, and spans from Coal Center all the way to a neighboring town. In some places, the cable droops so low that it is almost within arm's reach. As reported in the WSJ, the Verizon-owned aerial lead cable runs over the property of the Bibbys, as depicted in the photo below:




A lead-covered cable sags over the Bibby property in Coal Center. PHOTO: NATE SMALLWOOD FOR THE WALL STREET JOURNAL

232. Researchers analyzed the soil taken from the Bibby family's property and determined that the lead levels were 7.5 times the EPA's recommended threshold, or 40% higher than the recommended allowable lead levels for play areas as mandated by the EPA. Bibby's two children, aged six, both showed initial elevated blood-lead levels when tested.

233. As reported by the WSJ in July 2023, residents of Coal Center, PA "had known about and had been voicing their concerns for nearly a year."

234. A borough council member reported that "she and other Coal Center residents have been pushing Verizon to take the cable down." As the WSJ reported, "Verizon has told them it has working services on the old lead cable." In December 2023, the borough council discussed their concerns regarding the lead cable and, as indicated in the WSJ reporting, continue to pressure Verizon to remove the cable.

### H. THE WSJ'S THOROUGH REPORTING REVEALED THAT VERIZON'S TOXIC LEAD CABLES ARE LEACHING LEAD INTO THE ENVIRONMENT

235. The WSJ articles revealed shocking truths about Verizon's lead cables and their effects on the environment, particularly the fact that they are placing lead contaminants in the surrounding air, water and land. As detailed below, the WSJ reports were the product of a thorough investigation spanning 18 months, and the WSJ is known for its high standards of journalistic integrity.

236. Founded in 1889, the WSJ is one of the world's leading newspapers primarily covering business and financial news. The WSJ had an estimated average circulation of over 3.9 million as of August 2023. Its intended audience includes business professionals as well as active investors. As part of its mission, it endeavors to provide its audience with "facts, data and information, not assertions or opinions." Since its founding, the WSJ has won numerous awards for its work and publications, establishing its global credibility.

237. The WSJ has reported that its investigation into abandoned lead cables began with it getting an anonymous tip that AT&T was removing an old lead cable in Lake Tahoe. This was of particular interest because, according to Shalini Ramachandran ("Ramachandran"), a WSJ correspondent who has covered the telecom industry for many years, the use of lead cables in telecommunications received little to no media attention – to the point that it was almost unheard of. Ramachandran said that she "***had covered cable and telecom for a long time and had never heard of lead cables in the telecom networks***."

238. Ramachandran and WSJ colleague Susan Pulliam ("Pulliam") then proceeded to create a database of these cables with the aid of old U.S. Army Corps records, Google Street View, and artificial intelligence. To confirm the existence of these cables, Ramachandran and Pulliam also drove around the U.S. and visited 300 cable sites throughout the country.

239. The WSJ extracted images from Google Street View in front of each school in the nation's five most densely-populated states and 16 of the 20 most densely-populated counties. For example, in New Jersey, the most-densely populated state in the United States, the WSJ pulled images of a random sample of nearly 10,000 images near NJ Transit bus stops.

240. A machine-learning algorithm was then utilized to detect if there were lead-sheathed cables in these images. Whenever the algorithm recognized the existence of lead-sheathed cables in the images, WSJ employees would then manually review the images to verify the existence of lead-sheathed cables. Over 100,000 images were analyzed and those flagged as featuring lead-sheathed cables were manually reviewed.

241. Interested in whether lead was leaching from the cables hanging from utility poles, Pulliam met with researchers from New York University led by Dr. Jack Carvanos ("Carvanos") to investigate a site located in the Hudson Valley in upstate New York.

242. In the neighborhood where the site was located, they found cables – sheathed in lead – running along and around a playground called Temple Park. Next to the playground, close to a sign that said "Children at Play," Dr. Carvanos performed an X-ray fluorescence test and found that the area close to the cable indicated a rating of 1000 parts per million of lead. The EPA's threshold is 400 parts per million for areas where children play. Dr. Caravanos noted the particular dangers of lead in the soil of a playground: "You just need a little dirt on your fingers and your fingers to put into your mouth and ingest, and you get an elevated blood lead above the CDC level of 3.5%." The park has since been dubbed "toxic park."

243. Pulliam also investigated a site at New Iberia, Louisiana frequented by the local populace. This location was situated right by the bank of Bayou Teche, and there was a cable protruding from the ground. The investigation demonstrated levels of lead that were 14 times the EPA level that is safe for play areas.

244. In Coal Center, Pennsylvania, the WSJ found mile-long cables owned by Verizon that were sagging in the previously-determined investigation sites. Testing the soil samples obtained from a residential property adjacent to the cables revealed lead levels that were more than 40% above the level the EPA deems safe for play areas.

245. The WSJ's general protocol for extracting samples required that all containers to be used for sample collection be cleaned and rinsed with deionized water before being used. The team also needed to wear single-use nitrile gloves, which had to be changed whenever multiple samples were to be collected. Sediment and soil samples were collected using clean stainless-steel scoops. Samples were collected up to 6 inches from cables, and double bagged. Lead cable scrapings were taken and double bagged after soil and water sample collections were completed.

246. The WSJ located lead cables in and along waterways by using, e.g., coordinates from government authorities for underwater cable permits in spreadsheets or maps, and written descriptions of cable locations and maps attached to permits. The WSJ identified around 1,700 underwater cables. In building its marine cable database, the WSJ only included pre-1965 permits and records, which was when the Bell System phased out its use of lead, unless later permits referenced earlier cables that were not present in the database. This database of underwater cables represents just a fraction of those laid by telecom companies: Army Corps officers said many permits were likely lost or discarded over the years, and while many Army Corps offices returned hundreds of permits, some returned only a handful or none at all.

247. Moreover, the WSJ obtained maps of water bodies from the U.S. Geological Survey and created a computer program that identified the shortest path across the water in order to approximate the likely path of the cable from bank to bank.

248. The WSJ team shared with the EPA these identified locations, and learned that approximately 330 sites were located at what was called a "Source Water Protection Area," which meant that it provided drinking water.

249. The WSJ also collaborated with an organization called Marine Taxonomic Services, led by Seth Jones ("Jones") and Monique Ridell ("Ridell") to identify underwater lead cables and collect samples to be tested for contamination. With the WSJ team, Jones and Ridell navigated through Emerald Bay in Lake Tahoe to an area where the severed end of one cable was located. Jones then swam to where the severed end was, and collected a sample.

250. In collecting samples from cables found submerged under deep waters, divers like Jones would collect the water sample using a clean plastic syringe from a distance of less than an inch from the cable. Samples from shallow water were likewise collected from a distance of less

than an inch from the cable, through the use of a clean plastic syringe and in accordance with the general operating procedure outlined above.

251. The WSJ team also tested water from other parts of the U.S. and found lead leaching in the rivers of Michigan and Oregon.

252. Since lead is a naturally-occurring metal, the WSJ used several methods to connect the lead found in soil and water to the cables. To ensure that the lead was indeed sourced from the cable and not a natural occurrence, "background" samples were collected at various distances from the cables to test the naturally occurring lead levels in the vicinity. As interpreted by experts, a higher lead reading closer to the cables indicated the high likelihood of the cables being the cause of the contamination.

253. Several sets of samples were provided to Professor Bruce Nelson ("Professor Nelson"), a geochemistry professor at the University of Washington, who operates a laboratory that performed isotopic analyses of the samples. This analysis links the lead from the cables to the lead in the ground or water. Professor Nelson used a mass spectrometer, which measures the four common atomic masses that constitute lead, giving each sample a specific fingerprint.

254. Professor Nelson concluded that the samples selected by the WSJ team from cables in New Iberia, Louisiana, and Coal Center, Pennsylvania were the likely source of lead contamination found in the nearby soil.

255. As mentioned below, Dr. Carvanos's findings in New York were similar: that lead contamination in the soil was the highest in the area directly beneath or adjacent to the cables, within up to two feet, which indicated that the cable's exposure to the elements caused it to bleed lead onto the ground, where lead accumulated over time.

256. From water samples taken from Emerald Bay in Lake Tahoe, it was discovered that there were "very high" levels of lead. Lead was also found moving away from the cables and toward the beach. This confirmed that lead was, in fact, leaching near the cables' severed ends. Some other samples that the WSJ team tested were taken from areas where people swim, camp and boat. Notably, one sample collected was more than 2,500 times the level the EPA says is safe for drinking water

257. In Coal Center, Sharon Bibby, mentioned in the WSJ articles, reported that she along with other Coal Center residents asked Verizon to remove the lead sheathed cable, but Verizon responded that it has working services on the cable. Bibby had her two 6-year-old twins, Joyanna and Beau tested, and the tests – taken a few days after the kids played in a lot next to their house under a drooping cable – revealed that they had high levels of lead in their blood.

258. On or around August 3, 2023, after New York State conducted its own testing of Temple Park's lead levels, the state reopened Temple Park. However, according to an interview conducted by News12 Westchester, Dr. Caravanos disapproved, claiming that the park was still not safe for children. Dr. Caravanos reported: "I took more samples than New York state did" and "I still believe that there are areas that need to be further assessed." In particular, Dr. Caravanos and his fellow researchers took almost 200 readings in the site and received the highest level of lead of 1634 ppm (parts per million), which is significant. Conversely, New York only took 25 readings with an average level of 154 ppm, but the highest reading was more than twice that.

259. Dr. Caravanos further reported that elevated levels of lead were discovered at a football field near Temple Park and advised parents to avoid the area with their kids. Dr. Caravanos stated: "Ultimately, it needs to be removed [. . .] Until the site is better assessed by the state and hot spots are identified and some remediation may occur, my best advice is to maybe

think about going to another park if you can, or if you insist on using that park to be very cautious with hand to mouth activity."




260. The WSJ findings were largely confirmed by an investigation launched by the EPA in response to the articles, according to another WSJ article published on January 11, 2024. It reported, "EPA testing in three states near some telecom lead-cable locations identified by the Journal found 101 results, or 41% of the samples taken near lead cables, exceeded the EPA's lead-safety guideline for children. The elevated results were found at 95 of the 235 distinct sites tested by the agency and included 99 sediment and soil samples."

## I. The Fallout of the WSJ Exposé

261. Since the publication of the WSJ investigative series, Verizon has confronted persistent questioning and blowback from investment analysts, government agencies and representatives, and former employees confronting lead-based health risks, and has offered largely vague and indeterminate responses about the extent of its financial exposure due to lead sheathed cable issues. Verizon's stock price has fallen and remained depressed as a result of the WSJ's disclosures.

### 1. Verizon's Immediate Response to the WSJ Exposé

262. Verizon's public statements following the WSJ exposé were ambiguous and vague. But the Company has made three key admissions: (1) Verizon has long known that it has lead cables in its network, and has admitted that at least 3% of its 280,000 miles of aerial cables (which exclude underground and underwater cables, as well as cables acquired from MCI) are sheathed in lead; (2) Verizon's toxic lead cable network poses the risk of massive liability which may not be covered by Verizon's insurance; and (3) Verizon does not even know the full scope of its lead cable problem, and thus cannot currently quantify the liability risk, and even estimating the size of the problem will take time and be costly. In addition, Verizon has updated its risk disclosures to add a disclosure concerning the potential liabilities associated with its toxic lead cables.

263. Verizon first spoke publicly about the WSJ articles during its July 25, 2023 analyst call. Vestberg stated, "I want to address the recent news about the legacy lead cable in our network. We take this matter seriously, and to be very clear, lead infrastructure makes up a small percentage of our copper network, and we began phasing away from installing new lead cable by the 1950s."

264. During the same call, Defendant Skiadas stated:

> I'd like to address the recent media reports on lead-sheathed cables in our network. Here is what we currently know. ***We still have some lead-sheathed cable in our copper network. As a result of this infrastructure and the history of the industry, records are incomplete as to exactly how much of the cable on our network has lead sheathing***.
>
> ***However, to give you a sense of the scale of the infrastructure we are talking about, our copper network is comprised of less than 540,000 miles of cable, roughly half of which is aerial, and lead-sheathed cable makes up a small percentage of our copper network***. This number excludes the network elements previously owned by MCI and XO Communications because we are still reviewing the historical records of those companies.
>
> Now I think ***it's important to address the question we've received from a lot of investors, which is about the process for and potential cost of removal of the lead-sheathed cable in our network***. ***Given where we are in the process, it is far too***

> ***soon to make any projection on what the potential financial impact might be to the company.***
>
> ***There are a number of unknowns in this area***, including whether there is a health risk presented by undisturbed lead sheathed cable and if there is a risk, how that risk should be addressed. As a result, we do not believe there's a meaningful way to estimate any potential cost to the company or that any such estimate would even be useful. We won't be able to provide any additional color during the Q&A session, as we have more information new can share on the topic, we will certainly do that.

265. During the call, an analyst asked, "And then maybe just quickly on the lead. Obviously you guys can't quantify it, but when you guys say low single – low exposure of the 540,000 miles of copper, is that single digit? Can you guys tighten up that number for us a little bit? That would be great." In response, neither Vestberg nor Skiadas would provide any more specificity about what portion of the 540,000 miles of copper cables are sheathed with lead. Defendant Skiadas only offered, "we're still reviewing the records, and we mentioned that we're still reviewing the historical records of the former MCI and XO network. So that work is still ongoing as well."

266. On August 9, 2023, Verizon attended the Oppenheimer Tech Internet and Communications conference during which Oppenheimer analyst Timothy Horan asked: "So I do have to ask you on the lead issue, maybe it's subsiding here a little bit. But I saw there was a test up in Wappingers Falls that there really wasn't any lead. Even, I think, the Wall Street Journal said there was. Have you tested many other sites the Wall Street Journal has tested? And have you found any lead contamination yourselves?" Defendant Skiadas responded:

> Yes. So first, maybe, Tim, I'll pick up where we left off on the earnings call. So we said, look, we're going to take this seriously. We're going to do a very methodical fact-based, science-based approach. We're proactively working with the EPA on this. We also gave some stats as well. ***We said about 540,000 route miles in the network, half of it aerial and a very small percentage of lead***. We did say -- maybe just a couple of updates here. We did say we had work to do on the former XO and the former MCI networks. On the former XO network, we did that

> review, and that review is complete. It doesn't change the numbers and the stats that we shared previously. So that was good. We're still working through the MCI piece of that. So that work is ongoing. As you mentioned, we saw the same reports out of New York State that they did their own testing with their Department of Environmental Protection, and they found no evidence of elevated lead in the area, and they reopened the park. So that was very encouraging. We're going to continue to do our work and our testing, and that's ongoing. And we said that would take several weeks, and that work is well underway. And we know everybody wants more information here. And as soon as we have it and as soon as we have something to share, we'll certainly share with everybody.

267. On September 13, 2023, Bank of America held its Media Communications Entertainment Conference during which BofA securities analyst, David Barden, asked Defendant Skiadas: "Okay. I guess, and the third kind of big one is the lead issue that came up from the Wall Street Journal in July. I think people have been hopeful that we would kind of see the telco industry kind of bring more information to light and kind of try to put, as much as possible, this issue to bed. What can you share with us, where we stand right now in this issue in discovery?" Defendant Skiadas replied with the following:

- Sure, Dave. So maybe I can pick up where we left off at earnings, which was we said we take this matter very seriously. We're doing a very fact-based and science-based approach, prioritizing the health and safety of our employees and the communities that we serve.

- We also shared some stats. And we said that we had 540,000 [copper] (added by company after the call) route miles in the network, about half of which is aerial and a small percentage is lead. We said we're still doing a review of the old MCI-Western Union network. That work is still ongoing, but it hasn't changed those facts.

- In terms of some updates, what I would say is I think you might have seen last month, that New York State did their own testing. New York State Health Department did their own testing at Wappingers Falls, New York, which is one of our sites that was identified by the media. And they found no evidence of elevated lead levels and since reopened the park. More recently, last week, the EPA did their own testing in New Jersey at one of our sites and similarly found that there was no public health risk.

- And then on our side, we did our own testing at each of those 3 sites. And the average soil lead levels are below the remediation levels established by each of

> the applicable states. So therefore, the results are very consistent with what we saw and what the regulators have seen. We're working very proactively with the EPA on it and the other regulators. And as we said before, as we have more to share, we'll certainly do so.

268. Skiadas made substantially similar comments in response to analyst questioning about Verizon's lead-sheathed copper cables exposure on November 15, 2023 at Morgan Stanley's TMT Conference.

269. Further, in submissions to New York State agencies, Verizon has made additional statements about its lead-sheathed cables. In a letter dated August 21, 2023, Verizon acknowledged that it "has always been widely known that lead was used to protect some cables" and that "since November 2020, Verizon has removed 230 miles of copper cables in New York." In this letter, Verizon further acknowledged that "Whether to remove legacy cables or leave them in place requires a detailed analysis. Factors to be considered include the potential risk to workers who must handle the cables and the potential risk to the environment of disrupting the cables." Verizon stated that "there are limitations on Verizon's ability to provide this information and, in some instances, to verify its accuracy" due to "difficulty of gathering these infrastructure records" that "reflect[] a network with origins that date back to the late 19th century." Nevertheless, Verizon "identified 135,274 miles of cable in its copper network infrastructure in New York."

