**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
Kevin G. Cooper
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700

*Liaison Counsel for Lead Plaintiffs*
*and the Class (Lead Counsel for Lead*
*Plaintiffs and the Class Listed Below)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STICHTING PENSIOENFONDS METAAL EN TECHNIEK; STICHTING PME PENSIOENFONDS; STICHTING MN SERVICES AANDELENFONDS NOORD-AMERIKA; AKADEMIKERPENSION; E. ÖHMAN J:OR FONDER AB; and STOREBRAND ASSET MANAGEMENT AS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> VERIZON COMMUNICATIONS INC., HANS VESTBERG, MATTHEW ELLIS, KYLE MALADY, JAMES GOWEN and ANTHONY SKIADAS, <br><br> Defendants. | Case No.: 1:23-cv-05218-ESK-AMD <br><br> Hon. Edward S. Kiel <br> United States District Judge <br><br> Hon. Ann Marie Donio <br> United States Magistrate Judge <br><br> Return Date: <br> June 17, 2024 |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF FACTS ..................................................................... 4

I.    VERIZON OWNS A MASSIVE NETWORK OF LEAD-SHEATHED COPPER CABLES............................................................ 4

II.   LEAD'S TOXICITY IS WELL KNOWN ........................................... 5

III.  THE WSJ REPORTS REVEAL VERIZON'S MASSIVE FINANCIAL EXPOSURE FROM LEAD-SHEATHED CABLES .... 6

IV.   VERIZON CONCEALED ITS DECAYING LEAD CABLE NETWORK FROM INVESTORS ....................................................... 8

      A.    Verizon Made Misrepresentations Concerning Its Extensive Lead Problem ...................................................... 8

      B.    Verizon Knew It Was Misleading Investors About Its Lead Cable Network....................................................... 9

V.    REACTIONS TO THE WSJ SERIES EVIDENCE THE PUBLIC'S SURPRISE ABOUT VERIZON'S LEAD-SHEATHED CABLE NETWORK AND RELATED MULTI-BILLION DOLLAR RISKS ................................................... 13

LEGAL STANDARD............................................................................ 15

ARGUMENT ......................................................................................... 15

I.    THE COMPLAINT ALLEGES MATERIALLY FALSE OR MISLEADING STATEMENTS ......................................................... 15

      A.    Defendants' Statements About Legacy Copper Cables and FIOS Were Materially False or Misleading............................ 16

      B.    Defendants' Statements About E-Waste Were Materially False or Misleading................................................ 23

      C.    Defendants Made Materially False or Misleading Statements Regarding Employee Health and Safety .................................. 25

      D.    Defendants Issued Materially False or Misleading Statements in SEC Filings Regarding Loss Reserves and Loss Contingencies ................................................................. 27

II.   THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER ......................................................................... 30

i

**A.** There Is a Strong Inference That Defendants Made False Statements with Scienter ............................................................. 31

**B.** The Complaint Adequately Pleads Verizon's Scienter ............ 39

III. THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY ...................................................................................... 39

IV. THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY ......................................................................... 40

CONCLUSION ....................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Labs. Sec. Litig.*,
   2008 WL 1967509 (D.N.J. Mar 24, 2008) .......................................................40

*Abramson v. NewLink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020) ...........................................................................29

*Allegheny Cnty. Emps' Ret. Sys. v. Energy Transfer LP*,
   532 F. Supp. 3d 189 (E.D. Pa. 2021)......................................................24, 26, 36

*In re Allergan Generic Drug Pricing Sec. Litig.*,
   2019 WL 3562134 (D.N.J. Aug. 6, 2019) ......................................18, 23, 24, 35

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................................................15

*In re Bristol-Myers Squibb Sec. Litig.*,
   2005 WL 2007004 (D.N.J. Aug. 17, 2005) ................................................18, 26

*Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ...........................................................................15

*In re Cambrex Corp. Sec. Litig.*,
   2005 WL 2840336 (D.N.J. Oct. 27, 2005) .......................................................37

*City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*,
   70 F.4th 668 (3d Cir. 2023) ................................................................15, 28, 29

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) ..................................................20, 39

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
   2019 WL 1299673 (D.N.J. Mar. 21, 2019) ......................................................38

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017) .......................................................24, 27

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019).......................................................27, 32

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019)......................................................*passim*

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018)......................................................34

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
620 F. Supp. 3d 167 (D.N.J. 2022)......................................................36

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ......................................................*passim*

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
144 S. Ct. 885 (2024)......................................................16, 18, 20

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ......................................................35

*Malozzi v. Innovative Indus. Props., Inc.*,
2023 WL 6121499 (D.N.J. Sept. 19, 2023)......................................................26

*Maverick Fund, L.D.C. v. Comverse Tech., Inc.*,
801 F. Supp. 2d 41 (E.D.N.Y. 2011) ......................................................21

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ......................................................17, 20, 21, 25

*Monk v. Johnson & Johnson*,
2011 WL 6339824 (D.N.J. Dec. 19, 2011)......................................................17

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023) ......................................................38

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)......................................................29

*In re Omnicare Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ......................................................39

*Ong v. Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018) ......................................................26, 27

iv

*In re RAIT Fin. Tr. Sec. Litig.*,
2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)......................................................30

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018) ...................................................30, 31

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
351 F. Supp. 3d 874 (E.D. Pa. 2018)............................................................*passim*

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3rd Cir. 1992) ....................................................................2, 23

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
2021 WL 4864421 (N.D. Cal. Oct. 19, 2021) ...................................................33

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
2022 WL 17740482 (D.N.J. Dec. 16, 2022).....................................................30

*Teamsters Local 445 Freight Div. Pension Fund. v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008) .........................................................................39

*Tellabs, Inc. v. Makor Issues & Rts, Ltd.*,
551 U.S. 308 (2007)................................................................................30, 31

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882 (D.N.J. Dec. 6, 2018)........................................................22

*In re Toyota Motor Corp. Sec. Litig.*,
2011 WL 2675395 (C.D. Cal. July 7, 2011).....................................................33

*U.S. v. Schiff*,
602 F.3d 152 (3d Cir. 2010) .........................................................................16

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015).................................................19, 34, 35

*Weiner v. Quaker Oats Co.*,
129 F.3d 310 (3d Cir. 1997) .........................................................................15

*Winer Fam. Tr. v. Queen*,
503 F.3d 319 (3d Cir. 2007) .........................................................................20

v

*In re Xerox Corp. Sec. Litig.*,
 165 F. Supp. 2d 208 (D. Conn. 2001)...................................................................32

**Other Authorities**

17 C.F.R. § 240.10b-5(b) ........................................................................15, 16, 18

## GLOSSARY OF DEFINED TERMS[1]

| Term | Definition |
| --- | --- |
| ASC | Accounting Standards Codification (¶356) |
| ASC 450 | The Accounting Standards Codification chapter providing accounting and disclosure requirements for loss and gain contingencies (¶357) |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (¶154) |
| Class | Persons or entities who purchased or otherwise acquired publicly traded Verizon securities between October 30, 2018 and July 26, 2023, both dates inclusive (¶1) |
| Class Period | October 30, 2018 and July 26, 2023, both dates inclusive (¶1) |
| Company | Verizon (as defined herein) |
| Complaint | Corrected Amended Class Action Complaint (ECF No. 57) |
| Consumer Group | Verizon Consumer Group (¶70) |
| CSR | Corporate Social Responsibility |
| CW | Confidential Witness |
| CWA | Communications Workers of America (Preamble) |
| Defendants | Verizon and the Individual Defendants (¶34) |
| DOJ | United States Department of Justice |
| EHSCP | Environmental Health and Safety Communications Panel (¶15) |
| Ellis | Individual Defendant, Matthew Ellis. Verizon Chief Financial Officer from November 1, 2016 to May 1, 2023 (¶29) |
| EPA | United States Environmental Protection Agency (Preamble) |
| ESG | Environmental, Social, and Governance (¶338) |

---

[1] Unless otherwise noted herein, capitalized terms have the same meaning as in the Complaint; and "¶" refers to paragraphs in the Complaint.