270. In a letter dated September 13, 2023 directed to the Honorable Michelle L. Phillips, Secretary of the New York State Public Service Commission, Peter Sharko, Verizon's Managing Associate General Counsel, again acknowledged that: "***We have not deployed lead-sheathed cables for decades, but their existence, both in the telecommunications industry and in the transportation and power industries, has long been known***."

### 2. Government Response to the WSJ Exposé

271. As addressed in Section (V)(F) above, government regulators have widespread authority in ordering the cleanup and remediation of hazardous substances, including lead. Consistent with this authority and in the wake of the WSJ exposé, numerous state and federal agencies launched investigations into the telecom industry, including Verizon's ownership and abandonment of lead-sheathed copper cables.

272. On July 26, 2023, the EPA invoked its authority under the "Superfund law," or CERCLA, to open an investigation. The EPA tested two localized sites in Pennsylvania and California, and while it found no threats that "warrant an immediate EPA response action," its results did "show that some soil samples have lead concentrations above an EPA screening level of 400 parts per million." It also "established a national working group to consider next steps to ensure the public remains safe," according to the EPA website. It noted that "steps may include further analyses to better understand if the cables have released and continue to release lead. Any future actions will be done in coordination with state and local leaders, and the public will remain informed of any actions taken."

273. The EPA's further investigatory efforts have since confirmed that the lead cables are leaching toxic contaminants. On January 11, 2024, the WSJ reported that the EPA found "more than 100 soil and sediment readings with lead above the regulator's safety guideline for children at some phone lead-cable sites identified by The Wall Street Journal in three states." This represents 41% of samples taken near lead cables. Clifford Villa, head of the EPA's "Superfund" office that oversees cleanup of contaminated sites, stated, "This is lead that could be concerning," according to the January 11, 2024 WSJ article. Grant Scope, senior counselor to EPA Administrator Michael Regan, characterized the agency's investigation of lead cables as "high priority." Although the EPA has determined that the lead cables do not warrant an "emergency

response," this is just the first determination in a "multistep Superfund review process that also examines whether any other longer-term remedies should be undertaken," the WSJ reported on January 11, 2024. Indeed, in December 2023, the EPA sent letters requesting that Verizon and other telecom companies meet with the agency, and it will collect more data and documents as part of its review. The EPA plans to discuss "the companies' granular sampling data related to their lead cables" in late January 2024, according to the January 11, 2024 WSJ article.

274. As reported by the WSJ on January 11, 2024, the EPA is "coordinating closely with the Justice Department, whose Southern District of New York is investigating whether telecom companies had knowledge of any potential risks to their workers and future environmental impact when they left behind the lead cables." The Department of Justice originally filed a civil inquiry to investigate on July 27, 2023.

275. State regulators have also launched investigations. On July 20, 2023, New York Governor Kathy Hochul directed the Departments of Public Service, Health, and Environmental Conservation to "immediately investigate a recent report of old lead-covered cables left by telecommunication companies and the potential public health risks associated with exposure to those cables." Governor Hochul stated: "Lead-covered cables pose a serious threat to communities across New York, and I am directing State agencies to immediately launch a full investigation. We will hold the telecommunication companies responsible and take swift action to remediate problems."

276. As a result of Governor Hochul's directive, the "agencies sent a letter to the State's 246 facilities-based telecommunication providers to begin compiling an inventory of the presence of aerial and buried cables, both on land and below water, containing lead across New York." These letters were sent on July 20, 2023, and signed by Rory M. Christian, Chair and CEO of New

York's Public Service Commission; Basil Seggos, Commissioner of New York's Department of Environmental Conservation; and James V. McDonald, M.D., M.P.H, Commissioner of New York's Department of Health (the "New York Letters").

277. The New York Letters referenced "an aerial lead cable located in Wappingers Falls, New York, above the perimeter of a town playground" and "soil at the park perimeter" with "elevated lead levels above what the [EPA] considers safe in soil where children play." It states that in an effort to better understand the scope of this potential concern:

> The State is compiling an inventory of the presence of aerial and buried cables, both on land and below water, containing lead across New York to conduct its own investigation of the health and safety issues potentially caused by these cables. Lead is a hazardous substance on New York State's list of hazardous substances (6 NYCRR Section 597.3). Pursuant to New York Public service law (PSL) S94(q2) and (3); 16 NYCRR Part 5.2, and Environmental Conservation Law (ECL) SS 27-1305, 27-1307 and 27-1309, we are requesting a full inventory of lead-containing aerial and buried cable, both on land and below water, owned by your company for both cable still in use to provision service and cable that is no longer being used by has yet to be removed. The inventory shall indicate the type of cable (copper or fiber) and whether it is aerial or buried on land and below water, as well as the City, Town, or Village the cable is located in, street name where the cable is located, the length of the cable, the closest intersecting landmarks at the beginning and end of the cable, and any other information that would be useful to physically locate and inspect the cable.

278. Several Congressional leaders have also voiced concerns. Senator Edward Markey wrote a letter to USTelecom on July 11, 2023, stating:

> The telecommunications companies for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and public health effects . . . . This is corporate irresponsibility of the worst kind . . . . The members of USTelecom that are responsible for these lead-sheathed cables have a duty – both civic and legal – to ensure that they do not put Americans in harm's way. I will be awaiting answers to my questions, expecting further action and commitments from USTelecom's members, and watching closely from my seats on Senate committees that have jurisdiction over the environmental and public health issues these cables present.

279. Senator Markey posed questions to Verizon and other telecom companies including: (1) "Do the companies know the locations and mileage of lead-sheathed cables that they own or for which they are responsible?"; (2) "Why have the companies that knew about the cables – and the potential exposure risks they pose – failed to monitor them or act?"; and (3) "What plans do the companies have to address the environmental and public health issues posed by the cables? Specifically, will the companies commit to: (a) testing for soil, water, and other contamination by the cables? (b) remediation any contamination? (c) warning communities of the potential hazards the cables pose? (d) guaranteeing medical treatment and compensation to anyone harmed by lead poisoning caused by the cables?"

280. Similarly, New York Congressman Patrick Ryan issued a press release and letter to USTelecom on July 20, 2023 demanding that "Verizon and AT&T clean up their mess, remove lead cables from Hudson Valley and Across United States." Congressman Ryan's press release further stated, "For decades, big corporations have polluted our rivers and our drinking water, always putting their profit above the health and safety of our community. This latest failure by Verizon and AT&T is no different. It is absolutely unacceptable that their negligence is now making it dangerous for our kids to even go to the playground. They need to clean up their mess and safely remove these cables immediately." Congressman Ryan's letter to USTelecom posed similar question to Senator Markey's letter, asking USTelecom for an accounting of all lead cables, whether the lead-sheathed cables are still operations, and what plans USTelecom's member companies have in place to protect line workers who service the cables.

281. To inform Congress's response to the lead cable problem, on December 26, 2023, Congressional Research Service issued a briefing, "Legacy Lead-Sheathed Telecommunications Cables: Status and Issues for Congress" (the "CRS Issue Brief"). CRS "operates solely at the

behest of and under the direction of Congress." The CRS Issue Brief noted that "EPA may take CERCLA response actions to investigate and remediate the release, or substantial threat of a release, of lead into the environment under the Superfund program at sites on nonfederal lands." The CRS Issue Brief noted that "[i]f lead derived from lead-sheathed telecommunication cables were to migrate into groundwater or surface water, enforcement actions under two other federal statutes might be used to mitigate potential impacts on water quality," and cited the Safe Drinking Water Act and the Clean water Act.

282. The CRS Issue Brief noted several avenues for Congressional involvement. Congress could "mandate an inventory of legacy lead-sheathed cable locations and ownership nationwide." It could also "consider which agency could or should lead the development of an inventory," and make determinations about interagency coordination and public disclosure. Once an inventory is complete, Congress could "mandate or encourage federal coordination or assistance (e.g., technical, financial) to jurisdictional authorities (i.e., federal, state, local, tribal)."

### 3. Analysts Predict Verizon Faces Upwards of $8.5 Billion in Liability Associated with Its Lead Cable Network

283. Against the backdrop of Verizon's admissions of owning a sprawling and decaying lead cable network and widespread governmental investigations, Wall Street analysts have begun to estimate Verizon's potential liability in remediating the approximated ***81,000 miles*** of lead cabling in its network. While acknowledging the uncertainty of the situation, these estimates each place the anticipated cost to Verizon as being at least $1 billion, with some estimates coming in at many times that.

284. In mid-July 2023 when the news of Verizon's lead cable network first emerged, New Street Research ("New Street") estimated that the cost to the entire telecom industry would be ***$59 billion***. In particular, New Street predicted the cleanup cost for Verizon alone would be

approximately ***$8 billion*** in July 2023. The cost to Verizon could be higher or lower depending on the many factors and unknowns such as the amount of cables that have to be removed and the cost to evaluate and replace them. New Street relied on the following assumptions in estimating a $59 billion industry-wide cleanup: (i) copper is often left in place even where fiber is installed; (ii) approximately 44 million housing units may have lead exposure; (iii) of those 44 million housing units, 19.3 million have fiber underlying part of the connection and there is a remediation cost of approximately $500 per unit for a total estimated cost of $10 billion; and (iv) approximately 24.4 million of the 44 million housing units do not have fiber underlying the connection and thus the remediation cost for those units is approximately $2,000 per unit for an estimated remediation cost of $49 billion.

285. New Street has since lowered its clean-up cost estimate to approximately $5.2 billion to remediate the legacy lead cable infrastructure, but also stated it is too soon to tell what Verizon's exact expenditure will be. On July 28, 2023, the Brookings Institute revealed its "[c]ost estimates to remediate the problem for the entire industry are settling in at between $4 and $20 billion. To put that number in perspective, the total capital expenditures of Verizon and AT&T were each around $20 billion in 2022." USTelecom (a telecom trade association) has opined that, ultimately, whether the legacy lead cables have to be removed or can be left in place depends on: the age and composition of the cables, safety to workers, and environmental impact. Assessing those questions for Verizon's tens of thousands of miles of lead-sheathed cables and determining the appropriate remediation or approach – and addressing the same with relevant local, state and federal regulators and other stakeholders – will, on its own, generate significant costs.

286. Analysts who cover the Company have released clean up estimates in the billions. For instance, on July 25, 2023, Deutsche Bank issued a report stating that, "***[w]e estimate the cost***

***to remove Verizon's lead sheathed cables at about $1B, although there are still a number of outstanding variables***. Deutsche Bank further reported, "Verizon recently disclosed that a 'small percentage' of the company's 540K mile copper footprint is comprised of lead sheathed cables, and indicated today that about half of it is aerial. We believe VZ has only a small amount of underwater cable (we assume 5%), and the rest is buried or in conduit." In the same report, Deutsche Bank further warned that, "***this removal cost estimate does not account for the removal of lead cables that were abandoned in place, nor other potential liabilities such as soil remediation, personal injury litigation, property damage/contamination claims, or increased regulation or fines related to the potential mishandling of hazardous waste***." Analysts from J.P. Morgan also expressed caution and said that there was "little reason to be buying near term in part to the unknown lead-sheathed cable liability." Analysts from Wolfe Research reached a similar conclusion in their July 25, 2023 report, highlighting that Verizon was down -13.1%, underperforming the S&P (+19.0%) year-to-date, as the industry assesses & manages the impacts from lead-sheathed cables.

287. Indeed, since July 2023, analysts have continued to discuss and speculate as to the risks associated with Verizon's lead cable issue. On August 22, 2023, Oppenheimer gave Verizon a meager overall ESG rating of "C." On September 29, 2023, BuySellSignals reported that investor sentiment on telecom companies was affected by "concerns about lead-covered cables."

288. On October 4, 2023, Deutsche Bank reported that since July 2023, when the WSJ series was released, Verizon's stock price had declined by 14% compared to just a 5% decline by the S&P over the same time period. Deutsche Bank further stated: "VZ's stock has yet to recover to previous levels. . ."

289. On October 24, 2023, Oppenheimer reiterated that a "key risk[] to price target" was Verizon's lead cable exposure. A Morningstar Equity Company Report issued on October 24, 2023 reported; "Verizon's balance sheet isn't the fortress it once was. Paying down debt will limit strategic flexibility and shareholder returns. ***Liabilities tied to lead-sheathed cable could add another headache***." The report further stated: "investors remain focused on [Verizon's] exposure to lead-sheathed cabling."

**4. Verizon's Liability from Lead-Based Personal Injury and Toxic Tort Lawsuits**

290. In addition to removal and mitigation costs, Verizon also faces massive liability from personal injury litigation. Indeed, since the news of its expansive lead cable network emerged in July 2023, there have been at least two putative class action lawsuits filed against Verizon alleging that Verizon failed to protect individuals from its hazardous lead cables. Because both are putative class actions, they are each bound to have dozens, if not hundreds or thousands of class members. Thus, the potential financial liability that Verizon faces is tremendous.

291. On August 23, 2023, former Verizon utility worker Greg Bostard filed a toxic tort class action lawsuit against Verizon on behalf of a class of utility workers in connection with exposure to Verizon's toxic lead-sheathed aerial cables. This action is styled, *Bostard v. Verizon Communications Inc. et al.*, 1:23-cv-8564 (D.N.J.). Bostard was an employee of Comcast Corporation ("Comcast") in New Jersey between 1990 until 2019. In this role, Bostard maintained and serviced Comcast's aerial cables located on utility poles throughout New Jersey. As is alleged by Bostard, Comcast shares its space for aerial cables with Verizon's lead-sheathed cables – in particular, Comcast's aerial cables sit above Verizon's lead-sheathed cables. Accordingly, to reach Comcast's aerial cables, Bostard climbed over Verizon's lead-sheathed cables and his clothes and body would rub against the lead cables as he climbed the utility poles. Bostard also hooked himself

in to Verizon's lead-sheathed cables by using his hands to wrap a strap around the cables which resulted in him, and his clothes, coming into additional contact with lead. Bostard alleged that due to his "direct and regular contact with Verizon's lead-sheathed cables," he "ingested and inhaled lead from Verizon's lead-sheathed cables during the course of his 29-year career." Bostard specifically alleged that he became exposed to lead because when he "perspired, he would rub his face, including his eyes and mouth with his hands that had been in direct contact with Verizon's lead-sheathed cables. During lunch, Mr. Bostard would use his hands to eat."

292. On September 8, 2023, Mark Tiger, a utility worker formerly employed by Figure 8 Communications between 2019 and 2020 and currently employed by Duda Cable Construction who has regularly worked with and around Verizon's lead-sheathed cables, filed a putative class action lawsuit against Verizon in the Western District of Pennsylvania. That action is styled, *Tiger v. Verizon Communications Inc.*, 2:23-cv-1618 (W.D. Pa.). Tiger brought claims against Verizon and its subsidiary Verizon Pennsylvania LLC for negligence, negligence *per se*, and common law public nuisance. He alleged that Verizon knew of the risks presented by the toxic lead cables yet failed to take meaningful action. He further alleged that while employed at Duda Cable Construction, an independent contractor for Comcast, he would have to climb over Verizon's lead cables to reach Comcast's aerial cables as they were directly above Verizon's. As a result, he regularly made contact with Verizon's lead cables. Tiger alleged that while working with Verizon's lead cables he was routinely sick including experiencing mood changes, headaches, nausea, fatigue, irritability, muscle and joint pain, as well as constipation. Damages demanded include demands that he and the class be medically monitored for future lead-related health conditions.

### 5. After the Class Period, Verizon Finally Discloses Risk of Loss Related to Lead Sheathed Copper Infrastructure

293. Unable to conceal the truth regarding its lead-related exposure any longer, Verizon issued revised risk disclosures in its Form 10-Q for the quarter ended September 30, 2023. It added the following risk disclosure:

> Allegations related to lead sheathed copper cables in our copper network infrastructure could expose us to regulatory scrutiny, litigation, penalties, removal and compliance costs, operational impacts or reputational damage.
>
> There have been recent media reports alleging that certain lead sheathed copper cables that are part of our copper-based network infrastructure may present public health or environmental risks in areas where those facilities are deployed. These allegations could result in government investigations, legislative or regulatory actions, litigation penalties and other liability, remediation and compliance costs or negative operational impacts. In addition, we are currently subject to lawsuits related to these allegations, and additional legal proceedings or contingencies may arise in the future. Our insurance policies may not cover or may not be sufficient to fully cover the costs of these claims. Accordingly, we may incur substantial expenses as a result of these allegations, which cannot be reasonably estimated at this time but could be material.
>
> In addition, negative assertions about the public health or environmental impact of our lead sheathed cables may harm our reputation, which could adversely affect our business and our relationship with various stakeholders, even if such allegations ultimately prove to be inaccurate.