vii

| E-Waste | Electronic Waste which Verizon defines as "electronic products and parts, such as cell phones, chargers, set-top boxes, network equipment, and batteries, that are at the end of their useful life and/or have been returned by customers" in its public reports (¶¶347, 352) |
|---|---|
| FIOS | Verizon's internet, telephone, and television services provided over fiber optic cables (¶67) |
| GAAP | United States Generally Accepted Accounting Principles (¶356) |
| Gowen | Individual Defendant, James Gowen. Verizon Chief Sustainability Officer and Senior Vice President of Verizon's Global Supply Chain (¶31) |
| ILEC | Incumbent Local Exchange Carriers (¶390) |
| Individual Defendants | Ellis, Gowen, Malady, Skiadas, and Vestberg, collectively (¶¶28-32) |
| Lead Plaintiffs or Plaintiffs | Stichting Pensioenfonds Metaal en Techniek; Stichting PME Pensioenfonds; Stichting Mn Services Aandelenfonds Noord-Amerika; AkademikerPension; E. Öhman J:or Fonder AB; and Storebrand Asset Management AS (¶¶21-26) |
| Lead-sheathed cables | Copper telecommunication cables sheathed in lead conduit |
| Legacy network | Verizon's older phone and internet infrastructure built with copper wires, acquired from Bell Atlantic and NYNEX (¶65) |
| Malady | Individual Defendant, Kyle Malady. Verizon Executive Vice President and Chief Technology Officer for Verizon's Global Networks & Technology Group from 2019 to March 2, 2023; Executive Vice President and Chief Executive Officer of Verizon Business Group since March 2, 2023 (¶30) |
| Motion or Mot. | Defendants' Motion to Dismiss (ECF No. 58-1) |
| MCI | MCI Communications Corporation (¶67) |
| OSHA | Occupational Safety and Health Administration (Preamble) |
| P-PUC | Pennsylvania Public Utility Commission (¶191) |
| RCRA | Resource Conservation and Recovery Act of 1976, also called the Solid Waste Disposal Act (¶157) |

| | |
|---|---|
| SEC | United States Securities and Exchange Commission (Preamble) |
| Skiadas | Individual Defendant, Anthony Skiadas. Verizon Controller and Principal Accounting Officer during the Class Period, Chief Financial Officer and Executive Vice President since May 1, 2023 (¶32) |
| SOX | Sarbanes-Oxley Act of 2002 (¶28) |
| VBG | Verizon Business Group (¶70) |
| Verizon | Verizon Communications, Inc. (¶27) |
| Vestberg | Individual Defendant, Hans Vestberg. Verizon Chief Executive Officer since August 2018, Chairman of the Board of Directors since March 2019 (¶28) |
| WSJ | The *Wall Street Journal* (¶3) |
| XO | XO Communications (¶67) |

## PRELIMINARY STATEMENT

As Verizon does not dispute, it has long been the owner and custodian of a decaying network of copper telephone cables sheathed in lead, a substance known to poison humans and contaminate the environment. Tens of thousands of miles of its toxic infrastructure are strung across communities, submerged in bodies of water, and buried throughout the Mid-Atlantic and Northeastern United States. Further, as a corporate practice, Verizon has abandoned lead-sheathed cables in communities as it installed its flagship FIOS fiber optic cables in the past two decades. Verizon's lead network is an environmental hazard, exposes workers to disease and injury, and constitutes an exposure to a massive financial liability for the Company.

Throughout the Class Period, Defendants fraudulently concealed and misrepresented these material facts in their public statements to investors. For example, they touted the "***cost benefits and green benefits from removing some of the copper network at the same time***" as FIOS was installed, and that "***as you replace in a certain location copper with fiber, there's a good benefit from a cost standpoint.***" ¶¶98, 312, 318.[2] Verizon also assured investors of its commitment to e-waste (including lead) management, safe work sites, and environmental

---

[2] Except as noted, all emphasis is added and internal citations and quotations, omitted.

stewardship efforts. Similarly, Defendants made false or misleading disclosures regarding the Company's loss reserves and potential loss contingencies. These misrepresentations masked the true, material, adverse facts related to Verizon's sprawling lead-sheathed cable exposure. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3rd Cir. 1992) (statements putting material subjects "in play" are actionable if they "omit[] certain facts contradicting the[] representations").

The reality, as Verizon has now admitted in regulatory filings, is that it faces (and has always faced) substantial risk from its ownership of its deteriorating lead infrastructure, which is harming the environment and Verizon's employees. Notwithstanding Verizon's improbable claim that it does not know how much lead-sheathed cable it owns, even Defendants concede the amount is massive, and the related risks, acute—including government regulatory action, penalties, lawsuits, and interruption of business operations. Investors are, of course, keenly interested in these lead-related financial exposures, which are estimated in the ***billions***.

The truth about Verizon's toxic infrastructure issues first reached the market in July 2023, when the WSJ revealed, in a multi-part investigative series, that the Company owned an extensive network of lead cables that was contaminating bodies of water and the soil near playgrounds and bus stops, and that former Verizon workers had suffered dire health consequences from jobsite lead exposures. Upon learning this news, regulators, elected officials, financial analysts, and investors

2

reacted with dismay, and Verizon's stock dropped sharply, wiping out billions in market capitalization. Defendants do not contest loss causation in their Motion.

Nor do they dispute that they knew that Verizon owned a huge network of toxic cables, and regularly abandoned lead-sheathed cables in place, even while publicly touting the replacement of copper with FIOS. Indeed, Defendants blithely assert that Verizon's lead-sheathed cables "had been a matter of public record for decades and were simply one issue among many that Verizon had long addressed on an ordinary-course basis." Mot. at 27. Thus, according to Defendants, if they made any "mistake," it was that they "did not believe" that Verizon's tons of decaying lead cables in U.S. communities "presented a material problem." *Id*. at 3, 27.

This attempt to have it both ways—to suggest that the extent of a problem Verizon now claims not to fully grasp was somehow common knowledge all along—reeks of implausibility and revisionism. It would, in effect, require the Court to accept that the Individual Defendants—sophisticated corporate executives who, for years, had actively promoted Verizon's transition to FIOS and attendant copper cable "retirement"—failed to appreciate that risks and financial exposures incumbent in owning a network of toxic infrastructure across multiple states were material to investors. Until, that is, the *Wall Street Journal* published its exposé.

If the implausibility of Defendants' position were not enough, the Complaint alleges further specific facts giving rise to a strong inference that the Individual

3

Defendants (each of whom made false statements) acted with scienter, including the sheer magnitude of Verizon's lead cable issue, which the Defendants concede was addressed internally on an "ordinary-course basis." Mot. at 18, 27. Indeed, the inference of scienter arising from the alleged facts is more cogent than the inference Defendants posit (which is itself reckless)—that they never appreciated that issues regarding Verizon's network of lead-sheathed cables "presented a material problem" (Mot. at 3), even though regulators and financial markets immediately recognized them as such upon their disclosure by the WSJ.

## STATEMENT OF FACTS

**I.     VERIZON OWNS A MASSIVE NETWORK OF LEAD-SHEATHED COPPER CABLES**

Verizon provides telephone, internet, and related services to individual and business customers in nine states in the Mid-Atlantic and Northeast U.S. and the District of Columbia. ¶¶64-66, 71. Most of Verizon's revenues come from its Consumer Group, which provides consumer-focused wireline and wireless services. ¶71. For example, in the 2022 fiscal year, the Consumer Group contributed 76% of Verizon's $136 billion in consolidated revenues. *Id.*

Since 2004, Verizon's central operational focus has been providing telephone and internet services to customers through FIOS cables. ¶67. Verizon spent over $25 billion on its FIOS conversion by 2015, and it has consistently advertised and touted its growing FIOS network. *E.g.*, ¶¶90, 318, 320. As Verizon has installed FIOS

4

cables in U.S. communities, it has ceased using thousands of miles of copper cables that had served them before. ¶¶90-91, 269. In the remaining areas where Verizon has not laid FIOS, it still relies on copper wirelines. ¶71. In 2023, Verizon owned around 540,000 miles of "legacy" copper cables. ¶¶64-66, 88-90.