## J. The Price of Verizon Stock Precipitously Declined in the Wake of the WSJ Exposé

294. The WSJ exposé consisted of a series of articles published in July 2023. Each revealed, for the first time, news about Verizon's lead cables and exposure to related risks. Investors had been in the dark about the lead cables, and thus, as the series was released, and investors were able to consider the ramifications of the toxic network of lead cables on the Company, the price of Verizon's stock dropped further. Certain details of each article are excerpted below, and the effect on Verizon's stock price is indicated after each publication. To summarize, the price of Verizon's stock fell from $35.90 (price at market close on July 7, 2023)

to $31.46 (price at market close on July 27, 2023, the first trading day after the last article was published). This was a decline of 12.4% and wiped out approximately $18.6 billion in market capitalization.

**1. The July 9, 2023 Article**

295. On Sunday, July 9, 2023, the WSJ released an article entitled "America is wrapped in miles of toxic lead cables." It stated, in pertinent part:

> [. . .] Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.
>
> The lead can be found on the banks of the Mississippi River in Louisiana, the Detroit River in Michigan, the Willamette River in Oregon and the Passaic River in New Jersey, according to the Journal's tests of samples from nearly 130 underwater-cable sites, conducted by several independent laboratories. The metal has tainted the soil at a popular fishing spot in New Iberia, La., at a playground in Wappingers Falls, N.Y., and in front of a school in suburban New Jersey.
>
> The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination – more than 2,000 lead-covered cables – that hasn't been addressed by the companies or environmental regulators. These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.
>
> Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency. At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play. "We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.
>
> For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.
>
> Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Even without further exposure, lead can stay in the blood for about two or three months, and be stored in

bones and organs longer. Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.

The Journal's findings "suggest there is a significant problem from these buried lead cables everywhere, and it's going to be everywhere and you're not even going to know where it is in a lot of places," said Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, a federal agency.

In Coal Center, Pa., medical tests independently sought by the mother of 6-year-old twins, Joyanna and Beau Bibby, and shared with the Journal, showed they had high levels of lead in their blood. The tests were taken a few days after they played in a lot next to their house under a drooping cable.

In response to the Journal's reporting, [. . .] Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. They said they follow regulatory safety guidelines for workers dealing with lead.

The companies and an industry group representing them said they would work together to address any concerns related to lead-sheathed cables. "The U.S. telecommunications industry stands ready to engage constructively on this issue," said a spokeswoman for USTelecom, a broadband association that represents companies in the industry.

* * *

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

Some former telecom executives said companies believed it was safer at times to leave lead cables in place than remove them, given the lead that could be released in the process.

The lead-covered cable network included more than 1,750 underwater cables, according to public records collected by the Journal. A Journal analysis of the five most densely populated states, and more than a dozen of the most densely populated counties in the nation, identified about 250 aerial cables alongside streets and fields next to schools and bus stops, some drooping under the weight. There are likely far more throughout the country.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. The samples were analyzed for lead content by Pace Analytical Services, an accredited environmental-testing lab. A researcher at the University of Washington who analyzed the chemical fingerprint of lead at some of those sites verified that the lead contaminating the water and soil likely originated from the cable.

**AMONG THE FINDINGS:**

—***Roughly 330 of the total number of underwater cable locations identified by the Journal are in a "source water protection area***," designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal.

—Aerial lead cabling runs alongside more than 100 schools with about 48,000 students in total. More than 1,000 schools and child-care centers sit within half a mile of an underwater lead cable, according to a Journal analysis using data from research firm MCH Strategic Data.

—In New Jersey alone, more than 350 bus stops are next to or beneath aerial lead-covered cables, a Journal analysis of NJ Transit data found.

—Roughly 80% of sediment samples taken next to underwater cables, which the Journal tested, showed elevated levels of lead. It isn't known if the level of leaching is constant; experts say old cables tend to degrade over time.

Ben Grumbles, executive director of an association of state environmental regulators, called the Journal's findings disturbing. ***"This is a type of toxic exposure that isn't on the national radar and it needs to be," he said. "There is a need to act and clean it up."***

**AN ANCIENT NETWORK**

American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water. For underwater cables, steel cords sometimes surround the lead for further protection.

When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.

With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances

denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.

To track the underwater cables, the Journal collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables that were approved more than a century ago. ***Removing Army Corps-approved cables at any time would routinely require a permit or be noted in the original paperwork, officials say. The Journal tally of abandoned lead cables is sure to be an undercount***.

Researchers Seth Jones and Monique Rydel Fortner, from the environmental consulting firm Marine Taxonomic Services, collected lead, soil and water samples at the Journal's request—a process that included diving expeditions at some locations. They have become experts in lead cables since they discovered them under Lake Tahoe more than 10 years ago and have advocated for their removal. The Environmental Defense Fund, a nonprofit advocacy group, provided guidance and $85,000 to MTS to partly fund its field research for the project.

The Journal found that where lead contamination was present, the amount measured in the soil was highest directly under or next to the cables, and dropped within a few feet—a sign the lead was coming from the cable, experts said.

The Journal didn't find lead in all the locations it tested. The level of contamination can vary in water and soil, depending on environmental and other factors.

The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes. The EPA and other agencies have spent billions of dollars to reduce lead in the environment. In 1997, health regulators said average blood lead levels in children and adults had dropped more than 80% since the 1970s.

Yet large numbers of American children continue to show levels of lead in their blood— more than half of those tested, according to a Quest Diagnostics study published in 2021, based on an analysis of test results from more than one million children under age 6.

"A new, uncontrolled source of lead like old telephone cables may partly explain" why children continue to have lead in their blood, said Jack Caravanos, an environmental public-health professor at New York University, who assisted the Journal in its research. "We never knew about it so we never acted on it, unlike lead in paint and pipes."

Gordon Binkhorst, an environmental consultant and expert on lead sampling, said he believes cables should be removed because they are "continuing sources of soil and potentially groundwater contamination." Other experts said covering the cables and the area around them could reduce the risk.

Binkhorst reviewed the sampling methods used by the Journal and said they were appropriate techniques for basic testing of whether lead was present in the soil and water near the cables, using a certified environmental testing lab.

* * *

In Wappingers Falls, N.Y., about 60 miles north of New York City just off the Hudson River, an aerial lead cable hangs above the perimeter of a town playground, with a jungle gym, a swing set and a basketball court.

Near a "CHILDREN AT PLAY" sign, lead in the soil measured more than 1,000 parts per million, according to Caravanos, the NYU professor.

The EPA's recommendations for the levels of lead it believes are generally safe in soil are lower for areas where children play, at 400 parts per million, and higher for other areas, at 1,200 parts per million. (While lead in water is described in parts per billion, lead in soil is described in parts per million, with one part per million equivalent to about one inch in 16 miles.)

Caravanos used an X-ray fluorescence analyzer, or XRF, a device used by scientists to measure elements in soil. At the corner of the playground, the XRF showed lead in soil just under the cable at 850 parts per million.

It doesn't take much lead in soil to elevate a blood level for a child, said Caravanos. "You just need a little dirt on your fingers to put into your mouth and ingest, and you get an elevated blood lead above the CDC level of 3.5."

In West Orange, N.J., a lead-sheathed cable sags over tree-lined sidewalks and driveways for more than one-third of a mile, where children and their parents walk, across the street from Gregory Elementary School. The cable sometimes dips to about 12 feet above the ground.

Caravanos found contaminated soil beneath the cable in multiple spots and registered multiple readings far exceeding the EPA guideline for play areas. Gregory Elementary School is one of 64 schools in New Jersey where the Journal identified aerial lead cables.

* * *

**FINGERPRINTING LEAD**

At selected sites, the Journal took the extra step to confirm that lead stemmed from the cables and not another source. Reporters worked with a researcher to perform an isotopic analysis, a procedure that determines a specific fingerprint for the lead

involved. The testing by Bruce Nelson, a geochemistry professor at the University of Washington who specializes in the field, linked the lead found in samples most likely to the specific cables—as opposed to, say, lead from a factory or from paint.

* * *

At some cable sites, telecom companies disavowed ownership. In Lake Pend Oreille in the Idaho panhandle, a snarl of two lead-covered cables lies abandoned at a spot where children speed by on inner tubes in the summer. The cables sit under a railroad bridge in a prime fishing spot.

A sample of water collected in August at the lake bottom showed lead at 1,250 parts per billion. A water sample taken at the surface in that spot showed lead at 38.8 parts per billion. An isotopic analysis showed that the fingerprint of the lead in the water at the surface matched lead from a telecom cable at that site, and not that of a lakeside slag heap known as Black Rock, the detritus of a lead smelter that had ceased operations by 1913.

A predecessor company to Verizon laid a cable near the site, a U.S. Army Corps record shows. Verizon, Frontier Communications and Ziply Fiber, telecom companies that have variously served this region over the years, say they don't own the cables.

**COAL COUNTRY RISK**

***In Coal Center, Pa., an aerial lead-sheathed cable runs along the street, drooping so low in certain spots that it is nearly within arm's reach. The roughly mile-long cable, from Verizon, runs into neighboring California, Pa., across an entrance to apartment buildings, and near a school bus stop and playground. Some local residents had known about the cable and had been voicing their concerns for nearly a year***.

***Lead found at one of the locations measured 7.5 times the amount the EPA says is safe for play areas, according to a soil sample collected by the Journal. The isotopic analysis by Nelson showed the lead in the soil mirrored the lead from the cable and was unlike the background lead in that area.***

The lead-sheathed cable runs over the property of Shannon Bibby, 36, mother of the 6- year-old twins. This February, her children played under the cable in the lot next to their house, where ground was being dug up for the foundation of a home. ***An analysis of soil collected by the Journal from the family's property showed lead at a level more than 40% higher than the recommended level for play areas by the EPA***.

***A borough council member, Bibby had her children's blood tested after learning about the Journal's finding. Capillary tests, or blood pricks, found lead in one***

> ***child's blood higher than 3.5 micrograms per deciliter***. The other child hit that mark, which is the level at which the CDC recommends seeking medical or environmental follow-up. A subsequent blood test showed non-detectable levels of lead.
>
> It is impossible to say if the twins' initial elevated lead level tests were directly linked to exposure from the cable. The Bibbys' results were below what the EPA model could expect to find in a child playing in soil with the concentrations found at their property, according to Caravanos.
>
> ***Bibby said she and other Coal Center residents have been pushing Verizon to take the cable down. Verizon has told them it has working services on the old lead cable. In December, she and other Coal Center borough council members discussed their concerns in the tiny borough hall at the edge of the Monongahela River.***
>
> ***"We have to get moving on these cables," said council member Rob Lincavage, who grew up in Coal Center and said it has become one of his goals in life to see the cable removed.***
>
> ***"It shouldn't be here," said Bibby. She said the lead should be removed "before something bad happens."***

(Emphases added.)

296. On this news, Verizon's stock fell $0.76 per share, or 2.1% to close at $35.14 per share on July 10, 2023, on unusually heavy trading volume, damaging investors.

**2. The July 12, 2023 Article**

297. On July 12, 2023, the WSJ released a follow-up article entitled "What AT&T and Verizon knew about toxic lead cables." The article stated:

> For decades, […] Verizon and other firms dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.
>
> They knew their employees working with lead regularly had high amounts of the metal in their blood, studies from the 1970s and '80s show. . . . Government agencies have conducted inspections, prompted by worker complaints, that led to citations for violations involving lead exposure and other hazardous materials more than a dozen times over four decades, records show.

* * *

***Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead. The telecom industry's lead-covered cables have been largely unknown to the public. The industry doesn't have a program to remove or assess their condition. Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.***

* * *

"***They knew the risks, but they didn't want to do a lot to mitigate it***," said James Winn, who worked as a cable splicer among other jobs for several Bell System companies for 45 years. Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.

A Wall Street Journal investigation has revealed that telecom companies left behind more than 2,000 potentially dangerous lead-covered cables under water, in soil and overhead. Many more are likely to exist.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. Roughly 80% of sediment samples taken next to underwater cables showed elevated levels of lead.

Doctors say that no amount of lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Without further exposure, lead stays in the blood for only about two or three months, but it can be stored in organs longer and in bones even for decades, according to Dr. Philip Landrigan, director of the program for global public health and the common good at Boston College.

Like asbestos, lead must either be sealed away or removed completely to eliminate the risks. USTelecom, a trade group that represents companies in the industry, said "the scientific literature and available studies" on lead-sheathed cables show they aren't a public-health issue or a risk to workers when precautions are used.

The group declined to provide or describe any such studies and literature.

* * *

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

The cables were laid by the original American Telephone & Telegraph, also known as the Bell System, which operated as a group of regional telephone companies starting in the late 1800s. With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon.

Some lead experts say the cables should be removed, and any contaminated soil should be taken to an appropriate landfill. Removing a lead-sheathed cable could release lead into the environment during the process but some experts say leaving the lead could result in decades-long contamination.

Other experts say less-drastic measures could decrease the risk of contamination, such as covering areas where the cables are exposed. Removing underwater cables would be a far more complicated and costly process that could require an assessment of the risk of disturbing the lead.

Telecommunications companies have wrestled with how to handle the cables. Malone's 2010 presentation noted that removing the cables that were underground wasn't easy. "Extraction of cable from underground duct can release unexpected high levels of lead dust," the presentation said. "Underground cable presents real possibilities for overexposure" to workers removing them.

The oldest cables are typically at the bottom of a manhole or conduit, said retired AT&T executive Bill Smith. Cables from the 1920s could be nearly impossible to pull out, he said. "In the underground, unless you really needed the conduit duct...you would leave it in place," he said.

* * *

The question of who might be responsible for any cleanup is complicated, said Brian Berkey, an associate professor of legal studies and business ethics at the University of Pennsylvania's Wharton School. When the cables were installed, if they were a reasonable and responsible decision, and considered safe at the time, the cleanup could ethically be a collective responsibility involving companies and the government, he said.

**LEAD ROOTS**

After the invention of the telephone in the 1870s, the first lines to go up were single-line connections strung on poles, connecting one point to another. Tangles of wires soon filled city skies. In the late 19th century, companies began using cables containing bundles of wires that delivered more capacity and better transmission. Sheathing the cable in lead cut electromagnetic noise in the wires and kept water out. By 1940, the majority of the phone network was in lead-covered cables.

There were signs at the dawn of the industry that lead could harm workers. Alice Hamilton, a pioneer of modern industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her 1925 book "Industrial Poisons in the United States."

By 1956, the Bell System was using around 100 million pounds of lead a year, according to a Bell document. That's heavier than more than 6,660 male African elephants.

The industry began to deploy more cables that used plastics and alternative metals instead of lead over roughly the next decade, and moved away from installing new lead cables completely, as technology improved. Workers still maintained the old cables using molten lead and, at times, removed them.

In the 1970s, the U.S. began restricting lead in gasoline and banned lead-based paint in residential homes. The Occupational Safety and Health Administration drafted its first standards on worker exposure to lead and other hazards.

Bell Laboratories, the Bell System's technology and science engine, was a leader in lead research in the 1970s and invented a device that could screen for lead exposure from a drop of blood.

A 1977 Bell study provided a snapshot of high lead levels among female lead-soldering workers at Western Electric, then the manufacturing arm of the Bell System. Based on testing, it estimated that the workers had blood-lead levels in the range of 24 to 45 micrograms per deciliter. Those levels were as high as triple the average level of the population at the time. Bell scientists concluded the workers were "not being exposed to a lead hazard" because a control group of Western Electric office workers also had high estimated lead levels.

Blood tests showed high lead levels in another group of workers—cable splicers, who fixed and maintained cables. A 1978 letter between Communications Workers of America union officials said that AT&T "has confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."

The average lead levels in the blood of 90 cable splicers was more than 27 micrograms per deciliter, and 29% reported central nervous system symptoms, according to a 1980 paper by Mount Sinai, Bell Labs and New York City's health department.

While regulations and lead bans drove down exposure across the population, there were still more than 40,000 telecom employees working with lead in 1983, according to a Bell System document. Even though companies stopped deploying new lead-sheathed cables in the 1960s, the existing network still needed to be maintained, and lead-based solder has remained in use.

**SMELTING HEADACHES**

* * *

***Between 2007 and 2016, blood-lead test results for 208 Verizon workers showed that 85, or more than 40%, had levels above 3.5 micrograms per deciliter, according to Verizon data shared with the union. That's the current level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up.***

***Rob Prokopowicz, who retired from Verizon in 2021 after 40 years of working with lead, said he raised concerns with managers about routinely pumping out water from manholes that was potentially contaminated with lead, including in front of schools. He said they told him, "If you don't feel safe, we'll send someone else."***

"When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust," said Prokopowicz, 62.

"For the small percentage of our workforce that may need to work around lead-sheathed cable, we have a robust safety and health program to provide training, materials and resources needed to do so safely," a Verizon spokesman said. The company said its work practices on such cables are based on the available science, legal requirements and guidance from medical and work-safety organizations.

"Verizon's long standing policy allows for any employee who requests to be tested for lead exposure to do so at any time and without any cost to the employee," he said. A study last year at Mount Sinai of 20 Verizon workers, with an average tenure of 23 years, showed that 60% had measurable lead in their tibias, said Dr. Rabeea Khan, the study's principal investigator. "The fact that we can detect it in your bones suggests you have had long-term exposure," she said.

Nearly half of the workers in the study, mostly cable splicers, showed lead concentrations of 10 micrograms per gram of bone, indicating increased risk of neurological or biological problems, Khan said. Mount Sinai is planning a broader study later this year.