As disclosed through a series of reports in the WSJ in July 2023 (detailed below), a significant portion of Verizon's copper cables—both in-use and "retired"—are sheathed in lead. That same month, in response to the WSJ reports, Wall Street analysts estimated that at least 15% of Verizon's legacy cable (or **81,000 miles**) are lead-sheathed. ¶¶89, 284-85, 306. As each foot of copper cable uses roughly 3.4 pounds of lead sheathing, Verizon owns approximately **1.5 billion pounds** of lead in decaying infrastructure that crisscrosses U.S. communities. ¶89.

## II.    LEAD'S TOXICITY IS WELL KNOWN

Lead can cause catastrophic health impacts to exposed humans, including severe gastrointestinal, reproductive, and neurological harms. ¶103. According to national health organizations, there is no safe lead level in the human body. ¶104. Lead accumulates over time in humans. ¶111. Symptoms of lead poisoning can take years to manifest, and, once exhibited, cannot be reversed. ¶¶103, 111-12.

Due to the hazardous nature of lead, OSHA regulates its management and handling in workplace settings. ¶¶129-36. OSHA notes that inhalation of lead dust and fumes, lead ingestion, or absorption through the skin all present substantial risk

to the health of workers who encounter lead on the job. ¶136; *see also* ¶¶107-10.

Lead is toxic to many species of plants and wildlife, and the federal EPA and state agencies work to regulate the entry of lead into the environment. ¶¶154, 160. The EPA regulates lead under CERCLA, RCRA, the Clean Water Act, and the Safe Drinking Water Act, and states enforce similar, parallel statutes. ¶¶154-69.

## III. THE WSJ REPORTS REVEAL VERIZON'S MASSIVE FINANCIAL EXPOSURE FROM LEAD-SHEATHED CABLES

In July 2023, the WSJ published a series of investigative reports detailing the telecommunications industry's (including Verizon's) use and abandonment of lead-sheathed cables in the U.S. that had not been publicized before. The WSJ's 18-month investigation uncovered the presence of thousands of miles of lead-sheathed cables around the country, including near homes, playgrounds and parks (¶¶242-44); environmental contamination near lead-sheathed cable sites (¶¶242-57); and industry workers, including Verizon line workers, suffering adverse health effects from lead toxicity (¶¶116-19). The reports presented new information to the public. Indeed, a contributor to the series stated she "had covered cable and telecom for a long time and had never heard of lead cables in the telecom networks." ¶237.

The news of the toxic lead cables crisscrossing the U.S. reported in the WSJ prompted alarmed reactions from various constituencies, including elected officials, regulators, investors and lawyers. ¶¶272-92. Surprised securities analysts who covered Verizon scrambled to ascertain the scope of its lead holdings and its

6

financial exposure from related liabilities. ¶¶283-89.

Following the WSJ reports, Verizon "address[ed] *the recent news about the legacy lead cable in our network*" by acknowledging both its continued ownership of extensive lead-sheathed cables and its practice of abandoning in-place lead sheathing that was out of use. ¶263; *see also* ¶¶264-69. Specifically, on July 25, 2023, Skiadas stated that Verizon knew that it had "some" lead-sheathed cable, but that its "records are incomplete as to exactly how much of the cable on our network has lead sheathing." ¶264. Verizon asserted that its copper network included "less than 540,000 miles of cable," of which a "small percentage" was lead-sheathed, but claimed it did not know with any more precision how much. *Id.* Verizon's estimate of roughly 540,000 miles of copper cables *excluded* the copper cable networks it acquired in deals with MCI and XO, and thus the total amount of copper cable in Verizon's network likely exceeds 540,000 miles. ¶¶67, 264-66. Verizon also stated it was unable to address what Skiadas described as "*the question we've received from a lot of investors*, which is about the process for and potential cost of removing the lead-sheathed cable in our network," saying only that it was "too soon to make any projection on what the potential financial impact might be to the company." ¶264. Verizon remained unable to quantify such costs or even the amount of lead infrastructure it owned for months after the WSJ series' release. ¶¶266-70.

Moreover, in an August 21, 2023 letter to New York agencies, Verizon

publicly acknowledged its practice of removing some lead-sheathed cables upon replacement but ***abandoning*** others, stating that "[w]hether to remove legacy cables or leave them in place requires a detailed analysis." ¶269. After the WSJ reports—and at odds with its claim not to know the extent of its lead holdings or their removal costs—Verizon maintained that lead's use in the industry was "widely known." *Id.*

## IV.   VERIZON CONCEALED ITS DECAYING LEAD CABLE NETWORK FROM INVESTORS

### A.   Verizon Made Misrepresentations Concerning Its Extensive Lead Problem

The WSJ reports exposed an enormous risk of financial liability related to lead-sheathed cables that Verizon had hidden for years—as the responses to the news from Verizon and other critical constituencies confirmed. When Defendants had spoken publicly about Verizon's FIOS expansion and copper cables before and during the Class Period, they had omitted any mention of the true and complete picture—that an estimated 81,000 miles of Verizon's copper network were lead-sheathed, including both active copper lines and lines that Verizon had abandoned in place as it "upgraded," "retir[ed]," "remove[d]," and "replace[d]" copper with FIOS. ¶¶312-26. For example, Ellis referred to Verizon's "project of replacing copper in the ILEC footprint with fiber" and emphasized the purported "cost benefits and green benefits from removing some of the copper network," without mentioning

the Company's practice of abandoning lead-sheathed cables. ¶¶315-16, 318.[3]

Relatedly, Verizon touted its recycling efforts for e-waste and lead batteries, but failed to mention that it was abandoning lead-sheathed cables, a form of e-waste. ¶¶342-54. When Verizon made periodic public statements in its SEC filings about whether "reserves" had been "established to cover environmental matters relating to discontinued business and past telecommunications activities," it misled investors because Verizon had not set aside any reserves related to the discontinued and abandoned tons of lead. ¶¶309-10. And when Verizon repeatedly asserted its "safety culture," employee health and safety standards, and the Company's commitments to "well-being and health of [the] environment, employees, customers, and communities," it mentioned neither the significant lead-related health impacts that it knew its employees were experiencing nor the substantial environmental contamination caused by its lead-sheathed cables. ¶¶328-41.

### B.    Verizon Knew It Was Misleading Investors About Its Lead Cable Network

Privately, Defendants knew that Verizon's sprawling infrastructure of active and abandoned lead-sheathed cable constituted a source of substantial financial exposure. They left those adverse facts out of their public statements.

---

[3] *See also* ¶¶312-27. Defendants Gowen, Malady, and Ellis all discussed Verizon's transition to FIOS and away from legacy cables in the context of Verizon's sustainability and environmental initiatives. *Id.*

**Verizon's Standard Practices and Records Regarding Lead.** As Verizon acknowledged publicly in August 2023, and as the WSJ reported, the Company had a corporate practice of abandoning lead-sheathed cable in place when it was replaced or retired. ¶¶88-89, 91-93, 269. CW accounts in the Complaint confirm as much. ¶¶94-98. These former Verizon line workers report that abandoning lead cables "in place" was not only a routine practice at Verizon, but Verizon's *preference*. *See* ¶97. In such cases, the line workers would merely cap the inoperable cables and make corresponding notations to Verizon engineering documents, which Defendants had access to.[4] ¶¶94, 97-98. These "dead lead cables," which the Company sometimes overlaid with FIOS cable, were left to decay over time. ¶97. Such lead infrastructure was "all over the place," at "pretty much every job[,]" in "astonishing" amounts, and was "a significant issue in . . . the old, big metropolitan areas." ¶¶94-97, 120, 213.