* * *

In response to the Journal's reporting, AT&T, Verizon and a group representing the broader telecom industry said they would work together to address any concerns or issues related to lead-sheathed cables.

(Emphases added.)

### 3. The July 14, 2023 Article

298. On July 14, 2023, the WSJ released an article entitled 'I Was Really Sick, and I Didn't Know From What." The article stated, in pertinent part:

> Tracy Fitchhorn worked with lead solder. Her husband, Dan Fitchhorn, spliced lead cables. Her father, Peter Hopkins, handled lead as an installer and repairman. All worked for decades for telecom companies. All are now sick.
>
> The Fitchhorns, like tens of thousands of workers at American Telephone & Telegraph and its successor companies, were exposed to lead on the job over many years. Current and former workers say they often felt left in the dark about their exposure and how to stay safe.
>
> Some of the workers have neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure. There's no way to determine what triggered specific ailments. Doctors say no amount of lead is safe.
>
> The lead, which those workers handled for decades, is a potential health risk for communities across the U.S. The cables sheathed in the toxic metal are the subject of a Wall Street Journal investigation that has detailed how AT&T, Verizon and other telecom giants left behind a sprawling network of cables, many of which are leaching lead into the environment. Children are especially vulnerable to the effects of lead exposure.
>
> [. . .] Verizon said it has "a robust safety and health program to provide training, materials and resources," and that workers can get lead testing at any time at no cost.
>
> Current and former workers described scant precautions. Many said they learned how to handle lead on the job and weren't given respirators or regular blood lead tests.
>
> Over decades, they wiped hot lead solder to repair cables in New York, fixed aerial lead cables in Pottsville, Pa., and used shaving cream to contain manhole lead dust in Portland, Ore. James Innes said his taste changed, which can be a sign of lead exposure.
>
> The old Bell System of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers. They kept detailed medical records. [. . .]
>
> ***A study conducted in the 1970s at New York's Mount Sinai hospital of 90 Bell System cable splicers showed "a high lead content in their blood," with 10 "in danger of suffering medical and/or physical deterioration if they continue on***

> ***their jobs," according to letters among union officials. A small study last year of lead in Verizon workers' bones showed that exposures continued.***
>
> AT&T and Verizon declined to comment on the studies.
>
> ***Tommy Steed removed lead underground cables in the Bronx in the 1980s and said he often vomited after eating breakfast. He said he never got his blood test results from Nynex, now part of Verizon, despite repeated requests.*** The state health department later provided them, showing high levels of lead. Nynex "didn't try to get me any remedial help," said Steed, now chairman of the Association of BellTell Retirees, which advocates for former workers.

(Emphasis added.)

299. The article profiled Tim Killeen, a former cable splicer for, among other companies, Verizon. The article stated "Killeen has chronic headaches, memory loss and difficulty breathing. His first wife had two miscarriages. His daughter suffered from childhood heart problems and has been diagnosed with ADHD. Those conditions can be linked to lead exposure. Mr. Killeen stated, '***I was coming home every day and holding the baby, not thinking there is lead dust all over you***.'"

300. The article also profiled Tommy Steed, a former cable splicer and lineman for, among other companies, Verizon. The article stated that "Steed's blood-lead level was 43 micrograms per deciliter in May 1988 and 39 micrograms two months later, according to New York Health department records. The average level for the U.S. population at the time was 2.8 micrograms per deciliter, according to the Centers for Disease Control and prevention." According to the article, Mr. Steed stated ***"[a]t the height of my lead poisoning, I was really sick, and I didn't know from what."***

301. Finally, the article profiled James Innes, a former cable splicer for, among other companies, Verizon. Mr. Innes was reported as having "[d]ecades of gastrointestinal problems," and was quoted as saying ***"[y]ou were creating a kind of powder from shaving the lead sheath, and every now and then you'd get a sweet taste in your mouth from inhaling the lead.***"

302. On this news, the price of Verizon stock declined by $0.63 per share, or 1.8%, to close at $34.01 on July 14, 2023.

**4. The July 17, 2023 Article**

303. On July 17, 2023, the WSJ released an article entitled "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables." The article stated, in pertinent part:

> Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.
>
> In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.
>
> A Wall Street Journal investigation revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing showed that dozens of spots registered lead levels exceeding EPA safety guidelines.
>
> "Without EPA intervention, we expect that the risk posed by the cables will increase as they further deteriorate and release lead into the environment," according to the letter by the three nonprofit organizations, the Environmental Defense Fund, Clean Water Action and Below the Blue.
>
> The Journal used testing including isotopic analyses and control sampling to confirm that the contaminating lead in some locations most likely came from the cables. Below the Blue's co-founders, who also work at Marine Taxonomic Services, helped the Journal with environmental sampling for its investigation. The Environmental Defense Fund provided guidance and $85,000 to Marine Taxonomic Services to partly fund its field research for the project.
>
> The EPA and its administrator, Michael S. Regan, didn't immediately respond to a request for comment.
>
> The Journal found lead leaching into soil directly underneath aerial lead cables, according to test results by independent accredited laboratories. The Journal identified about 250 aerial lead cables alongside streets and fields next to schools and bus stops. There are likely far more throughout the country.
>
> "If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed, and taken out of service as soon as possible,

followed by removal," according to the letter, which was viewed by the Journal. "EPA should also ensure surface soil contaminated by the aerial cables is removed or permanently covered."

Roughly 330 underwater cable locations identified by the Journal are in a "source water protection area," according to an EPA review performed for the Journal. The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead. They declined to provide a full accounting of the number of lead cables in their networks to the Journal. They said they would work together to address any concerns related to lead cables.

Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases. The Safe Drinking Water Act allows the agency to take actions to protect health when informed of a contaminant "which is present in or is likely to enter a public water system or an underground source of drinking water" and may present "an imminent and substantial endangerment" to health.

Lead from cables and from junction boxes where cables are spliced is "accessible to the public from the ground with many near playgrounds, schools, child-care facilities, and greenways where inquisitive children may be exposed," the letter said.

Following the Journal investigation, a Wall Street analyst estimated it could cost $59 billion to remove all the lead cables nationwide.

Noting the EPA's limited resources, the groups urged the agency to tap telecom companies responsible for the most lead cables "to support the assessment and actions needed to protect the public from potential exposure."

In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables. In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.

"Does the EPA plan on compelling clean up action from these telecom companies?" Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water.

Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC [Federal Communications Commission] on this so we are happy to follow up in the coming weeks."

304. On this news, the price of Verizon stock declined by $2.55 per share, or 7.5%, to close at $31.46 per share.

305. Between July 7, 2023 (the last trading day before *The Wall Street Journal* exposé on lead cables was first published) and the close of trading on July 17, 2023, the price of Verizon shares fell 12.3%.

### 5. The July 26, 2023 Article

306. On July 26, 2023, the WSJ released an article called, "Justice Department and EPA Probe Telecom Companies Over Lead Cables." The article stated, in pertinent part:

> The Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead- sheathed telecom cables across the U.S.
>
> The Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with the inquiry.
>
> The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed [Verizon] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days. Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.
>
> A Wall Street Journal investigation recently revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines. The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement.
>
> * * *
>
> Verizon said it hasn't been contacted by the Justice Department. A Verizon spokesman said: "As we have said from the beginning, we remain committed to the

factual and scientific based analysis of the issues. We will continue to have a proactive and constructive dialogue with the EPA as we jointly work to better understand the facts and consider any potential actions."

* * *

The EPA sought data from Verizon on three lead-sheathed cable sites, and said it would begin independent sampling in Coal Center, Pa., and West Orange, N.J., and coordinate with New York state to review samples in Wappingers Falls, N.Y., all locations cited in the Journal articles.

The EPA said a priority would be "evaluating areas with vulnerable communities and sites closely linked with children, such as schools and playgrounds." The EPA said its Office of Land and Emergency Management and regional offices are coordinating with state environmental agencies to assess potential contamination at the sites identified by the Journal.

* * *

[. . .] Current and former workers at telecom companies stemming from Ma Bell said they learned lead work on the job and didn't receive respirators or regular blood testing, the Journal has reported.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, have said they don't believe cables in their ownership are a public-health hazard or a major contributor to environmental lead. They said they follow regulatory safety standards for workers dealing with lead.

In a statement Wednesday, USTelecom said the industry "prioritizes the health and safety of our communities and workers" and continues to "engage with policymakers on this important matter."

* * *

On Tuesday, Verizon Chief Financial Officer Tony Skiadas said in an earnings call that "it's far too soon" to project the financial impact that aging lead-sheathed cables might have on the telecom giant. Verizon said lead-clad cable makes up a small percentage of the less than 540,000 miles of cables in its copper-wire network, though that accounting excludes two previously acquired companies with records the company is still reviewing.

Wall Street research analysts have estimated that lead cables make up roughly 15% to 20% of Verizon's legacy footprint, totaling at least 81,000 miles of lead.

Last week, Gov. Kathy Hochul directed three state departments to "immediately investigate" lead cabling in New York, directing telecom providers to provide an inventory of all lead cable locations in the state. Hochul also directed state

> inspectors to conduct sampling for lead in the Wappingers Falls playground where a lead cable and contamination were identified by the Journal.
>
> "We will hold the telecommunication companies responsible and take swift action to remediate any problems," Hochul said in a statement.
>
> Rep. Pat Ryan, a New York Democrat, wrote to Verizon, AT&T and USTelecom demanding they remove the lead cables. He also asked the companies how many miles of lead-sheathed cables they are responsible for, and about any plans to protect workers, provide access to blood and bone testing for lead, and remediate any risk.
>
> The Manhattan U.S. attorney's office in recent years has brought a series of civil cases related to alleged environmental wrongdoing. In 2021, the office announced a settlement with Toyota Motor, in which the company paid a $180 million civil penalty for failing to comply with Clean Air Act reporting requirements. The company acknowledged that for a decade it either failed to file required emissions reports or filed them late.

307. On this news, the price of Verizon stock declined by $0.79 per share, or 2.3%, to close at $33.55 per share on July 27, 2023.

308. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Lead Plaintiffs and the other Class members have suffered significant losses and damages

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. STATEMENTS ABOUT VERIZON'S LOSS RESERVES FOR "ENVIRONMENTAL MATTERS"

309. On October 30, 2018, the first day of the Class Period, Verizon filed its quarterly financials for the third quarter of FY 2018 ("3Q18"). Verizon's 3Q18 Form 10-Q; FY 2018 Form 10-K; and Forms 10-Q for the first, second, and third quarters of FY 2019, contained the following statement:

> ***Reserves have been established to cover environmental matters relating to discontinued businesses and past telecommunications activities.*** These reserves include funds to address contamination at the site of a former Sylvania facility in Hicksville, NY, which had processed nuclear fuel rods in the 1950s and 1960s. In

> September 2005, the Army Corps of Engineers (ACE) accepted the site into its Formerly Utilized Sites Remedial Action Program. As a result, the ACE has taken primary responsibility for addressing the contamination at the site. An adjustment to the reserves may be made after a cost allocation is conducted with respect to the past and future expenses of all of the parties. Adjustments to the environmental reserve may also be made based upon the actual conditions found at other sites requiring remediation.

310. These statements were materially false and/or misleading. In truth, Verizon did not set aside reserves to cover the costs of remediation and clean-up for its lead cables, which fall under the category of "discontinued businesses and past telecommunications activities." If Verizon had set aside such reserves, it would have been required under ASC 450 to disclose the amount of reserves that had been set aside for the remediation of its lead cables, but it did not. *See* Section (VII), *infra*.

311. Additionally, although these statements discuss setting aside reserves for "environmental matters pertaining to discontinued and past telecom activities", Verizon omitted the material fact that it has tens of thousands of miles of lead cables which were, at the time these statements were made, leaching lead into the environment. The cost to remediate those lead cables is currently unknown, but even applying the most conservative estimates, exceeds $1 billion. These statements discuss a particular site in New York that housed nuclear fuel rods, but say nothing about Verizon's toxic lead cable network. Thus, investors were provided the false and/or misleading impression that the one example cited was Verizon's biggest environmental problem when in fact, Verizon's toxic lead cables presented a substantial, but not properly quantified, financial exposure.

### B. Statements About Converting Legacy Copper Cables into Fiber and the Associated Cost Savings

312. On October 20, 2021, Verizon held its third quarter earnings call for fiscal year 2021 ("3Q21 earnings call"). During the call, Brett Feldman, an analyst with Goldman Sachs, asked Defendant Ellis:

> If you don't mind as a quick follow-up there around the cost point. Those of us who live in regions that have Fios know that sometimes you can get Fios or maybe down the street, you can't. Are you kind of completing the communities? ***In other words, are you going to be at the point where you can finally rip out all this legacy infrastructure?*** Is that what you meant by the cost savings?

Defendant Ellis replied:

> Well, that's absolutely part of it. Now we're going to be all the way there. That's a long-term goal for us. But certainly, ***as you replace in a certain location copper with fiber, there's a good benefit from a cost standpoint***. In addition to the revenue step-up opportunities you get with that customer base. So it's a win-win on both sides of the P&L there.

313. This statement was materially false and/or misleading. Ellis stated that copper cables were being ***replaced*** with fiber. In fact, many of the copper cables were not "replaced" with fiber, but instead, left in place to decay. These facts were reported in the WSJ exposé, have been corroborated by CW2, CW6, CW7, CW12, CW22 and CW24, and were admitted to by Verizon, as alleged in ¶ 93.

314. This statement was also false and/or misleading because it talks about benefits from "a cost standpoint" in replacing copper with fiber, but omits to disclose that many of the "copper" cables in the "legacy infrastructure" were encased in lead. It is false and/or misleading to assert that to "replace" the lead cables is beneficial from "a cost standpoint." The cost to remediate Verizon's lead-sheathed cables, including removing them where necessary, is currently unknown, but even applying the most conservative estimates, exceeds $1 billion. In order for investors not to have been misled, Verizon should have disclosed that some portion of its copper cables were encased in lead, and their removal and remediation would be costly.

315. On November 17, 2021, Defendant Ellis attended the virtual Morgan Stanley European Technology, Media & Telecom Conference, during which he stated:

> But then also in continuing to -- our ***project of replacing copper in the ILEC footprint with fiber*** obviously gives us an opportunity to sell Fios into those

> consumer and business locations, also gives us the opportunity to pull out the copper that is expensive to operate. Certainly not – the equipment on that has -- also has higher emissions than some of the newer equipment, too. So ***from a green standpoint, it's also a benefit, too***.

316. This statement was materially false and/or misleading. Ellis referred to Verizon's "project of replacing copper in the ILEC footprint with fiber." That is not true because in fact, much of the copper wire was not being "replaced" with fiber, but instead, was being left in place to decay. These facts were reported in the WSJ exposé, have been corroborated by CW2, CW6, CW7, CW12, CW22 and CW24, and were admitted to by Verizon, as alleged in ¶ 93.

317. This statement was also materially false and/or misleading because it states that "from a green standpoint," it would be a benefit to remove the copper cables. But the statement omits to disclose that many of the copper cables are encased in lead, which were leaching lead into and harming the environment. Without this information, investors were left to believe that the only harm to the environment from the legacy infrastructure was related to "higher emissions." They did not know that the legacy infrastructure was also leaching lead into, and harming, the environment. The cost to remediate Verizon's lead-sheathed cables is currently unknown, but even applying the most conservative estimates, exceeds $1 billion. In order for investors not to have been misled, Verizon should have disclosed that some significant portion of its copper cables were encased in lead, and their removal and remediation would be costly.

318. During that same conference, Defendant Ellis stated:

> But we expect to do north of 400,000 open-for-sale each year for at least the next 2 to 3 years, and then we'll see where it goes from there. So it continues to be an opportunity to expand the Fios footprint within our existing ILEC space ***and not just get the revenue opportunities from expanding the size of the Fios customer base, but also some cost benefits and green benefits from removing some of the copper network at the same time."***

319. This statement was materially false and/or misleading for the reasons set forth in ¶¶ 316-17.

320. On March 3, 2022, Verizon held its Investor Day which was attended by Defendants Vestberg, Ellis, and Malady, among other Verizon employees. During the Investor Day call, Defendant Malady stated:

> But fundamentally, we picked fiber a long, long time ago. And now we're seeing that we're able to update that and still use the money we sunk in 20 years ago, right, because we can just upgrade the electronics and continue to push the technology up. So to Matt's point too, it also helps us in 2 ways. It allows us to drive more revenue, ***but it also allows us to take out the old equipment, the old copper stuff and get people on new things.*** So we're going to keep moving.

Defendant Malady further stated:

> We are also in a unique position in this respect because of our early start with our fiber builds. Fiber to new locations is pivotal both in and out of footprint. However, ***upgrading our existing copper plant to fiber in footprint is also very important to us. We have upgraded 4.5 million circuits off of copper and on to fiber.*** And at the same time, we've converted 36 central offices to all fiber, ***retiring the copper plant entirely in those locations. And we are seeing annual operational savings of about $180 million from this program.*** And this figure will continue to grow as we convert more and more customers and more and more COs. The savings are in part driven by a reduction in technician dispatches and maintaining the network and supporting customers. Additionally, ***we see savings because of energy from converting the copper to fiber***.