Consistent with these reports, multiple CWs confirm that Verizon maintained centralized documents, in the form of engineering blueprints and schematics, available in hardcopy plat books as well as electronically, showing where Verizon's cables are, *and whether they are sheathed in lead* or some other material—and that Verizon regularly provided job-specific blueprints with such information to its line

---

[4] Multiple CWs confirmed that, in addition to Verizon abandoning cables in place, when the workers did remove lead-sheathed cable, Verizon did not have a specific lead disposal protocol and thus workers often disposed of lead in dumpsters or public garbage cans. ¶86.

workers. ¶¶99-102.[5]

**Verizon's Knowledge of Employee Health Harms and Regulatory Risks from Its Lead Holdings.** Verizon knew that its employees were subject to major health hazards and the Company faced severe regulatory risk due to its lead cables. *First*, testing of employees of Verizon's predecessor entities in the 1970s and 1980s, and then by Verizon in the 2000s, demonstrated that its workers were exposed to excessive amounts of lead, as reflected in lead levels in their bones and bodily systems. ¶¶122-27, 200. Since then, Verizon has participated in, and sometimes hosted, EHSCP conferences in which Verizon and its peers give presentations on harms associated with working with lead-sheathed cables. ¶¶171-74, 180-90.[6]

*Second*, Verizon has been required to address worker petitions and regulator demands regarding its lead cables. Citing cables that were in an "appalling state of disrepair" and "pose a safety hazard to utility employees and the public," the CWA labor union petitioned regulators in six states and the District of Columbia to investigate Verizon's deteriorating network of lead-sheathed cables. ¶¶191-94.

---

[5] Additionally, Verizon's merger agreements identified lead as a "Hazardous Substance" and included warranties that the companies complied with applicable environmental laws. ¶¶393-405. The agreements also stated that the companies' "properties… including soils, groundwater, surface water… are not contaminated with any Hazardous Substances." *Id*.

[6] Nevertheless, and despite OSHA's stringent requirements (¶¶128-46), numerous CWs report that Verizon failed to provide basic workplace safety equipment and training for jobs working on Verizon's lead lines (¶¶147-52).

11

CWA's submissions highlighted lead risks to both workers and local communities ("Verizon's neglect of its copper network is also resulting in unsafe conditions for CWA members and the public..."). ¶194. In Pennsylvania, Verizon ultimately entered into a settlement with the CWA and the Pennsylvania Offices of Consumer Advocate and Small Business Advocate that required it to review and replace legacy cables deemed too damaged to remain in place. ¶199.[7]

**Verizon's Knowledge of Litigation Risk Related to Its Lead Holdings.** Meanwhile, evidence mounted that Verizon was increasingly likely to face costly litigation related to its lead infrastructure. ¶¶219-30. *First*, on March 1, 2016, Texas landowners sued Verizon peer, AT&T, seeking "damages for pollution of their land" related to "badly damaged" lead-sheathed cables. ¶¶220-21. The plaintiffs estimated the removal cost for the lead-sheathed cables at ***$33.43 per foot***.[8] ¶222. *Second*, on January 14, 2021, a California environmental group sued AT&T subsidiary Pac Bell to remove approximately 41,600 feet (7.9 miles) of lead-sheathed cables from Lake Tahoe, or over 68 tons of lead. ¶¶225-26. Pac Bell entered a settlement under which

---

[7] Throughout this time, RCRA required Verizon to report to the EPA "the nature, quantities, and disposition of hazardous waste generated" biennially. ¶215. Further showing its knowledge of its lead holdings, Verizon reported ***tons*** of lead at over 200 sites in densely populated areas in the Northeast, since 2015. ¶¶216-18.

[8] Under this per-foot cost estimate, removing all approximately 81,000 miles of lead cables in Verizon's network (excluding lead cables acquired from MCI and XO) would cost ***$14.3 billion***. ¶224.

it agreed to spend up to $1.5 million to remove the cables, but later backed out. ¶¶228-30. Likewise, residents and borough council members in Coal Center, Pennsylvania—where soil tests revealed lead levels 7.5 times greater than EPA's recommended threshold—have, since 2022, been "pushing Verizon to take the [lead] cable down[]" near areas where children play, adding to the likelihood of proliferating community pressure campaigns and litigation. ¶¶231-34.

## V. REACTIONS TO THE WSJ SERIES EVIDENCE THE PUBLIC'S SURPRISE ABOUT VERIZON'S LEAD-SHEATHED CABLE NETWORK AND RELATED MULTI-BILLION DOLLAR RISKS

As the WSJ's multi-part investigative series on the topic reflects, the enormous extent of Verizon's lead infrastructure, and its exposure to financial and regulatory risk from the same, was not publicly known before July 2023.

Critical stakeholders reacted to this news forcefully, further demonstrating that the WSJ reports revealed new, material, adverse information about Verizon's lead-sheathed cable issue in July 2023. For example, the DOJ and EPA each initiated investigations into lead-sheathed telecommunications cables. ¶¶272-74, 306. Environmental groups petitioned the EPA to intervene and ensure the immediate removal of lead-sheathed cables from areas accessible to children. ¶303. U.S. congressional leaders demanded information from Verizon and the telecommunications industry lobbying group USTelecom, among others. ¶¶278-80. The EPA has since conducted further testing, finding elevated lead levels at over

40% of sites, and has called for meetings with Verizon and other telecommunications companies. ¶273.

Analysts who covered Verizon and the telecommunications industry were also surprised. They raced to assess how much lead infrastructure Verizon owned, and its related financial exposures. On July 12, 2023, New Street Research estimated that Verizon would be responsible for at least **$8 billion** in costs tied to the newly revealed lead issue, while Deutsche Bank estimated Verizon's costs at $1 billion **before** factoring in "th[e] removal … of lead cables that were abandoned in place, [and] other potential liabilities such as soil remediation, personal injury litigation, property damage/contamination claims, or increased regulation or fines related to the potential mishandling of hazardous waste." ¶¶284-86; *see also* ¶¶286-89 (J.P. Morgan, Wolfe Research, and Oppenheimer analyst reports addressing Verizon lead liability cost concerns).

The market's reaction was also severe: Verizon's stock price dropped steeply on the news disclosed by the WSJ reports, falling from $35.90 at market close on July 7, 2023, the last trading day before the WSJ series, to $31.46 at market close on July 17, 2023, a decline of over 12%. ¶¶10, 294. Verizon's stock fell significantly on the first day of trading following numerous specific WSJ reports: for example, it dropped by $0.76 per share (2.1%) on July 10, 2023, $0.63 per share (1.8%) on July 14, and $2.55 per share (7.5%) on July 17. ¶¶296, 302, 304-05.

14

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint meets this standard if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court considers the entire complaint, takes factual allegations as true, and construes them in the light most favorable to plaintiff. *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997).

## **ARGUMENT**

## I.    THE COMPLAINT ALLEGES MATERIALLY FALSE OR MISLEADING STATEMENTS

Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To plead falsity, the complaint must "support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). "Rule 9(b) and the PSLRA do not insist upon irrefutable evidence of a statement's falsity at the pleading stage; rather, a complaint must contain particularized factual allegations that plausibly allege that a statement was misleading." *City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 681 (3d Cir. 2023). Courts have long

15

recognized that, "[a]bsent a duty to disclose, silence is not fraudulent or misleading under Rule 10b-5. When you speak, however, and it is material, you are bound to speak truthfully." *U.S. v. Schiff*, 602 F.3d 152, 162 (3d Cir. 2010). Thus, "half-truths" are actionable because they are "representations that state the truth only so far as it goes, while omitting critical qualifying information." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 891 (2024).

For reasons detailed below, the Complaint adequately alleges that Defendants violated Rule 10b-5 by misrepresenting Verizon's transition from legacy copper cables to FIOS, its network hardware recycling and waste practices, and the protection of its workers and the environment. It also alleges that Defendants falsely represented reserves set aside for environmental losses related to discontinued operations and that Verizon's financial statements complied with GAAP.

### A.    Defendants' Statements About Legacy Copper Cables and FIOS Were Materially False or Misleading

Throughout the Class Period, during earnings calls and investor conferences, Defendants repeatedly spoke about Verizon's huge investment to replace its copper cable infrastructure with FIOS, *see* ¶¶312-26, and constituent efforts to remove or "take out" Verizon's copper lines, *see, e.g.*, ¶312 ("as you replace in a certain location copper with fiber…"), ¶315 ("gives us the opportunity to pull out the copper"), ¶320 ("it also allows us to take out the old equipment, the old copper stuff…"). Defendants assured investors that Verizon's massive investment in this

16

transition away from copper would yield "cost benefits and green benefits." ¶¶315, 318; *see also* ¶324 (describing cost savings and "the cost to pull that copper out").