321. These statements were materially false and/or misleading. Investors receiving these statements were provided the impression that removing Verizon's copper plant and transitioning to fiber would result in an overall cost-benefit to Verizon. But many of Verizon's copper cables are encased in lead, a fact which significantly affects the costs and risks associated with retiring the cables, and which investors did not know. "[R]emoving some of the copper network" that is encased in lead would actually cost Verizon billions of dollars to do safely, and in satisfaction of governmental authorities and other stakeholders, without causing additional harm to employees or the environment. Thus, it was false and/or misleading for Defendant Malady to

discuss the costs associated with operating copper, and cost-savings associated with replacing copper cables with fiber, without also disclosing the enormous liability Verizon faces in the safe and careful removal of its lead-sheathed copper cables. Defendant Malady's statement that transitioning to fiber ***"allows us to take out the old equipment, the old copper stuff"*** was also materially false and/or misleading when made because according to, among other sources, the accounts of CW2, CW6, CW7, CW12, CW22 and CW24, Verizon was not taking out its "old copper stuff," which was often sheathed in lead, but rather "retiring" or "abandoning" it exactly where it was installed decades prior.

322. On March 7, 2023, Verizon attended the Morgan Stanley Tech Media Telecom Conference during which Defendant Ellis stated: "The great thing as we do that roughly 0.5 million premises a year, you get the open for sale opportunity, but you're also getting ***the benefit of retiring copper network as well***."

323. This statement was materially false and/or misleading. Investors were given the impression that removing copper cables would result in an overall cost-benefit to Verizon. In fact, many copper cables are encased in lead, a fact unknown to investors. The retiring and handling of copper cables encased in lead would actually cost Verizon billions of dollars to perform safely without causing additional harm to employees or the environment, and in satisfaction of governmental, regulatory and other stakeholders. Thus, it was false and/or misleading for Defendant Ellis to discuss "the benefit of retiring copper network" without also disclosing the enormous liability Verizon faces in the safe and careful removal of its lead-sheathed copper cables.

324. On March 15, 2023, Jim Gowen, Verizon's Chief Sustainability Officer, was interviewed by Srikrishna Koneru of Infosys. During the interview, Defendant Gowen stated:

> [Y]ou're absolutely right uh the business case for sustainability is incredibly incredibly important and ***it's looking at uh sustainability from a TCO perspective***

> ***a total cost of ownership*** it goes right back to a supply chain and sourcing and really business case 101. um how do you look at the impacts of any new product any new technology ***when we went through uh through my time here from a copper to fiber migration what is the cost to pull that copper out what is the absolute home run benefit of putting fiber in not only from a speed resiliency and things like that but it's that it's that long time uh it's that long-term mindset*** that is so so important when you're looking at business case cases you know it's interesting when you think about ***what we've been able to do here at Verizon and I think about the way we operate a responsible sourcing you know we think about everything from human rights to ethical conduct to making sure we protect the environment*** that's through our RFP process that's through our negotiation process that's where our supplier contracts you know and then we take it to the next step okay how do you take that to the next step and you start to look at the risk because everything we do at Verizon from a supply chain perspective or really from a business perspective looks at the end-to-end risk . . .

325. Defendant Gowen's statement was materially false and/or misleading. Contrary to his statement that Verizon was "making sure [it] protect[s] the environment," in fact Verizon had a vast network of lead cables that were leaching toxic lead into the surrounding environment causing harm, not protection. Further, it was false and/or misleading to discuss the "copper to fiber migration" and "the cost to pull that copper out" without explaining that many of Verizon's copper cables were encased in lead, and that, according to CW2, CW6, CW7, CW12, CW22 and CW24, among other sources, Verizon had a practice of just abandoning its lead cables in place and, according to CW1, CW6, CW9 and CW22 overlay the fiber optic technology ***directly on top of*** the poisonous lead cables. This statement further omits discussion of how the removal of lead-sheathed copper cables would potentially cost the Company billions of dollars.

326. On May 25, 2023, Defendant Malady attended the CTIA 5G Summit during which he was interviewed by CTIA's President and CEO Meredith Attwell Baker. During the summit, Malady stated:

> Verizon also has a large landline presence. And we have a lot of copper still out there that people still use. And ***we can use our wireless asset now to replace some of the old legacy copper which is very inefficient and in the day of ESG and trying to save energy and make sure all the resources you have you use them wisely we***

> ***can move some of those old copper things onto the wireless network at low bandwidth things. There is just a whole range of solutions we're going to be able to bring to the table for old legacy things that are out there that are that are inefficient*** with uh with this new fixed wireless offer.

327. Defendant Malady's statement was materially false and/or misleading because he omitted to disclose that the "old legacy copper" and the "those old copper things" were in fact encased in lead. Safe removal of the lead-sheathed cable cables would potentially cost the Company billions of dollars. Investors reading Defendant Malady's statements would not understand that removing the copper cables would be so costly because they did not know that they were encased in lead.

### C. Statements About Employee Health and Safety

328. On April 19, 2021, Verizon filed its annual ESG report (the "2020 ESG Report") which contained the following statement: "Both our Board and senior leadership team recognize that ***operating responsibly – promoting*** ethical business practices and ***the well-being and health of our environment, employees, customers and communities – is fundamental to the long-term success of Verizon.***"

329. This statement was materially false and/or misleading. Verizon was not, in fact, focused on "the well-being and health of [its] environment, employees, customers and communities." In fact, Verizon owns thousands of miles of lead-sheathed cables which are leaching lead into the surrounding environment, damaging the environment, employees and communities. Further, if Verizon's "Board and senior leadership team" did in fact focus on "promoting . . . the well-being and health of [Verizon's] environment, employees, customers and communities" as "fundamental to the long-term success of Verizon," they would have ensured the safe removal and remediation of the thousands of miles of lead cables that are causing damage. The falsity and/or misleading nature of this statement is further demonstrated by the accounts of

CW2, CW3, CW4, CW6, CW7, CW9, CW10, CW11, CW14, CW20, CW21, CW22, CW26, CW27 and CW29, who all, despite regularly handling lead-sheathed cables, were neither provided with adequate PPE nor given proper educational training on the safe handling of lead.

330. In April, 2022, Verizon posted on its website its 2021 Environmental, Social and Governance Report for the 2021 calendar year (the "2021 ESG Report"). Verizon's 2021 ESG Report contained a sub-section entitled "Safety culture" which stated: "***We are dedicated to maintaining a safe workplace. We regularly update our health and safety standards, programs and employee training to educate employees about best practices and working safely. Topics include*** *working roadside, operating aerial lifts,* ***splicing fiber, climbing poles***, handling ladders and ***installing fiber***. In 2021, our occupational injuries and illnesses rate was 1.0 per 100 employees, well below the Bureau of Labor Statistics telecommunications industry average of 1.7."

331. This statement was materially false and/or misleading. Verizon was, in fact, not dedicated to "maintaining a safe workplace," and particularly did not provide "employee training to educate employees about best practices and working safely" with regards to "splicing fiber" and "installing fiber." In fact, as discussed by e.g., CW6, CW7, CW9, CW17 and CW29, Verizon's employees regularly handled and worked with lead-sheathed cables in contained, dangerous conditions even despite worker complaints, and many employees, including CW2, CW3, CW4, CW6, CW7, CW9, CW10, CW11, CW14, CW19, CW20, CW21, CW22, CW26, CW27 and CW29, were not provided with sufficient personal protective equipment nor properly educated on safe handling of lead. Further, this statement omitted to disclose that Verizon's employees were not provided with sufficient personal protective equipment nor properly educated on safe handling of lead.

332. On February 4, 2020, Verizon issued its Environmental, Health and Safety Policy (the "EHS Policy") which contained the following statements:

- ***Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our commitment goes beyond maintaining compliance with laws, regulations and policies.*** Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareowners, and society.

- ***Verizon will conduct business in an environmentally and socially responsible manner and provide employees with a safe and healthful workplace. We are committed, through our environmental, health and safety (EHS) management system and supporting programs, to eliminate hazards and reduce EHS risks.***

333. These statements were materially false and/or misleading. Verizon was not, in fact, "committed to protecting the environment and the safety and health of its employees, customers, and the communities" but rather, owns thousands of miles of lead-sheathed cables which are leaching lead into the surrounding environment, damaging the environment, employees and communities. Further, if the "Board and senior leadership team" were in fact committed to "promoting . . . the well-being and health of [Verizon's] environment, employees, customers and communities" as "fundamental to the long-term success of Verizon," they would have safely addressed and removed the lead cables that are causing damage long ago.

334. These statements were also materially false and/or misleading because Verizon did not provide "employee training to educate employees about best practices and working safely" with regards to "splicing fiber" and "installing fiber." In fact, many former employees, including, CW1, CW6, CW7, CW9, CW14, CW17 and CW29 ***regularly handled lead-sheathed cables*** with equipment and in conditions that did not meet basic lead safety standards. Despite these employees' persistent exposure to lead, many employees were not provided with sufficient

personal protective equipment nor were they properly educated on safe handling of lead, as confirmed by CW2, CW3, CW4, CW6, CW7, CW9, CW10, CW11, CW14, CW20, CW21, CW22, CW26, CW27 and CW29.

335. Additionally, these statements omitted to disclose that Verizon owns a vast network of toxic lead cables which is harming its employees and the environment and that Verizon was not providing its employees with sufficient personal protective equipment or training on the safe handling of lead, all of which created substantial financial risk and exposure to Verizon.

336. On April 19, 2021, Verizon filed its annual ESG report for FY 2020 (the "2020 ESG Report") which contained the following statements:

- "***We regularly update our employee health and safety programs, including online and instructor-led training to educate employees about best practices and working safely.*** Topics include operating aerial lifts, ***splicing fiber, climbing poles***, handling ladders and ***installing fiber***."

- "In 2020, our occupational injuries and illnesses rate was 1.02 per 100 employees, well below the Bureau of Labor Statistics telecommunications industry average of 2.4. ***We are committed to maintaining a safe workplace and environmentally responsible work practices***, and we expect our suppliers – who play a critical role in our success – to share that commitment."

337. These statements were materially false and/or misleading for the reasons set forth in ¶¶ 333-35.

338. In 2023, Verizon released on its website its Environmental, Social and Governance Report for the 2022 calendar year (the "2022 ESG Report"), which stated:

> Safety Culture. ***We are dedicated to maintaining a safe workplace. We regularly update our health and safety standards, programs and training materials to educate employees about best practices and working safely. Field-related trainings include*** working roadside, operating aerial lifts, ***splicing fiber, climbing poles***, handling ladders and ***installing fiber***. General workplace safety topics include ergonomics, psychological safety and personal safety online. In 2022, our occupational injuries and illnesses rate was 1.1 per 100 employees, well below the Bureau of Labor Statistics telecommunications industry average of 1.7. In 2022,

> Verizon was selected as the EHS Daily Advisor recipient of the Best Overall Safety Program and Culture award.

339. This statement was materially false and/or misleading for the reasons set forth in ¶¶ 333-35.

340. Verizon's FY 2022 Proxy Statement, filed on March 28, 2022, and its FY 2023 Proxy Statement, filed on March 27, 2023, both contained the following statement: "***Employee health and safety. Verizon is committed to maintaining a safe workplace and environmentally responsible work practices***, and we expect our suppliers to share that commitment."

341. The statements that Verizon was "committed to maintaining a safe workplace and environmentally responsible work practices" were materially false and/or misleading for the reasons set forth in ¶¶ 333-35.

### D. Statements About Disposal of E-waste

342. Verizon characterizes its wireline assets, including its lead-sheathed copper cables, as "network equipment," in its public filings. For instance, Verizon's Forms 10-K state that "Network equipment consists primarily of cable (aerial, buried, underground or undersea) and the related support structures of poles and conduit, wireless plant, switching equipment, network software, transmission equipment and related facilities."

343. On March 18, 2019, Verizon issued its FY 2019 Proxy Statement which stated: "***We continue to work to reduce the environmental impact of our products through***: . . . ***recycling, refurbishing and/or reusing our products***, including the responsible management of out-of-service lead batteries."

344. This statement was materially false and/or misleading. In fact, Verizon had thousands of miles of lead-sheathed cables which were left in place, and which were leaching toxic lead into the surrounding environment. Thus, by leaving those lead-sheathed cables in place,

Verizon was not adequately "work[ing] to reduce the environmental impact" of its products. In fact, Verizon was not "recycling, refurbishing and/or reusing" the lead casings on the cables. Instead, these lead-sheathed cables were effectively abandoned by Verizon and left to damage the environment.

345. Further, this statement omitted to disclose that Verizon had abandoned its extensive lead cable network which was leaching lead into the environment. Without this information, an investor reading the statement that Verizon was "work[ing] to reduce the environmental impact" of its products was provided with the impression that Verizon was committed to protecting the environment, when in fact that was not the case, and that Verizon did not have a massive environmental liability, when in fact, it does.

346. The falsity of this statement is further demonstrated by the accounts of four former employees who reported that Verizon did not properly dispose of or recycle its lead cable waste. In particular, CW14, CW20, CW8, all reported that Verizon just dumped lead cables into dumpsters that contained other non-lead materials, rather than a lead-specific container. Additionally, CW29, reported that "sometimes we'd take it [lead] back to the garage and put it in the dumpster" but "***sometimes we'd just go to the street corner and throw it away. There were always garbage cans on the corner***," which further evidences that this statement was false and/or misleading.

347. On April 19, 2021, Verizon filed its annual 2020 ESG report which contained the following statement:

> Our goal is to divert as much e-waste as possible from landfills by reusing or responsibly recycling materials. Our priority is to reuse electronics internally. When that is not possible, we market these materials for reuse through approved vendors or work with partners to recycle them responsibly. ***Verizon defines e-waste as electronic products and parts***, such as cell phones, chargers, set-top

> boxes**, *network equipment*** and batteries, ***that are at the end of their useful life*** and/or have been returned by customers.

348. This statement was materially false and/or misleading. Verizon's lead-sheathed copper cables plainly qualify as "electronic . . . network equipment . . . at the end of their useful life." However, Verizon was not recycling these lead-sheathed cables responsibly, or at all. Instead, Verizon left toxic lead-leaching cables in place to damage the surrounding environment. While Verizon was happy to tout that it was recycling products that were simple to recycle – such as "cell phones, chargers [and] set-top boxes," it neglected to inform investors that it owned thousands of miles of lead-sheathed cables underground, underwater and in the air, and that safe removal of those lead-sheathed cables would cost billions of dollars.

349. Moreover, this statement omitted to disclose that Verizon had abandoned its extensive lead cable network which was leaching lead into the environment. Without this information, an investor reading the statement about Verizon's disposal of its electronic waste would not be informed that Verizon had in fact left over a billion pounds of lead waste across the country. Further, an investor would receive the impression that Verizon did not have a massive environmental liability, when in fact, it does.

350. In both its 2021 ESG Report and 2022 ESG Report, Verizon made the following statement regarding its handling of waste:

> ***Verizon's recycling practices exceed regulatory mandates. We engage e-waste vendors that manage our waste in accordance with high industry standards for environmental stewardship such as R2 or e-Stewards.*** Our practice is to require lead-acid batteries from our U.S. operations to be sent to Verizon-approved recycling facilities in the U.S. or Canada and to require vendors to provide certificates of recycling for the batteries. We regularly audit facilities, including battery smelters, that manage Verizon's hazardous or regulated waste.

351. This statement was materially false and/or misleading because its lead-sheathed cables traversing the country have been leaching lead into the surrounding environment and

damaging the surrounding areas, falling far short of regulatory mandates. Moreover, this statement omitted to disclose that Verizon had abandoned its extensive lead cable network which was leaching lead into the environment. Without this information, an investor reading the statement about Verizon's disposal of its electronic waste would not be informed that Verizon had in fact left over a billion pounds of lead waste across the country. Further, an investor would receive the impression that Verizon did not have a massive environmental liability, when in fact, it does.

352. Verizon's 2022 ESG Report also contained the following statement under a section titled: "E-waste: reducing, reusing and recycling":

> ***Verizon defines electronic waste, or e-waste, as electronic products and component parts that are at the end of their useful life*** and/or have been returned by customers. E-waste generated by our business operations includes cell phones, chargers, set-top boxes, network equipment, batteries and associated plastic components***. In 2022, Verizon reused or recycled approximately 43.4 million pounds of e-waste, including 1.6 million pounds of plastic and 2.7 million pounds of lead-acid batteries***.

353. This statement was materially false and/or misleading. Verizon's lead-sheathed copper cables plainly qualify as "electronic waste . . . at the end of their useful life." However, Verizon was not recycling these lead-sheathed cables responsibly, or at all. Instead, Verizon left these toxic lead-leaching cables in place to damage the surrounding environment. While Verizon was happy to tout that it was recycling products that were simple to recycle – such as "cell phones, chargers [and] set-top boxes," it neglected to inform investors that it owned thousands of miles of lead-sheathed cables underground, underwater and in the air, and that safe removal of those lead-sheathed cables would potentially cost billions of dollars.