But these alleged misstatements omitted all facts about Verizon's sprawling lead infrastructure and practice of abandoning its lead-sheathed copper cables in U.S. communities when installing FIOS. ¶¶89-98. As confirmed by multiple CWs, the Company routinely abandoned lead cables, even preferring it to removal. ¶¶94-97. Following the WSJ reports which revealed the practice and Verizon's broad-based lead-related exposures, Verizon admitted to its practice of abandoning cables, claiming to regulators that it conducts "a detailed analysis" before leaving toxic lead plant in place. ¶269. [9]

Thus, Defendants' statements about transitioning Verizon's network to FIOS were actionably misleading. Through these statements, Verizon **voluntarily** put constituent material issues, including the purported removal of copper cables (or their abandonment-in-place) and the associated cost impacts and supposed green benefits, "into play." *Monk v. Johnson & Johnson*, 2011 WL 6339824, at *23 (D.N.J.

---

[9] Defendants suggest that the market knew all material adverse facts regarding Verizon's lead-sheathed cables and corresponding risks. *See* Mot. at 5-6. But any tacitly asserted "truth-on-the-market" defense fails here because Defendants cannot show the adverse facts "had been conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatement[s]." *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *35 (D.N.J. Aug. 8, 2011).

Dec. 19, 2011); *see In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *24 (D.N.J. Aug. 17, 2005) ("a defendant may choose silence or speech based on the then-known factual basis, but cannot choose half-truths."). As such, when Defendants chose to speak about the Company's FIOS initiatives publicly, they were required to disclose the whole picture, which included the material adverse fact that Verizon was abandoning lead-sheathed cables in place while laying FIOS next to or even *on top of* them. *See In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *9-10 (D.N.J. Aug. 6, 2019) (holding that drug company's statements about "pricing and competition for generic drugs and revenue from those drugs" created a duty to "disclose facts about its anticompetitive conduct").

Defendants argue that "[t]he mere fact that these statements mention copper cables gives rise to no duty to say anything about lead-sheathed cables." Mot. at 32. That is incorrect. As the Supreme Court recently explained, Rule 10b-5 "requires disclosure of information necessary to ensure that statements already made are clear and complete," hypothesizing that a child telling his parents "he had dessert" when in reality "he ate a whole cake" would be an actionable half-truth. *Macquarie*, 144 S. Ct. at 891. Similarly, discussing copper cables without mentioning the negative aspects—that they are sheathed in lead and strewn about the U.S., decaying in place and giving potential rise to billions of dollars in liability—was actionably misleading. Moreover, the statements ***themselves*** reference the removal and

18

replacement of copper cables and related cost issues, sometimes in response to direct analyst questions about the same. For example:

- On Verizon's October 21, 2021 earnings call, Brett Feldman, an analyst with Goldman Sachs, asked, in part: "In other words, are you going to be at the point where *you can finally rip out all this legacy infrastructure?*" Defendant Ellis responded: "That's a long-term goal for us. But certainly, *as you replace in a certain location copper with fiber, there's a good benefit from a cost standpoint*." ¶312.

- During a November 17, 2021 investor event, Defendant Ellis referred to "*our project of replacing copper in the ILEC footprint with fiber*" and later touted the "*cost benefits and green benefits from removing some of the copper network at the same time.*" ¶315, 318.

- On March 3, 2022, during Verizon's Investor Day, Defendant Malady stated: "It allows us to drive more revenue, but it also *allows us to take out the old equipment, the old copper stuff and get people on new things*." ¶320.

- On March 15, 2023, during an interview, Defendant Gowen stated: "when we went through . . . my time here from a copper to fiber migration *what is the cost to pull that copper out what is the absolute home run benefit of putting fiber in* . . ." ¶324.

With these and similar statements, Defendants put the financial and environmental impacts of the "retirement" of Verizon's copper infrastructure (including lead-sheathed cables) at issue, creating a duty to accurately disclose the Company's practices, and related risks, regarding the retirement of lead cables that was integral to this operation. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 652 (E.D. Pa. 2015) (finding defendants' statements about "sales trends and promotional activity," "put these topics in play" which "triggered a duty to disclose

19

and correct any inaccurate or misleading prior disclosure.").[10]

Defendants next argue that their statements about removing copper lines were not misleading because they never said "Verizon removed **all** copper cable." Mot. at 33 (emphasis in original). Not so: "[e]ven if the statements were literally true," because Verizon did remove some copper, "they became through their context and manner of presentation, devices which [misled] investors." *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *17 (D.N.J. Aug. 8, 2018) (quoting *Merck*, 2011 WL 3444199, at *9). It was materially misleading to extoll Verizon's FIOS transition and "removal" of copper cables to investors while omitting the environmentally toxic dimension that exposed Verizon to enormous financial, legal and regulatory risk—including that Verizon routinely left lead infrastructure either still in use or decaying in place.

Defendants' argument that their statements were too non-particularized regarding cost savings and environmental benefits to be capable of being false, fares no better. Mot. at 32-33. To plead falsity with particularity, a plaintiff must allege the "who, what, when, where and how." *See Institutional Invs. Grp. v. Avaya, Inc.*,

---

[10] In contrast, in *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 333 (3d Cir. 2007) (Mot. at 32), the court held that a company disclosing its registration of common stock and the investors who facilitated the stock offering did not mislead investors by not referencing a prior failed business relationship with one of the investors. This type of "pure omission" (*see Macquarie*, 144 S. Ct. at 891) is clearly distinguishable to Defendants' pointed half-truths about its copper infrastructure.

564 F.3d 242, 253 (3d Cir. 2009). This requirement is met here, based upon well-pled allegations of Verizon's own admissions, the revelations in the WSJ series, and the uniform reports of multiple former employees that abandoned lead-sheathed cable was ubiquitous at Verizon sites. *See supra* at 4-13; *see also Merck*, 2011 WL 3444199, at *16 ("particularity under the PSLRA" met when considering "the[] misrepresentations of fact in the context of the many detailed factual allegations").[11]

Defendants' related argument that Plaintiffs must allege that "then-current estimates of any financial or environmental costs outweighed the benefits" of the FIOS transition (Mot. at 32) fabricates a prerequisite at this stage that misstates the law. A defendant is not required to disclose only those adverse material facts about an issue it has chosen to disclose that "outweigh[]" the positive information it has publicly highlighted. *See SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897, 900 (E.D. Pa. 2018)) (defendants may not publish "a favorable picture" of a material issue "without including the details that would have presented a complete and less favorable one."). Rather, "once a company has chosen to speak on an issue

---

[11] Defendants' suggestion that investors should have investigated and known the lead-related costs and risks (Mot. 5-6, 17) despite their false assurances is misguided because investors are "not require[d] to seek out information above and beyond what was publicly available." *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 58 (E.D.N.Y. 2011). It is particularly off-base here, where Verizon itself remained unable to quantify its lead holdings or costs in late 2023. ¶¶266-70.

. . . it cannot omit material facts related to that issue." *Id.*at 897.[12] Defendants ignore Plaintiffs' allegations and "place too much emphasis on the particularity requirement." *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *5 (D.N.J. Dec. 6, 2018).

Moreover, if Defendants' asserted ignorance about Verizon's exposure to lead-related risks and liabilities is accepted, Mot. at 3, then their misstatements lacked a reasonable basis. Verizon asserted in July 2023 that it did not have complete records of its lead-sheathed cable network, nor the ability to make any "projection on what the potential financial impact" of remediating or removing it would be. ¶¶264-65 (admitting there are "a number of unknowns"). Without this basic information on scale and cost, Defendants could not have been considering the savings, costs, green benefits and risks associated with "removing" or "retiring" cables. That such costs and risks were material is evident from not only Defendants' repeated reference to them when discussing Verizon's core FIOS initiative, but also (i) the sheer size of Verizon's lead cable footprint (approximately 1.5 billion pounds spanning thousands of miles) (¶89); (ii) the cost estimates from outside analysts for Verizon's lead cleanup (¶¶284-86); and (iii) the numerous indicators supporting the health and environmental dangers and risks of deteriorating lead cables (¶¶182-234).