354. Moreover, this statement omitted to disclose that Verizon had largely abandoned its extensive lead cable network which was leaching lead into the environment. Without this information, an investor reading the statement about Verizon's disposal of its electronic waste

would not be informed that Verizon in fact left owned over a billion pounds of largely abandoned lead waste across the country. Further, an investor would receive the impression that Verizon did not have a massive environmental liability, when in fact, it does.

## VII. DEFENDANTS VIOLATED GAAP BY FAILING TO DISCLOSE LOSS CONTINGENCIES ASSOCIATED WITH VERIZON'S LEAD CABLES

355. Verizon released consolidated financial statements in Class Period filings dated October 30, 2018 (Form 10-Q; signed by Defendant Skiadas and SOX Certification thereto signed by Defendants Ellis and Vestberg); February 15, 2019 (Form 10-K; signed by Ellis and Vestberg); April 26, 2019 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); August 8, 2019 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); October 20, 2019 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Vestberg and Ellis); February 21, 2020 (Form 10-K; signed by Ellis and Vestberg); April 27, 2020 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); July 28, 2020 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); October 27, 2020 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); February 25, 2021 (Form 10-K; signed by Ellis and Vestberg); April 27, 2021 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); July 28, 2021 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Skiadas and SOX Certification thereto signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); October 26, 2021 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); February 11, 2022 (Form 10-K; signed by Ellis and Vestberg); April 27, 2022 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); July 28, 2022 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Defendants Ellis and Vestberg); October 25, 2022 (Form 10-Q; signed by

Skiadas and SOX Certification thereto signed by Ellis and Vestberg); February 10, 2023 (Form 10-K; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg); and, April 27, 2023 (Form 10-Q; signed by Skiadas and SOX Certification thereto signed by Ellis and Vestberg).

356. In each filing, Defendants stated that the financial statements had been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). GAAP are a set of accounting rules, standards and procedures issued by the Financial Accounting Standards Board ("FASB"). The FASB Accounting Standards Codification ("ASC") codifies GAAP as the authoritative standards by which public traded companies in the U.S. must comply. The SEC requires that publicly traded companies in the U.S. regularly file GAAP-compliant financial statements in order to remain publicly listed.

357. Under ASC 450, a company must disclose certain loss contingencies. A loss contingency is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." *See* ASC 450-20-20. Uncertainty is inherent in all loss contingencies, and does not excuse their non-disclosure. Common examples of loss contingencies include litigation loss and environmental remediation liabilities. Indeed, the resolution of the uncertainty in the context of a loss contingency may confirm the loss, the impairment of an asset, or the incurrence of a liability. Nevertheless, the contingency itself must in certain cases be disclosed and accounted for.

358. ASC 450-20-25 provides that "[w]hen a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote." *See* ASC 450-20-25. ASC 450 uses the terms "probable, reasonably possible, and remote, to identify three areas within that range." *Id.*; *see also*

ASC 450-20-20, Glossary. The terms "probable, "reasonably possible," and "remote" in ASC 450-20 refer to the degree of likelihood of a future event that will confirm a loss, an impairment of an asset, or the incurrence of a liability.

359. Further, ASC 450-20-25 provides that "an estimated loss from a loss contingency" depends on "information available before the financial statements are issued or are available to be issued." *Id.* Although only "probable" loss contingencies must be recognized and accrued, ASC 450-20-50 makes clear, ***reasonably possible loss contingencies require disclosure***.

360. Specifically, ASC 450-20-50 explains that contingencies must be disclosed when certain conditions exist: "Disclosure of the contingency shall be made if there is at least a reasonable possibility that a loss or an additional loss may have been incurred and either of the following conditions exists: (a) An accrual is not made for a loss contingency . . . or (b) an exposure to loss exists in excess of the amount accrued …."

361. If a contingency is "at least a reasonable possibility", the issuer ***must*** disclose "(a) The nature of the contingency" and "(b) an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."

362. Here, Verizon's vast web of lead-sheathed cables represented "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity [ ]" under ASC 450-20. The exposure to Verizon was, throughout the Class Period, massive, and included regulatory risk and scrutiny, litigation risks, operational risks, compliance risks, remediation risks and the risk of severe reputational harm, with the potential to adversely affect business and business relationships.

363. At all times during the Class Period, Verizon faced at least a "reasonable possibility"—i.e., more than a remote possibility—of loss related to potential removal and

litigation costs associated with its lead cable network. As detailed above, there are myriad facts supporting the proposition that, throughout the Class Period, Verizon faced a reasonable (and increasing) possibility that it would suffer a loss related to its lead cable network and physical plant. Those risks of loss included:

364. ***Regulatory risk.*** Multiple federal and state statutes authorize actions to investigate and scrutinize lead and other types of contamination, and to require remediation if warranted. For example, under CERCLA, the EPA is authorized to hold Verizon liable for response costs and natural resource damages to remediate the release, or substantial threat of a release, of lead into the environment. The EPA, under RCRA, also requires the orderly remediation and removal of hazardous waste – including lead – and Verizon throughout the Class Period was required to report certain lead remediation activities directly to EPA. Verizon operated under numerous other federal laws by which it was subject to significant regulatory scrutiny, including the Safe Drinking Water Act and the Clean Water Act. S*ee* (V)(F)(1). Verizon also faced myriad state laws and regulations concerning lead contamination and environmental remediation. S*ee* (V)(F)(2).

365. By the start of the Class Period in 2018, the risks of regulatory scrutiny and investigation were manifest. First, Verizon had undertaken a vast initiative to replace legacy copper lines with fiber optics, but was retiring and abandoning copper cables in place. *See* (V)(C)(1). Second, by leaving degrading lead sheathed cables in place, Verizon's lead sheathed cables were causing environmental contamination (thereby increasing the risk of liability and costs). For example, in 2010, Verizon attended an industry conference where this point was emphasized: "***soils retained between 83 and 98 percent of the released lead within 2 inches***" of lead cables. Verizon's awareness of these regulatory risks is further evidenced by reports brought forth by union representation, who similarly raised concerns about the hazards caused by the

degradation of lead-sheathed cables. Indeed, Verizon was charged by the CWA in proceedings before the PUC for leaving its copper network in an "***appalling state of disrepair***" and causing "***the hazardous exposure of lead cable to the environment***."

366. ***Public Health and Operational Risks.*** Verizon faced significant risk of loss due to worker exposure to lead cables. As detailed above, Verizon's frontline workers—including cable splicers, linesmen, and technicians—worked with, or in the proximity of, lead cabling on a regular basis. *See* Section (V)(C). As the telecommunications industry recognizes, and OSHA requires, it was incumbent upon the companies to provide necessary equipment and protection to workers given the significant hazards of lead. *See* Section (V)(E)(3). Despite these risks, Verizon failed to protect its workers, and many workers, as a result, have been observed to have elevated levels of lead in their bodies, and to suffer from lead-related health and physical harms, increasing the risk of litigation and loss to Verizon. *See* Section (V)(G)(3).

367. ***Litigation Risks.*** Litigation risks associated with lead-sheathed cables emanated from numerous potential sources, under various causes of action. These risks, however, were not mere hypotheticals. First, in March 2016, six Texas landowners filed a class action against AT&T alleging that lead cables abandoned across Texas was damaging the surrounding environment. The Texas plaintiffs' expert opined that it would cost $33.47 to remove ***each foot*** of lead. Applying this just the 8,400 miles of lead cables that Verizon has admitted to owning equates to a cost of $1.48 billion. Applying this estimate to the 81,000 miles of lead cables that analysts estimate Verizon owns equates to a cost of $14.3 billion. The Texas plaintiffs' expert survived a motion by AT&T to exclude his testimony. The action also survived AT&T's motion for summary judgment and was proceeding towards trial when it was abruptly voluntarily dismissed. Further, in January 2021, a private environmental group sued AT&T to remediate and remove 8 miles of

lead cabling under Lake Tahoe. Notably, in November 2021, AT&T agreed to remove 40,000 feet (7.57 miles) of lead cabling in Lake Tahoe for a cost of up to $1.5 million. These actions and settlement(s) represented a "canary in the coalmine," and further indicated and increased the possibility that Verizon would similarly face loss contingencies related to its legacy lead cable network.

368. ***Remediation Risks***. Based on the foregoing risks stemming from governmental investigations and enforcement, worker safety requirements, personal injury lawsuits, and private environmental litigation, Verizon faced a significant risk of loss related to being forced to remediate its legacy lead sheathed copper network. Since the WSJ exposé, as detailed in Section (V)(I)(3), numerous sophisticated firms have estimated the potential costs of remediation. New Street estimated that it could cost the industry $5.2 billion in remediation costs, while the Brookings Institute provided an estimate of industry-wide costs ranging between $4 and $20 billion. Deutsche Bank specifically estimated that the cost to remove Verizon's lead sheathed cables would be approximately $1 billion.

369. Based on the enormous, high-risk uncertainty that Verizon faced regarding potential loss related to its legacy lead cabling network, Verizon was required, under ASC 450, to disclose this potential loss and provide an estimate of loss, or state that a loss was not estimable.

370. Verizon itself has recognized that it should have disclosed potential losses associated with its lead cable network in SEC filings issued after the WSJ's reporting. Accordingly, in Verizon's Form 10-Q covering the second quarter of 2023, Defendants represented that Verizon "cannot predict what actions, if any, we may ultimately take with respect to the lead sheathed cable in our network or the potential financial, operational, or reputational impacts of the situation on us." In the following Form 10-Q reporting results from the third quarter

of 2023, Verizon disclosed as a "Risk Factor" that "allegations related to lead sheathed copper cables in our copper network infrastructure could expose us to regulatory scrutiny, litigation, penalties, removal and compliance costs, operational impacts or reputational damage." Within this disclosure, Verizon stated that it could "***incur substantial expenses as a result of these allegations, which cannot be reasonably estimated at this time but could be material***."

371. By failing to disclose and reckon with the existence of Verizon's lead cables as causing a potential loss contingency related to litigation and regulatory compliance costs, Verizon's financial statements during the Class Period failed to meet GAAP standards and thus materially misled investors about potential contingencies facing the Company. Accordingly, Verizon, Vestberg, and Ellis's omission of this contingency violated Section 10(b) of the Securities Exchange Act in the statements set forth below.

372. In Forms 10-K dated February 15, 2019 and February 21, 2020, Defendants Verizon, Vestberg, and Ellis, stated: "We prepare our financial statements using U.S. generally accepted accounting principles (GAAP). . . ."

373. These statements were materially false and/or misleading for reasons set forth herein, including that Defendants failed to disclose Verizon's risk of loss related to its lead sheathed copper cable network which was reasonably possible to occur based on the foregoing facts, including: (i) the scope of Verizon's lead sheathed cable network which spanned over ten states and tens of thousands of miles; (ii) the acute public health concerns associated with lead contamination; (iii) the extensive federal and state regulation holding private actors liable for lead contamination and remediation; (iv) the known contamination caused by lead sheathed cables as acknowledged by industry officials; (v) Verizon's neglect of its lead sheathed cable network which had been described as being in an "appalling state of disrepair"; (vi) the systemic exposure of

Verizon employees to lead, as supported by scientific studies and worker complaints; and, (vii) Verizon's widespread failures to protect its employees from dangers of lead exposures.

374. In Verizon's Form 10-Q dated March 31, 2019 signed by Defendant Skiadas on behalf of Verizon, Skiadas stated: "The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principle (GAAP) . . . ." Skiadas made identical statements in Forms 10-Q dated April 26, 2019; August 8, 2019; October 20, 2019; April 27, 2020; July 28, 2020; and October 27, 2020.

375. These statements were materially false or misleading for reasons set forth in ¶ 373, *supra*.

376. In Verizon's Form 10-K dated February 25, 2021 signed by Defendants Ellis and Vestberg on behalf of Verizon, Ellis and Vestberg stated: "We prepare our financial statements using U.S. generally accepted accounting principles (GAAP). . . ."

377. This statement was false or misleading for the reasons set forth in ¶ 373, *supra*, and for the additional reason that, as of January 2021, AT&T was sued by an environmental group to remediate lead cables in Lake Tahoe, which further indicated that Verizon could suffer loss related to its legacy lead sheathed copper network. AT&T agreed to settle and remove the lead cables for a cost of up to $1.5 million in November 2021.

378. In Verizon's Form 10-Q dated April 27, 2021 signed by Defendant Skiadas on behalf of Verizon, Skiadas stated: "The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principle (GAAP) . . . ." Skiadas made identical statements in Forms 10-Q dated July 28, 2021; October 26, 2021; April 27, 2022; July 28, 2022; October 25, 2022; and April 27, 2023.

379. These statements were false or misleading for the reasons set forth in ¶¶ 373, 377, *supra*.

380. In Verizon's Form 10-K dated February 11, 2022 signed by Defendants and Ellis and Vestberg on behalf of Verizon, Ellis and Vestberg stated "We prepare our financial statements using U.S. generally accepted accounting principles (GAAP). . . ." Ellis and Vestberg made an identical statement in the Form 10-K dated February 10, 2023.

381. These statements were false or misleading for the reasons set forth in ¶¶ 373, 377, *supra.*

## VIII. ADDITIONAL ALLEGATIONS OF SCIENTER

### A. Defendants Had Actual Knowledge That Verizon's Extensive Lead Cable Network Posed Toxic Risks to the Environment and Its Workers

#### 1. Facts Underlying Defendants' Scheme Outlined Above Demonstrate Their Knowledge

382. Many facts underlying Defendants' scheme evidence their knowledge that Verizon had a vast network of lead sheathed cables which were decaying in place or otherwise posed an enormous risk to the environment and to Verizon's employees, and that the costs associated with cleaning up the lead cables as well as compensating exposed workers and citizens would be exorbitant. These include:

- Admissions by Verizon to analysts and governmental agencies in the wake of the WSJ exposé that Verizon owns thousands of miles of lead cables (¶ 262). This includes an admission to New York State agencies that the existence of lead-sheathed cables "***in the telecommunications industry and in the transportation and power industries, has long been known***." ¶¶ 13, 270.

- Throughout the decades, Verizon has been privy to data demonstrating that its employees have elevated levels of lead in their blood. *See* (V)(G)(3). Most recently, from 2007 to 2016, Verizon tested the lead levels in the blood of 208 of its workers, and ***40%*** had levels of lead in their blood that exceeded the levels where the CDC recommends that a person seek medical attention. ¶¶ 200, 297. Verizon provided the data to the CWA, who commissioned Dr. Khan at Mount Sinai to perform a wider study. ¶ 202.

- Since 2000, Verizon has attended annual EHSCP meetings which discussed in great detail the hazards of lead in the telecommunications industry. *See* (V)(G)(1). For example, delegates have specifically acknowledged at these conferences that: (i) "some older metropolitan areas may still have 50% lead cable" (¶ 182); (ii) "soils retained between 83 and 98 percent of the released lead within 2 inches" (*id.*); and, (iii) lead "is an issue for most member companies." (¶ 188). Verizon's own delegates have led or otherwise overseen these discussions in certain years. *See* ¶¶ 173, 174, 176.

- OSHA regulations require Verizon to provide its employees who come into contact with lead (i) personal protective equipment; and (ii) training in the safe handling of lead. ¶ 129. In some cases, Verizon did provide such equipment and training, evidencing that it knew it had hazardous lead cables in its network, that it was obligated to provide this critical safety equipment and training to its workers, and that its workers could be harmed by Verizon's lead cables. ¶¶ 120, 151. However, the provision of equipment and training was far from uniform and rigorous, evidencing that Verizon did not always comply with OSHA regulations, and that its statements concerning employee safety were false and misleading.

- There have been at least federal actions filed against Verizon's chief competitor AT&T concerning AT&T's lead cables. Verizon was aware of these actions. ***First***, on March 1, 2016, AT&T was sued by six Texas landowners for abandoning lead cable on their properties which was in disrepair and was damaging the environment. ¶ 220. The Texas plaintiffs' expert – whom AT&T unsuccessfully tried to exclude – opined that it would cost $33.47 ***per foot*** to remove and remediate the lead cables in the ground. ¶ 367. Based on current estimates of the amount of lead in Verizon's infrastructure, the cost to remove and remediate would be at a minimum $1.48 billion, and could exceed $14.3 billion. ¶¶ 15, 224, 367. ***Second***, on January 14, 2021, AT&T was sued by an environmental group for its abandonment of lead-sheathed cables at the bottom of Lake Tahoe. ¶ 225. AT&T initially agreed to remove the lead-sheathed cables, but reneged in the wake of the WSJ investigative reports and this litigation. ¶¶ 228, 230.

- In 2015, the CWA filed a petition with the Pennsylvania Public Utility Commission to investigate Verizon's abandonment of its lead cables. ¶¶ 191-95. Testimony during that proceeding explained that the CWA was concerned about "the hazardous exposure of lead cable to the environment" resulting from Verizon's cables, and that "exposed lead cable[s] . . . create hazards both for CWA members working on the facilities and for the general public." ¶¶ 194, 197.

- During the Class Period, Verizon reported to EPA, consistent with its obligations as a Large Quantity Generator of lead, of generating hazardous lead waste at 16 different sites. ¶ 217.