---

[12] This argument also has absurd practical implications—to accept it would mean that any corporation could avoid liability by simply failing to analyze adverse issues.

**B.**     **Defendants' Statements About E-Waste Were Materially False or Misleading**

In proxy materials and ESG Reports, Defendants omitted material facts regarding lead-sheathed cables when touting the Company's waste recycling and environmental efforts. *See* ¶¶343, 347, 350, 352. For example, Defendants stated Verizon was "reduc[ing] the environmental impact of [its] products . . . recycling, refurbishing and/or reusing our products" and that "[o]ur goal is to divert as much e-waste as possible from landfills by reusing or responsibly recycling materials." ¶¶343-44, 347. Defendants' statements were false or misleading by virtue of Verizon's preferred practice of abandoning lead cables in place and, as confirmed by CWs, dumping lead without proper precautions. ¶¶86, 90-97.

Defendants' arguments as to these statements fail. *First*, Defendants argue the statements are immaterial puffery. Mot. at 37. But "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro*, 964 F.2d at 280 n.11; *see also Allergan*, 2019 WL 3562134, at *7 (materiality is "fact-specific" and "courts have determined it is better resolved by the fact finder.").

Seen in context, these statements are plainly specific and material. *See Hall v. Johnson & Johnson*, 2019 WL 7207491, at *14 (D.N.J. Dec. 27, 2019) (context informs the puffery analysis). Defendants' statements about "responsibly recycling"

23

the Company's "network equipment" (which includes lead cables) (¶¶342, 347) were "specific assertions" regarding a discrete practice, which supports materiality. *See Allegheny Cnty. Emps' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 218-19 (E.D. Pa. 2021). Further, investors understood that Verizon operated a telecommunications network spanning hundreds of thousands of miles where improper disposal of industrial waste could significantly harm the Company in financial, legal and regulatory regards. No doubt, that is why Defendants took pains to emphasize to investors that Verizon was "work[ing] to reduce the environmental impact of [its] products" through "recycling refurbishing and/or reusing our products." ¶343. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (statements about "reputation for integrity or ethical conduct" actionable when "central to its financial condition").

*Second*, Defendants argue they had no duty to discuss the disposal of lead-sheathed cables. Mot. at 37. But once Defendants chose to discuss e-waste and recycling, including network equipment (i.e., cables), they were obligated to disclose all material adverse facts related to failures to properly remove and retire lead plant. *See, e.g.*, *Allergan*, 2019 WL 3562134, at *7. *Third*, Defendants argue the statement alleged in ¶350 is not pled with particularity because, in their view, the Complaint does not identify how their conduct ran afoul of regulatory mandates or industry standards. Mot. at 33. But this argument ignores that the Complaint alleges that this

24

statement would mislead a reasonable investor about Verizon's abandonment and dumping of lead-sheathed cables, corporate practices the Complaint pleads with particularity. ¶¶86, 90-97, 351; *Merck*, 2011 WL 3444199, at *16.

## C.    Defendants Made Materially False or Misleading Statements Regarding Employee Health and Safety

During the Class Period, Verizon emphasized its commitment to creating a safe work environment. *See* ¶332 ("Verizon is committed to protecting the environment and the safety and health of its employees… and the communities where we operate."); *see also* ¶¶328, 330, 336, 338, 340. These statements were false or misleading because Verizon's lead infrastructure and waste created dangerous conditions for workers and the environment at countless sites. ¶¶120, 150-52. Verizon failed to provide many employees with sufficient protective equipment or properly educate them on lead handling. *See id*. Moreover, the CWA detailed Verizon's failures to prevent hazardous conditions: "lines sagg[ed] dangerously below minimum clearance levels; cables [were] not properly repaired and replaced; ungrounded, exposed wires [were] used as a work-around because Verizon [would] not spend the money to replace damaged cables," resulting in "*the hazardous exposure of lead cable to the environment*." ¶197.

By putting the issues of employee health and safety and environmental responsibility in play, Defendants were required to disclose all material facts, but did not, instead omitting and misrepresenting the truth about Verizon's lead

25

infrastructure issues. *See Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *23. As here, a company's statements emphasizing "the strength of a particular business operation, may be actionable as securities fraud, where those operations are in reality deficient." *Hall*, 2019 WL 7207491, at *16.[13]

Defendants' materiality arguments fail. Mot. at 34-35. In the context of safety-related statements, courts consider facts such as whether a company made repeated and "specific assertions of the priority of safety" or "implied an underlying prioritization of resources and attention." *Energy Transfer*, 532 F. Supp. 3d at 218-19.[14] Verizon consistently touted its status and reputation as an environmentally responsible business that provides a safe and healthy workplace in its CSR Reports, ESG Reports, and SEC Filings. *See, e.g.*, ¶¶328-38, 406-13; *see also* ¶328 (describing "operating responsibly" as "fundamental to the long-term success of Verizon"). When taken in context, these statements are not empty generalities, but material and actionable.[15]

---

[13] Verizon's safety statements did not need to mention lead-sheathed cables to be misleading. *See Hall*, 2019 WL 7207491, at *16 (sustaining statements "although they did not specifically reference the Talc Products" because they "suggested that the Company was taking corrective action" on quality issues).

[14] *Malozzi v. Innovative Indus. Props., Inc.*, 2023 WL 6121499, at *11 (D.N.J. Sept. 19, 2023) (Mot. at 34) is in accord. That court specifically stated: "to the extent these statements provide specific numbers or repeatedly address subjects like . . . status and reputation . . . , these statements may go beyond the general and vague."

[15] Verizon's repeated assertions about the strength of its commitment to employee safety and environmental responsibility distinguish these allegations from *Ong v.*

**D.    Defendants Issued Materially False or Misleading Statements in SEC Filings Regarding Loss Reserves and Loss Contingencies**

As detailed above, throughout the Class Period, Verizon faced significant risks of loss related to its lead-sheathed cable network. These severe and varied risks included regulatory risk (¶¶364-65), public health and operational risks (¶366), litigation risks (¶367), and remediation risks (¶368). Throughout this time, as they would later admit, Defendants knew that Verizon's wireline infrastructure contained a vast network of toxic lead-sheathed cables, and that Verizon had a regular—and apparently preferred—practice of abandoning them in place. ¶¶97, 269-70.

Defendants materially misled investors regarding these undisclosed risks of loss in Verizon's financial statements in two respects. *First*, the Company represented that "[r]eserves have been established to cover environmental matters relating to discontinued businesses and past telecommunications activities." ¶309. But in reality, Defendants (i) had ***not*** set aside reserves to cover environmental matters related to its lead-sheathed cables; and, (ii) omitted the material fact of significant potential environmental costs stemming from them. ¶¶310-11.

*Second*, Defendants falsely represented to investors that Verizon's financial statements complied with GAAP. *See* ¶¶372, 374, 376, 378, 380. ASC 450 of GAAP

---

*Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018), and align them with *Eletrobras*, 245 F. Supp. 3d at 463 and *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) ("a reasonable investor would rely upon them to conclude that Equifax made cybersecurity a serious priority").

requires disclosure when the probability of a material loss is "reasonably possible," i.e., "more than remote but less than likely[.]" *See* ASC 450; ¶¶357-61. Defendants knew throughout the Class Period that the possibility of Verizon needing to expend significant sums to study, test, and/or remove lead-sheathed cables was, at minimum, more than "remote." *See* ASC 450; ¶¶362-68. Defendants, however, did not disclose any potential risk of loss related to lead-sheathed cables. As a result, Defendants submitted financial statements that did not accord with GAAP, rendering their statements about GAAP compliance materially misleading.