- In 1978, in connection with impending OSHA regulations, certain Bell companies including several predecessors to Verizon filed a petition seeking to minimize the burden of the regulations. ¶ 137. Among other things, the OSHA Petition stated, "***Petitioners [sic] use of lead products has been primarily in the form of lead-sheathed cables*** and the various lead sleeves and solders necessary to make moisture and airtight the entire cable

from end-to-end. Very little new lead-sheathed cable is placed in service today. However, the existing lead-sheathed cables must be maintained. ***Ultimately, these cables will be removed and the metals recycled. The maintenance and on-going removal of these facilities require that technicians work with the lead from time to time as well as work in the vicinity of lead at other times even though the lead-sheathed cable is not actually involved***." ¶ 138.

- Verizon employs a Chief Sustainability Officer (Defendant Gowen), a Chief ESG Officer, and an entire department devoted to ensuring Verizon's commitment to ESG principles is upheld. *See* (V)(B)(3). Verizon's Code of Conduct requires employees to report to their supervisor any conduct that undermines Verizon's ESG goals. ¶¶ 15, 76. In addition, Defendant Vestberg is centrally involved in the United Nations' sustainability initiatives. *See* ¶¶ 28, 408, 411.

**2. Verizon Submitted Comments to the EPA in 2011 Evidencing Its Knowledge of Lead Cables and Resulting Dangers to Workers**

383. On July 22, 2011, the EPA proposed revisions to its 2008 rule defining solid waste, 76 Fed. Reg. 44094, which would, among other things, strengthen the rule's requirements concerning the recycling of hazardous material by requiring generators of waste like Verizon and AT&T to take further measures to ensure compliance. Verizon opposed the EPA's new rule as too burdensome, and the EHSCP submitted a public comment on October 20, 2011, which Verizon incorporated into its own public comment. The EHSCP's public comment noted that certain requirements of the proposed rule would burden its members including Verizon, AT&T, Lucent, CenturyLink, and T-Mobile.

384. The EHSCP's comment, which Verizon incorporated by reference, stated that the new rule would impose unnecessary recycling requirements on generators of waste who already have in place recycling management practices for "spent" products such as lead-acid batteries. The EHSCP then ***expressly discussed the difficulties the rule would present as it pertains to lead-sheathed cables***:

> ***An even greater challenge would be posed by regulating lead-sheathed telecommunications cable. Such cable is removed from the ground, for example, when a road-widening project requires a buried cable to be moved, in which case it is replaced with new cable. The removed cable typically is brought back to a***

> ***company or contractor facility, from which a contracted hauler transports it to a metal reclamation facility.*** Regulating such activity could turn every roadside into a regulated generating site, creating enormous registration and paperwork burdens for no environmental benefit.
>
> We suspect that there are other businesses with comparable situations. ***We are concerned both with the administrative burden to us*** and with the impact of applying paperwork requirements to numerous small businesses that may not have the resources available to comply and may thus be encouraged toward less environmentally sound management options. As an industry, we are committed to recycling while at the same time working with the EPA to minimize the administrative burdens and cost of this beneficial practice.

(Emphases added.)

385. Verizon submitted its own public comment which "incorporate[d] by reference the comments regarding this draft permit submitted by the Environmental, Health & Safety Communications Panel (EHSCP)." Verizon's comment was signed by Manager of Corporate Safety and Environmental Compliance, Kathleen Tobin who noted: "Verizon believes that some of the administrative and regulatory burdens created by the proposed rule are unnecessary and easily avoidable by making some simple changes."

### 3. Verizon Is Required to Report Retirement of Copper Cables, Including Lead-Sheathed Cables, to the FCC

386. As the telecommunications industry transitioned from legacy copper lines to wireless communications, the FCC grew concerned that customers still reliant on copper wires for communicating would not be properly serviced by the major carriers.

387. In 2003, the FCC set rules governing the retirement of copper wires. In November 2014, in response to "fiber becoming the preferred choice for new greenfield deployments" and causing the "the pace of copper retirement [to] accelerate[]", the FCC initiated a new rulemaking process "to help guide and accelerate the technological revolutions that are underway." The FCC sought comments from industry participants in crafting its rule.

388. On February 5, 2015, the CWA submitted a comment (the February 5, 2015 Comment"). *See* Comments of Communications Workers of America, *In the Matter of Ensuring Customer Premises Equipment Backup Power for Continuity of Communications*, PS Docket No. 14-174; *Technology Transitions*, GN Docket No. 13-5; *Policies and Rules Governing Retirement of Copper Loops by Incumbent Local Exchange Carriers*, RM-11358; *Special Access for Price Cap Local Exchange Carriers*, WC Docket No. 05-25; *AT&T Corporation Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, RM-10593, dated February 5, 2015.

389. In its February 5, 2015 Comment, the CWA noted the prevalence of "de facto" copper retirement and "de facto" copper service discontinuance whereby local exchange carriers were "neglecting their copper facilities." In particular, the CWA labeled Verizon as the "poster child for 'de facto' copper discontinuance." The CWA also cited "evidence of Verizon's effective abandonment of copper networks and customers in many regions where it has not deployed its all-fiber network and FairPoint Communications' disinvestment in its copper network."

390. In 2015, the FCC issued its final rule on the retirement of copper by incumbent local exchange carriers ("ILEC") called *Technology Transitions, Policies and Rules Governing retirement of Copper Loops by Incumbent Local Exchange Carriers and Special Access for Price Cap Local Exchange Carriers.* The Final Rule, § 51.332, governs the "removal or disabling of copper loops, subloops or the feeder portion of such loops or subloops; the replacement of such loops with fiber-to-the-home loops or fiber-to-the-curb loops . . .; the failure to maintain copper loops, subloops, or the feeder portion of such loops or subloops that is the functional equivalent of removal or disabling."

391. The Final Rule, § 51.332, states that ILECs such as Verizon must provide notice to the FCC and in some instances, to retail customers, with detailed information concerning the location of the copper wires. In accordance with Rule 51.333, Verizon has issued a public notice each time it formally retires its copper wires.

392. In addition, as explained by CW1, CW3, CW6, CW10, CW12, CW17, CW22, CW26, and CW28, Verizon is able to tell which of its copper cables are sheathed in lead. Therefore, as Verizon retires copper cables, and provides public notice thereof, pursuant to the FCC's requirements Verizon confronts and acknowledges the extent of its copper cable network which is sheathed in lead.

### 4. Due Diligence Performed in Connection with Verizon's Corporate Reorganizations Revealed Its Extensive Lead Cable Network

393. Since its corporate formation, Verizon has embarked on a series of acquisitions in pursuit of expanding its network in the U.S. When companies enter into major corporate transactions such as these, conducting a comprehensive due diligence audit is standard operating procedure.

394. With the merger of Bell Atlantic Corp. and GTE Corp., Verizon was formed on June 30, 2000. Notably, in the merger agreement dated July 27, 1998 GTE Corp. made the following representations and warranties:

> Section 4.13--Environmental Matters.
> Except for such matters that, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect on GTE: (i) each of GTE and its Subsidiaries has complied with all applicable Environmental Laws (as defined below); (ii) the properties currently owned or operated by it or any of its Subsidiaries (including soils, groundwater, surface water, buildings or other structures) are not contaminated with any Hazardous Substances (as defined below); (iii) the properties formerly owned or operated by it or any of its Subsidiaries were not contaminated with Hazardous Substances during the period of ownership or operation by it or any of its Subsidiaries; (iv) neither it nor any of its Subsidiaries is subject to liability for any Hazardous Substance disposal or contamination on any third party property; (v) neither it nor any Subsidiary has

> been associated with any release or threat of release of any Hazardous Substance; (vi) neither it nor any Subsidiary has received any notice, demand, letter, claim or request for information alleging that it or any of its Subsidiaries may be in violation of or liable under any Environmental Law (including any claims relating to electromagnetic fields or microwave transmissions); (vii) neither it nor any of its Subsidiaries is subject to any orders, decrees, injunctions or other arrangements with any Governmental Entity or is subject to any indemnity or other agreement with any third party relating to liability under any Environmental Law or relating to Hazardous Substances; and (viii) there are not circumstances or conditions involving it or any of its Subsidiaries that could reasonably be expected to result in any claims, liability, investigations, costs or restrictions on the ownership, use, or transfer of any of its properties pursuant to any Environmental Law.
>
> As used herein and in Section 5.13, the term "Environmental Law" means any law relating to: (A) the protection, investigation or restoration of the environment, health, safety, or natural resources, (B) the handling, use, presence, disposal, release or threatened release of any Hazardous Substance or (C) ***noise, odor, wetlands, pollution, contamination or any injury or threat of injury to persons or property in connection with any Hazardous Substance***.
>
> As used herein and in Section 5.13, the term "Hazardous Substance" means any substance that is: ***listed, classified or regulated pursuant to any Environmental Law***, including any petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing, polychlorinated biphenyls, radioactive materials or radon.

395. As noted *supra* (V)(F)(1), lead has long been regulated pursuant to federal environmental statutes including CERCLA, the Clean Water Act, RCRA and numerous state environmental protection laws.

396. Bell Atlantic Corp. likewise made similar representations and warranties, *viz*:

> Section 5.13--Environmental Matters.
> Except for such matters that, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect on Bell Atlantic: (i) each of Bell Atlantic and its Subsidiaries has complied with all applicable Environmental Laws (as defined below); (ii) the properties currently owned or operated by it or any of its Subsidiaries (including soils, groundwater, surface water, buildings or other structures) are not contaminated with any Hazardous Substances (as defined below); (iii) the properties formerly owned or operated by it or any of its Subsidiaries were not contaminated with Hazardous Substances during the period of ownership or operation by it or any of its Subsidiaries; (iv) neither it nor any of its Subsidiaries is subject to liability for any Hazardous Substance disposal or contamination on any third party property; (v) neither it nor any Subsidiary has

> been associated with any release or threat of release of any Hazardous Substance; (vi) neither it nor any Subsidiary has received any notice, demand, letter, claim or request for information alleging that it or any of its Subsidiaries may be in violation of or liable under any Environmental Law (including any claims relating to electromagnetic fields or microwave transmissions); (vii) neither it nor any of its Subsidiaries is subject to any orders, decrees, injunctions or other arrangements with any Governmental Entity or is subject to any indemnity or other agreement with any third party relating to liability under any Environmental Law or relating to Hazardous Substances; and (viii) there are not circumstances or conditions involving it or any of its Subsidiaries that could reasonably be expected to result in any claims, liability, investigations, costs or restrictions on the ownership, use, or transfer of any of its properties pursuant to any Environmental Law.
>
> No representation is made by Bell Atlantic in this Section 5.13 for which neither Bell Atlantic nor any of its Subsidiaries is (or would be, if a claim were brought in a formal proceeding) a named defendant, but as to which Bell Atlantic or any of its Subsidiaries may be liable for an allocable share of any judgment rendered pursuant to the POR. No representation is made by Bell Atlantic in subsection (i) of this Section 5.13 as to properties owned, leased or operated by AT&T or any of its Subsidiaries except for such properties which are, or at any time since November 1, 1983 were, owned, leased or operated by Bell Atlantic or any of its Subsidiaries.

397. The inclusion of such representations and warranties in the merger agreement indicates awareness of the risk posed by hazardous substances such as lead to the overall business. Neither Bell Atlantic nor GTE Corp., both of which had thousands of miles of lead cables in their infrastructure, could have made these representations and warranties without a thorough investigation of whether their cables contained lead and/or were leaching lead into the environment.

398. In particular, both entities represented that "the properties currently owned or operated by it or any of its Subsidiaries (including soils, groundwater, surface water, buildings or other structures) are not contaminated with any Hazardous Substances." Further, despite that these representations and warranties refer specifically to "lead containing paint or plumbing," the definition of "Hazardous Substance" includes ***all lead***. Thus, the lead cables owned by Bell Atlantic and GTE Corp. fall squarely within the scope of this representation and warranty. It would

be at a minimum extremely reckless for either entity to make these representations and warranties without investigating the lead cables.

399. On February 14, 2005, Verizon announced an agreement to acquire MCI. The transaction was valued at approximately $8.5 billion, and the merger closed on January 6, 2006.

400. The merger agreement between Verizon and MCI was dated February 14, 2005, and amended on March 4, 2005, March 29, 2005, and May 1, 2005. It had the following provisions:

> Section 3.23 Environmental Laws and Regulations.
> Except as disclosed in Section 3.23 of the Company Disclosure Letter or as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect:
>
> (a) [MCI] and each Company Subsidiary has complied and is in compliance in all material respects with all applicable Environmental Laws and has obtained and is in compliance in all material respects with all Environmental Permits.
>
> (c) ***No Hazardous Substances are or were located and no disposal or Releases of Hazardous Substances have occurred at, on, above, under or from any properties currently or, to the knowledge of the Company at the time of the cessation of such ownership, lease, operation or use, formerly owned, leased, operated or used by the Company, any Company Subsidiary or any predecessors in interest that, in each case, has resulted in or would reasonably be expected to result in any material cost, liability or obligation of the Company or any Company Subsidiary under any Environmental Law.***
>
> (d) Neither the Company nor any Company Subsidiary, nor, to the knowledge of the Company, any other Person, has caused or taken any action that could reasonably be expected to result in any material liability or obligation relating to (i) the environmental conditions at, on, above, under, or about any properties or assets currently or formerly owned, leased, operated or used by the Company or any Company Subsidiary or any of their respective predecessors in interest, or (ii) the past or present use, management, handling, transport, treatment, generation, storage, disposal, Release or threatened Release of Hazardous Substances.
>
> (e) ***The Company has provided to [Verizon] all material environmental site assessments, audits, investigations and studies in the possession, custody or control of the Company or any Company Subsidiary relating to properties or assets currently or formerly owned, leased, operated or used by the Company or any Company Subsidiary***.

> (f) Neither the Company nor any Company Subsidiary has been in businesses other than those related to the provision of telecommunication services that would reasonably be expected to present environmental issues of a materially different scope or magnitude than those presented in the provision of telecommunication services. Without limiting the generality of the foregoing, neither the Company nor any Company Subsidiary has operated or currently operates: (i) any manufacturing facilities; (ii) any facilities that are or have been permitted under the Resource Conservation and Recovery Act; or (iii) any business that manages the hazardous wastes of any unrelated party. The representations contained in this Section 3.23(f) shall not deemed to be breached unless the operation or ownership of such other business or businesses has resulted in any material cost, liability or obligation of the Company or any Company Subsidiary under any Environmental Law.

401. Again, these are not simply boilerplate merger agreement provisions; rather, these reflect an awareness on the part of Verizon of the potential risk brought about by acquiring assets that may contain hazardous substances.

402. When later partially spinning off Verizon's business in certain states, Verizon made similar representations and warranties. For example, in 2015, Verizon announced a securities purchase agreement whereby its assets, books and records, as well as local exchange business and related wireline activities in California, Florida, and Texas were transferred to Frontier. In the securities purchase agreement dated February 5, 2015, it was stated that:

> 4.13 <u>Environmental Matters</u>.
> (a) All material Environmental Permits required for operation of the Transferred Business (i) have been obtained and are held by the Transferred Companies and (ii) are currently in full force and effect. The Transferred Companies are in material compliance with all Environmental Permits required for operation of the Transferred Business.
>
> (b) The Transferred Companies and the Transferred Business are, and at the Effective Time each of the foregoing will be, in material compliance with all Environmental Laws applicable or relating to the Transferred Business, the Transferred Real Property or the Transferred Leased Real Property, including all reporting, discharge and emission requirements under or pursuant to any Environmental Laws, and neither Seller nor any of the Transferred Companies has received any notice from any Person alleging that any of the foregoing are not in such compliance with any Environmental Laws. There are no events, conditions, circumstances, activities, practices or incidents, including the release, emission, discharge, transportation, handling, storage, presence or disposal of any Hazardous

Materials, related to the Transferred Business, the Transferred Real Property or the Transferred Leased Real Property which have given, or, to Seller's Knowledge, would reasonably be likely to give, rise to any material Environmental Claim or Liability.

(c) There is no civil, criminal or administrative action, suit, demand, Environmental Claim, hearing, notice, or demand letter, notice of violation, investigation or proceeding pending or, to Seller's Knowledge, threatened against the Transferred Companies or against any Person for whom the Transferred Companies are or would reasonably be expected to have Liability for, related to any Environmental Permit or any Environmental Law, or any plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated, pending or approved thereunder, that has constituted or would reasonably be expected to constitute a material Liability.

(d) (i) The Transferred Companies have not generated, stored, used, emitted, discharged or disposed of any Hazardous Material in the conduct of the Transferred Business except in material compliance with applicable Environmental Law, (ii) all underground storage tanks located at any Transferred Real Property or Transferred Leased Real Property are listed in Schedule 4.13(d) . . .

(e) Prior to the date hereof, Seller has made available to Buyer all recent environmental assessments, reports, Environmental Permits, results of investigations, or audits, any material correspondence with agencies or third parties, and any other material documents concerning any of the foregoing regarding any matters that are outstanding or otherwise prepared in the last five (5) years that are in the possession of or reasonably available to Seller, any of its Subsidiaries, or any of the Transferred Companies pertaining to the Transferred Business, the Transferred Real Property or the Transferred Leased Real Property, or Liability of any of the foregoing under or pertaining to any Environmental Law.