Defendants argue both categories of statements are nonactionable opinions, citing *Prudential*, 70 F.4th 668. Mot. at 30, 38. But *Prudential* undercuts Defendants' position as to the reserve statements. According to *Prudential*, "when the stated amount of reserves is challenged, ***not on the factual ground that the indicated amount is not actually set aside***, but for the sufficiency of that set-aside to pay claims by policyholders, the stated reserve amount, as a manifestation of actuarial judgment, functions as an opinion." 70 F.4th at 684. Here, Verizon misled investors by speaking positively about its reserves without disclosing that it had not "actually set aside" any reserves to contend with Verizon's lead-sheathed cable problem. *Id.* Accordingly, these statements were "not [] subjective interpretation[s] or expression[s] of belief" but "affirmative statement[s] that painted a favorable picture without including the details that would have presented a complete and less

28

favorable one." *See Endo*, 351 F. Supp. 3d at 900.

Even if both sets of statements are opinions, they are still actionable. Under *Omnicare*, opinions may be false or misleading where they: (i) express an insincere statement of the speaker's opinion; (ii) include an "embedded" factual assertion, if "any of the embedded factual assertions are untrue"; or, (iii) involve omissions that render the statement misleading, if under the circumstances, "an opinion reasonably implies facts that are untrue . . . without a qualifying statement regarding those facts." *Prudential*, 70 F.4th at 685 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-89 (2015)).

In particular, the reserve statements, under the second *Omnicare* prong, include the embedded fact that Verizon had analyzed and accounted for risks associated with its lead-sheathed cable network, and set aside reserves related to it, when this was untrue. ¶¶269-70. Under the third *Omnicare* prong, these statements involve omissions (i.e., regarding Verizon's massive lead-sheathed cable infrastructure) that rendered the statements materially misleading. Accordingly, these statements are actionable even under *Omnicare*. *See Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 174-76 (2d Cir. 2020) (finding liability for opinion statement that "implie[d] . . . the absence of contrary facts").

The GAAP certification statements also meet the second and third *Omnicare* prongs. Verizon's GAAP certifications posited an embedded fact that the Company

29

did not face contingent liabilities related to its lead-sheathed cables, when it did. ¶¶364-68. Further, the GAAP statements omitted mention of lead-sheathed cables and issued no qualifying statement. These facts support the "plausible inference that Defendants did not sincerely believe, nor did they have a reasonable basis to believe, that their financial statements complied with ASC 450 . . ." *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *8 (D.N.J. Dec. 16, 2022); *see also In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164, at *7 (E.D. Pa. Dec. 22, 2008) ("[T]here was a probability that RAIT would not be able to collect all amounts owed by its TruPS issuers and that therefore RAIT was not in compliance with GAAP.").

## II.   THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

A plaintiff adequately pleads scienter through "facts that constitute circumstantial evidence of either recklessness or conscious behavior." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *15 (D.N.J. July 27, 2018).[16] A plaintiff "must sufficiently plead defendants' knowledge of facts or access to information contradicting their public statements . . . [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts

---

[16] Defendants overstate the import of the absence of motive and opportunity allegations. Mot. at 18-19. "While it is true that motive can be a relevant consideration . . . the absence of a motive allegation is not fatal . . . allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Avaya*, 564 F.3d at 277 (quoting *Tellabs, Inc. v. Makor Issues & Rts, Ltd.*, 551 U.S. 308, 325 (2007)).

related to the corporation." *Id.* at \*18. The allegations "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Rather, the question is "whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. "Inference is not arithmetic. The inferential significance of any single allegation can be determined only by reference to all other allegations." *Id*. at 273. The court assesses scienter "with a practical and common-sense perspective." *Id*. at 272-73.

## A.    There Is a Strong Inference That Defendants Made False Statements with Scienter

The material adverse information that Defendants failed to disclose to investors in the public statements at issue was the scope and extent of Verizon's lead-sheathed cable (estimated as ***81,000 miles'*** worth) (¶89), which it had a practice of abandoning in place in U.S. communities—and thus, Verizon's exposure to acute regulatory, litigation and other risks with financial impacts to the Company estimated in the ***billions*** of dollars. Importantly, Defendants concede they "were aware of the lead-sheathed cables' existence," (Mot. at 3), which they "long addressed on an ordinary-course basis" (Mot. at 27); that is, they knew they owned an abundance of decaying lead infrastructure; that lead is toxic; and that lead was not removed upon installation of FIOS. Nevertheless, Defendants contend the "only . . . inference to be drawn" is that the existence of lead-sheathed cables was not

31

something they "believe[d] . . . presented a material problem. . . ." *Id*. at 3.

This proffered inference strains credulity. Verizon grasped the enormous environmental, health and regulatory risks posed by decaying lead infrastructure. ¶15. It now acknowledges in regulatory filings that its lead-sheathed copper cables may present material risks including "regulatory actions, litigation, penalties and other liability, remediation and compliance costs or negative operational impacts[.]" ¶14. There exists only one intervening event of consequence: the WSJ reports, which made known the extent of Verizon's risk exposure from its lead network—where Verizon, itself, had not. For these reasons, in addition to their admissions, the more probable inference is that Defendants misrepresented these facts knowingly or recklessly, and did not simply misunderstand the significance of the risk as a matter of "mistake" or "negligence." Mot. at 27.[17]

*First*, the massive scope of Verizon's potential liability supports an inference of scienter. After the bombshell WSJ series stunned regulators, government leaders and investors, Verizon confirmed its ownership and responsibility for its extensive lead infrastructure, *see* ¶¶269-70, and acknowledged its practice of abandoning toxic lead-sheathed cabling in place when replacing it with FIOS (which multiple first-

---

[17] Courts routinely reject arguments at this stage that conduct was mere "mismanagement" or "negligence" where, as here, defendants "made false or misleading statements" concerning the conduct. *See Equifax*, 357 F. Supp. 3d at 1217-18; *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001).

hand CW accounts confirm). ¶¶90-97. While Verizon floundered, contending that it did not even know the precise extent of its lead holdings in 2023, it took investment analysts who cover the Company mere days to estimate the amount of Verizon's lead infrastructure and the multi-billion-dollar cost to remove and remediate it. ¶¶284-86. The "magnitude" of the toxic lead cable network that Verizon knew remained in U.S. communities after broad-based FIOS implementation supports a finding that Defendants knew or recklessly disregarded that they were misrepresenting and/or omitting material, adverse facts in their public statements regarding replacing copper with FIOS. *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *5 (N.D. Cal. Oct. 19, 2021) ("magnitude of the problems" that defendants failed to disclose and rapidity with which they became apparent raised "inference that Defendants knew their statements were misleading, or were deliberately reckless to the possibility"). The lead cable risk exposure was "simply too significant for it to be plausible that top . . . management was not aware of the possible ramifications of the problem by the time statements at issue [regarding replacing copper with FIOS] were made . . . ." *In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011).

The recklessness of Defendants' conduct is further substantiated by representations made about Verizon's loss reserves and contingencies. *See supra* Argument Part I.D. In issuing these statements, Defendants should have

33

accounted—or recklessly failed to account—for the liabilities associated with Verizon's lead-sheathed cable network, particularly if they were regularly confronting them on an "ordinary-course basis." Mot. at 27. *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at \*10 (N.D. Cal. Feb. 27, 2018) ("Just as it is implausible that the [] Defendants were unaware of the … scheme given the extent of the alleged fraud and the number of red flags, it is implausible that Wells Fargo's senior management, involved in the day-to-day operations…was unaware of the alleged fraud.").

*Second,* the Individual Defendants' scienter is further corroborated by the "content and context of many of the alleged misleading statements," which addressed the implementation of the FIOS network and replacement of Verizon's existing copper infrastructure. *Hall*, 2019 WL 7207491, at \*24-25; *see* ¶¶312, 315, 317, 320, 322, 324, 326 (Defendants Ellis, Malady, and Gowen each discussing Verizon's installation of FIOS while removing legacy infrastructure). Defendants' emphatic repetition of the proposition that Verizon was replacing legacy copper with FIOS, including in response to specific analyst questions about the same, evinces knowledge of the subject matter in question and supports an inference of their scienter. *See Avaya,* 564 F.3d at 270 ("the context (specific analyst queries)" and consistent material "content" of the alleged misstatements supported inference of scienter); *Urban Outfitters*, 103 F. Supp. 3d at 653 ("[M]aybe the most powerful

34

evidence of scienter is the content and context of the statements made by [defendants], which were made 'in response to . . . analysts questions. . . . [D]efendants' omission of actual circumstances that were contrary to their answers present[ed] an obvious risk of misleading investors.'"); *Endo*, 351 F. Supp. 3d at 906 (presuming that officers who spoke as "authoritative sources" spoke with scienter and knew that "withholding the negative data . . . contradicted their public statements [and] was misleading to investors").