(f) None of Seller, the Transferred Companies or the Transferred Business (i) have received any request for information or Environmental Claim regarding, or have been notified that they are a potentially responsible party under, or that any of the Transferred Business, the Transferred Real Property or the Transferred Leased Real Property are the subject of or responsible for any investigation, claim, remediation or Action for any on-site or off-site locations relating to the handling, transportation, storage, disposal, treatment or recycling of Hazardous Materials, including pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, or any state or provincial analog thereto, in connection with the conduct of the Transferred Business, the Transferred Real Property or the Transferred Leased Real Property, and (ii) have not been, and, to Seller's Knowledge, are not reasonably expected to be, subject to Liability for any Environmental Claim arising under or pursuant to such Laws in connection with the conduct of the Transferred Business, the Transferred Real Property or the Transferred Leased Real Property.

> (g) Notwithstanding any other provision of this Article IV, the representations and warranties contained in this Section 4.13 constitute the sole and exclusive representations and warranties of Seller with respect to any Environmental Law, Environmental Claim or Hazardous Material.

403. Pertinently, "Hazardous Material" was defined as follows:

> "Hazardous Material" means chemical, pollutant, contaminant, waste, and any other substance or material that is listed, defined, designated, treated or classified as hazardous or toxic pursuant to applicable Environmental Laws, and including . . . **lead or lead-based paints or materials** . . ..

404. At a minimum, the inclusion of these provisions indicates that Verizon recognized the potential risk that assets containing lead posed to its overall business. Otherwise, there would be no need to make such representations and warranties, disclaim liability, or shift the burden to counterparties to the respective transactions.

405. Indeed, any reasonable due diligence audit conducted in the furtherance of major corporate transactions like these would have brought to the attention of Verizon and those executing such transactions, the existence of these assets and lead-based risks. Verizon cannot feign ignorance of its lead sheathed cables now.

**5. Defendants Claim to Be Tuned in to Sustainability, the Environment, and Employee and Community Health**

406. Defendants Vestberg and Ellis are actively involved with the United Nation's sustainability initiatives. Vestberg is a member of the Leadership Council of the UN's Sustainable Development Solutions Network and serves on the board of the UN Foundation and the Whitaker Peace & Development Initiative. He is also a member of the Leadership Council of the UN's Sustainable Development Solutions Network and a member of the boards of the UN Foundation and the Whitaker Peace and Development Initiative.

407. On July 7, 2021, an interview of Vestberg was published on the UN's website. The interview focused on the UN's sustainable development goals ("SDGs"). Vestberg noted that

Verizon has "four stakeholders . . . . our shareholders, our customers, our employees, and our society." Vestberg continued, "the SDGs are very much connected to how we do business, how we act in society, and how we show our employees that we have a purpose and we're actually doing right for our society. All that is for us, a cycle of interconnections: If we do right for employees, for our customers, in our society, ultimately our shareholders are going to benefit as well."

408. In an article dated May 6, 2022, appearing on broadbandcommission.com, Vestberg is quoted as saying, "As we execute on our strategy we consider how our core business can benefit the communities where we operate and how we can mitigate adverse impacts to create long-term measurable value for a broad set of stakeholders – our shareholders, customers, employees and society. Our ESG strategy supports these objectives."

409. In April or May, 2023, Vestberg posted on his LinkedIn Account: "At Verizon, we are mobilizing our resources, partnerships and people to help protect the planet for future generations. I am proud to announce that we issued our fifth $1 billion green bond, another step we're taking to deliver critical solutions for a sustainable future."

410. On June 22, 2023, Vestberg wrote on Twitter that he "had the privilege of serving as a member of the Leadership Council for the @UN Sustainable development Solutions Network where I helped write the #UNSDGs . . ."

411. Similarly, on September 23, 2021, then-CFO of Verizon Ellis was featured on the UN Global Compact series *Financing a Sustainable Future CFO Insights* during which he discussed how sustainability and ESG is at the "heart of what we do."

412. Verizon also has a "Shared Success Council" that provides direction and oversight, establishes benchmarks and goals, assigns and enforces accountability and tracks results for

corporate responsibility initiatives across Verizon through six working committees: Accessible Products & Services, ***Environmental Sustainability***, Online Safety, Wireless Safety, Human Rights and Supply Chain.

413. The Shared Success Council – which is ordinarily chaired by a senior executive of the Company, and includes senior leaders from all operating units and several corporate officers – reports directly to Vestberg, who in turn, is overseen by the Corporate Governance and Policy Committee of Verizon's Board.

**6. The Lead Cables Concerned Defendants' Core Operations**

414. The alleged fraud concerns a critical component of Verizon's business. Verizon's legacy copper cable system forms the backbone of Verizon's wireline services, which, as alleged *supra* in ¶ 71, is reported under Verizon Consumer Group. In fiscal year 2022, Verizon Consumer Group accounted for $103.5 billion or 76% of the Company's consolidated revenues. Verizon's copper cable network is sheathed in ***1,454,112,000 pounds*** of toxic lead, a fact not only material to the Company's core operations, but also to investors.

415. Also integral to Verizon's core operations is its ongoing transition from legacy copper cables (approximately 15% of which are sheathed in lead) to fiber optic cables, which commenced in or around 2004. That this network migration is a core operation of the Company's business is evident by the fact that Verizon spent more than $25 billion to deploy its fiber network between 2004 and 2015 (see ¶ 100), and the Individual Defendants regularly discussed the Company's progress in rolling out fiber optics during earnings and analyst calls. This undertaking would have brought to the fore not only how vast Verizon's lead cable network is, but also that many of these toxic cables are decaying or abandoned and leaching lead into the environment.

416. During the Class Period, the Individual Defendants, as the Company's highest-ranking executives, issued numerous statements about environmental, health, and safety; recycling

initiatives; and cost savings associated with transitioning from copper to fiber cables, that rendered false or misleading the true nature of Verizon's wireline operations. The Individual Defendants knew that: the market was relying on the veracity of those statements; much of Verizon's legacy copper cable network was still encased in lead; the lead was decaying, abandoned, and improperly maintained or disposed of; lead poses environmental, health, and safety hazards to communities, employees, and the environment; and to remove, let alone maintain, the lead cables was costly.

## B. The Individual Defendants Were Verizon's Top Executives

417. The Individual Defendants, by virtue of their association with and control of confidential internal information regarding Verizon's legacy lead-sheathed copper cables which were ailing its employees, the environment, and the communities where they remained, participated in the fraudulent scheme to hide the true status of the Company's hazardous lead cable infrastructure.

### 1. Vestberg

418. Vestberg held the highest-level position in the Company and controlled the contents of Verizon's public statements. Because of his position, Vestberg was provided, or had access to, copies of the documents, interview and conference transcripts, and other publicly disseminated statements, alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Vestberg knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors about Verizon's commitment to the safety of its employees, the cost savings associated with it moving on from its legacy copper cables, and its e-waste recycling efforts which focused on lead-acid batteries while ignoring the lead-encased cables strewn throughout the country, were

materially false, misleading, and or incomplete. As the Company's senior-most executive, Vestberg was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

**2. Ellis**

419. As the CFO of Verizon from November 1, 2016 through May 1, 2023, Ellis held one of the highest-level positions at the Company, controlled the contents of Verizon's public statements, and had access to material, adverse, nonpublic information concerning Verizon's lead-sheathed copper cables. Because of his position, Ellis was provided to, or had access to, copies of the documents, interview and conference transcripts, and other publicly disseminated statements alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Ellis knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. As the Company's second senior-most executive, Ellis was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

**3. Malady**

420. As the EVP and CTO of Verizon's Global Networks & Technology Group during most of the Class Period, and EVP and CEO of VBG since March 2, 2023, Malady held one of the highest-level positions at the Company, controlled the contents of Verizon's public statements, and had access to material, adverse, nonpublic information concerning Verizon's lead-sheathed copper cables. Because of his position, Malady was provided, or had access to, copies of the documents, interview and conference transcripts and other publicly available statements made

during the Class Period alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Malady knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. Malady was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

**4. Gowen**

421. Defendant Gowen is – and was during the Class Period – Verizon's Chief Sustainability Officer. As such, Gowen was responsible for overseeing Verizon's green initiatives throughout the Company including expanding recycling and waste reduction and the management of end of life material recovery. Because of his high-level position, Gowen was provided, or had access to, copies of the documents, interview and conference transcripts, and other publicly available statements issued during the Class Period alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Gowen knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. As one of the Company's senior-most executives, who was specifically responsible for overseeing Verizon's green initiatives Gowen was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

### 5. Skiadas

422. Defendant Skiadas was the SVP and Controller and Principal Accounting Officer of Verizon during the Class Period. On May 1, 2023, Defendant Skiadas replaced Defendant Ellis as the EVP and CFO of Verizon, which role he presently occupies. As such, Skiadas was responsible for Verizon's accounting and finance operations, compliance, financial policies, and SEC reporting. Because of his high-level position, Skiadas was provided, or had access to, copies of the documents, interview and conference transcripts, and other publicly available statements issued during the Class Period alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Skiadas knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. As one of the Company's senior-most executives, who was specifically responsible for overseeing Verizon's finance and accounting, Skiadas was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

## IX. LOSS CAUSATION

423. During the Class Period, as alleged herein, Defendants made materially false and/or misleading statements and omissions, and engaged in a scheme to deceive the market. Defendants knowingly and/or recklessly misstated the true nature of the Company's business in order to inflate the market's perception of Verizon's securities' value. This resulted in the prices of Verizon's securities becoming artificially inflated and operated as a fraud or deceit on the Class (as defined below). Subsequently, the truth concealed by Defendants' previous misrepresentations and omissions was disclosed to the market and from July 10 through July 27, 2023, the price of Verizon

common stock fell more than 12%. *See* Sections (V)(H)-(V)(J). As a result of Defendants' material misstatements and omissions, Lead Plaintiffs and other members of the Class have suffered economic loss, i.e., damages, under the federal securities laws.

## X. CLASS ACTION ALLEGATIONS

424. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Verizon securities during the Class Period. Excluded from the Class are Defendants, officers and directors of Verizon, and their families and affiliates, i.e., legal representatives, heirs, successor or assigns and any entity in which Defendants have or had a controlling interest.

425. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims as a class action will provide substantial benefits to the parties and the Court. As of the date of this Amended Complaint, Verizon had approximately 4.2 billion shares of common stock outstanding owned by millions of investors.

426. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

- Whether Defendants violated the Exchange Act;
- Whether Defendants omitted and/or misrepresented material facts;
- Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;
- Whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;

- Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;
- Whether Defendants' conduct impacted the price of Verizon's securities;
- Whether Defendants' conduct caused the members of the Class to sustain damages; and
- The extent of damages sustained by Class members and the appropriate measure of damages.

427. Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

428. Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiffs have no interests which conflict with those of the Class.

429. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

430. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and/or misleading statements pleaded in this Complaint. None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Verizon's commitments to employee safety, management and maintenance of its legacy copper network, and waste recycling efforts.

431. Verizon's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. To the extent that any of the false and/or misleading statements alleged herein can be construed as forward-looking, they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Verizon's recycling programs for electronic waste, its commitment to employee safety, and costs associated with removing its legacy copper cables. Given the then-existing facts contradicting Defendants' statements, any risk disclosures made by Verizon were not sufficient to insulate Defendants from liability for their materially false and misleading statements

432. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and/or approved by an executive officer of Verizon who knew that the statement was false when made.

433. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Verizon who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions when they were made, nor were any of the projections or forecasts made by Defendant expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XII. PRESUMPTION OF RELIANCE

434. At all relevant times, the market for Verizon's securities was an efficient market for the following reasons, among others:

(a) Verizon's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) Verizon filed periodic public reports with the SEC and the NYSE;

(c) Verizon regularly and publicly communicated with investors via established market communications mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Verizon was followed by securities analysts employed by numerous major brokerage firms, including Goldman Sachs, JP Morgan, Wells Fargo, and Oppenheimer, who wrote reports which were distributed to the certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace.

435. Based on the foregoing, the market for Verizon's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Verizon's securities. Under these circumstances, all purchasers of Verizon securities during the Class Period suffered similar injury through their purchase of Verizon securities at artificially inflated prices and the presumption of reliance applies.

436. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because certain of the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose the true, material, negative financial impact of

its legacy lead-sheathed copper cables – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## XIII. CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

437. Lead Plaintiffs repeat, incorporate, and reallege every allegation contained above as if fully set forth herein.

438. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule -5 promulgated thereunder by the SEC.

439. During the Class Period, Defendant Verizon and the Individual Defendants – Vestberg, Ellis, Malady, Gowen, and Skiadas – carried out a plan, scheme, and course of conduct which intended to and, throughout the Class Period, did (i) deceive the investing public, including Lead Plaintiffs and other Class Members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Verizon's securities at artificially inflated prices.

440. During the Class Period, Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Verizon common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

441. During the Class Period, Defendants, individually and in concert, directly or indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's legacy network operations, business prospects, and finances.

442. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. In particular:

(a) **Vestberg**: Defendant Vestberg made, or caused Verizon to make the statements alleged in ¶¶ 309, 328, 330, 336, 338, 340, 343, 347, 350, 352, 372, 376, and 380, *supra.*

(b) **Ellis**: Defendant Ellis made, or caused Verizon to make the statements alleged in ¶¶ 309, 312, 315, 318, 322, 372, 376, and 380, *supra.*

(c) **Malady:** Defendant Malady made, or caused Verizon to make the statements alleged in ¶¶ 320, 326, *supra.*

(d) **Gowen:** Defendant Gowen made, or caused Verizon to make the statements alleged in ¶ 324, *supra.*

(e) **Skiadas:** Defendant Skiadas made, or caused Verizon to make the statements alleged in ¶¶ 309, 374, and 378, *supra*.

(f) **Verizon:** Defendant Verizon is responsible for all of the statements set forth in ¶¶ 309, 312, 315, 318, 320, 322, 324, 326, 328, 330, 332, 336, 338, 340, 343, 347, 350, 352, 372, 374, 376, 377, and 380, *supra.*

443. As set forth in Section (VIII)(A), these Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Verizon's

true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

444. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Verizon's securities. Lead Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

445. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class have suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

446. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

447. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

448. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

449. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition

and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

450. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they culpably participated in the unlawful conduct alleged, which artificially inflated the market price of Company securities.

451. Defendant Vestberg controlled Verizon by virtue of the fact that: (i) at all relevant times, was the Chief Executive Officer; and (ii) he issued public statements to investors and analysts.

452. Defendant Ellis controlled Verizon by virtue of the following facts: (i) he was the Chief Financial Officer from November 1, 2016 through May 1, 2023; and (ii) he issued public statements to investors and analysts.

453. Defendant Malady controlled Verizon by virtue of the following facts: (i) he was the CTO from 2019 to March 2, 2023 and EVP and CEO of Verizon Business Group from March 2, 2023 through present; and (ii) he issued public statements to investors and analysts.

454. Defendant Gowen controlled Verizon by virtue of the following facts: (i) he was the Chief Sustainability Officer and SVP of Global Supply Chain at all relevant times throughout the Class Period; and (ii) he issued public statements to investors and analysts.

455. Defendant Skiadas controlled Verizon by virtue of the following facts: (i) he was the SVP and Controller and Principal Accounting Officer of Verizon from the beginning of the Class Period until May 1, 2023, when he became the Company's Chief Financial Officer; and (ii) he issued public statements to investors and analysts.

456. The Individual Defendants are culpable for participation in the matters alleged herein because they did not act in good faith in connection with the conduct at issue, acted with knowledge that Verizon's public statements were materially false or misleading, or omitted material information, and/or or they acted with reckless disregard for the truth.

457. By virtue of their positions as controlling persons of Verizon, and their culpable participation in the Defendants' violation of Section 10(b) and Rule 10b-5(b) as alleged herein, the Individual Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiffs, and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

(d) awarding Lead Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: January 12, 2024

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**

*/s/ James E. Cecchi*
James E. Cecchi
Kevin Cooper
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrbe.com

*Local Counsel for Lead Plaintiffs and the Class*

**GRANT & EISENHOFER**

*/s/ Daniel L. Berger*
Daniel L. Berger (*pro hac vice* forthcoming)
Caitlin M. Moyna (*pro hac vice* forthcoming)
Mica A. Cocco (*pro hac vice* forthcoming)
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
dberger@gelaw.com
cmoyna@gelaw.com
mcocco@gelaw.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Gregory M. Castaldo*
Gregory M. Castaldo
Joshua E. D'Ancona
David A. Bocian
Nathaniel C. Simon (*pro hac vice* forthcoming)
Zachary M. Winkler (*pro hac vice* forthcoming)
280 King of Prussia Road
Radnor, PA 19087

Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jdancona@ktmc.com
dbocian@ktmc.com
nsimon@ktmc.com
zwinkler@ktmc.com

*Lead Counsel for Lead Plaintiffs and the Class*