*Third,* Verizon's abandonment of its lead infrastructure—the offal or "other side of the coin" of its signature FIOS network expansion—concerns Verizon's core operation and chief business driver since the early 2000s, and thus supports an inference of scienter. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) (finding it "exceedingly unlikely" that CEO was unaware of problems with the company's two major products where he made numerous false statements about the products); *Allergan*, 2019 WL 3562134, at \*12 (core operations doctrine "allows knowledge of fraud to be imputed to individual defendants where the alleged fraud relates to the core business of the company").

Verizon's cabling infrastructure is the backbone of its Consumer Group, which constituted 76% of Verizon's consolidated revenues in fiscal year 2022. ¶71; *see Hall*, 2019 WL 7207491, at \*21 (crediting core operations inference to statements concerning flagship product that made up only 0.3% of sales). Verizon

35

has invested over $25 billion in the past two decades to transition its copper network to FIOS. ¶90. Defendants regularly discussed the Company's progress in expanding its FIOS network and replacing its copper network during earnings and analyst calls. As detailed above (*see supra* Argument Part I.A.), they specifically referenced, "removing" and "taking out" copper, and the "cost benefits and green benefits from removing some of the copper network at the same time"—without ever mentioning the toxic lead sheathing that Verizon still owned and/or left behind. *See, e.g.*, ¶318; *see also Energy Transfer*, 532 F. Supp. 3d at 232 (that statements concerned "company's [largest] capital spending" project supported core operations inference).[18] The known, severe toxicity of lead to humans in the communities where Verizon left it, "coupled with the fact that the allegations of fraud relate to a core operation of the Company," also support an inference of scienter. *Hall,* 2019 WL 7207491, at *25.[19]

---

[18] The reputational risk associated with health and environmental risks from lead also belies claims that Defendants were somehow unaware of Verizon's exposures in this regard. *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 196 (D.N.J. 2022) (issues with "products that present substantial reputational risk may suffice" to plead scienter based on core operations doctrine).

[19] Defendants' assertion that the lead-sheathed cable issue is unrelated to a core operation because the cables "are believed to be a small portion of its legacy network" (Mot. at 25) misses the point that such cables are integral to the Company's wireline infrastructure, indisputably a core operation, and were routinely abandoned during Verizon's central, flagship business activity—the FIOS expansion.

*Fourth*, Defendants' "access to information that contradict[ed] their statements," firmly supports an inference of scienter. *See In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005). As Verizon's senior-most leadership, the Individual Defendants had access to Verizon's proprietary network of engineering schematics and blueprints, which were available in both electronic form and hard copy books, and provided minute, street-level detail on the locations of Verizon's live and abandoned lead-sheathed cables. ¶¶99-102. As multiple CWs report, Verizon employees could tell which cables were lead-sheathed just by looking at the schematics. ¶102. These were the cables the Defendants repeatedly discussed "replacing," "removing," and "retiring," to Verizon's purported financial and green benefit.

Beyond Verizon's extensive lead-related internal records, Defendants also had access to claims and reports made by key Company stakeholders. These include claims by the CWA, which represented approximately 20% of Verizon's line workers, that were addressed to key governmental and regulatory agencies and urged that Verizon's lead-sheathed cables were deteriorating and contaminating local environments. For example, in 2015, the CWA filed a petition with the P-PUC and multiple other states to investigate Verizon's deteriorated lead cables. ¶¶191-95. Verizon ultimately entered into a settlement with Pennsylvania in the wake of related hearings. ¶¶194, 197. It is implausible that Verizon's executives would not know

37

about the claims made by a key union filed in numerous states about Verizon's decaying lead infrastructure, which led to at least one settlement. Rather, it can "be inferred at this stage of the litigation that Defendants were aware of the threat to operations posed by the company's [alleged regulatory] noncompliance." *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at \*16 (D.N.J. Mar. 21, 2019).

*Fifth*, the inference of Defendants' scienter is even stronger because of their "fail[ure] to check information they had a duty to monitor." *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at \*16 (W.D. Pa. May 18, 2023). Defendants have **conceded** that "lead-sheathed cables . . . were simply one issue among many that Verizon had long addressed on an ordinary-course basis." Mot. at 27. There are, of course, responsibilities that come with owning toxic, decaying assets. For example, as the Company's senior-most executives, the Individual Defendants were responsible for monitoring Verizon's adherence to regulations and compliance with environmental and worker safety laws as they related to potential toxic effects stemming from its lead-sheathed cables. *See supra* at 5-6.

Taken together, these facts establish Defendants' knowledge. The counter-inference offered by Defendants would require the Court to conclude that Verizon's executives knew of the Company's sprawling, abandoned network of toxic cables throughout the United States, but did not consider the implication of that to be material to investors—*until the WSJ made those very facts known* to the world.

38

### B.    The Complaint Adequately Pleads Verizon's Scienter

The Complaint alleges Verizon's scienter. *First*, the Court may impute each Individual Defendant's scienter, addressed above, to Verizon, because each is a "high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *See Cognizant*, 2018 WL 3772675, at *33 (citing *In re Omnicare Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014)).

*Second*, the Court may also find Verizon's scienter based on the "pervasiveness of the fraud, the conscious misbehavior of the particular corporate employees, and the complicity of the corporate entities. . . ." *Id.* (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). Here, Verizon's scheme to abandon lead cables in place and deceive investors about the concomitant risks "did not involve a limited group of rogue employees perpetuating fraud and concealing it from corporate management, but instead was a pervasive operation extending from senior management itself." *Id.*

### III.    THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY

Defendants' arguments as to scheme liability fail. *First*, scienter is established for this claim for the same reasons provided above. *Second*, Plaintiffs sufficiently allege the "acts, practices, and a course of business which operated as a fraud and deceit upon [investors]" in support of this claim. *Cognizant*, 2018 WL 3772675, at *16-19 (explaining contours of "scheme" liability and collecting cases). These

39

allegations include that Verizon engaged in a routine practice to "abandon" and "retire" lead cables to decay in U.S. communities, and hid this practice and the associated risks of financial losses to investors. *See, e.g.*, ¶¶94-97, 312-28, 356-71.

## IV.  THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Because Plaintiffs adequately allege a Section 10(b) claim, the alleged Section 20(a) claim for control person liability against the Individual Defendants also must be sustained. The Individual Defendants do not dispute that they controlled Verizon, and while "the Third Circuit does not require that culpable participation be pled," Plaintiffs plead their culpable participation in Verizon's violations. *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *29 (D.N.J. Mar 24, 2008).

<u>**CONCLUSION**</u>

Plaintiffs respectfully request that Defendants' Motion be denied in its entirety. If the Court dismisses the Complaint in any respect, Plaintiffs respectfully request leave to amend.

Date:  May 6, 2024

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**

*/s/ James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
Kevin Cooper
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

40

jcecchi@carellabyrne.com
decklund@carellabyrne.com
kcooper@carellabyrbe.com

*Liaison Counsel for Lead Plaintiffs and the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Gregory M. Castaldo*
Gregory M. Castaldo
Joshua E. D'Ancona
David A. Bocian
Nathaniel C. Simon (*pro hac vice* forthcoming)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jdancona@ktmc.com
dbocian@ktmc.com
nsimon@ktmc.com

**GRANT & EISENHOFER**

*/s/ Daniel L. Berger*
Daniel L. Berger (*pro hac vice* pending)
Caitlin M. Moyna (*pro hac vice* pending)
Mica A. Cocco (*pro hac vice* pending)
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
dberger@gelaw.com
cmoyna@gelaw.com
mcocco@gelaw.com

41

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

## CERTIFICATE OF SERVICE

I, James E. Cecchi, hereby certify that on May 6, 2024, I caused a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

Dated:  May 6, 2024

/s/ James E. Cecchi
James E. Cecchi
**CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs
and the Class*

43