**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

STICHTING PENSIOENFONDS METAAL EN TECHNIEK; STICHTING PME PENSIOENFONDS; STICHTING MN SERVICES AANDELENFONDS NOORD-AMERIKA; AKADEMIKERPENSION; LANNEBO KAPITALFÖRVALTNING AB; and STOREBRAND ASSET MANAGEMENT AS, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

VERIZON COMMUNICATIONS INC., HANS VESTBERG, MATTHEW ELLIS, KYLE MALADY, JAMES GOWEN and ANTHONY SKIADAS,

Defendants.

No.: 3:23-cv-05218-ESK-AMD

Hon. Edward S. Kiel
District Judge

Hon. Ann Marie Donio
Magistrate Judge

CLASS ACTION

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 2

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. PLAINTIFFS ..... 6

B. DEFENDANTS ..... 7

IV. RELEVANT NON-PARTIES ..... 10

V. FACTS ..... 16

A. BACKGROUND ON VERIZON ..... 17

B. VERIZON'S ENVIRONMENTAL AND SAFETY SYSTEMS ..... 18

1. Verizon's Environmental Health and Safety Policy ..... 18

2. Verizon's ESG and Sustainability Infrastructure ..... 19

3. Verizon's Recycling Initiatives ..... 20

C. VERIZON OWNS A MASSIVE NETWORK OF DECAYING LEAD CABLES ..... 21

1. Verizon Abandoned Its Decaying Lead Cables ..... 21

2. Verizon Knew Where Its Lead Cables Were Because It Kept Detailed Records of Its Cable Footprint and Cable Materials in Proprietary Engineering Databases ..... 24

D. LEAD POSES SERIOUS HUMAN HEALTH CONCERNS ..... 27

E. VERIZON'S LEAD-SHEATHED CABLES PRESENTED SIGNIFICANT AND KNOWN RISKS TO WORKER SAFETY, BUT VERIZON FAILED TO ENSURE WORKERS WERE PROTECTED ..... 27

1. Telecommunications Workers Working on Cable Lines Are Regularly Exposed to Lead and Face Health Consequences as a Result ..... 28

2. Empirical Evidence Has Long Established High Levels of Lead in Telecommunications Workers ..... 31

3. In Light of Severe Health Hazards, OSHA Sets Stringent Lead Safety Regulations ........ 32

4. The CWA Has Long Raised Concerns of Lead Exposure in the Telecommunications Industry ........ 35

5. Verizon Regularly Violates OSHA Lead Regulations ........ 37

F. VERIZON'S LEAD-SHEATHED CABLES PRESENTED SIGNIFICANT RISK OF ENVIRONMENTAL CONTAMINATION AND REGULATION ........ 38

G. VERIZON KNEW THAT ITS CABLES WERE HARMING THE ENVIRONMENT AND ITS EMPLOYEES ........ 39

1. The Risk of Lead Contamination Has Been Discussed at EHSCP Conferences Involving Verizon for More Than a Decade ........ 40

a. Verizon Employees Have Been Deeply Involved in the EHSCP ........ 40

b. Lead Hazards Are Discussed Regularly at EHSCP Annual Symposiums ........ 41

2. The CWA Reported that Verizon Was Causing the "Hazardous Exposure of Lead Cable to the Environment" ........ 46

3. Verizon Received Blood Sampling Data of Workers Showing Lead Exposure ........ 50

4. Verizon Employees Internally Raised Issues of Lead Exposure ........ 52

5. Verizon Was Subject to Repeated RCRA Notices for Lead Contamination ........ 54

6. Verizon's Prospect of Environmental Litigation Is Heightened as AT&T Is Sued with Regard to Its Lead Cables ........ 57

7. Verizon Faces Community Pressure to Remove Lead Cables in Coal Center, Pennsylvania ........ 61

H. THE *WSJ*'S THOROUGH REPORTING REVEALED THAT VERIZON'S TOXIC LEAD CABLES ARE LEACHING LEAD INTO THE ENVIRONMENT ........ 62

I. THE FALLOUT OF THE *WSJ* EXPOSÉ ........ 67

1. Verizon's Immediate Response to the *WSJ* Exposé ........ 67

2. Government Response to the *WSJ* Exposé ........ 68

3. Estimates of the Scope of Verizon's Lead Cables and Associated Liability ........ 73

4. Verizon's Liability from Lead-Based Personal Injury and Toxic Tort Lawsuits ........ 76

5. After the Class Period, Verizon Finally Disclosed Risk of Loss Related to Lead-Sheathed Copper Infrastructure ........ 77

J. THE PRICE OF VERIZON STOCK PRECIPITOUSLY DECLINED IN THE WAKE OF THE *WSJ* EXPOSÉ ........ 78

1. The July 9, 2023 Article ........ 78

2. The July 12, 2023 Article ........ 85

3. The July 14, 2023 Article ........ 89

4. The July 17, 2023 Article ........ 91

5. The July 26, 2023 Article ........ 94

VI. DEFENDANTS INTENTIONALLY MISLED INVESTORS ABOUT VERIZON'S LEAD CABLES ........ 96

A. DEFENDANTS INTENTIONALLY MISLED INVESTORS ABOUT LEAVING COPPER WIRES IN PLACE DURING VERIZON'S CONVERSION TO FIBER OPTICS ........ 96

B. DEFENDANTS INTENTIONALLY MISLED INVESTORS ABOUT VERIZON'S E-WASTE RECYCLING PRACTICES ........ 116

C. DEFENDANTS INTENTIONALLY MISLED INVESTORS ABOUT VERIZON'S COMMITMENT TO EMPLOYEE HEALTH AND SAFETY AND THE ENVIRONMENT ........ 120

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ........ 133

A. DEFENDANTS HAD ACTUAL KNOWLEDGE THAT VERIZON'S EXTENSIVE LEAD CABLE NETWORK POSED TOXIC RISKS TO THE ENVIRONMENT AND ITS WORKERS ........ 133

1. Facts Underlying Defendants' Scheme Outlined Above Demonstrate Their Knowledge ........ 133

2. Verizon Submitted Comments to the EPA in 2011 Evidencing Its Knowledge of Lead Cables and Resulting Dangers to Workers ........ 135

3. Verizon Is Required to Report Retirement of Copper Cables, Including Lead-Sheathed Cables, to the FCC ........ 136

4. Due Diligence Performed in Connection with Verizon's Corporate Reorganizations Revealed Its Extensive Lead Cable Network .................. 138

5. Defendants Claim to Be Focused on Sustainability, the Environment, and Employee and Community Health .................. 139

6. The Lead Cables Concerned Defendants' Core Operations .................. 141

7. Defendants Spoke Regularly About the Issues They Misled Investors About .................. 141

B. DEFENDANTS HAD MOTIVE AND OPPORTUNITY TO MISLEAD INVESTORS ABOUT VERIZON'S LEAD CABLES .................. 141

C. THE INDIVIDUAL DEFENDANTS WERE VERIZON'S TOP EXECUTIVES .................. 144

1. Vestberg .................. 144

2. Ellis .................. 145

3. Malady .................. 145

4. Gowen .................. 146

5. Skiadas .................. 147

VIII. LOSS CAUSATION .................. 147

IX. CLASS ACTION ALLEGATIONS .................. 148

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................. 149

XI. PRESUMPTION OF RELIANCE .................. 151

XII. CLAIMS FOR RELIEF .................. 152

COUNT I For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants .................. 152

COUNT II For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants .................. 154

XIII. PRAYER FOR RELIEF .................. 156

XIV. JURY TRIAL DEMANDED .................. 157

Lead Plaintiffs Stichting Pensioenfonds Metaal en Techniek, Stichting PME Pensioenfonds, Stichting Mn Services Aandelenfonds Noord-Amerika, AkademikerPension, Lannebo Kapitalförvaltning AB, and Storebrand Asset Management AS (collectively, "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their undersigned attorneys, allege the following information upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, *inter alia*, Lead Counsel's investigation which included review and analysis of: (a) regulatory filings made by Verizon Communications Inc. ("Verizon" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) regulatory filings made by Verizon with the Federal Communications Commission ("FCC"); (c) regulatory filings made by Verizon and its predecessor companies, including with the Department of Labor's ("DOL") Occupational Safety and Health Administration ("OSHA") department; (d) regulatory filings made by Verizon with the Environmental Protection Agency ("EPA"); (e) filings made by the Communications Workers of America ("CWA") with public utility commissions and government agencies; (f) press releases, presentations, and media reports issued and disseminated by the Company; (g) analyst and media reports concerning Verizon; (h) regulatory filings made by Verizon with New York State's Department of Public Service, Department of Environmental Conservation, and Department of Health; (i) other public information concerning the Company; and (j) investigative interviews with former Verizon employees who had first-hand knowledge of the Company's business operations regarding its lead-sheathed copper cable network.

This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Verizon securities between March 18, 2019 and July 26, 2023, both dates inclusive (the "Class Period"). Lead Plaintiffs seek to recover compensable damages caused by Defendants'

violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## I. INTRODUCTION

1. On July 9, 2023, *The Wall Street Journal* ("*WSJ*") shocked investors, environmental advocates and the nation, with its bombshell article titled "America Is Wrapped in Miles of Toxic Lead Cables." This article was the first in an investigative series that revealed that American telecom companies, including Verizon, own legacy lead-sheathed copper cables strewn across the country which are "a hidden source of contamination." The article reported that the *WSJ* investigation alone discovered more than 2,000 lead-covered cables "that haven't been addressed by the companies or environmental regulators." Due to these abandoned cables, "[l]ead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency."

2. The *WSJ* published four additional articles concerning lead cables in the telecom industry, the last on July 26, 2023. They revealed the following facts: (i) "[r]oughly 330 of the total number of underwater cable locations identified by the Journal are in a 'source water protection area,'" i.e., contribute to the drinking-water supply; (ii) "more than 1,000 schools and child-care centers sit within half a mile of an underwater lead cable;" (iii) "roughly 80% of sediment samples taken next to underwater cables," which the *WSJ* tested, "showed elevated levels of lead;" (iv) 41% of soil and sediment samples were above the EPA's safety guideline for children at lead-cable sites; and (v) Verizon's employees are suffering from lead-induced diseases from exposure to Verizon's lead cables, and 40% of Verizon workers tested between 2007 and 2016 had unsafe blood lead levels.

3. Following publication of the *WSJ* articles, Verizon told investors that it owns at least 540,000 miles of copper cables. With an estimated 15% of its cables encased in lead,

Verizon's lead-sheathed cables span 81,000 miles of land, sea and air across the country. The estimated "all-in" cost for Verizon to clean up its lead cables is as high as $15 billion, exclusive of the legacy wireline assets the Company inherited when it acquired telecommunications companies MCI and XO in recent years. *See* ¶¶ 74, 178, 224, 229.

4. Throughout the Class Period, Verizon misled investors about Verizon's enormous exposure to financial risk from its legacy lead infrastructure in myriad ways including, (i) announcing that it was removing or replacing its copper cables, including lead-sheathed cables, when in fact it was abandoning them in place; (ii) stating that it was recycling "e-waste," which by its own definition includes its lead-sheathed cables, when it was not; and (iii) claiming that its procedures governing employee health and safety and the environment exceed regulations and laws, when in fact, as dozens of confidential witnesses have attested, Verizon's failure to provide employees with basic safety training and equipment for working with lead was causing them to contract lead-based illnesses, and as the *WSJ* reported, Verizon's abandoned lead cables were leaching lead into the environment.

5. While Defendants misled the market that Verizon was purportedly pulling out and replacing its lead-sheathed cables with fiber cables, that it was recycling e-waste, including lead-sheathed cables, and that it was committed to employee health and safety regarding lead, investors were kept in the dark about Verizon's abandonment-in-place – not replacement – of lead-sheathed cables, and its derelict and dangerous approach to worker safety with respect to lead. As Defendants touted the "cost benefits" and "green benefits" of replacing "legacy copper" with Verizon's new, fiber optic cable network, which it dubbed "FiOS," they concealed the extent of and Verizon's treatment of its extensive network of lead-sheathed cables.

6. Since the *WSJ* report, Verizon has admitted several times over that it knows it has been abandoning its lead cables in place, as a corporate practice. In an August 2023 letter to a New York state agency, Verizon stated that "since November 2020, Verizon has removed 230 miles of copper cables in New York," and, referencing its practice of routinely abandoning lead-sheathed cables in place rather than disposing of them, Verizon added that, "***[w]hether to remove legacy cables or leave them in place requires a detailed analysis***." Thus, during the Class Period, Verizon not only knew about its vast network of lead cables, it was actively conducting analyses about whether to abandon them and routinely doing so. Meanwhile, investors were told only that Verizon was "removing," "replacing" or "recycling" its lead cables as it discussed its conversion to fiber optic cables to implement its widely-touted FiOS products and services. Even if investors might have known that telecom companies had once wrapped copper cables in lead, they did not know critical facts which Defendants knew, including the massive scope of Verizon's lead cable network; that Verizon has decided to abandon much of the lead-sheathed cabling in place, and left it to decay and contaminate the environment; and that Verizon's employees are suffering high levels of lead-based illnesses because Verizon has failed to train them properly on the safe handling of lead, or provide them with personal protective equipment ("PPE").

7. While government officials and regulators reacted with surprise and outrage to the *WSJ* investigative series, the market's reaction to the reports is the best evidence that investors did not know about the costs and risks associated with Verizon's purported removal and replacement of its extensive lead cable network, or its actual practices of abandoning lead-sheathed cables in place across its network. Following the publication, the price of Verizon stock sunk from $35.90 at market close on July 7, 2023, to $31.46 at market close on July 27, 2023, a drop of 12.4%. In total, $18.6 billion in Verizon's market capitalization evaporated. Investment analysts who study

the Company and the industry estimated Verizon's financial exposure to the newly disclosed issue in the billions of dollars. State and federal government agencies also responded en masse following publication of the articles. In particular, state and federal elected officials demanded information from Verizon, and the Environmental Protection Agency ("EPA") invoked its Superfund powers to characterize the telecom lead cable issue as "high priority."

8. Only following the *WSJ* exposé did Verizon belatedly disclose what it should have disclosed earlier, and what it knew all along. In addition to its admission to the State of New York regarding its analysis of the abandonment of lead-sheathed cables, Verizon added a risk disclosure to its SEC filings on October 26, 2023 in its Form 10-Q for the quarter ended September 30, 2023, that "certain lead sheathed copper cables that are part of our copper-based network infrastructure may present public health or environmental risks in areas where those facilities are deployed," which could "result in government investigations, legislative or regulatory actions, litigation penalties and other liability, remediation and compliance costs or negative operational impacts."

## II. JURISDICTION AND VENUE

9. Lead Plaintiffs' claims arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as at least one of the Defendants, Matthew Ellis, resides in this judicial district, Defendant Verizon maintains its Operational Headquarters with executive leadership and corporate functions in this judicial district at One Verizon Way, Basking

Ridge, New Jersey, and the alleged misstatements entered and the subsequent damages took place in this judicial district.

12. In connection with the conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

### A. PLAINTIFFS

13. Lead Plaintiff Stichting Pensioenfonds Metaal en Techniek ("PMT") is the Netherland's third largest pension fund, covering 34,300 employers and 1.5 million plan participants. PMT currently has approximately $96.4 billion in assets under management ("AUM").

14. Lead Plaintiff Stichting PME Pensioenfonds ("PME") is a pension fund based in the Netherlands that covers 1,527 employers and approximately 612,565 participants. PME has approximately $64.4 billion in AUM.

15. Lead Plaintiff Stichting Mn Services Aandelenfonds Noord-Amerika ("ANA") is a pension fund based in the Netherlands. ANA has approximately $584.7 million in AUM.

16. Lead Plaintiff AkademikerPension is a pension fund based in Denmark. AkademikerPension has approximately $16.7 billion in AUM.

17. Lead Plaintiff Lannebo Kapitalförvaltning AB ("Lannebo") is the largest independent fund manager in Sweden. Lannebo has approximately $12.36 billion in AUM.

18. Lead Plaintiff Storebrand Asset Management AS ("Storebrand") is a leading asset manager in the Nordic region with $101.42 billion in AUM. PMT, PME, ANA, AkademikerPension, Lannebo, and Storebrand are referred to collectively herein as "Lead

Plaintiffs." Lead Plaintiffs purchased Verizon securities during the Class Period, as reflected in Exhibits A-D, attached, and were economically harmed thereby.

B. **Defendants**

19. Defendant Verizon is a telecommunications company that offers both wireless and wireline telecom services. Throughout the Class Period, Verizon common stock traded on the New York Stock Exchange ("NYSE") and the NASDAQ under the ticker symbol "VZ." Verizon's headquarters are located at 1095 Avenue of the Americas in New York, NY. Verizon's principal place of business is the Verizon Center in Basking Ridge, New Jersey. Verizon's fiscal year begins on January 1 and ends on December 31.

20. Defendant Hans Vestberg ("Vestberg") has served as the Company's Chief Executive Officer ("CEO") since August 2018 and as the Chairman of the Board of Directors (the "Board") since March 2019. Vestberg first joined Verizon in April 2017 as the Executive Vice President and President of Global Networks and Technology. Vestberg currently serves on the UN's Leadership Council for the UN Sustainable Development Solutions Network and claims to have helped write the UN Sustainable Development Goals ("SDGs"). Vestberg certified the Company's financial statements pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX"), stating that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods referred to in the Report" for each of the Company's Forms 10-Q and Forms 10-K filed with the SEC during the Class Period.

21. Defendant Matthew Ellis ("Ellis") served as Verizon's Chief Financial Officer ("CFO") from November 1, 2016 through May 1, 2023. Between 2013 (when Ellis first joined Verizon) and his promotion to CFO, Ellis was the Senior Vice President and CFO of Operations Finance. While serving as the CFO of Verizon, Ellis was an active participant in the UN Global Compact's CFO Taskforce for the SDGs. Defendant Ellis suddenly left Verizon on May 1, 2023 to

"pursue other interests" after working at the Company for 10 years. Ellis certified the Company's financial statements pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, stating that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods referred to in the Report" for each of the Company's Forms 10-Q and Forms 10-K filed with the SEC during the Class Period.

22. Defendant Kyle Malady ("Malady") served as Verizon's Executive Vice President and Chief Technology Officer ("CTO") in its Global Networks & Technology group from 2019 through March 2, 2023, at which point he was appointed Executive Vice President and CEO of Verizon Business Group. Malady also served as Verizon's interim CTO between July 10, 2018 and his official promotion to CTO in 2019. Malady has worked in the telecommunications industry for decades. Malady started his telecommunications career as a cell site technician for NYNEX Mobile Communications which later became Bell Atlantic Mobile, which eventually became Verizon Wireless. Malady is currently a member of the President's National Security Telecommunications Advisory Committee (NSTAC), which advises the White House on reliability, security, and preparedness of communications and information infrastructure.

23. Defendant James Gowen ("Gowen") is the Senior Vice President ("SVP") of Verizon's Global Supply Chain and Verizon's Chief Sustainability Officer, responsible for Verizon's sustainability initiatives including recycling and waste reduction goals and the management of end-of-life-cycle material recovery. Gowen has worked at Verizon for over 25 years in various sustainability and operations roles. Gowen is the current Chairman of GESI (Global eSustainability Advisory Board), a member of Penn State University's Smeal Sustainability Advisory Board, and a board member of the MIT Climate and Sustainability Consortium.

24. Defendant Anthony Skiadas ("Skiadas") served as Verizon's Senior Vice President and Controller as well as its Principal Accounting Officer, responsible for Verizon's accounting and finance operations, compliance, financial policies, and SEC reporting during the Class Period. On May 1, 2023, Skiadas replaced Defendant Ellis as the EVP and CFO of Verizon, responsible for Verizon's Finance Operations. Skiadas has worked at Verizon for 28 years in various financial and accounting roles. Defendants Vestberg, Ellis, Malady, Gowen, and Skiadas, are collectively referred to herein as the "Individual Defendants."

25. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements concerning the Company were being issued; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

26. Verizon and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. RELEVANT NON-PARTIES

27. CW1 worked at Verizon for nearly three decades in various roles, including Field Technician/Lineman and finally as a Field Operations Manager, a role he[1] worked until he departed the Company in 2019. In the Field Operations Manager role, CW1 managed 22 direct reports and many times, as many as 40 to 60 other men working on projects. CW1 reported that he worked with lead-sheathed cables his entire career.

28. CW2 worked at Verizon from mid-2000 through early 2023 as a lineman and later a foreman in Massachusetts. As a lineman and foreman, CW2 was responsible for removing lead cables and performing underground work in Massachusetts.

29. CW3 worked at Verizon from Q1 2019 through Q2 2021 as a technician. While employed at Verizon, CW3 was affiliated with the CWA Union's Local 2100 chapter. CW3 worked in the Maryland area and reported to a copper splicing manager. As a technician, CW3 was responsible for splicing and replacing lead cables used for telephone lines with plastic cables. In particular, CW3 removed lead cables from defective copper telephone lines and spliced them with plastic cables. CW3 also worked in manholes and with aerial lead cables throughout his entire tenure with the Company.

30. CW4 worked at Verizon between late 2021 and mid-2022 as a construction site manager.

31. CW5 worked at Verizon for several decades as a cable splicer in the mid-Atlantic region of the U.S. As a cable splicer, CW5 worked on and around lead-sheathed cables and, in particular, spliced cables while in manholes and removed lead patches of cables.

[1] For ease and convenience, the pronouns "he/him/his" are used herein in connection with all CW allegations. However, not all CWs are male or would otherwise use these pronouns.

32. CW6 worked at Verizon and its predecessor companies for 30 years in various roles. CW6's employment history at Verizon is as follows: cable splicer and outside plant technician in Brooklyn, New York (July 1989 through 1995); cable maintenance (1995 through September 2001); Ground Zero remediation and clean-up following 9/11 (September 2001 through 2002); cable technician in Westchester, New York (2002 through 2003); Local Manager (June 2005 through July 2007); Area Operations Manager (2007 through 2015). In 2015, CW6 transitioned into Verizon's sales and marketing department where he worked as a sales account manager until September 2017, at which point CW6 resumed working in the operations department as the Manager of National Operations Support until April 2019, at which point CW6 departed from the Company.

33. CW7 worked at Verizon from the mid-1990s until Q2 2016 and from 2017 until 2020. From the mid-1990s until 2004, CW7 worked as a technician handling lead-covered cables. During this time period, CW7 reported to a local supervisor.

34. CW8 worked at Verizon (and its predecessor companies) from 1987 through 2015 in various roles, including: Special Technician, Cable Maintenance, and Cable Locator.

35. CW9 was a lineman at Verizon from Q2 2010 until Q2 2021. As a lineman, CW9 worked primarily with fiber cables in the Philadelphia area and also removed lead cables from manholes.

36. CW10 was a field technician cable splicer at Verizon from mid-2000 until early 2016. In this role, CW10 worked in New York City's manhole systems. CW10 worked with lead cables throughout his entire employment at Verizon.

37. CW11 was a lineman from 2018 through Q2 2023. CW11 worked in Staten Island, New York. CW11 reported working around lead-sheathed cables.

38. CW12 was a lineman in the Northeastern area of New York from early 2018 through the summer of 2021.

39. CW14 worked at Verizon from May 2011 through November 2022. While at Verizon, CW14 held various roles including Network Operations Manager from September 2016 through November 2022; Installation and Maintenance Manager from May 2014 through September 2016; FiOS Troubleshooter from January 2014 through May 2014; and Field Technician from May 2011 through January 2014. As a Network Operations Manager, CW14 supervised a team of over 100 field technicians in Plattsburgh and Albany, New York.

40. CW14 worked in the field during his entire course of employment with Verizon and personally handled lead "whenever there was a cable repair that needed it."

41. CW15 worked at Verizon's Basking Ridge, New Jersey, office from 1999 through 2007 as the Director of Program Management. CW15 was involved in the Network Transformation at Verizon, i.e., migrating its network of cables from copper to fiber. CW15 recalled discussing the Network Transformation project with John Stratton, the senior vice president who oversaw the wireline.

42. CW16 worked at Verizon from 2005 through 2016 first as the West Coast Market Area President of Network Operations from approximately 2005 through 2010 and later as the President of Verizon California from 2010 through 2016. As President of Verizon California, CW16 reported to Bob Mudge, the former Executive Vice President of Network Operations. As the Vice President of Operations for the West Coast (which included Montana, Oregon, Idaho, Washington, and California), CW16 worked on the physical aspects of the business. As President of Verizon California, CW16 also worked in sales and marketing.

43. CW17 worked at Verizon from May 1997 through December 2018. Most recently, CW17 was a senior manager of network engineering and operations at Verizon between July 2014 and December 2018. Prior to that, CW17 worked in various roles at Verizon including: Lean Six Sigma Black Belt between July 2012 and July 2014; Senior Manager of Network Engineering and Operations between October 2011 and December 2012; Manager, Network Field Operations (August 2008 – October 2011), Team Lead Manager (March 2006 – August 2008), Network Engineer (July 2000 – March 2006), and Field Technician (May 1997 – July 2000).

44. CW18 worked at ASG, a major Verizon subcontractor, from February 2017 through February 2019 as Project Manager, New York Survey Team. In this role, CW18 traveled throughout the five boroughs of New York to identify pathways to bring Verizon services into buildings. In particular, CW18 would survey, document, and measure the spaces and conduits and then make recommendations as to what should be removed and how the pathways for new fiber lines should be designed.

45. CW19 was a Verizon lineman from Q1 2018 through Q4 2020 in the Schenectady, New York area.

46. CW20 was a construction cable splicer at Verizon from Q2 2004 through Q2 2016 throughout the state of Texas. CW20's main reporting location was Georgetown, Texas, where CW20 received work assignments in the form of work prints which contained schematics of the work location, manholes, and four-letter cable identification codes, cable direction, and cable sizes to be worked on. CW20 worked primarily on repairing air pressure copper and lead-sheathed cables. CW20 worked with and handled Verizon's lead-sheathed cables and, in particular, was responsible for cutting and soldering lead-based cable sleeves and welding joints.

47. CW21 worked at Verizon between Q4 2011 and Q3 2021 as a lineman in the Philadelphia, Pennsylvania area. In this role, CW21 worked on fiber cables in manholes with lead-sheathed cables.

48. CW22 worked at Verizon for over two decades – from the early 2000s until Q2 2022 in various roles in the Westchester and Duchess Counties of New York. From the early 2000s through 2017, CW22 worked as a technician, and from 2017 until the end of CW22's employment, he worked as a field manager. As a field manager, CW22 oversaw employees who occasionally worked on lead-covered cables.

49. CW23 worked at Verizon from September 2013 through December 2021. During his tenure at Verizon, CW23 worked in various capacities, including: Manager, Strategy, Development & Planning, Verizon Ventures, from September 2013 through December 2015; Business Intelligence Manager from January 2017 through May 2019; and Manager, Planning and Forecasting, Verizon Business Markets, from May 2019 through December 2021.

50. CW24 worked at Verizon from Q2 2000 through Q1 2016 as a cable splicer in the University, Kenwood, Melbourne, and High Park areas of Florida. Between approximately 2009 and 2015, he was involved in removing lead place closures and transitioning to stainless steel closures.

51. CW25 worked at Verizon between 2000 and August 2017. Prior to working at Verizon, CW25 had worked at Bell Atlantic Corp. ("Bell Atlantic") since 1972. In CW25's 46-year career with Verizon and its predecessor companies, CW25 worked in Network Technology and Planning as an engineer and designer of outside plant networks primarily in offices in Allentown, Pennsylvania. In CW25's most recent role, he reported to director Vincent O'Byrne.

52. CW26 worked at Verizon in Los Angeles, California from 2008 through 2009 and again in Portland, Oregon, from 2018 through 2019. Prior to working at Verizon, CW26 worked as an engineer at Pacific Bell in 1999. CW26 has 25 years of experience working with cable networks.

53. CW27 worked at Verizon between August 1999 and July 2017 in various capacities. In particular, between August 1999 and March 2006, CW27 was an Area Manager/Local Manager/Team Leaders of Customer & Business Operations; between March 2006 and June 2007, CW27 was Area Manager, FiOS Western Pennsylvania Office; between June 2007 and July 2010, CW27 was Manager, FiOS Program Management Office (Best Practices, Technology & Service Rollouts); from July 2010 to March 2011, CW27 was Manager, FiOS Regional Operations Support (Multistate East Coast Region); and between March 2011 and July 2017, CW27 was Associate Director, Wireline Network Operations and Engineering for FiOS Products & Services. CW27 also served in Verizon Lean Six Sigma Team from April 2012 through March 2013. In CW27's first role, he was a construction supervisor, i.e., managed the technicians that worked on the cables. In CW27's last role at Verizon, he reported to Erik Sheehan, then-Director of Strategic Initiatives who, in turn, reported to Vice President Paul Sullivan.

54. CW28 worked at Verizon between 2000 and December 2018, in various capacities. Between 2000 and 2010, CW28 was an area operations manager; between January 2014 and May 2016, CW28 was a senior consultant, process engineering; and between June 2016 and December 2018, CW28 was a senior manager of operations for Empire City Subway. CW28 primarily worked in Verizon's Staten Island, New York location. CW28 began working in the telecommunications industry in 1990 when he joined NYNEX as a cable splicing technician.

55. CW29 worked at Verizon between August 1996 and November 2019 in various roles. In particular, CW29 worked as a field technician, cable splicer, and fiber install and repair technician. CW29 began his career as a cable splicer at NYNEX in 1996, then worked at Bell Atlantic, and finally Verizon. CW29 worked in New York City for 22 years and later transferred to Virginia.

56. CW30 worked at Verizon as a cable splicer in Pennsylvania for over two decades, until he retired in the first quarter of 2020. He worked on lead cable maintenance and lead cable tear-downs.

57. CW31 was employed at Verizon for over 15 years until his departure in the fourth quarter of 2018. CW31 originally served as a cable splicer, and subsequently worked in management at the director level in the Wireline Operations Unit, covering New York, New Jersey and Pennsylvania. CW31 worked directly with Verizon's lead cables during his tenure.

58. CW32 was a Verizon Regional Safety Manager in New York for over a decade and through the end of the Class Period. He led a training process based on working with lead cables beginning around the time that fiber optics were introduced.

## V. FACTS

59. Verizon and its predecessors have long been at the forefront of the telecommunications industry. In the early 2000s, Verizon led the industry in a migration from legacy copper (and lead-sheathed) cables to fiber optic cables. Its marketing has made the FiOS brand a household name synonymous with Verizon. While consistently touting the benefits of FiOS, and attendant cost savings to the Company, Defendants represented they were "replacing" legacy cables with fiber, and that Verizon was "taking out the old equipment, the old copper stuff" and "pull[ing] that copper out." That was false. Verizon, in fact, was intentionally leaving the "old copper stuff" in place, contaminating the environment and injuring its workers. Verizon also

claimed there were "cost benefits" from laying its fiber wires, but did not explain that any such "cost benefits" resulted from abandoning its old wires, rather than replacing them as Verizon represented it was doing. Verizon also stated it was committed to "employee health and safety programs" and trained its workers in "best practices and working safely" while "splicing fiber" and "installing fiber." But as numerous confidential witnesses attest, Verizon cable splicers and linemen were not provided with PPE nor trained on safe practices, and were becoming sick as a result.

### A. Background on Verizon

60. Verizon traces its corporate roots back to 1885 when Alexander Graham Bell's American Bell Telephone Company formed the American Telephone and Telegraph Company ("AT&T"). In 2000, Bell Atlantic merged with General Telephone & Electronics Corporation ("GTE") to become the largest local telephone company in the United States. It changed its name at this point to "Verizon."

61. Today, Verizon is a holding company. Through its subsidiaries, it provides "communications, information and entertainment products and services to consumers, businesses and government entities," according to its 2022 Form 10-K. Verizon's Consumer Group provides consumer-focused wireless and wireline communications services and products in nine states in the Mid-Atlantic and Northeastern United States, in addition to Washington D.C., over: (a) its fiber-optic network which is provided through its Verizon FiOS product portfolio; or (b) its traditional copper-based network, of which a considerable amount is sheathed in lead, i.e., its "Legacy Network," to customers not served by FiOS. The lead-sheathed cables at the heart of this action fell under Verizon's Consumer Group segment which reported revenues of $103.5 billion in fiscal year 2022, accounting for approximately 76% of Verizon's consolidated revenues.

62. The launch of Verizon's FiOS accelerated the extinction of voice telephone lines. Verizon is considered to be the pioneer of fiber optics communications, and FiOS is therefore critical to its brand and business. Indeed, Verizon's widespread marketing campaigns throughout the 2000s have made "FiOS" nearly synonymous with "Verizon." Between 2004 and 2015, Verizon invested more than $25 billion to deploy its FiOS fiber network.

63. Verizon's public statements during the Class Period emphasize how central FiOS is to its business. Vestberg has focused investors on the "very strong demand" for FiOS and stated Verizon is "winning the business" of fiber optic communication. He also referred to Verizon's "***enormous investment in fiber***," and noted Verizon's "focus on fiber in the FiOS footprint." Vestberg also commented: "I mean, ***clearly, we're going to expand as much as we can on FiOS. You heard all the numbers, we're increasing again this year, how many open for sale we do***. We have a great market share and a superior product in the ILEC. We're going to continue to do that. ***We're really committed to it***."

## B. VERIZON'S ENVIRONMENTAL AND SAFETY SYSTEMS

64. Verizon and its executives, including Defendant Vestberg, have long touted their commitment to environmental stewardship and employee safety, as evidenced by the following policies and public statements.

### 1. Verizon's Environmental Health and Safety Policy

65. Verizon has enacted strict standards to ensure stewardship of the environment and promote employee health and safety. For example, on February 4, 2020, Verizon issued its Environmental, Health and Safety Policy (the "EHS Policy") which provides as follows:

- Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our commitment goes beyond maintaining compliance with laws, regulations and policies. Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic,

environmental, and social responsibilities we have to our employees, customers, shareowners, and society.

- Verizon will conduct business in an environmentally and socially responsible manner and provide employees with a safe and healthful workplace. We are committed, through our environmental, health and safety (EHS) management system and supporting programs, to eliminate hazards and reduce EHS risks.

- Verizon employees and everyone who conducts business on our behalf must perform their jobs in a safe and environmentally responsible manner and must comply with all laws, regulatory requirements, and company programs for protecting the environment and human health and safety. Verizon will seek employees' participation and consultation to identify concerns and opportunities for improvement.

### 2. Verizon's ESG and Sustainability Infrastructure

66. Verizon maintains an "ESG Resources Hub" and employs a "Chief Sustainability Officer," a "Chief ESG Officer" and an entire ESG department.

67. Until March 2023, Beth Sasfai ("Sasfai") served as Verizon's Chief ESG Officer. Sasfai described her role as Verizon's Chief ESG Officer as follows on her LinkedIn page:

> I partner throughout the organization with business units and functional areas to ensure engagement and alignment of ESG initiatives companywide. I oversee the effectiveness of Verizon's ESG commitments and develop appropriate reporting and disclosures to share progress with shareholders. I head a cross-functional team that focuses in strategic areas including governance, reporting, human rights, environmental sustainability, and digital trust and safety. My team is responsible for Verizon's ESG-related investor, customer, employee and broader stakeholder engagement. ***I support Verizon's Deputy General Counsel & Corporate Secretary, and serve as a liaison to the Corporate Governance & Policy Committee of the Board of Directors, the Committee charged with overseeing sustainability, governance and reputational risk.***

68. Defendant Gowen, Verizon's Chief Sustainability Officer since 2009, describes his position as follows on his LinkedIn page:

> I have been deeply involved in the advancement of innovative and sustainable technologies and recently spearheaded the launch of Verizon's flagship $137 million green energy initiative which enabled Verizon to eliminate 20,000 metric tons of CO2. I also oversee other green initiatives being implemented across Verizon including the introduction of a carbon intensity metric, paper suppression,

***waste reduction and recycling, and management of end-of-life-cycle material recovery***.

69. Since 2019, Verizon has published annual ESG Reports. On April 19, 2021, Verizon published its annual ESG report for FY 2020 (the "2020 ESG Report"), which stated that Verizon "regularly update[s] its employee health and safety programs" and topics include "splicing fiber, climbing poles" and "installing fiber." Verizon's 2022 ESG Report contained a subsection entitled "Safety Culture," where the Company made similar claims.

70. In addition, Verizon stated in its proxy statements for FY 2022 and 2023 that it was "committed to maintaining a safe workplace and environmentally sustainable work practices." Similarly, in its Form 10-Q for the first quarter of 2023, filed on April 27, 2023 (fewer than 3 months before the *WSJ* investigative series was published), Verizon stated that it is "limiting [its] environmental impact."

**3. Verizon's Recycling Initiatives**

71. Verizon has also, for years, touted its recycling of electronic waste or "e-waste" which, according to Verizon's own definition of e-waste, includes network equipment which consists of aerial, buried, underground, or undersea cables. For instance, in Verizon's 2022 ESG Report, the Company stated that it reused or recycled 43.4 million pounds of e-waste including 1.6 million pounds of plastic and 2.7 million pounds of lead-acid batteries.

72. In Verizon's FY 2018 Proxy Statement filed on March 18, 2019, Verizon stated that it was "reducing waste and supporting recycling" by, among other things, "[r]ecycling, refurbishing and/or reusing our products, including the responsible management of out-of-service lead batteries."

### C. Verizon Owns a Massive Network of Decaying Lead Cables

73. Verizon has long – and outside the public view – maintained a massive, decaying web of cables sheathed in lead. Lead was pervasively used in the telecommunications industry from the late 1800s through the 1950s as a protective sheathing. As of the 1950s, roughly 90% of all telecommunications wiring was sheathed with lead.

74. Following the publication of the *WSJ* investigative series in July 2023, Verizon estimated that it owned copper cables spanning at least 540,000 miles. This figure ***excludes*** certain copper wireline assets Verizon inherited when it acquired MCI and XO, and so the actual amount is greater. According to the *WSJ* articles, approximately 15% to 20% of all copper cables are sheathed in lead. *See* ¶¶ 3, 224, 250. Crediting these estimates, Verizon still owns ***at least 81,000 miles of lead*** in its wireline infrastructure. *Id*. Each ***foot*** of copper cable requires approximately 3.4 pounds of lead sheathing. Thus, based on these estimates from Verizon and the *WSJ*, Verizon owns approximately 1.5 billion pounds of lead strewn across communities in the U.S. ¶ 226.

75. More recently, on March 4, 2025, during the Morgan Stanley Technology Media & Telecom Conference, Defendant Skiadas stated that approximately 3% of Verizon's 280,000 miles of ***aerial*** copper cables (excluding Verizon's extensive holdings of underground and underwater copper cables, and any cables acquired via MCI and XO) are lead-sheathed. ¶¶ 209, 225. Thus, today, Verizon's owns 8,400 miles of above-ground lead cable, which equates to more than 146 million pounds of lead. ¶¶ 74, 178, 225, 228, 255(b). Again, the estimated totals that include all cables, including underground and underwater, as well as legacy MCI and XO cables, are much higher. ¶¶ 74, 178, 225.

#### 1. Verizon Abandoned Its Decaying Lead Cables

76. In the late 1990s, Verizon's predecessor companies began to transition from legacy copper cable networks to fiber cables. Verizon refers to its copper cable network as "legacy

cables." As the copper cables – many of which were encased in lead – became obsolete, it became imperative for Verizon to properly retire those that were no longer being used. To a substantial degree, however, it failed to do so, opting instead to employ a practice of simply converting customers to fiber, and abandoning its lead-sheathed copper cables in place.

77. Verizon's lead cables currently hang aerially on utility poles or remain buried in the ground either directly, in conduits, or under water. They run under people's homes and properties, in the water that people swim in and drink, and hang above parks where children play.

78. Verizon has admitted to knowingly leaving its copper cables (including those that are lead-sheathed) in place. In a submission to the New York State Public Service Commission dated August 21, 2023, Verizon stated that while it has "deployed roughly 81,750 total miles of fiber-optic cable" in New York State, it had removed only 230 miles of copper cables since November 2020.

79. Former Verizon employees have confirmed that Verizon's cable footprint includes many abandoned lead cables. For example, CW1, a Verizon employee who worked with lead-sheathed cables throughout his decades-long career, reported that Verizon has left lead cables "all over the place" in New York State, and Westchester County, in particular. CW1 stated that it was Verizon's ***preference*** to leave the lead cables in place. In these cases, Verizon workers would cap the cables and notate on engineering prints that the cables were "retired" or "abandoned" in place, and leave the inoperable cables to decay in the community. CW1 further stated that aerial lead cables are still in place that have just been "overlaid" with fiber-optic cables. CW1 referred to these cables as "dead lead cables," "dead plant" or "lead plant cables."

80. CW6, who worked as a cable splicer and in operations at Verizon for 30 years in New York State reported that approximately ***51% of the cables he encountered between 1989 and***

***2002 were sheathed in lead***. CW6 recalled: "pretty much every job I worked had lead cables." CW6 reported that, beginning in 2004, in some cases, Verizon would just put the fiber on top of existing cables that had lead sheath. Abandoned cables were tagged as "duct obstruction RIP" ("RIP" is short for "retired in place").

81. CW7 stated that Verizon's lead cables had a limited life-span and would fail over time. According to CW7, certain lead cables could not be replaced and were therefore "abandoned in place." For instance, at times, road work or other types of infrastructure would cause the area in which the cables were laid to collapse; to recover lead cables under collapsed infrastructure would have required Verizon to dig up the street which, according to CW7, Verizon would not do. As a result, Verizon just abandoned its lead cables in place.

82. CW12 also reported observing abandoned lead cables everywhere, and noted that many were in visible disrepair. In particular, CW12 could plainly see that lead cables on poles were falling apart and were a hazard.

83. CW18 reported that "there was definitely lead out there."

84. CW21 reported that although some lead cables were removed, many others were simply left in place "for dead" where they had been laid, and that Verizon laid newer fiber optic cables over the dead cables.

85. CW22 reported that Verizon left its old lead cables in place even when the cables were migrated over to fiber optic cables. CW22 further recalled that fiber optic cables would be placed ***on top of and secured to*** the lead covered cables.

86. CW23 reported that it is incredible how many lead-sheathed cables Verizon has left, noting: "You can't miss it; if you drive down the street, you see cross boxes. It's astonishing there's so much plant that's out there."

87. CW24 stated that Verizon left lead cables in place at which point the Company would refer to them as "AIPs," or "airborne in place."

88. Despite the vast scope of its lead-sheathed copper cable network, Verizon never disclosed to the public, including its investors, that it had abandoned its lead-sheathed copper cables in place. To the contrary, Verizon misleadingly told investors that it was "pulling out the copper [lines] that are expensive to operate" and sold investors on the idea that the transition to fiber was providing "cost benefits and green benefits from removing some of the copper network," while failing to mention its legacy lead cables it routinely abandoned.

89. In the instances when Verizon did remove its cables, it did not dispose of them safely. Instead, Verizon improperly dropped lead cables in regular trash cans and dumpsters not intended for lead waste. This practice is confirmed by the accounts of CW14, CW20, CW8, CW29, and CW30, cable splicers and network technicians who personally worked with lead-sheathed cables throughout their careers and threw lead from the cables into regular dumpsters with non-lead materials.

### 2. Verizon Knew Where Its Lead Cables Were Because It Kept Detailed Records of Its Cable Footprint and Cable Materials in Proprietary Engineering Databases

90. Verizon housed a proprietary network of engineering blueprints or "schematics" that tracked, in granular detail, its wireline network. It knows where most if not all of its lead-sheathed cables are.

91. According to CW1, CW3, CW6, CW12, CW17, CW19, CW26 and CW28, these "blueprints" or "schematics," which were prepared by Verizon's engineering department, were given to Verizon's field workers such as linemen and cable splicers prior to beginning a job in the field so that they would know the location of the cables (i.e., whether it was in a manhole, or an

aerial cable, and the exact address of the cable). According to CW6, the blueprints were so detailed that they functioned as service orders which instructed his team on what to do.

92. In particular, according to CW1, CW3, CW6, CW10, CW12, CW17, CW22, CW26 and CW28, the Company's "blueprints" or "schematics" contained the following detailed information:

- The location of every telephone cable and pole in Verizon's network;
- the year each pole or cable was installed;[2]
- unique alphanumeric codes accompanying each cable ***signifying the type of cable and its sheathing*** (e.g., aluminum, lead, or plastic); and
- how many wire pairs were in each cable.[3]

93. CW1, CW3, CW6, CW10, CW12, CW17, CW22, CW26 and CW28 further reported that these engineering prints were provided to field technicians either digitally or via print-outs. In particular, CW6 reported that the schematics were accessible digitally via Verizon's proprietary database called "ICGS" or "Intelligent Computer Graphics System," and CW12 reported that schematics could be accessed via a Verizon website called "Verizon Build." The following former Verizon employees further reported as follows:

- CW3 stated that the schematics were originally stored on computers in the York Road, Monrovia and Annapolis offices, among others, but at some point, these schematics also became accessible on the phone via mobile app. CW3 and others at Verizon accessed the digital schematics by logging in with a Verizon ID and password. CW3 stated that the engineers knew how to read the schematics or prints in order to find the lead cables. CW3 reported that one could infer whether the cable was sheathed in lead or not based on the installation date; for example, if you saw a cable with an installation date in the 1930s with a 200 pair count, it was likely a lead-sheathed cable.

[2] CW10 did not provide this information.

[3] CW10 and CW12 did not provide this information.

- CW6 reported that every cable contained on the print had its own four-letter alphanumeric code which would indicate exactly what type of cable it was. For example, CW6 said a code might be BKTA-6 which would indicate a 600-pair terra cable, and that the letters "B," "K" and "A" indicated what kind of sheath the cable had. According to CW6, ***you could determine whether the cable was sheathed in lead simply by looking at the cable's alphanumeric code.*** CW6 further stated that the prints had a section stating what year the cable was installed. These blueprints were housed in ICGS.

- CW10 reported that manholes had numbers which identified the cables he worked with. Verizon's engineering department had a central database of the manholes and cables.

- CW12 stated that employees could digitally access the schematics and information about the poles and cables via Verizon Build by entering a username and password for access.

- CW15, the Director of Program Management, confirmed that Verizon had a proprietary database or repository that housed information about Verizon's legacy copper cable network.

- CW17 recounted that the blueprints were important work tools because they displayed the cable junctions, what manholes cables went to, and where cables went when they entered a building. According to CW17, "they were essentially really big wiring diagrams, and you couldn't do the job without them."

- CW19 reported that he would receive his work assignments from a foreman in the form of engineering prints that contained locations, specs, map keys to the cables, and work to be performed. CW19 stated that these prints could be as long as 30-40 pages depending on the size of the job. CW19 stated that they received these work assignments on tablets.

- CW22 reported that Verizon had both electronic and physical plans of where its cables – including its lead cables – were located. The physical engineering plans were located in large books called "Cable Platts." CW22 stated that every Verizon office in every town serviced by Verizon had a Cable Platt. According to CW22, technicians were provided with electronic tablets that gave them access to the engineering plans which revealed where Verizon's lead cables were located. CW22 reported that Verizon did not have a maintenance schedule for the lead-covered cables and described Verizon's business model as "reactive."

### D. Lead Poses Serious Human Health Concerns

94. Lead exposure can cause catastrophic health effects to humans. The EPA, U.S. Food and Drug Administration ("FDA"), World Health Organization ("WHO"), Centers for Disease Control and Prevention ("CDC"), American Medical Association ("AMA"), and National Institute of Environmental Health Sciences have all independently verified that there is ***no safe level of lead in a human body***. High levels of lead exposures, according to the WHO, can cause coma, convulsions and even death. In 2021, the WHO attributed one million deaths in 2019 to lead exposure. According to the United States Department of Health and Human Services, lead poisoning in humans cannot be reversed or undone.

95. A person may be exposed to lead by: (i) breathing in its dust or fumes; (ii) ingesting it orally; and (iii) absorbing it through the skin. 70% of lead dust or fumes that one breathes is absorbed into the body. As for oral ingestion, babies and young children are particularly susceptible because lead may be on their hands which they insert in their mouths. Further, "[t]he rate of lead absorption through the skin increases with increased sweating of the skin," putting at risk Verizon splicers and other frontline technicians in particular, as well as the public at large.

### E. Verizon's Lead-Sheathed Cables Presented Significant and Known Risks to Worker Safety, but Verizon Failed to Ensure Workers Were Protected

96. Verizon employs thousands of workers who come into regular contact with its network of lead cables. This exposure has resulted in levels of lead in the bodies of Verizon workers that exceed regulatory guidelines.

97. Employers are subject to exacting regulatory guidelines with regard to lead. In particular, OSHA sets baseline acceptable levels of lead, and requires employers to test employees who may be exposed regularly. OSHA standards have been influenced by workers' unions, including the CWA. The CWA is the largest communications and media labor union in the U.S.,

representing about 700,000 members in public and private sectors, including approximately 30,000 Verizon workers including cable splicers and linemen presently.

98. Despite the known risks presented to Verizon employees, binding OSHA regulations, and protections advocated by the CWA, Verizon has failed to abide by the OSHA standards and thus has largely failed to properly protect its workers from lead exposure.

**1. Telecommunications Workers Working on Cable Lines Are Regularly Exposed to Lead and Face Health Consequences as a Result**

99. As a part of its investigative series on lead in the U.S. telecommunications industry, on July 14, 2023, the *WSJ* published an article titled, "I Was Really Sick, and I Didn't Know From What." The article spotlighted several longtime Verizon employees who suffered lead-based illnesses from their work with Verizon's lead cables. For example, one reported "chronic headaches, memory loss and difficulty breathing," and would come home with "lead dust all over" himself. Another said he was "really sick" at the "height of [his] lead poisoning. A third described a "sweet taste" from "inhaling" lead dust.

100. More than 20 former Verizon field technicians, including cable splicers and linemen, reported that they frequently came into contact with lead while working for Verizon and its predecessor entities, and many reported they did not have the proper safety equipment:

- CW3 reported that he worked in manholes with aerial lead cables suspended in the air. Air quality spectrometers referred to as "sniffers" sounded an alarm if the air in the manholes was toxic. CW3 stated that ***the sniffers were "always sounding the alarm***." After working with lead cables, CW3's body, tools, tool bag, and inside of his work truck would be covered with lead dust. CW3 also described eating lunch with colleagues while wearing Tyvek suits which were covered with lead dust. CW3 has been experiencing health problems that began around the time his tenure with Verizon ended. His mouth and esophagus feel "raw" and he has severe heartburn and back pain.

- CW5, who worked as a Verizon cable splicer for several decades and throughout most of the Class Period, worked on and around lead-sheathed

cables throughout his employment and, in particular, spliced cables while in manholes and removed lead patches of cables.

- CW6 worked as a cable splicer and outside plant technician in Brooklyn, New York. CW6 reported that in these roles, he worked with lead cables. CW6 reported that he was provided with training on how to handle lead, however, ***was not provided a mask, so resorted to wearing rags over his face to protect himself from the toxic lead dust.***

- CW7 worked directly with Verizon's lead-covered cables from the mid-1990s until 2004. Between 2004 and 2016 as well as between 2017 through 2020, CW7 oversaw a work crew that performed maintenance work on Verizon's lead cables.

- CW8, who worked at Verizon and its predecessor companies for ***28 years***, reported that he "***worked on lead every goddamn day***, right on Main Street in Plattsburgh, New York." CW8 further reported: "***I was chipping off lead all the time*** . . . what they used to have, back in the day, were lead spliced. It was half an inch thick, so it takes a long time." CW8 stated that he would have to "cut the wires off, drop it down, scrape [the lead] off with a chiseling tool to get to the wire, then sit there and do that on both ends."

- CW9 reported using toxic gas meters to test manholes for toxic gas, but the workers were not provided with proper training on lead safety protocols. CW9 reported that he just wore gloves and Tyvek white suits when working in a dirty location, but not necessarily when working with lead.

- CW10 reported that ***during his 16 years as a field technician cable splicer, lead dust would go into his face when he opened up lead cables. He was not provided with ventilation, masks, or other respiratory protective gear.***

- CW12, a Verizon lineman in upstate New York, reported observing many lead cables, noting that they were everywhere.

- CW14, who worked at Verizon from May 2011 through November 2022, and personally handled and repaired lead-sheathed cables by, for instance, using a chipping knife to break apart the lead-sheathing and disconnect old copper cables, stated that there was "***zero safety equipment to protect from lead***."

- CW17 reported performing ***a lot of "rehab work" on lead cables.*** In particular, CW17 ripped out telephone equipment and lead cables. CW17 performed "pot-wiping" or the process of opening up a lead cable and re-sealing it with molten lead.

- CW19 reported that he worked with old lead-sheathed cables in manholes. CW19 reported that he never wore any PPE when working with lead cables and never saw other employees wearing any PPE either.

- CW20 worked with and handled lead-sheathed cables throughout his career as a Verizon cable splicer in San Antonio, Texas. CW20 reported that ***he would remove sections of old lead cables, cut them, manually roll them up, and then place the cable on the back of his work truck.***

- CW21, a Verizon lineman between Q4 2021 and Q3 2021 in the Philadelphia, Pennsylvania area, worked in manholes containing lead-sheathed cables.

- CW22 worked at Verizon from the early 2000s through Q2 2022. From the early 2000s through 2009, CW22 performed a lot of maintenance work on Verizon's lead-covered cables including repairing underground and aerial lead cables. CW22 also stated that Verizon ***did not provide him with a mask and never offered him health screening for lead exposure***.

- CW24, worked at Verizon from Q2 2000 through Q1 2016 as a cable splicer throughout Florida. CW24 reported that between 2009 and 2015, he was involved in removing lead closures and transitioning to stainless steel closures.

- CW25 worked at Verizon and its predecessor companies for 46 years and reported that ***he often encountered lead in the course of his employment.***

- CW26 worked at Verizon from 2008 through 2019. While working in the field, CW26 reported that he ran into lead when "opening old intersections or old manholes."

- CW27 reported that he "***of course" encountered lead-sheathed cables*** while employed at Verizon.

- CW28 reported ***often encountering lead in underground cable systems throughout New York City,*** particularly in Manhattan. CW28 tried to remove lead cables anytime he came across them in the ground.

- CW29 ***worked with Verizon's lead-sheathed cables throughout his 23-year career, including repairing and removing lead cables***. CW29 recalled: "***Of course there's lead! I was doing lead wiping all the way back in 1996; I did it all through my career***." In particular, CW29 handled lead and performed lead wiping during his tenure in New York City. CW29 stated that more senior technicians taught him how to do lead wiping in 1996 at NYNEX; the older technicians would always say, "Let the kid do it." CW29 described the process by which lead wiping is done: "You put the lead in the pot and heat it up, then you pour it in to seal up the cables, once they'd been pulled through the manholes." CW29 stated that at that time, the only PPE provided by NYNEX

(now owned by Verizon) were gloves and a mask. CW29 reported that at this time he worked at the NYNEX/Bell Atlantic "garage" at 1221 Redfern Avenue in Queens where splicers often handled lead. CW29 reported that people he worked with "***were getting sick left and right***."

- CW31 worked directly with Verizon's lead-sheathed cables in New York, New Jersey, and Pennsylvania during his 15-year tenure. He reported that Verizon provided no formal training in New Jersey.

### 2. Empirical Evidence Has Long Established High Levels of Lead in Telecommunications Workers

101. Empirical evidence has existed for decades showing telecom workers have increased levels of lead in their bodies. Several studies in the 1970s and 1980s revealed elevated lead in telecom workers, including in 1977 by Bell Telephone Company, one of Verizon's predecessors; in the 1970s, by Mount Sinai Hospital, Bell Labs and the New York City Health Department (showing 29% of cable splicers had lead-associated central nervous system symptoms and 21% had gastrointestinal symptoms, due to lead exposure); and in 1980, by a researcher at AT&T.

102. Verizon's own testing, which spans decades, revealed elevated blood levels in its lead-exposed employees. In the Spring of 1980, New England Telephone Company (now owned by Verizon) published results of a study comprised of 1,843 employees of New England Telephone who worked in the outside plant and materials management. It revealed that 1.41% of Verizon's entire employee population had high levels of lead in the blood. Further, the study detailed the procedure used to medically surveil the employees who had been exposed to lead particles, defining as the "exposed population" those "employees who handle lead sheathed cable and lead sleeves, (especially after being in place and oxidized to the oxides of lead)."

103. Similarly, in 1977, Bell Telephone Company conducted a study which revealed high levels of lead in female lead-soldering workers. Specifically, the testing revealed that the female workers had blood-lead levels ranging from 24 to 45 micrograms per deciliter – triple the

average level of the population at that time. Currently, lead levels exceeding 10 micrograms per deciliter of blood is considered harmful.

### 3. In Light of Severe Health Hazards, OSHA Sets Stringent Lead Safety Regulations

104. In 1970, Congress passed the Occupational Safety and Health Act, which resulted in the establishment of OSHA on April 28, 1971. OSHA also created the National Institute for Occupational Safety & Health ("NIOSH"), as a research agency focused on the study of worker safety and health.

105. OSHA regulations include detailed rules about employee exposure to lead; regular testing of lead in the body for employees; provision of PPE; and training on the safe handling of lead. Verizon knew about these regulations, but its commitment to fulfilling its OSHA obligations was inconsistent at best.

106. On November 14, 1978, OSHA promulgated a rule addressing lead in the workplace called: Final Standard on Occupational Exposure to Lead, 29 C.F.R. § 1910.1025 ("OSHA Lead Standard"). The OSHA Lead Standard requires, among other things, that blood lead levels ("BLL") of workers should be limited to 30 micrograms per deciliter. It also set forth a permissible exposure limit ("PEL") of 50 $\mu g/m^3$ (micrograms per cubic meter of air) over an eight-hour time weighted average. This PEL remains in effect to today, but the standard has been heightened so that 30 $\mu g/m^3$, averaged over an 8-hour period, constitutes the maximum exposure. 29 C.F.R. § 1910.1025(c)(1).

107. OSHA's rules also require monitoring and testing for lead at workplace sites. 29 C.F.R. § 1910.1025(d)(1)(ii). If the testing shows "the possibility of any employee exposure at or above the action level, the employer shall conduct monitoring which is representative of the exposure for each employee in the workplace who is exposed to lead." 29 C.F.R. §

1910.1025(d)(4)(i). The testing must be repeated at least once every three or six months, depending on if the exposure is above the "action" level or the PEL. 29 C.F.R. § 1910.1025(d)(6)(ii)-(iii). Employee blood sampling must also be made available.

108. OSHA also requires that employers provide protective gear to employees who are exposed to lead. Section 1926.62(g) deals with protective work clothing and equipment. It applies:

> Where an employee is exposed to lead above the PEL without regard to the use of respirators, where employees are exposed to lead compounds which may cause skin or eye irritation . . . and as interim protection for employees performing tasks as specified . . . the employer shall provide at no cost to the employee and assure that the employee uses appropriate protective work clothing and equipment that prevents contamination of the employee and the employee's garments such as, but not limited to:
>
> Coveralls or similar full body work clothing;
>
> Gloves, hats, and shoes or disposable shoe coverlets; and
>
> Face shields, vented goggles or other appropriate protective equipment.

109. Section 1926.62(g) also contains detailed instructions requiring employers to clean and launder employees' garments that have come into contact with lead. Further, containers of contaminated protective clothing and equipment must be labeled as follows: "DANGER: CLOTHING AND EQUIPMENT CONTAMINATED WITH LEAD. MAY DAMAGE FERTILITY OR THE UNBORN CHILD. CAUSES DAMAGE TO THE CENTRAL NERVOUS SYSTEM. DO NOT EAT, DRINK OR SMOKE WHEN HANDLING. DO NOT REMOVE DUST BY BLOWING OR SHAKING."

110. On December 29, 1978, AT&T and associated Bell System Companies (including several of Verizon's predecessors: Bell Telephone Company of Pennsylvania; The Chesapeake and Potomac Telephone Companies; New Jersey Bell Telephone Company; New York Telephone

Company; and Bell Telephone Laboratories, Inc.) petitioned OSHA to reconsider regulations setting acceptable standards and testing for workers exposed to lead (described below).

111. The OSHA Petition for Reconsideration acknowledged the harms associated with lead exposure in the workplace:

> At the outset, it should be recognized that Petitioners support the principle that workers exposed to a potentially lead-hazardous environment should be protected from adverse effects from such exposure. Indeed, Petitioners themselves have recognized the limited potential for lead-exposure in some telecommunications work places and have taken decisive action against any adverse effect from such exposure.
>
> ***Petitioners' use of lead products has been primarily in the form of lead-sheathed cables and the various lead sleeves and solders necessary to make moisture and airtight the entire cable from end-to-end.*** Very little new lead-sheathed cable is placed in service today. However, the existing lead-sheathed cables must be maintained. ***Ultimately, these cables will be removed and the metals recycled. The maintenance and on-going removal of these facilities require that technicians work with the lead from time to time as well as work in the vicinity of lead at other times even though the lead-sheathed cable is not actually involved.***

(Emphasis added.)

112. The OSHA Petition for Reconsideration also acknowledged: "***There are millions of poles carrying lead cable***, and often cable is accessed in the span between poles, hence signs posted at each pole would not even address the cable in these locations. There are some ***700,000 manholes in the Bell System many of which house lead cable***."

113. On August 29, 1989, one of Verizon's predecessor companies – GTE – submitted a comment to OSHA titled "Feasible Exposure Assessment Strategy for the Telecommunications Industry." Under the subsection called "Air Monitoring," GTE inquired: "How many employees should be monitored for each operation chosen? Nationwide operations are similar but not exactly the same (e.g., ***some of the variables in exposures during lead cable wrecking are climate, age of the cable and minor differences in the equipment used***)."

**4. The CWA Has Long Raised Concerns of Lead Exposure in the Telecommunications Industry**

114. The CWA warns workers that "[w]orking with and around lead-sheathed cables and other telecom plant, such as old lead splice cases, without proper protections can expose you to lead. The lead-sheathed cables in the telecommunications network are all old. Any handling, touching, or disturbance of those cables can create lead-containing dust."

115. On December 9, 1980, the CWA submitted a comment in connection with OSHA's lead standard regulations. The comment explained that 42,000 CWA members were employed in occupations in which they were regularly exposed to lead, including in roles such as cable splicers and outside plant technicians. The CWA noted that until "such cables can be replaced by polyurethane-encased cable or fiber optics," "the cable splicer will continue to be exposed to hazardous lead dust and fumes produced while performing splicing operations with lead-encased cable." The CWA's comment further discussed that lead cable removal is yet another hazardous source of lead exposure for its members. In so doing, the CWA cited a study carried out by the Bell System demonstrating that employees who removed underground lead cables were exposed to lead ranging from 5 to 51 $\mu g/m^3$ of air even after control measures had been implemented. The CWA's comment further noted the importance of implementing safety measures for jobs where workers may come into contact with lead.

116. On October 23, 1989, the CWA submitted a public comment on OSHA's Rule on "Permit Required Confined Spaces." The public comment stated, in pertinent part: "Safety and health hazards are encountered by workers both outside of and within the confined space. Hazards associated with work outside of the confined space include … as a result of pulling and removing lead cable, lead dust." The CWA further stated:

> As the primary representatives of affected workers, CWA contends that the OSHA Telecommunications Standard provides inadequate protections. Our occupational

> safety and health office receives numerous complaints from the union's locals regarding member confined space health problems and the inadequacy of the Confined Spaces Section of the Telecommunications Standard.
>
> The same is true when members perform cable splicing work with lead and polyurethane encased telecommunications cables. Exposure to lead fumes occurs when the metal is heated and lead dust is produced when performing grinding, filing, and carding tasks.
>
> Exposure to lead hazards is more likely in a confined space due to its design and limited ventilation. Exposure can lead to nervous system and kidney damage, sterility and birth defects, anemia, and interference with the body's blood-forming mechanism.

117. Accordingly, the CWA requested that OSHA revise its Confined Spaces Entry Rule by revising the definition of "Hazardous Atmosphere" to include chronic health risks because its members "report health symptoms that have occurred after being exposed to low-levels of contaminants, e.g., lead. . . while performing confined space work."

118. The CWA and other unions continue to advocate for safer working conditions for employees who regularly come into contact with lead. For instance, CW12, a member of the CWA, reported that in May or June 2021, he and his coworkers voiced concerns to a Verizon safety representative who came to speak with them at their site location regarding a job that would require the removal of thousands of pieces of lead cable in the Glenn Falls area of New York. In particular, CW12 stated that he and his coworkers informed the representative that they refused to do the lead cable removal without the proper conditions; in particular, they wanted better training and to be fitted for respirators before completing the job. CW12 stated that the Verizon safety representative was "not okay" with the linemen refusing to remove the lead cables.

119. CW22 reported that his union informed Verizon that it needed to provide workers who handled lead cables with safety training.

### 5. Verizon Regularly Violates OSHA Lead Regulations

120. Despite these OSHA regulations, and consistent with the reports of multiple Verizon former employees, Verizon was often derelict in its obligation to screen its workers who regularly came into contact with lead and in providing the appropriate protective gear. Indeed, CW10, a Verizon cable splicer for 16 years, worked with lead cables in manholes throughout his ***entire 16-year tenure***. CW10 reported that lead dust would go into his face when he opened lead cables and that he was ***not provided with ventilation, masks, or other respiratory protective gear***. CW10 reported that Verizon ***never tested him for lead exposure.*** Similarly, CW22 worked at Verizon for 22 years; 17 of which he was a field technician and worked with lead cables. CW22 reported that Verizon ***did not provide him with a mask***, and ***never offered him health screening for lead exposure.*** CW8 who worked at Verizon and its predecessor companies for 28 years and regularly worked with lead cables throughout his tenure reported that Verizon never offered him or any of his coworkers medical screening for lead exposure.

121. CW2, CW6, CW7, CW8, CW9, CW10, CW14, CW20, CW21, CW22, CW26, CW29, CW31 and CW32 all worked with lead cables, and reported that ***Verizon did not provide them with adequate PPE to protect against lead's toxic properties.*** Further, CW2, CW3, CW4, CW8, CW9, CW14, CW20, CW21, CW26, CW27 and CW31 all recounted that ***Verizon did not provide any training specific to safely working with or handling lead cables.*** CW11 recalled not receiving any safety training concerning lead until 2021 when an outside third party provided some safety training on lead cables in response to the publication of a news article about hazardous lead cables. Notably, CW8 who regularly worked on lead cables throughout his 28-year career at Verizon and its predecessor companies NYNEX and Bell Atlantic, reported: "***They never taught me anything about lead in all my time***." CW29 stated that the Verizon garage where he was

based, in Far Rockaway Queens, always had lead casings lying around, and that the garage has since been shut down due to issues pertaining to contamination and health hazards.

122. As a result of Verizon's failure to provide adequate PPE or safety training to field technicians including linemen and cable splicers, many Verizon employees found themselves coated in lead while handling the toxic metal and some even reported subsequent health problems. For instance, CW3 reported that after working with lead cables, his body, tools, tool bag, and inside of his work truck, would be covered with lead dust. CW3 now reports that his esophagus feels "raw," and is intending to seek medical treatment.

### F. VERIZON'S LEAD-SHEATHED CABLES PRESENTED SIGNIFICANT RISK OF ENVIRONMENTAL CONTAMINATION AND REGULATION

123. Verizon faces significant risk of being forced to clean up and remediate lead-sheathed cables by federal and state regulators who carry substantial authority to regulate hazardous substances, including lead contamination.

124. At the federal level, for example, lead is a hazardous substance under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") of 1980, as amended. The EPA may take CERCLA response actions to investigate and remediate the release, or substantial threat of a release, of lead into the environment under the Superfund program at sites on nonfederal lands. The state in which an individual site is located also has a role in such actions. Companies that install and operate lead cables, including current and past owners of the site, can be liable for environmental harms. *See* CRS In Focus IF11790, *Liability Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)*.

125. Lead is also listed as a hazardous waste under the Solid Waste Disposal Act (often referred to as the Resource Conservation and Recovery Act or RCRA). Section 7003 of RCRA authorizes the EPA to issue enforcement orders for abating an imminent and substantial

endangerment to human health or the environment resulting from the past or present handling, storage, treatment, transportation, or disposal of a solid or hazardous waste. This authority applies only to a discarded substance, pursuant to the definitions under Section 1004 of RCRA.

126. The Safe Drinking Water Act (Section 1431) and the Clean Water Act (Section 5045) both grant the EPA "emergency powers" to issue orders for abating an imminent and substantial endangerment to public health when contaminants are present under certain conditions.

127. Each of the states in which Verizon presently owns wireline assets (i.e., Delaware, Maryland, Massachusetts, New York, New Jersey, Pennsylvania, Rhode Island and Virginia) also closely regulates lead contamination in the environment through a state department of environmental protection. These departments work with the EPA to regulate lead contamination, including through enforcing laws relating to water pollution, conservation, and solid and hazardous waste management. Many of these state laws expand upon federal laws such as CERCLA, RCRA, the Safe Drinking Water Act, and the Clean Water Act.

### G. VERIZON KNEW THAT ITS CABLES WERE HARMING THE ENVIRONMENT AND ITS EMPLOYEES

128. Verizon has admitted that it knew about its extensive network of lead cables. Leading up to and throughout the Class Period, Verizon faced increasing signs and pressure that its lead cables were endangering its employees and the public, and that the true extent of its sprawling lead-sheathed cable network and related potential financial liabilities would come to light.

129. Specifically, the following facts evidencing that Verizon had abandoned its lead cables and that these cables were injuring Verizon's employees were known to Verizon, but not to the public: (1) annual meetings on employee safety in the telecommunications industry, which Verizon planned and attended, discussed the perils of working with lead cables; (2) the CWA filed

letters in six states demanding an investigation into Verizon's deteriorating legacy cables; (3) in 2015, the CWA filed a petition with the Pennsylvania Public Utility Commission to investigate Verizon's abandonment of lead cables; (4) Verizon tested its workers for lead, 40% of whom showed elevated blood lead levels; (5) Verizon employees internally complained about lead exposure; and (6) per EPA regulations, Verizon self-reported that it was generating hazardous lead waste in sixteen locations throughout Rhode Island and Massachusetts.

### 1. The Risk of Lead Contamination Has Been Discussed at EHSCP Conferences Involving Verizon for More Than a Decade

130. High-ranking industry officials recognized and discussed risks related to lead exposure and contamination during industry conferences in the period leading up to and during the Class Period.

#### a. Verizon Employees Have Been Deeply Involved in the EHSCP

131. The Environmental Health and Safety Communications Panel ("EHSCP") is "a consortium of communications environmental, health and safety professionals dedicated to promoting employee safety and health and preventing accidents throughout the communications industry." The organization's purpose is "[t]o encourage consistent and coordinated safety policies throughout the telecommunications industry, and to present a unified voice for the industry in response to government regulatory actions."

132. Verizon has been deeply involved with EHSCP. Verizon employees have attended its annual symposiums, and its employees have served on the board of EHSCP every year since Verizon's formation in 2000. High-ranking Verizon managers are EHSCP members and have chaired EHSCP committees. Verizon itself hosted the annual telecommunications safety conferences in 2001, 2007 and 2011.

133. From 2015 to 2017, Gary Schongar, a Health and Safety Consultant in Verizon's Corporate Safety & Environmental Compliance Department, was the Chairperson for the EHSCP.

134. Since at least as early as 2015, Kyle Madden – Verizon's EHS Industrial Hygienist since August 2008 and consultant to Verizon's Director of EHS in matters regarding the assessment and control of workplace exposure – has served as a member on the EHSCP's Industrial Hygiene Committee. Madden became co-chair of the Industrial Hygiene Committee with John Malone, former Senior Manager of EHS at AT&T. The Industrial Hygiene Committee included in its "ground rules" meeting bi-monthly or more frequently; discussing "improving the working environment or work procedures of the employees of our companies by sharing knowledge experience and judgment"; and circulating agendas before each meeting and minutes after each meeting. "Proposed committee topics" included "Lead Safety – (cable & battery straps)", as detailed in ¶ 143.

135. Verizon regularly participated in EHSCP's annual, multi-day symposiums, e.g., in 2018 (attended by Verizon's Madden and Todd Harris), in 2020 (attended by Verizon's Neal Maloney and Madden), and in 2022 (attended by Implementation and Program Manager of Verizon's EHS Department, Chrissy Chapman).

### b. Lead Hazards Are Discussed Regularly at EHSCP Annual Symposiums

136. A recurring topic of discussion at past EHSCP symposiums has been lead: its hazards to workers; training employees on safe handling of lead; and monitoring employees for lead exposure.

137. When Verizon hosted the EHSCP annual symposium in 2007, AT&T Senior Manager of EHS, John Malone, presented on various industrial hygiene-related issues including

lead. In a slide show, Malone classified "lead" as a "common telecommunications hazard[] requiring sampling." Malone also discussed the risk assessment process for handling lead:




138. In 2010, Malone also cautioned the group about lead-covered cables. One of his slides emphasized that "[s]ome older metropolitan areas may still have over 50% lead cable." Malone further concluded, according to the *WSJ*, that the lead-sheathed cables posed risks for phone-company workers and the surrounding environment in some places. In this presentation, Malone acknowledged specific details regarding the environmental impact, stating that "***soils retained between 83 and 98 percent of the released lead within 2 inches***" from the cables.

139. At the 2013 EHSCP annual symposium, Malone presented on "Managing Lead Exposure During Cable Removal Operations." This presentation addressed the dangers of working with lead-encased cables. Verizon representatives were present. Malone discussed exactly how working with lead can severely harm employee health, including in the below slides addressing how workers may be exposed to lead:







140. Malone also discussed the PPE telecom employees must wear while handling lead cables, as mandated by OSHA regulations:




141. Malone's 2013 presentation further stated that visible signs that say "POISON" should be posted near lead cable sites, and that workers who handle lead should wear respirator masks and disposable Tyvek coveralls.

142. At the annual EHSCP symposium in 2014, which was attended by Verizon, CenturyLink (now Lumen Technologies, Inc.) gave a presentation called "Working with Lead," which discussed the necessary engineering controls required to reduce or limit exposure to lead and the required PPE necessary for handling lead, which includes coveralls or full-body work clothing, gloves, hats, shoes, disposable shoe coverlets, face shields or vented goggles and Tyvek. Additionally, the presentation contained examples of various OSHA citations, including one issued to an employer who "had not monitored employee exposure to lead when a lead sleeve, used to protect spliced connections, was removed in an underground vault." It further discussed that the "employer must conduct initial monitoring of lead."

143. During EHSCP's 2015 conference, the EHSCP Industrial Hygiene Committee – of which Verizon's Kyle Madden was a member – shared a presentation with the symposium attendees. In the presentation deck, one of the topics for discussion was "***lead safety***" in particular "cable & battery straps, OSP cable":

**Topics include:**

- EH&S Proposed Regulations
- Hazard Communication (GHS)
- Manhole Entry - Gas Monitors
- Lead Safety – (cable & battery straps, OSP cable)
- Asbestos
- Hearing Conservation
- Distributed Antenna Systems – DAS RF
- Indoor Air Quality
- Chemical Exposures
- Communicable Diseases
- Other topics of concern to the industry

144. Another slide touted "lead-sheathed cable" as an accomplishment for 2014-2015. In this slide, the EHSCP Industrial Hygiene Committee stated, "***[t]his is an issue for most member companies*** and we are attempting to consolidate our knowledge database and share best practices."

**2014-15 Accomplishments**

Lead Sheathed Cable

- Continue to compare data and practices on management of lead-sheathed cable. This is an issue for most member companies and we are attempting to consolidate our knowledge database and share best practices.

EHSCP
Environmental, Health & Safety Communications Panel

145. During the 2018 EHSCP conference, Madden and his co-chair, John Malone, led a breakout session called: "Lead in the Communication Industry." The contents of this presentation are not publicly available.

146. In 2020, EHSCP released its newsletter called *The Wire* which contained a section on the Industrial Hygiene Committee (of which Kyle Madden remained Co-Chair). The newsletter

noted that the Committee was "still closely following the proposed CA Lead ruling" and that the ruling "is going to have a huge impact on work with lead sheathed cable in California":

## Committee News

**Industrial Hygiene Committee**

The Industrial Hygiene Committee has been focusing on COVID-19 so far in 2020. We are meeting weekly and reviewing issues like:

- Face coverings, masks, N95s and other PPE
- Methods for cleaning surfaces and equipment
- Work practices such as social distancing and when to require employees to quarantine
- How to conduct 2 person operations
- Engineering Controls, Administrative Controls, and PPE necessary to re-open company offices that are currently closed

We still continue to follow Non-COVID-19 related issues as well:

- Implication of small 5G units on safety of technicians working in aerial plant.
- We are also still closely following the proposed CA Lead ruling. The Lead PEL in California will be reduce from 50 $\mu g/m^3$ to 10 $\mu g/m^3$. This is going to have a huge impact on work with lead-sheathed cable in California.
- Respiratory Protection and wildfire smoke. We are continuing to follow the CA Wildfire Smoke regulation as it moves from an emergency order to a permanent regulation.

### 2. The CWA Reported that Verizon Was Causing the "Hazardous Exposure of Lead Cable to the Environment"

147. At the same time that high-ranking industry officials openly discussed the dangers of lead exposure, in 2015, the CWA filed letters with state regulators in *six states* in Verizon's footprint – New York, New Jersey, Pennsylvania, Maryland, Virginia, Delaware – as well as the District of Columbia, demanding an investigation into Verizon's deteriorating legacy landline network. The CWA accused Verizon of failing to maintain the safety and reliability of its wireline copper network in violation of the respective public utility codes of each state. For example, in Pennsylvania, the CWA argued to the Pennsylvania Public Utility Commission (the "P-PUC") that Verizon had failed to comply with 66 Pa. C.S. § 1501, which requires that "every public utility" provide "adequate, efficient, safe, and reasonable service and facilities" and to "make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and

facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public." The CWA asked these state commissions to formally investigate the "actual investment policies and practices of Verizon as they pertain to the copper network." In particular, in a letter addressed to the New York Public Service Commission, Dennis Trainor, the Vice President of District 1 of the CWA requested the investigation include "a financial analysis of copper network revenue and expenditures over the past ten years; the current state of the copper infrastructure; staffing levels dedicated to preventative maintenance, repair, installation, and customer service over the past ten years; policies and procedures that impact the quality of service that customers receive." Further, the CWA stated that Verizon conceded in a July 2015 letter it had sent the FCC that it had spent only $200 million over the ***prior seven years*** to maintain its copper wireline network in 11 states and Washington, D.C.

148. On October 21, 2015, the CWA petitioned the P-PUC to investigate the safety, adequacy, and reasonableness of service provided by Verizon Pennsylvania LLC. Verizon was a party to the petition.

149. In its petition, the CWA stated that it had investigated the conditions at Verizon-Pennsylvania, where its union members work, and discovered that throughout Pennsylvania, Verizon's plant equipment including its cables and wires were in an "***appalling state of disrepair that pose a safety hazard to utility employees and the public***."

150. In connection with the CWA's efforts to have the P-PUC launch an investigation into Verizon's neglect of its legacy copper cables, CWA President of Local 13000, James Gardler, testified on September 29, 2016. When asked about the "general condition of Verizon's copper network" Gardler stated: "***Verizon's neglect of its copper network is also resulting in unsafe conditions for CWA members and the public*** who come into contact with those facilities . . .

Verizon has allowed the copper network to deteriorate to the point where we are sad to work for a company that cares so little about the condition of its plant and equipment . . ..” When asked about concerns that CWA’s members have expressed with respect to Verizon’s physical plant, Gardler reported “***the hazardous exposure of lead cable to the environment***.” When asked “Does Verizon’s neglect of its copper plant cause any safety concerns?” Gardler replied: “Yes. Damaged poles, sagging wires, corroding batteries, animal and insect infestations, and ***exposed lead cable all create hazards both for CWA members working on the facilities and for the general public.***” Gardler continued:

> Verizon is unwilling to put money into copper service areas. It won’t properly repair or replace damaged or worn out plant. It won’t hire enough people to do the work properly. It won’t upgrade the areas to its highly reliable fiber-to-the-home service, FiOS. Basically, when you get outside of Pennsylvania’s high-density urban and suburban areas, Verizon has no interest in spending money to repair, maintain, or improve its service to customers. ***As a result, Verizon’s poles, cables, batteries, and other facilities are in a sorry state of disrepair.*** Service quality continues to decline, customers leave (if they have alternatives)***, public and worker safety are threatened, and Verizon does nothing***.

151. Gardler further stated, as has been corroborated by many former Verizon employees: “What Verizon really does is put a band-aid on [neglected copper cables] because the real fix would require an investment of time and money.” Further, CWA’s “members [we]re being told that if they actually try to repair copper plant instead of using VoiceLink, they will be subject to disciplinary action by Verizon.” Finally, when asked what the CWA was asking the P-PUC to do, Gardler stated the following:

> Finally, ***the PUC should order Verizon to maintain, repair, and replace (as needed) the air pressure system that is vitally important to protect the integrity of certain types of cable, especially lead cable***. I showed an example of exposed lead cable that is supposed to be enclosed in an air pressure system to ensure that moisture does not penetrate the paper cable wrapping. ***A wet lead cable not only impairs the quality of service to customers, it also risks environmental exposure to lead as the water reacts with the lead in the cable.***

152. Similarly, in 2017, the CWA submitted comments to the FCC in connection with *In the Matter of Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84. This proceeding arose in connection with the FCC's regulation of the transition from legacy copper wires to fiber wires. In particular, the FCC set regulations requiring that a telecom company publicly notify an intent to retire copper wires. The CWA noted that in many instances, telecom companies were not properly maintaining the copper cables and wires.

153. In particular, the CWA's comments discussed Gardler's testimony referenced above, in particular, stating:

> CWA submitted extensive testimony – including analysis of confidential Verizon documents, photographs of deteriorating Verizon outside plant (see Attachment A-2), and testimony from James Gardler, the CWA president representing Verizon technicians in Pennsylvania, who summarizes the condition of Verizon's copper infrastructure this way: "[P]oles that are deteriorating, including unsafe poles that remain in service; ***lines sagging dangerously below minimum clearance levels; cables that are not properly repaired and replaced; ungrounded, exposed wires used as a work-around because Verizon will not spend the money to replace damaged cables***; damaged cabinets and splice boxes that are not repaired or replaced, allowing animals and insects to nest inside; air pressure systems that are not tested and maintained, ***resulting in customer outages and the hazardous exposure of lead cable to the environment***; batteries in remote terminals, controlled environment vaults, and high-capacity optical cable installations that are corroding and that are not being tested and replaced, resulting in preventable telephone outages during power outages."

154. The CWA's comments further stated that Verizon was required to remove a lead cable in Beacon, New York more than thirty years prior, but left it in place. Specifically, the CWA stated, "[t]his picture below from Beacon, New York shows lead cable that is over 70 years old (the grey cable). Verizon was supposed to get rid of lead cable over 30 years ago. The black 'squirrel guard' that is above the lead cable should enclose it, but it doesn't." This statement was accompanied by the following picture:



155. On June 2, 2017, Verizon Pennsylvania LLC ("Verizon PA"), the CWA, the PA Office of Consumer Advocate, and the Pennsylvania Offices of Small Business Advocate entered into a Settlement Agreement providing that, among other things, Verizon PA would "conduct an engineering review of all cable replacement requests for 2015 and 2016," i.e., all locations where the CWA requested that Verizon PA investigate and replace any copper cables deemed too damaged to remain in place. Verizon PA was also required to complete all cable replacement jobs within 18 months.

**3. Verizon Received Blood Sampling Data of Workers Showing Lead Exposure**

156. In addition to historical indicators of elevated lead levels in telecommunications workers described *supra* at Section (V)(E)(2), more recently, Verizon has reviewed data showing its workers have elevated blood-lead levels. Between 2007 and 2016, Verizon tested 208 of its employees for lead exposure. Of those tested, 85 of them, or approximately ***40%***, had blood-lead levels above 3.5 micrograms per deciliter – the level at which the Centers for Disease Control and Prevention advises that one seeks medical treatment.

157. There are two primary medical indicators of lead exposure: blood-lead levels and bone-lead levels. Blood testing reveals lead exposure just days after the exposure but typically

does not reveal exposures from more than approximately 30 days prior because red blood cells regenerate during this time. Higher and/or more persistent lead exposures can become so concentrated that the body deposits lead in the bones. Once in the bones, it is almost impossible for the body to eliminate that lead. Thus, ***any*** lead in the bones indicates long-term, chronic lead exposure. According to Dr. Philip Landrigan, Director of the Program for Global Public Health at Boston College, lead can be stored in organs longer than blood, and in ***bones for decades***.

158. Verizon provided the CWA with the data showing that 85 of 208 of its workers had heightened levels of lead in their blood. In or around late 2019 or very early 2020, the CWA contacted Mount Sinai medical researchers, including Dr. Rabeea Khan, an expert in occupational environmental medicine, doctor at the Mount Sinai Selikoff Centers for Occupational Health, and professor in the Department of Environmental Medicine and Public Health at Mount Sinai's Icahn School of Medicine, regarding the troubling news that its union members employed by Verizon had elevated levels of lead in their blood. The CWA informed Dr. Khan that through the years, it had conducted non-systematic sampling of worksite and air quality at Verizon sites where its union members worked. The data from the CWA's sampling revealed that these Verizon employees had elevated blood lead levels and further, that the air quality in which they worked was tainted with lead. According to Dr. Khan, the CWA study consisted of data from 2007 through 2016 of 208 Verizon employees who had significant blood-lead levels, i.e., greater than 40 micrograms of lead in their blood.

159. In 2022, Dr. Khan and her colleagues designed and conducted a study to measure levels of lead in employees' bones, which consisted of 20 Verizon employees who were also members of the CWA 1101 - Manhattan chapter. According to Dr. Khan, these 20 study participants included the following:

- 19 cable splicers;
- 17 men, 3 women;
- the average age of the splicers was 50;
- all 20 participants worked in manholes while employed at Verizon;
- 16 participants never used a respirator or adequate PPE; and
- the average tenure of the 20 participants was 23 years at Verizon.

160. Dr. Khan and her colleagues ruled out other activities associated with lead exposure such as handling bullets, home renovations, or ceramics through standard testing procedures such as questionnaires.

161. Dr. Khan and her colleagues measured the Verizon employees' bone-lead levels using x-ray fluoresce, which measures long-term cumulative lead exposure. The bone-lead test revealed that 12 out of 20, or ***60%*** of the workers had measurable levels of lead in their tibias. As Dr. Khan stated in the July 12, 2023 *Wall Street Journal* article titled "What AT&T and Verizon knew about toxic lead cables": "the fact that we can detect it in your bones suggests you have had long-term exposure." Further, ***half*** of the workers tested had lead concentrations of 10 micrograms per gram of bone which indicates an ***increased risk of neurological or biological problems***.

162. Dr. Khan presented her research findings at the American Occupational Health Conference in April 2023.

**4. Verizon Employees Internally Raised Issues of Lead Exposure**

163. According to the *WSJ* investigative series and the reports of many former linemen, technicians, and network operations employees, numerous Verizon utility workers have complained to Verizon about its lead-sheathed cables, voicing their fears about long-term exposure, and health issues that may be connected. Despite decades of complaints voiced by

concerned employees, Verizon has either ignored or, in some cases, actively silenced workers' concerns, as further alleged below.

164. The July 12, 2023 *WSJ* article, "What AT&T and Verizon knew about toxic lead cables," featured an interview with Rob Prokopowicz, a former Verizon employee who retired from Verizon in 2021 after working with lead for 40 years. Prokopowicz disclosed that when he voiced concerns to his managers about pumping water from manholes that were possibly contaminated with lead, Verizon just told him: "If you don't feel safe, we'll send someone else." Prokopowicz further stated: "When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust."

165. Several CWs corroborate that Verizon was notified of worker lead exposure. For instance, CW2, who worked at Verizon for 23 years as a head lineman in the Framingham, Massachusetts area, reported that leadership ***did not care about safety hazards*** and that if an employee pushed back, management made it seem like "***you were just a jerk that didn't want to work***" and "***would try to suspend you***."

166. Further, in May or June 2021, CW12, a member of the CWA, reported that he, along with his coworkers, voiced concerns to a Verizon safety representative who came to speak with him and 20 of their coworkers at their "shop" in New York regarding a job in Glen Falls, New York, that would require the removal of thousands of pieces of lead cables. CW12 stated that he and his coworkers informed the Verizon safety representative that they refused to do the lead cable removal without the proper conditions; in particular, they wanted better training and to be fitted for respirators before completing the job. CW12 stated that the Verizon safety representative was "not okay" with the linemen refusing to remove the lead cables. According to

CW12, the Verizon safety representative was informed of the scope of the lead in Glen Falls, New York.

167. Further, CW16, the former President of Verizon California, noted that "any time lead was involved – when there was a cut or an outage – it was a big deal." He further noted that lead is "a significant issue in New York City and the old, big metropolitan areas."

**5. Verizon Was Subject to Repeated RCRA Notices for Lead Contamination**

168. Verizon also knew first-hand of its significant liability risks associated with hazardous lead based on the Company's EPA-reporting requirements. As noted above, RCRA is one of the principal federal laws governing the management of hazardous waste. Lead is among the hazardous wastes regulated under RCRA. Under RCRA, the EPA has authority to implement regulations for managing hazardous waste from generation through disposal (i.e., "cradle to grave"). RCRA requires facilities that treat, store or dispose of lead and other hazardous wastes to investigate and clean up contaminated soil, groundwater and surface water. The EPA uses a coding system to identify and track hazardous waste. The code for lead toxicity is "D008."

169. The EPA identifies generators of hazardous waste based on the quantity of hazardous material the entity produces or stores. *See* 40 CFR § 260.10. The EPA identifies Verizon as a Large Quantity Generator ("LQG"). This means that Verizon generates more than 1,000 kilograms of hazardous material per month or more than 1 kilogram of acutely toxic hazardous waste. As an LQG, Verizon is subject to heightened regulations under RCRA, including mandatory biennial hazardous waste reporting. Verizon is also required to self-report and submit a report by March 1 of every even-numbered year on "the nature, quantities, and disposition of hazardous waste generated" at each hazardous waste facility. Verizon must register each hazardous waste site with the EPA.

170. According to the EPA's database of RCRA hazardous waste facilities, Verizon and its subsidiaries operate over 350 active hazardous waste sites subject to reporting and environmental management under RCRA, including its active LQG sites. Verizon has submitted biennial reports for over 200 unique LQG sites since 2001 that include the code "D008 – Lead," including dozens of unique lead-related sites since 2015 in New York, Massachusetts, and Rhode Island. A significant number of these sites relate to Verizon manhole locations containing segments of its lead cable network.

171. During the Class Period, Verizon reported generating hazardous lead waste at the below 16 sites.

| ***Year*** | ***Site ID*** | ***Site Name*** | ***Site Location (Street)*** | ***Site City*** | ***Site State*** | ***Site Zip*** |
|---|---|---|---|---|---|---|
| 2021 | MAC300013141 | VERIZON NEW ENGLAND | 2 HAMPSHIRE ST | LAWRENCE | MA | 01840 |
| 2021 | RIP000038477 | VERIZON - MH #N48-1 | BROAD ST. ANN & HOPE WAY | CUMBERLAND | RI | 02864 |
| 2021 | RIP000038692 | VERIZON - MH#52/52-1 | LAPRE ROAD | NORTH SMITHFIELD | RI | 02896 |
| 2019 | MAC300013141 | VERIZON NEW ENGLAND | 2 HAMPSHIRE ST | LAWRENCE | MA | 01840 |
| 2019 | RIP000038142 | VERIZON MH - CRANSTON ST & PHENIX AVE | CRANSTON ST PHENIX AVE | CRANSTON | RI | 02910 |
| 2019 | RIP000038158 | VERIZON - MH SPRING ST & HOZIER ST | SPRING STREET HOZIER STREET | NEWPORT | RI | 02840 |

| *Year* | *Site ID* | *Site Name* | *Site Location (Street)* | *Site City* | *Site State* | *Site Zip* |
|---|---|---|---|---|---|---|
| 2019 | RIP000038163 | VERIZON MH - SPRING ST & STONE ST | SPRING STREET STONE STREET | NEWPORT | RI | 02840 |
| 2019 | RIP000038168 | VERIZON MH - MINERAL SPRING & HICKS ST | MINERAL SPRING AVE HICKS ST | PAWTUCKET | RI | 02860 |
| 2019 | RIP000038202 | VERIZON MH - VEAZIE ST. POLE #21 | VEAZIE ST DOUGLAS AVE | PROVIDENCE | RI | 02908 |
| 2019 | RIP000038236 | VERIZON MH - CANAL ST & PARK ROW | CANAL ST PARK ROW | PROVIDENCE | RI | 02908 |
| 2019 | RIP000038243 | VERIZON MH - WEBSTER & OCHRE POINT AVE | WEBSTER ST OCHRE POINT AVE | NEWPORT | RI | 02841 |
| 2019 | RIP000038278 | VERIZON MH - POST ROAD & AIRPORT RD | POST RD AIRPORT RD | WARWICK | RI | 02886 |
| 2019 | RIP000038286 | VERIZON MH - WEST RIVER ST & CHARLES ST | WEST RIVER ST CHARLES ST. | PROVIDENCE | RI | 02908 |
| 2019 | RIP000038303 | VERIZON MH - 5 DUKE STREET | 5 DUKE ST | NEWPORT | RI | 02840 |

| *Year* | *Site ID* | *Site Name* | *Site Location (Street)* | *Site City* | *Site State* | *Site Zip* |
|---|---|---|---|---|---|---|
| 2019 | RIP000038304 | VERIZON NEW ENGLAND | VALLEY ST AND EAGLE ST | PROVIDENCE | RI | 02908 |
| 2019 | RIP000038335 | VERIZON MANHOLE POWER ST & BENEFIT ST | MH #T6-5 POWER ST | PROVIDENCE | RI | 02908 |

172. As indicated in the above table, Verizon's notices include sites in densely populated urban centers such as Providence, Rhode Island. For example, the below depicts the site of one of Verizon's sites, which is located by a park in downtown Providence.




**6. Verizon's Prospect of Environmental Litigation Is Heightened as AT&T Is Sued with Regard to Its Lead Cables**

173. The risks that Verizon could be called upon to remediate and remove its crumbling lead cable infrastructure became even more concrete when AT&T was hit with two lawsuits concerning its abandoned lead cables.

174. ***First***, on March 1, 2016, AT&T was sued in the class action, *Kenneth Cook, et al. v. AT&T Corp.*, 4:16-cv-00542 (S.D. Tex.) (the "Texas Action") by six Texas landowners seeking "damages for pollution of their land," among other things. This class action lawsuit alleged that

in the 1950s, AT&T's predecessor had been granted an easement to lay its lead cables along their property, among many other landowners' properties. After being granted the easement, AT&T's predecessor "buried a six-inch cable within the easement." The plaintiffs in the Texas Action alleged that:

> The buried cable "contains lead . . . The type of cable on [p]laintiffs' property has been used in the United States for decades. Corrosion of the lead sheath on this type of cable is a mechanism that can result in lead being released to the environment. Such corrosion is a common occurrence with older cables, especially when the cable is cut or damaged. Cables of the type used on [p]laintiffs' property require routine inspection and maintenance. If the cover surrounding the lead is damaged, the lead will contaminate the immediate area. The Environmental Protection Agency has stringent rules for the storage and disposal of lead.

175. The Texas Action alleged that the lead remained under each of the plaintiffs' land, and had "been cut in multiple places and is in disrepair." The plaintiffs alleged that the lead cable coverings were "badly damaged," and that lead was "directly contacting the soil" under their land. The plaintiffs further alleged that the lead cable, and specifically the plastic surrounding the lead, was continuing to deteriorate and "contaminate the subsurface of the [p]laintiffs' real property."

176. The plaintiffs in the Texas Action engaged an expert, David Howell, who has extensive experience on the subject of abandonment of rights of way, and easements. His company, Pipeline Equities, has removed over 12 million feet of retired, abandoned or out of use pipelines and cables. In Mr. Howell's report submitted in the case, he opined that the cost to remove the cables buried under the plaintiffs' land was approximately $33.43 per foot. Mr. Howell reached this conclusion by considering the following factors: mobilization equipment and labor to prepare for removal; excavation, removal, cut and load 3-inch cable; land and title work for right of way; damages to landowners; transportation of hazardous waste to a certified land fill; disposal of hazardous waste at a licensed land fill; removal of underground vaults, soil remediation and replacement. *Cook v. AT&T Corp.*, 4:16-cv-542 (S.D. Tex.) (ECF No. 64-3).

177. AT&T sought to have Mr. Howell excluded as an expert in the Texas Action. *Id.* (ECF No. 51). The court denied the motion to exclude. *Id.* (ECF No. 75). The Court also denied AT&T's motion for summary judgment. *Id.* (ECF No. 95). The case was proceeding to trial when the plaintiffs abruptly dismissed their claims. *Id.* (ECF Nos. 99-102).

178. Applying Mr. Howell's estimates to the lead cables in Verizon's lead cable network yields the following costs to remove and remediate. Crediting estimates that 15% of Verizon's copper cables were encased in lead, i.e., 81,000 miles, the cost to remove and remediate would be $14.3 billion. Even taking just the 8,400 miles of aerial lead cables that Verizon has already admitted to owning (which exclude any underground or underwater cables or cables obtained via MCI or XO), the cost to remove and remediate would be $1.48 billion.

179. ***Second***, on January 14, 2021, the California Sportfishing Protection Alliance filed a lawsuit in the United States District Court for the Eastern District of California against Pac Bell, an AT&T subsidiary. *See California Sportfishing Protection Alliance v. Pacific Bell Telephone Company*, 2:21-cv-00073 (E.D. Cal.) (the "Lake Tahoe Action").

180. In the Lake Tahoe Action, the plaintiff asserted claims under RCRA and the California State Drinking Water and Toxic Enforcement Act of 1986 ("Prop 65"). It alleged that approximately 41,600 feet of cables (approximately 7.9 miles) owned by Pac Bell were located at the bottom of Lake Tahoe. "The inner portion of each cable consists of a lead jacket with walls approximately 0.25 inches thick. . . . Each foot in length of the cables contains approximately 3.3 pounds of lead." The plaintiff alleged that the total amount of lead was 137,280 pounds, more than 68 tons. *Id.* (ECF No. 1 at 5). The plaintiff further alleged that these lead-sheathed cables have been abandoned. A "Lead Cable Investigation" prepared by Marine Taxonomic Services, Ltd. on June 30, 2023 for the Environmental Defense Fund in Washington, D.C., estimated that

each foot of cable requires 3.39 pounds of lead, a figure used for the estimates in ¶¶ 74, 226. Further, a study conducted for the Lake Tahoe Action determined that microscopic plants known as "biofilms," or algae, which serve as a food source for fish, had lead concentrations 67,000 times higher in samples taken from cables as opposed to rocks.

181. The Lake Tahoe Action alleged that a portion of the lead cables were removed and tested to determine if the cables were likely to leach lead into the Lake Tahoe water. Based on this testing, "[a] reasonable inference . . . can be drawn . . . that lead in the [c]ables is being disseminated into the aquatic environment of Lake Tahoe, and that humans and wildlife who make contact with, or who drink, Lake Tahoe water are exposed to the toxic heavy metal, lead."

182. On September 13, 2021, the plaintiff in the Lake Tahoe Action filed a motion to "Approve Settlement and for Entry of Consent Decree." *Id.* (ECF No. 16). The parties had reached an agreement to settle the claims. Pac Bell agreed to "pursue any necessary approvals required for the removal of the Cables and to remove them so long as the removal costs do not exceed $1.5 million." *Id.* (ECF No. 16-1 at 1). With the court's supervision, Pac Bell worked for approximately two years to remove the lead cables in Lake Tahoe.

183. On June 15, 2023 – less than a month before the *WSJ* exposé was published – Pac Bell filed another status update claiming that the parties were at an impasse as to when Pac Bell would be permitted to remove the cables. In June 2023, it is likely that Pac Bell knew of the impending *WSJ* exposé because, as reflected therein, the *WSJ* had asked AT&T to comment on the litigation and AT&T's ownership of lead-sheathed cables more generally.

184. On July 19, 2023, Pac Bell filed another status update with the court. It attached a "meet and confer" letter that it had sent to the environmental group plaintiffs. The letter stated that "in 2021, AT&T agreed to remove [the lead cables in Lake Tahoe] simply to avoid the expense

of litigation." It further stated that it no longer wished to abide by the Consent Decree it had agreed to two years prior. Instead, "the parties should agree to maintain these cables in place to permit further analysis by any qualified and independent interested party, including the EPA, and allow the safety of these cables to be litigated with objective scientific evidence rather than sensationalized media coverage." In other words, in the wake of the *WSJ* reporting, Pac Bell (AT&T) was reneging on its agreement to remove its abandoned lead cables from Lake Tahoe.

185. On November 7, 2024, however, AT&T was ***ordered*** by the magistrate judge to remove eight miles of lead-sheathed cables at the bottom of Lake Tahoe by November 30, 2024. On November 17, 2024, AT&T completed the removal of its lead-sheathed cables from Lake Tahoe.

**7. Verizon Faces Community Pressure to Remove Lead Cables in Coal Center, Pennsylvania**

186. Coal Center, Pennsylvania, is home to a mile-long aerial telecom cable owned by Verizon. The cable runs across entrances to apartment buildings, near a school bus stop and playground, and near people's properties, and spans from Coal Center all the way to a neighboring town. In some places, the cable droops so low that it is almost within arm's reach. As reported in the *WSJ*, the Verizon-owned lead cable runs over the property of the Bibby family, as depicted in the photo below:




A lead-covered cable sags over the Bibby property in Coal Center. PHOTO: NATE SMALLWOOD FOR THE WALL STREET JOURNAL

187. Researchers analyzed the soil taken from the Bibby family's property and determined that the lead levels were 7.5 times the EPA's recommended threshold, or 40% higher than the recommended allowable lead levels for play areas as mandated by the EPA. The Bibbys' two children, aged six, both showed initial elevated blood-lead levels when tested.

188. As reported by the *WSJ* in July 2023, residents of Coal Center "had known about and had been voicing their concerns for nearly a year."

189. A borough council member reported that "she and other Coal Center residents have been pushing Verizon to take the cable down." As the *WSJ* reported, "Verizon has told them it has working services on the old lead cable." In December 2023, the borough council discussed their concerns regarding the lead cable and, as indicated in the *WSJ* reporting, continue to pressure Verizon to remove the cable.

### H. THE *WSJ*'S THOROUGH REPORTING REVEALED THAT VERIZON'S TOXIC LEAD CABLES ARE LEACHING LEAD INTO THE ENVIRONMENT

190. The *WSJ* articles revealed shocking truths about Verizon's lead cables and their effects on the environment. The *WSJ* reports were the product of an investigation spanning 18

months. Since its founding, the *WSJ* has won numerous awards for its work and publications, establishing its global credibility.

191. The *WSJ* received an anonymous tip that AT&T was removing an old lead cable in Lake Tahoe. This was of particular interest because, according to Shalini Ramachandran ("Ramachandran"), a *WSJ* correspondent who has covered the telecom industry for many years, the use of lead cables in telecommunications received little to no media attention – to the point that it was almost unheard of. Ramachandran said that she "***had covered cable and telecom for a long time and had never heard of lead cables in the telecom networks***."

192. Ramachandran and *WSJ* colleague Susan Pulliam ("Pulliam") then proceeded to create a database of lead cables with the aid of old U.S. Army Corps records, Google Street View, and artificial intelligence. To confirm the existence of these cables, Ramachandran and Pulliam also drove around the U.S. and visited 300 cable sites throughout the country.

193. The *WSJ* extracted images from Google Street View in front of each school in the nation's five most densely-populated states and 16 of the 20 most densely-populated counties. A machine-learning algorithm was used to detect if there were lead-sheathed cables in these images, numbering over 100,000. *WSJ* employees manually reviewed images that the machine algorithm identified as containing lead-sheathed cables.

194. Pulliam met with researchers from New York University led by Dr. Jack Caravanos ("Caravanos") to investigate a site located in the Hudson Valley in upstate New York to determine if lead was leaching from the cables.

195. In the neighborhood where the site was located, they found lead cables running along and around a playground called Temple Park. Next to the playground, close to a sign that said "Children at Play," Dr. Caravanos performed an X-ray fluorescence test and found that the

area close to the cable indicated a rating of 1000 parts per million of lead. The EPA's threshold is 400 parts per million for areas where children play. Dr. Caravanos noted the particular dangers of lead in the soil of a playground: "You just need a little dirt on your fingers and your fingers to put into your mouth and ingest, and you get an elevated blood lead above the CDC level of 3.5%." The park has since been dubbed "toxic park."

196. Pulliam also investigated a site at New Iberia, Louisiana frequented by the local populace. This location was situated right by the bank of Bayou Teche, and there was a cable protruding from the ground. The investigation demonstrated levels of lead that were 14 times the EPA level that is safe for play areas.

197. In Coal Center, Pennsylvania, the *WSJ* found mile-long cables owned by Verizon that were sagging in the previously-determined investigation sites. Testing the soil samples obtained from a residential property adjacent to the cables revealed lead levels that were more than 40% above the level the EPA deems safe for play areas.

198. The *WSJ* also identified around 1,700 underwater cables, using only pre-1965 permits and records. This database of underwater cables represents just a fraction of those laid by telecom companies. Moreover, the *WSJ* obtained maps of water bodies from the U.S. Geological Survey and created a computer program that identified the shortest path across the water in order to approximate the likely path of the cable from bank to bank. From the EPA, the *WSJ* team learned that approximately 330 sites were located at what was called a "Source Water Protection Area," which meant that those sites provided drinking water.

199. The *WSJ* also collaborated with an organization called Marine Taxonomic Services, led by Seth Jones ("Jones") and Monique Ridell ("Ridell") to identify underwater lead cables and collect samples to be tested for contamination. With the *WSJ* team, Jones and Ridell navigated

through Emerald Bay in Lake Tahoe to an area where the severed end of one cable was located. Jones then swam to where the severed end was, and collected a sample. The *WSJ* team also tested water from other parts of the U.S. and found lead leaching in the rivers of Michigan and Oregon.

200. Several sets of samples were provided to Professor Bruce Nelson ("Professor Nelson"), a geochemistry professor at the University of Washington, who operates a laboratory that performed isotopic analyses of the samples. This analysis links the lead from the cables to the lead in the ground or water.

201. Professor Nelson concluded that the samples selected by the *WSJ* team from cables in New Iberia, Louisiana, and Coal Center, Pennsylvania were the likely source of lead contamination found in the nearby soil.

202. As mentioned below, Dr. Caravanos's findings in New York were similar: that lead contamination in the soil was the highest in the area directly beneath or adjacent to the cables, within up to two feet, which indicated that the cable's exposure to the elements caused it to bleed lead onto the ground, where lead accumulated over time.

203. From water samples taken from Emerald Bay in Lake Tahoe, it was discovered that there were "very high" levels of lead. Lead was also found moving away from the cables and toward the beach. Some other samples that the *WSJ* team tested were taken from areas where people swim, camp and boat. Notably, one sample collected was more than 2,500 times the level the EPA says is safe for drinking water

204. In Coal Center, Sharon Bibby, mentioned in the *WSJ* articles, reported that she along with other Coal Center residents asked Verizon to remove the lead-sheathed cable, but Verizon responded that it has working services on the cable. Bibby had her two 6-year-old twins,

Joyanna and Beau tested, and the tests – taken a few days after the kids played in a lot next to their house under a drooping cable – revealed that they had high levels of lead in their blood.

205. On or around August 3, 2023, after New York State conducted its own testing of Temple Park's lead levels, the state reopened Temple Park. However, according to an interview conducted by News12 Westchester, Dr. Caravanos disapproved, claiming that the park was still not safe for children. Dr. Caravanos reported: "I took more samples than New York state did" and "I still believe that there are areas that need to be further assessed." In particular, Dr. Caravanos and his fellow researchers took almost 200 readings in the site and received the highest level of lead of 1634 ppm (parts per million), which is significant. Conversely, New York only took 25 readings with an average level of 154 ppm, but the highest reading was more than twice that.

206. Dr. Caravanos further reported that elevated levels of lead were discovered at a football field near Temple Park and advised parents to avoid the area with their kids. Dr. Caravanos stated: "Ultimately, it needs to be removed [. . .] Until the site is better assessed by the state and hot spots are identified and some remediation may occur, my best advice is to maybe think about going to another park if you can."



207. The *WSJ* findings were largely confirmed by an investigation launched by the EPA in response to the articles, according to another *WSJ* article published on January 11, 2024. It reported, "EPA testing in three states near some telecom lead-cable locations identified by the Journal found 101 results, or 41% of the samples taken near lead cables, exceeded the EPA's lead-safety guideline for children. The elevated results were found at 95 of the 235 distinct sites tested by the agency and included 99 sediment and soil samples."

## I. The Fallout of the *WSJ* Exposé

208. Since the publication of the *WSJ* investigative series, Verizon has confronted persistent questioning and blowback from investment analysts, government agencies and representatives, and former employees confronting lead-based health risks, and has offered largely vague and indeterminate responses about the extent of its financial exposure due to lead-sheathed cable issues. Verizon's stock price fell sharply as a result of the *WSJ*'s disclosures, as investors have reacted to the new information and analysts including Evercore and New Street have estimated Verizon's financial exposure to be in the billions of dollars (*see* ¶¶ 231-33, 238, 240, 246, 248, 249, 251 *infra* Section (V)(I)(3), (V)(J)).

### 1. Verizon's Immediate Response to the *WSJ* Exposé

209. Verizon's public statements following the *WSJ* investigative series were ambiguous and vague. But the Company has made four key admissions: (1) Verizon has long known that it has lead cables in its network, and has admitted that at least 3% of its 280,000 miles of aerial cables (which exclude underground and underwater cables, as well as cables acquired from MCI and XO) are sheathed in lead; (2) Verizon's toxic lead cable network poses the risk of massive liability which may not be covered by Verizon's insurance; (3) Verizon does not know the exact size of its lead cable problem, and thus cannot currently quantify the liability risk, and even estimating the size of the problem will take time and be costly; and (4) Verizon has a practice of analyzing its

lead-sheathed cables to determine whether to abandon them in place. In addition, since the publication of the *WSJ* articles, Verizon has updated its risk disclosures to address the potential liabilities associated with its toxic lead cables for the first time.

210. Verizon first spoke publicly about the *WSJ* articles during its July 25, 2023 analyst call, during which Defendant Skiadas stated:

> I'd like to address the recent media reports on lead-sheathed cables in our network. Here is what we currently know. ***We still have some lead-sheathed cable in our copper network. As a result of this infrastructure and the history of the industry, records are incomplete as to exactly how much of the cable on our network has lead sheathing***.
>
> ***However, to give you a sense of the scale of the infrastructure we are talking about, our copper network is comprised of less than 540,000 miles of cable, roughly half of which is aerial, and lead-sheathed cable makes up a small percentage of our copper network***. This number excludes the network elements previously owned by MCI and XO Communications because we are still reviewing the historical records of those companies.

211. Further, in submissions to New York State agencies, Verizon has made additional statements about its lead-sheathed cables. In a letter dated August 21, 2023, Verizon acknowledged that it "has always been widely known that lead was used to protect some cables" and that "since November 2020, Verizon has removed 230 miles of copper cables in New York." In this letter, Verizon disclosed for the first time that it was not simply replacing the old cables as represented to the public. Rather, Verizon acknowledged that "***[w]hether to remove legacy cables or leave them in place requires a detailed analysis***. Factors to be considered include the potential risk to workers who must handle the cables and the potential risk to the environment of disrupting the cables."

### 2. Government Response to the *WSJ* Exposé

212. As addressed in Section (V)(F) above, government regulators have broad authority in ordering the cleanup and remediation of hazardous substances, including lead. In the wake of

the *WSJ* exposé, numerous state and federal agencies launched investigations into the telecom industry, including Verizon's ownership and abandonment of lead-sheathed cables.

213. On July 26, 2023, the EPA invoked its authority under the "Superfund law," or CERCLA, to open an investigation. The EPA tested two localized sites in Pennsylvania and California, and while it found no threats that "warrant an immediate EPA response action," its results did "show that some soil samples have lead concentrations above an EPA screening level of 400 parts per million." It also "established a national working group to consider next steps to ensure the public remains safe," according to the EPA website. It noted that "steps may include further analyses to better understand if the cables have released and continue to release lead. Any future actions will be done in coordination with state and local leaders, and the public will remain informed of any actions taken."

214. The EPA's further investigatory efforts have since confirmed that the lead cables are leaching toxic contaminants. On January 11, 2024, the *WSJ* reported that the EPA found "more than 100 soil and sediment readings with lead above the regulator's safety guideline for children at some phone lead-cable sites identified by The Wall Street Journal in three states." This represents 41% of samples taken near lead cables. Clifford Villa, head of the EPA's "Superfund" office that oversees cleanup of contaminated sites, stated, "This is lead that could be concerning." Grant Scope, senior counselor to EPA Administrator Michael Regan, characterized the agency's investigation of lead cables as "high priority." Although the EPA has determined that the lead cables do not warrant an "emergency response," this is just the first determination in a "multistep Superfund review process that also examines whether any other longer-term remedies should be undertaken," according to the January 22, 2024 *WSJ* report. Indeed, in December 2023, the EPA

sent letters requesting that Verizon and other telecom companies meet with the agency, and it will collect more data and documents as part of its review.

215. As further reported by the *WSJ* on January 11, 2024, the EPA is "coordinating closely with the Justice Department, whose Southern District of New York is investigating whether telecom companies had knowledge of any potential risks to their workers and future environmental impact when they left behind the lead cables." The Department of Justice originally filed a civil inquiry to investigate on July 27, 2023.

216. State regulators have also launched concurrent investigations. On July 20, 2023, New York Governor Kathy Hochul directed the Departments of Public Service, Health, and Environmental Conservation to "immediately investigate a recent report of old lead-covered cables left by telecommunication companies and the potential public health risks associated with exposure to those cables." Governor Hochul stated: "Lead-covered cables pose a serious threat to communities across New York, and I am directing State agencies to immediately launch a full investigation. We will hold the telecommunication companies responsible and take swift action to remediate problems."

217. As a result of Governor Hochul's directive, the "agencies sent a letter to the State's 246 facilities-based telecommunication providers to begin compiling an inventory of the presence of aerial and buried cables, both on land and below water, containing lead across New York." These letters were sent on July 20, 2023, and signed by Rory M. Christian, Chair and CEO of New York's Public Service Commission; Basil Seggos, Commissioner of New York's Department of Environmental Conservation; and James V. McDonald, M.D., M.P.H, Commissioner of New York's Department of Health (the "New York Letters").

218. The New York Letters referenced "an aerial lead cable located in Wappingers Falls, New York, above the perimeter of a town playground" and "soil at the park perimeter" with "elevated lead levels above what the [EPA] considers safe in soil where children play." It states that in an effort to better understand the scope of this potential concern:

> The State is compiling an inventory of the presence of aerial and buried cables, both on land and below water, containing lead across New York to conduct its own investigation of the health and safety issues potentially caused by these cables. Lead is a hazardous substance on New York State's list of hazardous substances (6 NYCRR Section 597.3). Pursuant to New York Public service law (PSL) S94(q2) and (3); 16 NYCRR Part 5.2, and Environmental Conservation Law (ECL) SS 27-1305, 27-1307 and 27-1309, we are requesting a full inventory of lead-containing aerial and buried cable, both on land and below water, owned by your company for both cable still in use to provision service and cable that is no longer being used by has yet to be removed. The inventory shall indicate the type of cable (copper or fiber) and whether it is aerial or buried on land and below water, as well as the City, Town, or Village the cable is located in, street name where the cable is located, the length of the cable, the closest intersecting landmarks at the beginning and end of the cable, and any other information that would be useful to physically locate and inspect the cable.

219. Several Congressional leaders have also voiced concerns. Senator Edward Markey wrote a letter to USTelecom on July 11, 2023, stating:

> The telecommunications companies for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and public health effects . . . . This is corporate irresponsibility of the worst kind . . . . The members of USTelecom that are responsible for these lead-sheathed cables have a duty – both civic and legal – to ensure that they do not put Americans in harm's way. I will be awaiting answers to my questions, expecting further action and commitments from USTelecom's members, and watching closely from my seats on Senate committees that have jurisdiction over the environmental and public health issues these cables present.

220. Senator Markey posed questions to Verizon and other telecom companies including: (1) "Do the companies know the locations and mileage of lead-sheathed cables that they own or for which they are responsible?"; (2) "Why have the companies that knew about the cables – and the potential exposure risks they pose – failed to monitor them or act?"; and (3) "What plans

do the companies have to address the environmental and public health issues posed by the cables? Specifically, will the companies commit to: (a) testing for soil, water, and other contamination by the cables? (b) remediation any contamination? (c) warning communities of the potential hazards the cables pose? (d) guaranteeing medical treatment and compensation to anyone harmed by lead poisoning caused by the cables?"

221. Similarly, New York Congressman Patrick Ryan issued a press release and letter to USTelecom on July 20, 2023 demanding that "Verizon and AT&T clean up their mess, remove lead cables from Hudson Valley and Across United States." Congressman Ryan's press release further stated, "For decades, big corporations have polluted our rivers and our drinking water, always putting their profit above the health and safety of our community. This latest failure by Verizon and AT&T is no different. It is absolutely unacceptable that their negligence is now making it dangerous for our kids to even go to the playground. They need to clean up their mess and safely remove these cables immediately." Congressman Ryan's letter to USTelecom posed similar question to Senator Markey's letter, asking USTelecom for an accounting of all lead cables, whether the lead-sheathed cables are still operations, and what plans USTelecom's member companies have in place to protect line workers who service the cables.

222. To inform Congress's response to the lead cable problem, on December 26, 2023, Congressional Research Service issued a briefing, "Legacy Lead-Sheathed Telecommunications Cables: Status and Issues for Congress" (the "CRS Issue Brief"). CRS "operates solely at the behest of and under the direction of Congress." The CRS Issue Brief noted that the "EPA may take CERCLA response actions to investigate and remediate the release, or substantial threat of a release, of lead into the environment under the Superfund program at sites on nonfederal lands." The CRS Issue Brief noted that "[i]f lead derived from lead-sheathed telecommunication cables

were to migrate into groundwater or surface water, enforcement actions under two other federal statutes might be used to mitigate potential impacts on water quality," and cited the Safe Drinking Water Act and the Clean water Act.

223. The CRS Issue Brief noted several avenues for Congressional involvement. Congress could "mandate an inventory of legacy lead-sheathed cable locations and ownership nationwide." It could also "consider which agency could or should lead the development of an inventory," and make determinations about interagency coordination and public disclosure. Once an inventory is complete, Congress could "mandate or encourage federal coordination or assistance (e.g., technical, financial) to jurisdictional authorities (i.e., federal, state, local, tribal)."

**3. Estimates of the Scope of Verizon's Lead Cables and Associated Liability**

224. As noted above, Verizon told investors that it owns approximately 540,000 miles of copper cables, exclusive of certain copper wireline assets Verizon inherited when it acquired MCI and XO. The *WSJ* reported that approximately 15% to 20% of Verizon's copper cables are sheathed in lead. Crediting these estimates, Verizon still owns ***at least 81,000 miles of lead*** in its wireline infrastructure.

225. Verizon itself has admitted that approximately 3% of its 280,000 miles of ***aerial*** copper cables (excluding underground and underwater copper cables, and any cables acquired via MCI and XO) are lead-sheathed. *See* ¶¶ 75, 209. Thus, according to Verizon's own admission, ***at an absolute minimum, Verizon owns 8,400 miles of above-ground lead-sheathing***. (But as noted, the figures that include all cables, including underground and underwater, as well as legacy MCI and XO cables, are much higher, consistent with analyst estimates and *WSJ* reports.)

226. According to research conducted by Marine Taxonomic Services, Ltd. and as confirmed by the California Sportfishing Protection Alliance, each ***foot*** of copper cable requires approximately ***3.39 pounds of lead sheathing***. Thus, based on the estimates above by industry

analysts, Verizon owns approximately ***1.5 billion pounds*** of lead strewn across communities in the U.S.

227. David Howell, an expert with extensive experience on the subject of abandonment of rights of way and easements, whose company, Pipeline Equities, has removed over 12 million of retired, abandoned, or out of use pipelines and cables, has estimated that it costs ***$33.43 per foot to remove lead cables underground***. Accordingly, it would cost Verizon ***$14.3 billion*** to remove its approximately 81,000 miles of lead-sheathed cables left in place.

228. Additionally, even applying this $33.43 per foot removal cost to Verizon's ***own*** record of its 8,400 miles of just its aerial lead-sheathed cable yields a removal and remediation cost to Verizon of ***$1.48 billion***, before addressing any of its underground or underwater lead infrastructure.

229. Based on the foregoing calculations, it would cost Verizon, ***at least $1.48 billion*** to remove ***just*** its aerial lead-sheathed cables, and approximately ***$14.3 billion*** to remove and remediate its lead-sheathed cables that are aerial, underground and underwater (excluding the wireline assets Verizon inherited when it acquired MCI and XO).

230. Other estimates yield even higher costs. For example, in 2010, the Northeast Utilities Service Company estimated that it would cost approximately ***$800 million*** to remove just ***1,200 miles of its lead cables*** within an underground electric distribution system, or ***$666,667 per mile***. Applying this figure to Verizon's 81,000 miles of lead cables yields a removal cost of ***$53 billion***.

231. Analysts who study the telecommunications industry also predicted extremely high costs to remove the lead cables. After the *WSJ* articles were published, New Street Research ("New Street") estimated that the cost of lead cleanups to the entire telecom industry would be ***$59***

***billion***, and ***$8 billion*** for Verizon alone. New Street relied on the following assumptions in estimating a $59 billion industry-wide cleanup: (i) copper is often left in place even where fiber is installed; (ii) approximately 44 million housing units may have lead exposure; (iii) of those 44 million housing units, 19.3 million have fiber underlying part of the connection and there is a remediation cost of approximately $500 per unit for a total estimated cost of $10 billion; and (iv) approximately 24.4 million of the 44 million housing units do not have fiber underlying the connection and thus the remediation cost for those units is approximately $2,000 per unit for an additional estimated remediation cost of $49 billion. New Street has since lowered its clean-up cost estimate to approximately $5.2 billion to remediate the legacy lead cable infrastructure, but also stated it is too soon to tell what Verizon's exact expenditure will be.

232. On July 28, 2023, the Brookings Institute revealed its "[c]ost estimates to remediate the problem for the entire industry are settling in at between $4 and $20 billion. To put that number in perspective, the total capital expenditures of Verizon and AT&T were each around $20 billion in 2022." USTelecom (a telecom trade association) has opined that, ultimately, whether the legacy lead cables have to be removed or can be left in place depends on: the age and composition of the cables, safety to workers, and environmental impact. Assessing those questions for Verizon's tens of thousands of miles of lead-sheathed cables and determining the appropriate remediation or approach – and addressing the same with relevant local, state and federal regulators and other stakeholders – will, on its own, generate significant costs.

233. Analysts from Wolfe Research reached a similar conclusion in their July 25, 2023 report, highlighting that the price of Verizon's stock was down 13.1%, underperforming the S&P (+19.0%) year-to-date, as the industry assessed and managed the impacts from lead-sheathed cables. And on July 23, 2023, an Evercore analyst issued a report that estimated that Verizon had

54,000 miles of lead cable, and estimated that removing all lead-clad cables would cost Verizon $2.1 billion. ¶ 255.

#### 4. Verizon's Liability from Lead-Based Personal Injury and Toxic Tort Lawsuits

234. In addition to removal and mitigation costs noted above, Verizon also faces massive liability from personal injury litigation. Indeed, since the news of its expansive lead cable network emerged in July 2023, there have been at least two putative class action lawsuits filed against Verizon alleging that Verizon failed to protect individuals from its hazardous lead cables. Because both are putative class actions, they are each likely to have hundreds or thousands of class members. Thus, the potential financial liability that Verizon faces is tremendous.

235. On August 23, 2023, former Verizon utility worker, Greg Bostard, filed a toxic tort class action lawsuit against Verizon on behalf of a class of utility workers in connection with exposure to Verizon's toxic lead-sheathed aerial cables. This action is styled, *Bostard v. Verizon Communications Inc. et al.*, 1:23-cv-8564 (D.N.J.). Bostard was an employee of Comcast Corporation ("Comcast") in New Jersey between 1990 until 2019. Bostard maintained and serviced Comcast's aerial cables located on utility poles throughout New Jersey. Comcast shares its space for aerial cables with Verizon's lead-sheathed cables. Accordingly, to reach Comcast's aerial cables, Bostard climbed over Verizon's lead-sheathed cables and his clothes and body would rub against the lead cables as he climbed the utility poles. Bostard alleged that due to his "direct and regular contact with Verizon's lead-sheathed cables," he "ingested and inhaled lead from Verizon's lead-sheathed cables during the course of his 29-year career." Bostard specifically alleged that he became exposed to lead because when he "perspired, he would rub his face, including his eyes and mouth with his hands that had been in direct contact with Verizon's lead-sheathed cables. During lunch, Mr. Bostard would use his hands to eat."

236. On September 8, 2023, Mark Tiger, a utility worker formerly employed by Figure 8 Communications between 2019 and 2020 and currently employed by Duda Cable Construction, and who has regularly worked with and near Verizon's lead-sheathed cables, filed a putative class action lawsuit against Verizon in the Western District of Pennsylvania. That action is styled, *Tiger v. Verizon Communications Inc.*, 2:23-cv-1618 (W.D. Pa.). Tiger brought claims against Verizon and its subsidiary Verizon Pennsylvania LLC for negligence, negligence *per se*, and common law public nuisance. He alleged that Verizon knew of the risks presented by the toxic lead cables yet failed to take meaningful action. He further alleged that while employed at Duda Cable Construction, an independent contractor for Comcast, he would have to climb over Verizon's lead cables to reach Comcast's aerial cables as they were directly above Verizon's. As a result, he regularly came into contact with Verizon's lead cables. Tiger alleged that while working with Verizon's lead cables he was routinely sick including experiencing mood changes, headaches, nausea, fatigue, irritability, muscle and joint pain, as well as constipation. Damages include demands that he and the class be medically monitored for future lead-related health conditions.

**5. After the Class Period, Verizon Finally Disclosed Risk of Loss Related to Lead-Sheathed Copper Infrastructure**

237. Unable to conceal the truth regarding its lead-related exposure any longer, Verizon added the following to its risk disclosures in its Form 10-Q for the quarter ended September 30, 2023:

> Allegations related to lead sheathed copper cables in our copper network infrastructure could expose us to regulatory scrutiny, litigation, penalties, removal and compliance costs, operational impacts or reputational damage.
>
> There have been recent media reports alleging that certain lead sheathed copper cables that are part of our copper-based network infrastructure may present public health or environmental risks in areas where those facilities are deployed. These allegations could result in government investigations, legislative or regulatory actions, litigation penalties and other liability, remediation and compliance costs or negative operational impacts. In addition, we are currently subject to lawsuits

> related to these allegations, and additional legal proceedings or contingencies may arise in the future. Our insurance policies may not cover or may not be sufficient to fully cover the costs of these claims. Accordingly, we may incur substantial expenses as a result of these allegations, which cannot be reasonably estimated at this time but could be material.
>
> In addition, negative assertions about the public health or environmental impact of our lead sheathed cables may harm our reputation, which could adversely affect our business and our relationship with various stakeholders, even if such allegations ultimately prove to be inaccurate.

### J. The Price of Verizon Stock Precipitously Declined in the Wake of the *WSJ* Exposé

238. The *WSJ* exposé revealed, for the first time, facts about Verizon's lead cables and exposure to related risks. Investors had been denied critical information about the lead cables, their purported replacement and risks, and thus, as the series was released, and investors were able to consider the ramifications of the toxic network of lead cables on the Company, the price of Verizon's stock further declined. In sum, the price of Verizon's stock fell from $35.90 (price at market close on July 7, 2023) to $31.46 (price at market close on July 27, 2023, the first trading day after the last article was published). This was a decline of 12.4% and wiped out approximately $18.6 billion in market capitalization.

#### 1. The July 9, 2023 Article

239. On Sunday, July 9, 2023, the *WSJ* released an article entitled "America is wrapped in miles of toxic lead cables." It stated, in pertinent part:

> [. . .] Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.
>
> The lead can be found on the banks of the Mississippi River in Louisiana, the Detroit River in Michigan, the Willamette River in Oregon and the Passaic River in New Jersey, according to the Journal's tests of samples from nearly 130 underwater-cable sites, conducted by several independent laboratories. The metal has tainted the soil at a popular fishing spot in New Iberia, La., at a playground in Wappingers Falls, N.Y., and in front of a school in suburban New Jersey.

The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination – more than 2,000 lead-covered cables – that hasn't been addressed by the companies or environmental regulators. These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.

Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency. At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play. "We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.

For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.

Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Even without further exposure, lead can stay in the blood for about two or three months, and be stored in bones and organs longer. Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.

The Journal's findings "suggest there is a significant problem from these buried lead cables everywhere, and it's going to be everywhere and you're not even going to know where it is in a lot of places," said Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, a federal agency.

In Coal Center, Pa., medical tests independently sought by the mother of 6-year-old twins, Joyanna and Beau Bibby, and shared with the Journal, showed they had high levels of lead in their blood. The tests were taken a few days after they played in a lot next to their house under a drooping cable.

In response to the Journal's reporting, [. . .] Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. They said they follow regulatory safety guidelines for workers dealing with lead.

The companies and an industry group representing them said they would work together to address any concerns related to lead-sheathed cables. "The U.S. telecommunications industry stands ready to engage constructively on this issue," said a spokeswoman for USTelecom, a broadband association that represents companies in the industry.

* * *

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

Some former telecom executives said companies believed it was safer at times to leave lead cables in place than remove them, given the lead that could be released in the process.

The lead-covered cable network included more than 1,750 underwater cables, according to public records collected by the Journal. A Journal analysis of the five most densely populated states, and more than a dozen of the most densely populated counties in the nation, identified about 250 aerial cables alongside streets and fields next to schools and bus stops, some drooping under the weight. There are likely far more throughout the country.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. The samples were analyzed for lead content by Pace Analytical Services, an accredited environmental-testing lab. A researcher at the University of Washington who analyzed the chemical fingerprint of lead at some of those sites verified that the lead contaminating the water and soil likely originated from the cable.

**AMONG THE FINDINGS:**

—***Roughly 330 of the total number of underwater cable locations identified by the Journal are in a "source water protection area***," designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal.

—Aerial lead cabling runs alongside more than 100 schools with about 48,000 students in total. More than 1,000 schools and child-care centers sit within half a mile of an underwater lead cable, according to a Journal analysis using data from research firm MCH Strategic Data.

—In New Jersey alone, more than 350 bus stops are next to or beneath aerial lead-covered cables, a Journal analysis of NJ Transit data found.

—Roughly 80% of sediment samples taken next to underwater cables, which the Journal tested, showed elevated levels of lead. It isn't known if the level of leaching is constant; experts say old cables tend to degrade over time.

Ben Grumbles, executive director of an association of state environmental regulators, called the Journal's findings disturbing. ***"This is a type of toxic exposure that isn't on the national radar and it needs to be," he said. "There is a need to act and clean it up."***

**AN ANCIENT NETWORK**

American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water. For underwater cables, steel cords sometimes surround the lead for further protection.

When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.

With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.

To track the underwater cables, the Journal collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables that were approved more than a century ago. ***Removing Army Corps-approved cables at any time would routinely require a permit or be noted in the original paperwork, officials say. The Journal tally of abandoned lead cables is sure to be an undercount***.

Researchers Seth Jones and Monique Rydel Fortner, from the environmental consulting firm Marine Taxonomic Services, collected lead, soil and water samples at the Journal's request—a process that included diving expeditions at some locations. They have become experts in lead cables since they discovered them under Lake Tahoe more than 10 years ago and have advocated for their removal. The Environmental Defense Fund, a nonprofit advocacy group, provided guidance and $85,000 to MTS to partly fund its field research for the project.

The Journal found that where lead contamination was present, the amount measured in the soil was highest directly under or next to the cables, and dropped within a few feet—a sign the lead was coming from the cable, experts said.

The Journal didn't find lead in all the locations it tested. The level of contamination can vary in water and soil, depending on environmental and other factors.

The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes. The EPA and other agencies have spent billions of dollars to reduce lead in the environment. In 1997, health regulators said average blood lead levels in children and adults had dropped more than 80% since the 1970s.

Yet large numbers of American children continue to show levels of lead in their blood— more than half of those tested, according to a Quest Diagnostics study published in 2021, based on an analysis of test results from more than one million children under age 6.

"A new, uncontrolled source of lead like old telephone cables may partly explain" why children continue to have lead in their blood, said Jack Caravanos, an environmental public-health professor at New York University, who assisted the Journal in its research. "We never knew about it so we never acted on it, unlike lead in paint and pipes."

Gordon Binkhorst, an environmental consultant and expert on lead sampling, said he believes cables should be removed because they are "continuing sources of soil and potentially groundwater contamination." Other experts said covering the cables and the area around them could reduce the risk.

Binkhorst reviewed the sampling methods used by the Journal and said they were appropriate techniques for basic testing of whether lead was present in the soil and water near the cables, using a certified environmental testing lab.

* * *

In Wappingers Falls, N.Y., about 60 miles north of New York City just off the Hudson River, an aerial lead cable hangs above the perimeter of a town playground, with a jungle gym, a swing set and a basketball court.

Near a "CHILDREN AT PLAY" sign, lead in the soil measured more than 1,000 parts per million, according to Caravanos, the NYU professor.

The EPA's recommendations for the levels of lead it believes are generally safe in soil are lower for areas where children play, at 400 parts per million, and higher for other areas, at 1,200 parts per million. (While lead in water is described in parts per billion, lead in soil is described in parts per million, with one part per million equivalent to about one inch in 16 miles.)

Caravanos used an X-ray fluorescence analyzer, or XRF, a device used by scientists to measure elements in soil. At the corner of the playground, the XRF showed lead in soil just under the cable at 850 parts per million.

It doesn't take much lead in soil to elevate a blood level for a child, said Caravanos. "You just need a little dirt on your fingers to put into your mouth and ingest, and you get an elevated blood lead above the CDC level of 3.5."

In West Orange, N.J., a lead-sheathed cable sags over tree-lined sidewalks and driveways for more than one-third of a mile, where children and their parents walk, across the street from Gregory Elementary School. The cable sometimes dips to about 12 feet above the ground.

Caravanos found contaminated soil beneath the cable in multiple spots and registered multiple readings far exceeding the EPA guideline for play areas. Gregory Elementary School is one of 64 schools in New Jersey where the Journal identified aerial lead cables.

* * *

**FINGERPRINTING LEAD**

At selected sites, the Journal took the extra step to confirm that lead stemmed from the cables and not another source. Reporters worked with a researcher to perform an isotopic analysis, a procedure that determines a specific fingerprint for the lead involved. The testing by Bruce Nelson, a geochemistry professor at the University of Washington who specializes in the field, linked the lead found in samples most likely to the specific cables—as opposed to, say, lead from a factory or from paint.

* * *

At some cable sites, telecom companies disavowed ownership. In Lake Pend Oreille in the Idaho panhandle, a snarl of two lead-covered cables lies abandoned at a spot where children speed by on inner tubes in the summer. The cables sit under a railroad bridge in a prime fishing spot.

A sample of water collected in August at the lake bottom showed lead at 1,250 parts per billion. A water sample taken at the surface in that spot showed lead at 38.8 parts per billion. An isotopic analysis showed that the fingerprint of the lead in the water at the surface matched lead from a telecom cable at that site, and not that of a lakeside slag heap known as Black Rock, the detritus of a lead smelter that had ceased operations by 1913.

A predecessor company to Verizon laid a cable near the site, a U.S. Army Corps record shows. Verizon, Frontier Communications and Ziply Fiber, telecom

companies that have variously served this region over the years, say they don't own the cables.

**COAL COUNTRY RISK**

***In Coal Center, Pa., an aerial lead-sheathed cable runs along the street, drooping so low in certain spots that it is nearly within arm's reach. The roughly mile-long cable, from Verizon, runs into neighboring California, Pa., across an entrance to apartment buildings, and near a school bus stop and playground. Some local residents had known about the cable and had been voicing their concerns for nearly a year***.

***Lead found at one of the locations measured 7.5 times the amount the EPA says is safe for play areas, according to a soil sample collected by the Journal. The isotopic analysis by Nelson showed the lead in the soil mirrored the lead from the cable and was unlike the background lead in that area.***

The lead-sheathed cable runs over the property of Shannon Bibby, 36, mother of the 6- year-old twins. This February, her children played under the cable in the lot next to their house, where ground was being dug up for the foundation of a home. ***An analysis of soil collected by the Journal from the family's property showed lead at a level more than 40% higher than the recommended level for play areas by the EPA***.

***A borough council member, Bibby had her children's blood tested after learning about the Journal's finding. Capillary tests, or blood pricks, found lead in one child's blood higher than 3.5 micrograms per deciliter***. The other child hit that mark, which is the level at which the CDC recommends seeking medical or environmental follow-up. A subsequent blood test showed non-detectable levels of lead.

It is impossible to say if the twins' initial elevated lead level tests were directly linked to exposure from the cable. The Bibbys' results were below what the EPA model could expect to find in a child playing in soil with the concentrations found at their property, according to Caravanos.

***Bibby said she and other Coal Center residents have been pushing Verizon to take the cable down. Verizon has told them it has working services on the old lead cable. In December, she and other Coal Center borough council members discussed their concerns in the tiny borough hall at the edge of the Monongahela River.***

***"We have to get moving on these cables," said council member Rob Lincavage, who grew up in Coal Center and said it has become one of his goals in life to see the cable removed.***

> ***"It shouldn't be here," said Bibby. She said the lead should be removed "before something bad happens."***

(Emphasis added.)

240. On this news, Verizon's stock fell $0.76 per share, or 2.1% to close at $35.14 per share on July 10, 2023, on unusually heavy trading volume, damaging investors.

**2. The July 12, 2023 Article**

241. On July 12, 2023, the *WSJ* released a follow-up article entitled "What AT&T and Verizon knew about toxic lead cables." The article stated:

> For decades, […] Verizon and other firms dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.
>
> They knew their employees working with lead regularly had high amounts of the metal in their blood, studies from the 1970s and '80s show. . . . Government agencies have conducted inspections, prompted by worker complaints, that led to citations for violations involving lead exposure and other hazardous materials more than a dozen times over four decades, records show.
>
> * * *
>
> ***Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead. The telecom industry's lead-covered cables have been largely unknown to the public. The industry doesn't have a program to remove or assess their condition. Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.***
>
> * * *
>
> "***They knew the risks, but they didn't want to do a lot to mitigate it***," said James Winn, who worked as a cable splicer among other jobs for several Bell System companies for 45 years. Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.

A Wall Street Journal investigation has revealed that telecom companies left behind more than 2,000 potentially dangerous lead-covered cables under water, in soil and overhead. Many more are likely to exist.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. Roughly 80% of sediment samples taken next to underwater cables showed elevated levels of lead.

Doctors say that no amount of lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Without further exposure, lead stays in the blood for only about two or three months, but it can be stored in organs longer and in bones even for decades, according to Dr. Philip Landrigan, director of the program for global public health and the common good at Boston College.

Like asbestos, lead must either be sealed away or removed completely to eliminate the risks. USTelecom, a trade group that represents companies in the industry, said "the scientific literature and available studies" on lead-sheathed cables show they aren't a public-health issue or a risk to workers when precautions are used.

The group declined to provide or describe any such studies and literature.

* * *

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

The cables were laid by the original American Telephone & Telegraph, also known as the Bell System, which operated as a group of regional telephone companies starting in the late 1800s. With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon.

Some lead experts say the cables should be removed, and any contaminated soil should be taken to an appropriate landfill. Removing a lead-sheathed cable could release lead into the environment during the process but some experts say leaving the lead could result in decades-long contamination.

Other experts say less-drastic measures could decrease the risk of contamination, such as covering areas where the cables are exposed. Removing underwater cables would be a far more complicated and costly process that could require an assessment of the risk of disturbing the lead.

Telecommunications companies have wrestled with how to handle the cables. Malone's 2010 presentation noted that removing the cables that were underground wasn't easy. "Extraction of cable from underground duct can release unexpected high levels of lead dust," the presentation said. "Underground cable presents real possibilities for overexposure" to workers removing them.

The oldest cables are typically at the bottom of a manhole or conduit, said retired AT&T executive Bill Smith. Cables from the 1920s could be nearly impossible to pull out, he said. "In the underground, unless you really needed the conduit duct...you would leave it in place," he said.

*     *     *

The question of who might be responsible for any cleanup is complicated, said Brian Berkey, an associate professor of legal studies and business ethics at the University of Pennsylvania's Wharton School. When the cables were installed, if they were a reasonable and responsible decision, and considered safe at the time, the cleanup could ethically be a collective responsibility involving companies and the government, he said.

**LEAD ROOTS**

After the invention of the telephone in the 1870s, the first lines to go up were single-line connections strung on poles, connecting one point to another. Tangles of wires soon filled city skies. In the late 19th century, companies began using cables containing bundles of wires that delivered more capacity and better transmission. Sheathing the cable in lead cut electromagnetic noise in the wires and kept water out. By 1940, the majority of the phone network was in lead-covered cables.

There were signs at the dawn of the industry that lead could harm workers. Alice Hamilton, a pioneer of modern industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her 1925 book "Industrial Poisons in the United States."

By 1956, the Bell System was using around 100 million pounds of lead a year, according to a Bell document. That's heavier than more than 6,660 male African elephants.

The industry began to deploy more cables that used plastics and alternative metals instead of lead over roughly the next decade, and moved away from installing new lead cables completely, as technology improved. Workers still maintained the old cables using molten lead and, at times, removed them.

In the 1970s, the U.S. began restricting lead in gasoline and banned lead-based paint in residential homes. The Occupational Safety and Health Administration drafted its first standards on worker exposure to lead and other hazards.

Bell Laboratories, the Bell System's technology and science engine, was a leader in lead research in the 1970s and invented a device that could screen for lead exposure from a drop of blood.

A 1977 Bell study provided a snapshot of high lead levels among female lead-soldering workers at Western Electric, then the manufacturing arm of the Bell System. Based on testing, it estimated that the workers had blood-lead levels in the range of 24 to 45 micrograms per deciliter. Those levels were as high as triple the average level of the population at the time. Bell scientists concluded the workers were "not being exposed to a lead hazard" because a control group of Western Electric office workers also had high estimated lead levels.

Blood tests showed high lead levels in another group of workers—cable splicers, who fixed and maintained cables. A 1978 letter between Communications Workers of America union officials said that AT&T "has confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."

The average lead levels in the blood of 90 cable splicers was more than 27 micrograms per deciliter, and 29% reported central nervous system symptoms, according to a 1980 paper by Mount Sinai, Bell Labs and New York City's health department.

While regulations and lead bans drove down exposure across the population, there were still more than 40,000 telecom employees working with lead in 1983, according to a Bell System document. Even though companies stopped deploying new lead-sheathed cables in the 1960s, the existing network still needed to be maintained, and lead-based solder has remained in use.

**SMELTING HEADACHES**

*   *   *

***Between 2007 and 2016, blood-lead test results for 208 Verizon workers showed that 85, or more than 40%, had levels above 3.5 micrograms per deciliter, according to Verizon data shared with the union. That's the current level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up.***

***Rob Prokopowicz, who retired from Verizon in 2021 after 40 years of working with lead, said he raised concerns with managers about routinely pumping out water from manholes that was potentially contaminated with lead, including in front of schools. He said they told him, "If you don't feel safe, we'll send someone else."***

> "When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust," said Prokopowicz, 62.
>
> "For the small percentage of our workforce that may need to work around lead-sheathed cable, we have a robust safety and health program to provide training, materials and resources needed to do so safely," a Verizon spokesman said. The company said its work practices on such cables are based on the available science, legal requirements and guidance from medical and work-safety organizations.
>
> "Verizon's long standing policy allows for any employee who requests to be tested for lead exposure to do so at any time and without any cost to the employee," he said. A study last year at Mount Sinai of 20 Verizon workers, with an average tenure of 23 years, showed that 60% had measurable lead in their tibias, said Dr. Rabeea Khan, the study's principal investigator. "The fact that we can detect it in your bones suggests you have had long-term exposure," she said.
>
> Nearly half of the workers in the study, mostly cable splicers, showed lead concentrations of 10 micrograms per gram of bone, indicating increased risk of neurological or biological problems, Khan said. Mount Sinai is planning a broader study later this year.
>
> * * *
>
> In response to the Journal's reporting, AT&T, Verizon and a group representing the broader telecom industry said they would work together to address any concerns or issues related to lead-sheathed cables.

(Emphasis added.)

### 3. The July 14, 2023 Article

242. On July 14, 2023, the *WSJ* released an article entitled "I Was Really Sick, and I Didn't Know From What." The article stated, in pertinent part:

> Tracy Fitchhorn worked with lead solder. Her husband, Dan Fitchhorn, spliced lead cables. Her father, Peter Hopkins, handled lead as an installer and repairman. All worked for decades for telecom companies. All are now sick.
>
> The Fitchhorns, like tens of thousands of workers at American Telephone & Telegraph and its successor companies, were exposed to lead on the job over many years. Current and former workers say they often felt left in the dark about their exposure and how to stay safe.
>
> Some of the workers have neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure.

There's no way to determine what triggered specific ailments. Doctors say no amount of lead is safe.

The lead, which those workers handled for decades, is a potential health risk for communities across the U.S. The cables sheathed in the toxic metal are the subject of a Wall Street Journal investigation that has detailed how AT&T, Verizon and other telecom giants left behind a sprawling network of cables, many of which are leaching lead into the environment. Children are especially vulnerable to the effects of lead exposure.

[. . .] Verizon said it has "a robust safety and health program to provide training, materials and resources," and that workers can get lead testing at any time at no cost.

Current and former workers described scant precautions. Many said they learned how to handle lead on the job and weren't given respirators or regular blood lead tests.

Over decades, they wiped hot lead solder to repair cables in New York, fixed aerial lead cables in Pottsville, Pa., and used shaving cream to contain manhole lead dust in Portland, Ore. James Innes said his taste changed, which can be a sign of lead exposure.

The old Bell System of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers. They kept detailed medical records. [. . .]

***A study conducted in the 1970s at New York's Mount Sinai hospital of 90 Bell System cable splicers showed "a high lead content in their blood," with 10 "in danger of suffering medical and/or physical deterioration if they continue on their jobs," according to letters among union officials. A small study last year of lead in Verizon workers' bones showed that exposures continued.***

AT&T and Verizon declined to comment on the studies.

***Tommy Steed removed lead underground cables in the Bronx in the 1980s and said he often vomited after eating breakfast. He said he never got his blood test results from Nynex, now part of Verizon, despite repeated requests.*** The state health department later provided them, showing high levels of lead. Nynex "didn't try to get me any remedial help," said Steed, now chairman of the Association of BellTell Retirees, which advocates for former workers.

(Emphasis added.)

243. The article profiled Tim Killeen, a former cable splicer for, among other companies, Verizon. The article stated "Killeen has chronic headaches, memory loss and difficulty breathing. His first wife had two miscarriages. His daughter suffered from childhood heart problems and has been diagnosed with ADHD. Those conditions can be linked to lead exposure. Mr. Killeen stated, '***I was coming home every day and holding the baby, not thinking there is lead dust all over you***.'"

244. The article also profiled Tommy Steed, a former cable splicer and lineman for, among other companies, Verizon. The article stated that "Steed's blood-lead level was 43 micrograms per deciliter in May 1988 and 39 micrograms two months later, according to New York Health department records. The average level for the U.S. population at the time was 2.8 micrograms per deciliter, according to the Centers for Disease Control and prevention." According to the article, Mr. Steed stated "***[a]t the height of my lead poisoning, I was really sick, and I didn't know from what***."

245. Finally, the article profiled James Innes, a former cable splicer for, among other companies, Verizon. Mr. Innes was reported as having "[d]ecades of gastrointestinal problems," and was quoted as saying "***[y]ou were creating a kind of powder from shaving the lead sheath, and every now and then you'd get a sweet taste in your mouth from inhaling the lead***."

246. On this news, the price of Verizon stock declined by $0.63 per share, or 1.8%, to close at $34.01 on July 14, 2023.

**4. The July 17, 2023 Article**

247. On July 17, 2023, the *WSJ* released an article entitled "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables." The article stated, in pertinent part:

> Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.

In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.

A Wall Street Journal investigation revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing showed that dozens of spots registered lead levels exceeding EPA safety guidelines.

"Without EPA intervention, we expect that the risk posed by the cables will increase as they further deteriorate and release lead into the environment," according to the letter by the three nonprofit organizations, the Environmental Defense Fund, Clean Water Action and Below the Blue.

The Journal used testing including isotopic analyses and control sampling to confirm that the contaminating lead in some locations most likely came from the cables. Below the Blue's co-founders, who also work at Marine Taxonomic Services, helped the Journal with environmental sampling for its investigation. The Environmental Defense Fund provided guidance and $85,000 to Marine Taxonomic Services to partly fund its field research for the project.

The EPA and its administrator, Michael S. Regan, didn't immediately respond to a request for comment.

The Journal found lead leaching into soil directly underneath aerial lead cables, according to test results by independent accredited laboratories. The Journal identified about 250 aerial lead cables alongside streets and fields next to schools and bus stops. There are likely far more throughout the country.

"If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed, and taken out of service as soon as possible, followed by removal," according to the letter, which was viewed by the Journal. "EPA should also ensure surface soil contaminated by the aerial cables is removed or permanently covered."

Roughly 330 underwater cable locations identified by the Journal are in a "source water protection area," according to an EPA review performed for the Journal.
The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead. They declined to provide a full

> accounting of the number of lead cables in their networks to the Journal. They said they would work together to address any concerns related to lead cables.
>
> Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases. The Safe Drinking Water Act allows the agency to take actions to protect health when informed of a contaminant "which is present in or is likely to enter a public water system or an underground source of drinking water" and may present "an imminent and substantial endangerment" to health.
>
> Lead from cables and from junction boxes where cables are spliced is "accessible to the public from the ground with many near playgrounds, schools, child-care facilities, and greenways where inquisitive children may be exposed," the letter said.
>
> Following the Journal investigation, a Wall Street analyst estimated it could cost $59 billion to remove all the lead cables nationwide.
>
> Noting the EPA's limited resources, the groups urged the agency to tap telecom companies responsible for the most lead cables "to support the assessment and actions needed to protect the public from potential exposure."
>
> In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables. In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.
>
> "Does the EPA plan on compelling clean up action from these telecom companies?" Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water.
>
> Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC [Federal Communications Commission] on this so we are happy to follow up in the coming weeks."

248. On this news, the price of Verizon stock declined by $2.55 per share, or 7.5%, to close at $31.46 per share.

249. Between July 7, 2023 (the last trading day before the *WSJ* exposé was first published) and the close of trading on July 17, 2023, the price of Verizon shares fell 12.3%.

**5. The July 26, 2023 Article**

250. On July 26, 2023, the *WSJ* released an article called, "Justice Department and EPA Probe Telecom Companies Over Lead Cables." The article stated, in pertinent part:

> The Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead- sheathed telecom cables across the U.S.
>
> The Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with the inquiry.
>
> The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed [Verizon] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days. Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.
>
> A Wall Street Journal investigation recently revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines. The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement.
>
> * * *
>
> Verizon said it hasn't been contacted by the Justice Department. A Verizon spokesman said: "As we have said from the beginning, we remain committed to the factual and scientific based analysis of the issues. We will continue to have a proactive and constructive dialogue with the EPA as we jointly work to better understand the facts and consider any potential actions."
>
> * * *
>
> The EPA sought data from Verizon on three lead-sheathed cable sites, and said it would begin independent sampling in Coal Center, Pa., and West Orange, N.J., and coordinate with New York state to review samples in Wappingers Falls, N.Y., all locations cited in the Journal articles.

The EPA said a priority would be "evaluating areas with vulnerable communities and sites closely linked with children, such as schools and playgrounds." The EPA said its Office of Land and Emergency Management and regional offices are coordinating with state environmental agencies to assess potential contamination at the sites identified by the Journal.

* * *

[. . .] Current and former workers at telecom companies stemming from Ma Bell said they learned lead work on the job and didn't receive respirators or regular blood testing, the Journal has reported.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, have said they don't believe cables in their ownership are a public-health hazard or a major contributor to environmental lead. They said they follow regulatory safety standards for workers dealing with lead.

In a statement Wednesday, USTelecom said the industry "prioritizes the health and safety of our communities and workers" and continues to "engage with policymakers on this important matter."

* * *

On Tuesday, Verizon Chief Financial Officer Tony Skiadas said in an earnings call that "it's far too soon" to project the financial impact that aging lead-sheathed cables might have on the telecom giant. Verizon said lead-clad cable makes up a small percentage of the less than 540,000 miles of cables in its copper-wire network, though that accounting excludes two previously acquired companies with records the company is still reviewing.

Wall Street research analysts have estimated that lead cables make up roughly 15% to 20% of Verizon's legacy footprint, totaling at least 81,000 miles of lead.

Last week, Gov. Kathy Hochul directed three state departments to "immediately investigate" lead cabling in New York, directing telecom providers to provide an inventory of all lead cable locations in the state. Hochul also directed state inspectors to conduct sampling for lead in the Wappingers Falls playground where a lead cable and contamination were identified by the Journal.

"We will hold the telecommunication companies responsible and take swift action to remediate any problems," Hochul said in a statement.

Rep. Pat Ryan, a New York Democrat, wrote to Verizon, AT&T and USTelecom demanding they remove the lead cables. He also asked the companies how many miles of lead-sheathed cables they are responsible for, and about any plans to protect workers, provide access to blood and bone testing for lead, and remediate any risk.

> The Manhattan U.S. attorney's office in recent years has brought a series of civil cases related to alleged environmental wrongdoing. In 2021, the office announced a settlement with Toyota Motor, in which the company paid a $180 million civil penalty for failing to comply with Clean Air Act reporting requirements. The company acknowledged that for a decade it either failed to file required emissions reports or filed them late.

251. On this news, the price of Verizon stock declined by $0.79 per share, or 2.3%, to close at $33.55 per share on July 27, 2023.

252. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Lead Plaintiffs and the other Class members have suffered significant losses and damages

## VI. DEFENDANTS INTENTIONALLY MISLED INVESTORS ABOUT VERIZON'S LEAD CABLES

### A. DEFENDANTS INTENTIONALLY MISLED INVESTORS ABOUT LEAVING COPPER WIRES IN PLACE DURING VERIZON'S CONVERSION TO FIBER OPTICS

**False Statement No. 1**

253. On February 25, 2021, Verizon filed its Form 10-K for FY 2020, which was signed by Defendants Vestberg, Ellis and Skiadas. The 10-K stated: "To compensate for the shrinking market for traditional copper-based products, we continue to build fiber-based networks supporting data, video and advanced business services - areas where demand for reliable high-speed connections is growing. We are evolving the architecture of our networks to a next-generation multi-use platform, providing improved efficiency and virtualization, increased automation and opportunities for edge computing services that will support both our fiber-based and radio access network technologies. We call this the Intelligent Edge Network. ***We expect that this new architecture will simplify operations by eliminating legacy network elements***, speed the deployment of 5G wireless technology and ***create new opportunities in the business market in a***

***cost efficient manner***." This disclosure was repeated in Verizon's Forms 10-K for FY 2021 (filed on February 21, 2022) and FY 2022 (filed on February 10, 2023).

254. **First Reason Why Statement No. 1 Was False and Misleading**: This statement was false and misleading because Verizon was not "eliminating legacy network elements." Rather, Verizon was leaving or "abandoning in place" copper cables (i.e., legacy network elements), including lead-sheathed cables, and simply placing the new architecture, i.e., fiber, ***on top of or next to the*** copper cables. The following facts confirm that Verizon was not removing the copper cables, including lead-sheathed cables, but rather was leaving them in place:

a. In Defendants' motion to dismiss Lead Plaintiffs' Amended Complaint, Verizon stated, "When Verizon installs fiber-optic cable, it sometimes removes the copper cable (whether lead- or plastic-sheathed), and sometimes leaves it in place." ECF No. 58-1 at 3. Although Defendants themselves admit to knowing about Verizon's vast network of lead cables, the public at large did not. For example, Shalini Ramachandran, the author of the *WSJ* articles, stated that she "had covered cable and telecom for a long time and had never heard of lead cables in the telecom networks."

b. Verizon admitted in its August 21, 2023 submission to the NY State Public Service Commission that it had removed only 230 miles of copper cables since November 2020, despite having deployed 81,750 miles of fiber optic cables. ¶¶ 6, 78, 211.

c. Also, in an August 21, 2023 letter to New York agencies, Verizon publicly acknowledged its practice of removing some lead-sheathed cables upon replacement but abandoning others, stating that "[w]hether to remove legacy cables or leave them in place requires a detailed analysis."

d. In 2017, the CWA submitted comments to the FCC in connection with a proceeding related to the FCC's regulation of the transition from legacy copper to fiber wires. The CWA's comments described Verizon's copper infrastructure as follows: "lines sagging dangerously below minimum clearance levels, cables that are not properly repaired and replaced; ungrounded, exposed wires used as a work-around because Verizon will not spend the money to replace damaged cables . . . resulting in customer outages and the hazardous exposure of lead cable to the environment."

e. During the Class Period, Verizon reported to RCRA that it was generating hazardous lead waste at 16 sites in Massachusetts and Rhode Island.

f. The falsity of this statement is also confirmed by the following CW accounts:

(i) CW1, who worked at Verizon for nearly three decades until 2019 and worked with lead-sheathed cables for his entire career, stated that it was Verizon's ***preference*** to leave lead cables in place when laying lines for its fiber optics system. ¶¶ 27, 79.

(ii) CW2, a Verizon lineman from mid-2000 through early 2023, stated that Verizon left cables in place.

(iii) CW6 who began working with fiber around 1993, stated that, beginning in 2004, in some cases, he would just put the fiber on top of existing cables that had lead sheathing. CW6 also reported that Verizon did not remove the lead-encased copper cables if the cable duct was blocked or inaccessible because it was located on private property or a non-Verizon friendly location. ¶¶ 32, 80.

(iv) CW7, a technician that worked with lead-covered cables from mid-1990s until the second quarter of 2016 and subsequently from 2017 until 2020, stated that certain

lead-cased copper cables could not be replaced and were therefore "abandoned in place." ¶¶ 33, 81.

(v) CW12, a Verizon lineman from early 2018 through the summer of 2021, stated that the vast majority of the lead cables were abandoned. ¶¶ 38, 82.

(vi) CW21, a Verizon lineman between the fourth quarter of 2011 and the third quarter of 2021, stated that although some lead cables were removed, many others were simply left in place "for dead" where they had been laid, and Verizon laid newer fiber optic cable over the dead cables. ¶¶ 47, 84.

(vii) CW22, who worked at Verizon for over two decades from the early 2000s until the second quarter of 2022 and regularly handled lead cables, reported that Verizon left its old lead cables in place even when the cables were migrated over to fiber optic cables. CW22 further recalled that fiber optic cables would be placed ***on top of and secured to*** the lead covered cables. ¶¶ 48, 85.

(viii) CW24, who worked at Verizon as a cable splicer between the second quarter of 2000 and the first quarter of 2016, stated that Verizon left lead cables in place at which point the Company would refer to them as "AIPs," or "airborne in place." ¶¶ 50, 87.

(ix) CW31 reported that a lot of Verizon's lead-sheathed copper cables were just abandoned in place due to new fiber optic installations, and that cost to remove the old lead cables was definitely a factor in the decision to leave the lead cables in place.

(x) CW32 reported that lead-sheathed cables were not being maintained, many were hanging from the air by poles. In many areas where Verizon was installing the new

fiber cables, they were simply placing them over the lead cables, and there was no real effort to take the lead cables down.

255. **Second Reason Why Statement No. 1 Was False and Misleading**: Statement No. 1 was also false and misleading because Verizon stated that its conversion from copper wire to fiber was "creat[ing] new opportunities in the business market in a ***cost efficient manner***." However, if Verizon had actually been replacing its copper wires with fiber, instead of leaving them in place as it was doing, enormous costs would have attached to the removal and remediation of those copper wires, particularly wires encased in lead. Thus, any "cost efficiencies" were, in many instances, achieved by leaving the toxic lead cables in place, which investors did not know. Moreover, those "cost efficiencies" would be diminished if and when Verizon were charged with actually removing its lead cables, which was extremely expensive. Telling investors that the conversion from copper to fiber was "cost efficient" without stating that Verizon was leaving its toxic lead wires in place is akin to an oil company stating that it is "cost efficient" to replace gasoline pumps with electric vehicle charging stations, but omitting that it was leaving its oil pipelines and pumps in place, despite the fact that those pipelines and pumps were environmental hazards and would be costly to remediate or remove. The omitted facts – the costs associated with remediating and removing Verizon's lead cables – are demonstrated by the following facts:

a. In 2010, Northeast Utilities Service Company informed the EPA that it would cost approximately $800 million to remove just 1,200 miles of its lead cables within an underground electric distribution system. This converts to a cost of approximately $666,667 per mile. Applying this figure to Verizon's 81,000 miles of lead cables results in total cost of removal of $53 billion. ¶ 230.

b. Based on estimates of David Howell, an expert with extensive experience on the subject of abandonment of rights of way and easements and whose company, Pipeline Equities, has removed over 12 million of retired, abandoned, or out of use pipelines and cables, has opined that it costs $33.43 per foot to remove lead cables underground, it would cost Verizon $14.3 billion to remove its approximately 81,000 miles of lead cables left in place (based on analyst estimates). Verizon has admitted that it has left at least 8,400 miles in place of aerial lead cables in place. Under the noted [analyst] estimate, the cost to remove just these aerial cables (while still leaving unaddressed Verizon's underground and underwater cables) would be $1.48 billion. ¶¶ 178, 228-29, 303.

c. On July 23, 2023, an Evercore analyst issued a report that estimated that Verizon had 54,000 miles of lead cable, and estimated that if all lead-clad cables needed to be removed, this would cost Verizon $2.1 billion. ¶ 233.

256. **Scienter for False Statement No. 1**: The following facts demonstrate Defendants Vestberg's, Ellis's, and Skiadas's knowledge of, or at a minimum, reckless disregard for, the facts that made this statement false and misleading, i.e., (a) that Verizon was not "replacing" copper cables with fiber, but, in fact, abandoning its copper cables, which included thousands of miles of lead sheathing; and (b) that any purported "cost efficiencies" associated with converting copper cables to fiber cables could not be achieved if Verizon had removed the copper cables:

a. Defendants have admitted in their brief in support of their Motion to Dismiss, that they "were aware of the lead-sheathed cables' existence, but did not believe they presented a material problem." ECF 58-1 at 3. Defendants' admission that they were "aware of the lead-sheathed cables' existence" establishes their scienter for the facts that Verizon was abandoning its lead cables in place, i.e., that Verizon was not "replacing" its copper cables

with fiber. Defendants' statement that they "did not believe they [lead-sheathed cables] presented a material problem" is not only implausible, but also demonstrates their reckless disregard for the facts that reasonable estimates indicate that the removal of the lead cables would cost Verizon billions of dollars, a material amount by any measure.

b. Defendant Ellis admitted on June 15, 2021 during the Credit Suisse Communications Conference that he and Verizon were analyzing Verizon's "wireline footprint" in connection with the transition from copper to fiber. He stated, "We've made a lot of good progress there in terms of bringing fiber into the footprint and not being 100% copper. That's probably not where you want to be in 2021. So we look at the wireline footprint, and I'm sure there will be opportunities going forward and we'll determine what the right thing is for us there, but we're very happy, especially within the ILEC footprint with what we're doing with FiOS." This statement indicates that Ellis paid close attention to the "wireline footprint," i.e., the copper cables, and thus knew that the copper cables, many of which were sheathed in lead, were being left in place rather than removed and replaced.

c. Verizon kept detailed records of its legacy cable network in two databases, ICGS and Verizon Build, which were accessible by Defendants Vestberg, Ellis and Skiadas. These databases housed the blueprints or schematics of Verizon's cable infrastructure and detailed the exact location of all of Verizon's copper cables, the year they were installed, and whether the cable was sheathed in lead, aluminum, or plastic, which was recorded via alphanumeric code. ¶¶ 90-93.

d. Verizon stated in its Form 10-K for the fiscal year ended December 31, 2019 that "[r]eserves have been established to cover environmental matters relating to discontinued

businesses and past telecommunications activities." Defendants Vestberg and Ellis signed the 2019 Form 10-K. ¶¶ 20-21.

e. Verizon admitted in its August 21, 2023 submission to the NY State Public Service Commission that it had removed only 230 miles of copper cables since November 2020, despite having deployed 81,750 miles of fiber optic cables. ¶¶ 6, 78, 211. In the same submission, Verizon acknowledged that it was not simply replacing the old cables as represented, but that "[w]hether to remove legacy cables or leave them in place requires a detailed analysis." ¶¶ 6, 211.

f. The conversion of Verizon's legacy copper network to fiber cables was at the core of Verizon's highly touted "FiOS" program, which brand has become synonymous with Verizon's own name. ¶¶ 59, 62.

g. AT&T was sued in Texas and in California for abandoning its lead cables in place. In the Texas action, it was estimated that it would cost AT&T $33.43 per foot to remove buried lead cables. ¶¶ 176, 227. In the California action, testing was done which determined that AT&T's lead cables were leaching lead into Lake Tahoe. ¶¶ 180-81. AT&T estimated the cost of removing its lead cables from Lake Tahoe, which resulted in a range of $34,375 to $68,750 per mile. Verizon disclosed in its annual reports that it closely monitors all regulatory and legal proceedings pertaining to the Company:

> [I]n the ordinary course of business, Verizon is involved in various commercial litigation and regulatory proceedings at the state and federal level. Where it is determined, in consultation with counsel based on litigation and settlement risks, that a loss is probable and estimable in a given matter, the Company establishes an accrual. . . . We continuously monitor these proceedings as they develop and adjust any accrual or disclosure as needed. We do not expect that the ultimate resolution of any pending regulatory or legal matter in future periods will have a material effect on our financial condition.

While the AT&T actions did not name Verizon as a defendant, given that AT&T is Verizon's largest competitor, and Verizon also has an extensive network of lead cables, the Verizon legal team, including its Chief Legal Officers during the Class Period, Craig Silliman and later Vandana Venkatesh, were aware of these actions and were monitoring them to determine the impact on Verizon. Defendants Vestberg, Ellis, and Skiadas signed Verizon's Form 10-Ks during the Class Period and therefore "consult[ed] with counsel" on litigation and regulatory proceedings involving Verizon, including the AT&T actions. ¶¶ 20-21.

h. In 2020, the CWA filed a petition with the Pennsylvania Public Utility Commission to investigate Verizon's abandonment of lead cables. Testimony described hazardous "exposed lead cable[s]." ¶¶ 150, 153. As noted above, Verizon "continuously monitors" regulatory proceedings Verizon is involved in.

i. During the Class Period, Verizon was a "large quantity generator" of hazardous material under EPA regulations and guidelines. ¶ 169. Verizon was thus required to self-report its hazardous lead waste every year. *Id.* During the Class Period, Verizon reported having hazardous lead waste in 16 sites in Massachusetts and Rhode Island. ¶ 171. Because Verizon was required to, and did, make these reports, Verizon was aware that it had left its lead cables in place.

j. Verizon professes to be highly committed to the environment. It employs a Chief Sustainability Officer (Defendant Gowen), a Chief ESG Officer, and an entire department devoted to ensuring Verizon's commitment to ESG principles is upheld. Verizon's Code of Conduct requires employees to report conduct which undermines Verizon's ESG goals. ¶¶ 66-70.

k. In 2011, Verizon submitted comments on a proposed EPA rule, which conveyed that the rule presented difficulties in connection with removal of "lead-sheathed telecommunications cable." ¶¶ 304-06.

l. Verizon's predecessors submitted comments to OSHA, acknowledging that Verizon's copper cable network was encased in lead. ¶¶ 110-113.

m. Verizon is required to report retirement of copper cables to the Federal Communications Commission. Thus, Defendants knew which copper cables were being retired, and which were remaining in place. ¶¶ 152, 307-313.

n. Verizon has been an active participant in annual EHSCP meetings since 2000, during which participants regularly discussed the hazards of lead in the telecommunications industry. ¶¶ 131-146.

o. Due diligence in connection with Verizon's corporate mergers and reorganizations required analysis of Verizon's Hazardous Materials, including lead. ¶¶ 314-19.

p. Defendant Vestberg purports to be committed to ESG goals. He is a member of the Leadership Council of the UN's Sustainable Development Initiative and a member of the boards of the UN Foundation and Whitaker Peace and Development Initiative. Further, during the Class Period, Vestberg touted Verizon's "strategy" to "mitigate adverse impacts to create long-term measurable value" and the "mobiliz[ation of] resources, partnerships and people to help protect the planet for future generations." ¶¶ 20, 320-24.

q. Defendant Ellis was attuned to issues concerning ESG goals and the environment. On September 23, 2021, Defendant Ellis was featured on the UN Global Compact series, *Financing a Sustainable Future CFO Insights*, during which he discussed how sustainability and ESG are at the "heart of what [Verizon] do[es]." ¶¶ 21, 320, 325.

r. Defendants Ellis and Vestberg spoke authoritatively during the Class Period about Verizon's conversion from its Legacy Network to FiOS. ¶¶ 253, 257, 261, 271, 329.

s. Defendant Skiadas has worked for Verizon for 29 years, beginning at Bell Atlantic Mobile in 1996. He has held various accounting, financial management and executive positions within Verizon. ¶¶ 24, 340, 373. During the Class Period and until May 1, 2023, Defendant Skiadas was Verizon's Controller. *Id.* On May 1, 2023, Defendant Skiadas became Verizon's CFO, replacing Defendant Ellis. When the *WSJ* exposed new facts about Verizon's lead cables, it was Defendant Skiadas who explained that Verizon has long known that it abandons lead cables. ¶¶ 210, 250.

**False Statement No. 2**

257. On October 20, 2021, Verizon held its third quarter earnings call for fiscal year 2021 ("3Q21 earnings call"). During the call, Brett Feldman, an analyst with Goldman Sachs, asked Defendant Ellis:

> If you don't mind as a quick follow-up there around the cost point. Those of us who live in regions that have Fios know that sometimes you can get Fios or maybe down the street, you can't. Are you kind of completing the communities? ***In other words, are you going to be at the point where you can finally rip out all this legacy infrastructure?*** Is that what you meant by the cost savings?

Defendant Ellis replied:

> Well, that's absolutely part of it. Now we're going to be all the way there. That's a long-term goal for us. But certainly, ***as you replace in a certain location copper with fiber, there's a good benefit from a cost standpoint***. In addition to the revenue step-up opportunities you get with that customer base. So it's a win-win on both sides of the P&L there.

258. **First Reason Why Statement No. 2 Was False and Misleading**: This statement was false. Verizon was not "rip[ping] out the legacy infrastructure" or "replacing" copper wires with fiber. The term "replacing" means "substitute," "exchange" or "take the place of." Verizon

was not replacing copper wires with fiber because it was ***leaving or "abandoning in place"*** the copper wires. The fiber was regularly placed simply ***on top of or next to*** the copper wires, including lead-sheathed wires, which were left in place. Verizon's abandonment of its copper wire network is demonstrated by the facts listed above in ¶¶ 254(a)-(f).

259. **Second Reason Why Statement No. 2 Was False and Misleading**: Defendant Ellis's statement that there was a "***good benefit from a cost standpoint***" does not explain that any such benefit was premised on Verizon abandoning its copper wires, including lead-sheathed wires, in place. If Verizon were actually ***replacing*** its copper wires with fiber, instead of leaving lead-sheathed cables in place as it was doing, enormous costs would have attached to the removal and remediation of those copper wires, particularly those wires that are encased in lead. Any "cost efficiencies" were in many places achieved by leaving the toxic lead cables in place, which investors did not know. Moreover, those "cost efficiencies" would be substantially impacted and mitigated if and when Verizon were charged with actually removing its lead cables. Telling investors that the conversion from copper to fiber was "cost efficient" without stating that Verizon was leaving its toxic lead wires in place is akin to an oil company stating that it is "cost efficient" to replace gasoline pumps with electric vehicle charging stations, but omitting that it was leaving its oil pumps and pipelines in place, despite that those pipelines and pumps were environmental hazards which would be costly to remove. Because Defendants omitted to explain that Verizon was leaving its lead-sheathed copper wires in place, and omitted to explain the costs associated with removal of those wires (*see* ¶¶ 255(a)-(c)), this statement was false and misleading.

260. **Scienter for False Statement No. 2**: Defendant Ellis knew, or recklessly disregarded the facts that made this statement false and misleading, i.e., (a) the fact that Verizon was not "replacing" copper wires with fiber, but in fact was abandoning its copper wires, which

included thousands of miles of lead sheathing and (b) the fact that it would be enormously costly for Verizon to remove the lead-sheathed cables it had abandoned in place. Ellis knew these facts. *See* ¶¶ 256(a)-(o), (q)-(r). Ellis also held himself out as knowledgeable and authoritative in making representations on earnings calls regarding Verizon's actions to "replace" the old infrastructure and the associated economic impacts of those actions, including in response to direct analyst questions. Ellis thus either had knowledge of the subject matter of the remarks he made to investors, or alternatively, recklessly disregarded critical facts in so answering.

**False Statement No. 3**

261. On November 17, 2021, Defendant Ellis attended the virtual Morgan Stanley European Technology, Media & Telecom Conference, during which he stated:

> But then also in continuing to – our ***project of replacing copper in the ILEC footprint with fiber*** obviously gives us an opportunity to sell Fios into those consumer and business locations, also gives us the ***opportunity to pull out the copper that is expensive to operate***. Certainly not – the equipment on that has – also has higher emissions than some of the newer equipment, too. So ***from a green standpoint, it's also a benefit, too.***

262. **First Reason Why Statement No. 3 Was False and Misleading**: This statement was false and misleading. Verizon's practice was not to "replac[e] copper in the ILEC network." Nor was it pull[ing] out the copper that is expensive to operate." Rather, Verizon had routinely left copper wire in place, including copper wire encased in lead, when installing fiber. The facts listed in ¶¶ 254(a)-(f), above, demonstrate that Verizon was leaving copper wire in place.

263. **Second Reason Why Statement No. 3 Was False and Misleading**: The statement was also false and misleading because it referred to a "benefit" from a "green standpoint." Because Verizon was routinely not actually "pull[ing] out the copper," but instead leaving it in place, and because much of that copper wire was encased in toxic lead that leached into the environment, any discussion of a "benefit" from a "green standpoint" to conversion from copper to fiber wire was

materially incomplete and omitted adverse information if it did not disclose the abandoned lead cables Verizon routinely left in place when switching to fiber. The facts listed in ¶¶ 255(a)-(c) demonstrate that Verizon was leaving the copper wire in place.

264. In addition, the following facts demonstrate that the lead from the lead-sheathed cable left in place was leaching into the environment, and therefore substantially undermining or mitigating any "benefit" from a "green standpoint" to conversion from copper to fiber:

a. The CWA reported that Verizon's abandoned lead cables were creating "hazardous exposure of lead cable to the environment." ¶ 150.

b. Verizon was subject to RCRA notices for lead contamination. During the Class Period, Verizon reported generating hazardous lead waste at 16 sites. ¶¶ 168-172.

c. AT&T was sued in Texas and Lake Tahoe for environmental hazards associated with its abandoned lead cables. ¶¶ 173-185.

d. The *WSJ* reporting demonstrated that the lead cables were leaching into the environment. ¶¶ 190-207.

265. **Scienter for False Statement No. 3**: Defendant Ellis knew, or recklessly disregarded the facts that made this statement false and misleading, i.e., (a) that Verizon was not "replacing" copper wires with fiber, but in fact was abandoning its copper wires, which included thousands of miles of lead cables; and (b) that it would be enormously costly for Verizon to remove the lead cables it had abandoned in place. *See* ¶¶ 256(a)-(o), (q)-(r), above. Ellis also held himself out as knowledgeable and authoritative in making representations on earnings calls regarding Verizon's actions to "replace" the old infrastructure and the associated economic impacts of those actions, including in response to direct analyst questions. Ellis thus either had knowledge of the

subject matter of the remarks he made to investors, or alternatively, recklessly disregarded critical facts in so answering.

**False Statement No. 4**

266. During the virtual Morgan Stanley European Technology, Media & Telecom Conference on November 17, 2021, Defendant Ellis also stated:

> But we expect to do north of 400,000 open-for-sale each year for at least the next 2 to 3 years, and then we'll see where it goes from there. So it continues to be an opportunity to expand the Fios footprint within our existing ILEC space ***and not just get the revenue opportunities from expanding the size of the Fios customer base, but also some cost benefits and green benefits from removing some of the copper network at the same time.***

267. **First Reason Why Statement No. 4 Was False and Misleading**: This statement was false and misleading because Verizon was not as a practice "***removing***" the copper network at the "***same time***" that it was "expand[ing] the Fios footprint" by laying fiber cables. In actuality, Verizon had a practice of leaving or "abandoning in place" copper cables and placing the fiber ***on top of or next to*** existing copper cables, which included lead-sheathed cables. ¶¶ 254(a)-(f).

268. **Second Reason Why Statement No. 4 Was False and Misleading**: The statement above was also false and misleading because Defendant Ellis's reference to the "***cost benefits***" associated with converting from copper wire to fiber fails to explain that such "cost benefit" resulted in substantial part from the fact that Verizon had been abandoning its copper wires, including lead-sheathed wires, in place. If Verizon had actually been ***replacing*** its copper wires with fiber as it claimed, instead of leaving them in place as it was doing, enormous costs would have attached to the removal and remediation of those copper wires, particularly those wires that are encased in lead. The referenced "cost efficiencies" entailed leaving toxic lead cables in place across cities and towns, which investors did not know. Moreover, those "cost efficiencies" would be substantially impacted and mitigated if and when Verizon were charged with actually removing

its lead cables. Telling investors that the conversion from copper to fiber had "cost benefits" without stating that Verizon was leaving its toxic lead wires in place is akin to an oil company stating that it is "cost efficient" to replace gasoline pumps with electric vehicle charging stations, but omitting that it was leaving its oil pumps and pipelines in place, despite the fact that those pumps and pipelines were an environmental hazard which would be costly to remediate or remove. Because Defendants omitted to disclose that Verizon was leaving its lead-sheathed copper wires in place, and omitted to explain the costs associated with removal of those wires (*see* ¶¶ 255(a)-(c)), this statement was false and misleading.

269. **Third Reason Why Statement No. 4 Was False and Misleading**: This statement was also false and misleading because it refers to "green benefits" associated with converting from copper to fiber. Because Verizon had a practice of not actually "removing the copper network," but instead leaving it in place, and because much of that copper wire was encased in lead which was leaching into the environment, any "green benefits" to conversion from copper to fiber wire was misleading. To continue with the oil company analogy, it would be misleading for an oil company to tout the environmental benefits of replacing gasoline pumps with electric vehicle charging stations, yet omit that it was dumping the gasoline that it no longer needed into the ground only to create massive liabilities by harming the environment and people, rather than safely and responsibly disposing of the gasoline. Omission of the facts listed in ¶¶ 254(a)-(f) render this statement misleading.

270. **Scienter for False Statement No. 4**: Defendant Ellis knew, or recklessly disregarded, the facts that made this statement false and misleading, specifically, (a) Verizon was removing only a portion of its copper cables; (b) a significant portion of its copper cables were encased in lead; (c) any "green benefit" associated with removing copper cables was mitigated and

undermined by risks of the abandoned lead cables; and (d) it would be enormously costly for Verizon to remove the lead cables it had abandoned in place. *See* ¶¶ 256(a)-(o), (q)-(r), above. Ellis also held himself out as knowledgeable and authoritative in making representations on earnings calls regarding Verizon's actions to "replace" the old infrastructure and the associated economic impacts of those actions, including in response to direct analyst questions. Ellis thus either had knowledge of the subject matter of the remarks he made to investors, or alternatively, recklessly disregarded critical facts in so answering.

**False Statement No. 5**

271. On March 3, 2022, Verizon held its Investor Day which was attended by Defendants Vestberg, Ellis, and Malady, among other Verizon employees. During the Investor Day call, Defendant Malady stated:

> But fundamentally, we picked fiber a long, long time ago. And now we're seeing that we're able to update that and still use the money we sunk in 20 years ago, right, because we can just upgrade the electronics and continue to push the technology up. So to Matt's point too, it also helps us in 2 ways. It allows us to drive more revenue, ***but it also allows us to take out the old equipment, the old copper stuff and get people on new things.*** So we're going to keep moving.

During the same Investor Day, Ellis stated as follows:

> Yes. So look, I think absolutely, we'll continue to expand FiOS footprint . . . And in addition to doing that, you get cost savings as well, of course, ***as you take copper out and – and obviously, the maintenance on that becomes a lot easier on the fiber side.***

272. **Reason Why Statement No. 5 Was False and Misleading**: Defendant Malady stated that Verizon was "tak[ing] out the old equipment, the old copper stuff." That was false. Similarly, Defendant Ellis stated that Verizon was "tak[ing] copper out." That too was false. His statement that "the maintenance . . . becomes a lot easier on the fiber side" gave the impression

that there was no copper wire left to maintain. That was also false. Verizon had a practice of leaving the copper wires, including lead-sheathed copper wires, in place. *See* ¶¶ 254(a)-(f).

273. **Scienter for False Statement No. 5**: Defendant Malady knew these facts. Malady was the Company's Chief Technology Officer, and had knowledge for the reasons explained in ¶¶ 256(a), (c)-(n), (q)-(r). Malady also held himself out as knowledgeable and authoritative in making representations on earnings calls regarding Verizon's actions to "take out" the "old equipment, the old copper stuff," including in response to direct analyst questions. Malady thus either had knowledge of the subject matter of the statements he made during the investor call, or alternatively, recklessly disregarded critical facts in so answering. Similarly, Defendant Ellis knew these facts for the reasons listed above. *See* ¶¶ 256(a)-(o), (q)-(r).

**<u>False Statement No. 6</u>**

274. On March 15, 2023, Defendant Gowen, Verizon's Chief Sustainability Officer, was interviewed by Srikrishna Koneru of Infosys. During the interview, Gowen stated:

> [Y]ou're absolutely right uh the business case for sustainability is incredibly incredibly important and it's looking at uh sustainability from a TCO perspective a total cost of ownership it goes right back to a supply chain and sourcing and really business case 101. um how do you look at the impacts of any new product any new technology ***when we went through uh through my time here from a copper to fiber migration what is the cost to pull that copper out what is the absolute home run benefit of putting fiber in not only from a speed resiliency and things like*** that but it's that it's that long time uh it's that long-term mindset that is so so important when you're looking at business case cases you know it's interesting when you think about ***what we've been able to do here at Verizon and I think about the way we operate a responsible sourcing you know we think about everything from human rights to ethical conduct to making sure we protect the environment*** that's through our RFP process that's through our negotiation process that's where our supplier contracts you know and then we take it to the next step okay how do you take that to the next step and you start to look at the risk because everything we do at Verizon from a supply chain perspective or really from a business perspective looks at the end-to-end risk . . .

275. **First Reason Why Statement No. 6 Was False and Misleading**: Verizon was not "pull[ing] that copper out" as Gowen represented. *See* ¶¶ 254(a)-(f). In fact, Verizon had a practice of leaving the copper wires, including those encased in lead, in place, and simply laying the fiber wires alongside the copper wires.

276. **Second Reason Why Statement No. 6 Was False and Misleading**: Gowen's statement was also false and misleading because he stated that Verizon was committed to, among other things, "protect[ing] the environment" in connection with its migration from copper cables to fiber cables. But in fact, Verizon was not protecting the environment because it was not "pull[ing] that copper out;" rather it was leaving the copper in place. Much of that copper wire that Verizon was not "[p]ulling out" was encased in lead which was leaching into the environment, and therefore, any discussion of protecting the environment in this context was materially incomplete and omitted adverse information if it did not disclose Verizon's abandonment of lead cables when switching to fiber. Omission of the facts listed in ¶¶ 255(a)-(c) render this statement misleading.

277. **Scienter for False Statement No. 6**: Defendant Gowen knew these facts. In addition, the following facts demonstrate that Gowen knew that Verizon was not "pulling copper out," but instead was leaving copper wires, including lead-sheathed wires in place:

a. Gowen has served as Verizon's Chief Sustainability Officer since 2009. He is also the Chairman of Global eSustainability Advisory Board, a member of Penn State's Smeal Sustainability Advisory Board, and a member of the MIT Climate and Sustainability Consortium. It was literally Gowen's job to know exactly how Verizon was impacting the environment, and to determine ways Verizon could minimize any harm it was doing to the

environment. If Gowen did not know that Verizon's lead cables were left in place, he was not doing his job.

b. Gowen's LinkedIn page states: "Gowen has been deeply involved in the advancement of innovative and sustainable technologies . . . ***Gowen also oversees other green initiatives*** being implemented across Verizon including the introduction of a carbon intensity metric, paper suppression, ***waste reduction and recycling, and management of end-of-life-cycle material recovery***." It would be impossible for Gowen to "oversee . . . waste reduction and recycling and management of end of life cycle material recovery" and not know that Verizon was abandoning tens of thousands of lead-sheathed cables across the country.

**False Statement No. 7**

278. On May 25, 2023, Defendant Malady attended the CTIA 5G Summit during which he was interviewed by CTIA's President and CEO Meredith Attwell Baker. During the summit, Malady stated:

> Verizon also has a large landline presence. And we have a lot of copper still out there that people still use. And ***we can use our wireless asset now to replace some of the old legacy copper which is very inefficient and in the day of ESG and trying to save energy and make sure all the resources you have you use them wisely we can move some of those old copper things onto the wireless network at low bandwidth things. There is just a whole range of solutions we're going to be able to bring to the table for old legacy things that are out there that are that are inefficient*** with uh with this new fixed wireless offer.

279. **First Reason Why Statement No. 7 Was False and Misleading**: It was false to state that Verizon was "replac[ing] some of the old legacy copper" when, in fact, Verizon had a practice of leaving the copper wires, including those encased in lead, in place, and simply laying the fiber on top of the lead-sheathed copper wires. *See* ¶¶ 254(a)-(f).

280. **Scienter for False Statement No. 7**: Defendant Malady was the Chief Technology Officer of Verizon. Defendant Malady also held himself out as knowledgeable and authoritative

in making representations on earnings calls regarding Verizon's actions to "replace" the old infrastructure and the associated economic impacts of those actions, including in response to direct analyst questions. Malady thus either had knowledge of the subject matter of the statement he made to investors, or alternatively, reckless disregarded critical facts in making this statement. *See* ¶¶ 256(a), (c)-(n), (q)-(r).

### B. DEFENDANTS INTENTIONALLY MISLED INVESTORS ABOUT VERIZON'S E-WASTE RECYCLING PRACTICES

**False Statement No. 8**

281. Verizon published annual ESG reports during the Class Period which contained a "Message from our Chairman and CEO," signed by Defendant Vestberg. Many of Verizon's Class Period ESG reports also included a "Message from our Chief ESG Officer," signed by Beth Safari, Verizon's Chief ESG Officer & SVP, Corporate Governance. Every Class Period ESG Report that Verizon filed contained a substantially similar definition of e-waste:

> ***Our goal is to divert as much e-waste as possible from landfills by reusing or responsibly recycling materials***. Our priority is to reuse electronics internally. When that is not possible, we market these materials for reuse through approved vendors or work with partners to recycle them responsibly. ***Verizon defines e-waste as electronic products and parts***, such as cell phones, chargers, set-top boxes, ***network equipment*** and batteries, ***that are at the end of their useful life*** and/or have been returned by customers.

282. **Reason Why Statement No. 8 Was False and Misleading:** This statement was false because as a practice Verizon was ***not*** recycling its "network equipment" which includes its lead-sheathed copper wires. Verizon defines "network equipment" as follows in its Forms 10-K: "***Network equipment consists primarily of cable (aerial, buried, underground or undersea)*** and the related support structures of poles and conduit, wireless plant, switching equipment, network software, transmission equipment and related facilities." Thus, for the statement above to be true, Verizon would have to have been reusing or recycling its "cable (aerial, buried, underground or

undersea)" which includes its lead-sheathed copper cables. Verizon was doing neither. As a practice, Verizon was not recycling its lead-sheathed copper cable. Rather, it was leaving lead-sheathed cables in place or laying fiber optic cables on top of them. *See* ¶¶ 254(a)-(f).

283. In addition, to the extent that Verizon was removing its lead-sheathed copper wires, it was not recycling them. Rather, Verizon was disposing of its lead sheathing irresponsibly, as evidenced by the following facts:

a. CW14, a former Verizon technician who worked at Verizon from May 2011 through November 2022 and personally handled lead throughout his tenure, stated that Verizon disposed of lead cables in non-lead specific containers with other materials. CW14 further stated that ***all waste materials*** were placed ***indiscriminately into a dumpster at the garage for the job site***, except for old telephone poles, which were collected by a company that incinerated them. CW14 added, that at the garages he oversaw, "it all went into the trash."

b. CW20, a construction cable splicer at Verizon from the second quarter of 2004 through the second quarter of 2016, stated that Verizon dumped lead cables into dumpsters that contained other non-lead materials, rather than a lead-specific container.

c. CW8, who worked at Verizon from 1987 through 2015 and stated that he "worked on lead every goddamn day," stated that Verizon just dumped lead cables into dumpsters that contained other non-lead materials, rather than lead-specific containers.

d. CW29, who removed and repaired Verizon's lead cables for 23 years, stated that one of the Verizon garages where he was based in Far Rockaway, Queens, did ***not have separate dumpsters for different materials to be disposed of; all waste from a repair or removal site went into the same dumpster.*** CW29 stated that he personally threw out all waste, including ***lead, copper, cardboard, food into "one big dumpster***," as was instructed by the

more senior employees at the garages. CW29 stated that "I guarantee you there was no separation." CW29 stated that "sometimes we'd take [lead] back to the garage and put it in the dumpster" but "***sometimes we'd just go to the street corner and throw it away. There were always garbage cans on the corner***."

e. CW19 recounted one winter day in New York during which a lead cable had been cut and left in the street.

f. CW30 was a cable splicer for Verizon in Pennsylvania for over two decades. He stated that initially, Verizon's cut lead cables were taken back to the Verizon garage and put in bins for lead waste. But approximately 18 years ago, the bins for lead disappeared. He was told that upper management determined that lead recycling was no longer necessary because lead cable work had ended, which CW30 stated "was a lie."

284. **Scienter for False Statement No. 8**: Defendant Vestberg knew that Verizon was not recycling its abandoned copper wires encased in lead. *See* ¶¶ 256(a), (c)-(p), (r).

**False Statement No. 9**

285. During the Class Period, Verizon also reported on exactly how many pounds of e-waste it recycled each year, in particular, how many pounds of lead-acid batteries it had recycled, yet omitted to discuss its lead-sheathed copper wires. In particular, Verizon made the following false and misleading statements about its recycling of e-waste in the below Class Period ESG Reports, each of which was signed by Defendant Vestberg:

a. In Verizon's 2019 ESG Report, Verizon stated: "In 2019, we recycled more than 84.8 million pounds of telecommunications equipment, metal, batteries, paper, cardboard and other items. This included more than 43.3 million pounds of e-waste and over 2.3 million pounds of plastic. Verizon also recycled nearly 5.2 million pounds of lead acid batteries."

b. In Verizon's 2020 ESG Report, signed by Defendant Vestberg and Verizon reported the following in its ESG Report: "In 2020, Verizon recycled or reused more than 38.3 million pounds of telecommunications equipment, electronic products, batteries, paper, cardboard and other items. We recycled more than 33 million pounds—and reused nearly 2.6 million pounds—of e-waste. Recycled e-waste included over 1.2 million pounds of associated plastic and nearly 3.5 million pounds of lead-acid batteries."

c. In Verizon's 2021 ESG Report, Verizon stated: "In 2021, Verizon reused or recycled approximately 35.5 million pounds of e-waste, including 1.79 million pounds of plastic and 3.4 million pounds of lead-acid batteries."

d. And in Verizon's 2022 ESG Report, Verizon stated: "In 2022, Verizon reused or recycled approximately 43.4 million pounds of e-waste, including 1.6 million pounds of plastic and 2.7 million pounds of lead-acid batteries.

286. **First Reason Why Statement No. 9 Was False and Misleading**: Defendants' statements in Verizon's ESG Reports were false and misleading because Verizon chose to speak about how it reused or recycled millions of pounds of e-waste each year during the Class Period, yet failed to disclose that Verizon was not recycling its lead cables, which came within Verizon's definition of "network equipment." ¶¶ 71, 281. Verizon chose to speak in positive terms about its recycling and reuse of e-waste yet failed to disclose the approximately ***1,454,112,000 pounds*** of lead-sheathed network equipment strewn across the country, not being reused or recycled and, in some cases, being improperly disposed of in street corner trash cans.

287. **Second Reason Why Statement No. 9 Was False and Misleading**: It was also false and misleading for Verizon to affirmatively tout how many million pounds of ***lead-acid batteries*** Verizon recycled each year yet omit to disclose that it was not recycling its ***lead-sheathed***

***cables***, but rather abandoning them in place or improperly disposing of them in general waste containers.

288. The facts listed in ¶¶ 283(a)-(f) confirm that Verizon was not recycling its lead cables.

289. **Scienter for False Statement No. 9**: Defendant Vestberg knew that Verizon was not recycling its abandoned copper wires encased in lead. *See* ¶¶ 256(a), (c)-(p), (r).

**False Statement No. 10**

290. On March 18, 2019, Verizon issued its FY 2019 Proxy Statement which stated: "We continue to work to reduce the environmental impact of our products through: . . . recycling, refurbishing and/or reusing our products, including the responsible management of out-of-service lead batteries."

291. **Reason Why Statement No. 10 Was False and Misleading**: It was misleading for Verizon to state that it was recycling "lead batteries," but omit to disclose that it was leaving in place 81,000 miles of lead cables strewn across the country, or to the extent they were removed, Verizon was not disposing of them responsibly. The facts listed in ¶¶ 283(a)-(f) demonstrate that as a practice Verizon was not, in fact, responsibly managing its out of service lead-sheathed copper cable but rather, was leaving lead-sheathed cables in place, laying fiber optic cables on top of them, and in some cases, disposing of them improperly in trash cans and dumpsters.

292. **Scienter for Statement No. 10**: Defendants Vestberg and Ellis knew that Verizon was not recycling its abandoned copper wires encased in lead, as demonstrated by the facts listed in ¶¶ 256(a)-(r).

### C. DEFENDANTS INTENTIONALLY MISLED INVESTORS ABOUT VERIZON'S COMMITMENT TO EMPLOYEE HEALTH AND SAFETY AND THE ENVIRONMENT

**False Statement No. 11**

293. Verizon also misled investors about its commitment to employee health and safety during the Class Period in its annual ESG Reports which were signed by Defendant Vestberg. Each ESG Report filed during the Class Period included the following statement: "We ***regularly update our employee health and safety programs***, including online and instructor-led training to educate employees about best practices and working safely. Topics include operating aerial lifts, ***splicing fiber***, climbing poles, handling ladders and ***installing fiber***."[4]

294. **Reason Why Statement No. 11 Was False and Misleading**: This statement was false. Investors could reasonably draw the conclusion that Verizon's employee health and safety programs were sufficient for Verizon's workers who splice and install fiber, and that Verizon was committed to protecting its workers' health and safety. That was not true. During the Class Period, Verizon's employees who ***spliced and installed fiber*** worked directly with and alongside Verizon's lead cables. These employees were not provided with the proper PPE or training for working in the presence of lead, as required by OSHA. Further, the ESG Reports did not disclose that Verizon's decaying lead cable network posed serious hazards to Verizon's employees, often resulting in their developing lead-borne illnesses. Results from medical studies conducted on Verizon employees revealed heightened blood-lead and bone-lead levels according to CDC guidelines. Investors did not know these facts that were contrary to Verizon's statement about protecting its employees' health and safety.

295. The following facts contradict Verizon's representation about worker safety and confirm that (a) Verizon's decaying lead cables posed worker safety hazards; (b) Verizon's

[4] Verizon's 2023 ESG Report did not include the sentence: "Topics include operating aerial lifts, splicing fiber, climbing poles, handling ladders and installing fiber."

workers had elevated blood-lead levels and were becoming sick as a result; and (c) Verizon was not properly training its cable splicers or providing them with the requisite PPE:

a. The *WSJ* articles described Verizon employees' experience working with lead cables and demonstrate that Verizon's cable splicing employee safety protocols were insufficient, and that Verizon's employees were developing lead-borne illnesses:

(i) Tim Killeen, a 74-year-old retired cable splice who had worked for Bell Atlantic and Verizon, reported that he had come home from work "every day" with "***lead dust all over***" him. As a result, he suffered lead poisoning. ¶¶ 99, 243.

(ii) Tommy Steed, a former cable splicer and lineman who worked for Verizon, worked on removal of lead cables, and experienced severe lead poisoning including frequent vomiting. He stated that "***removal of lead cables . . . was the most dangerous part of our jobs because it created dust that we had to breathe***."

(iii) James Innes, a 73-year-old retired cable splicer for Verizon, stated that splicers "***were creating a kind of powder from shaving the lead sheath, and every now and then you'd get a sweet taste in your mouth from inhaling the lead***." ¶ 245.

b. The CWA found and reported on Verizon's decaying lead cables which posed serious hazards to Verizon's cable splicers and linemen. In 2015, the CWA filed letters with state regulators in six eastern US states and the District of Columbia accusing Verizon of failing to maintain its wireline copper network. On October 21, 2015, the CWA petitioned the Pennsylvania Public Utility Commission to investigate the safety, adequacy and

reasonableness of service provided by Verizon Pennsylvania LLC. Verizon is a party to the petition. The petition states that Verizon's cables and wires were in an "***appalling state of disrepair that pose a safety hazard to utility employees*** and the public." ¶ 149.

c. Between 2007 and 2016, 208 of Verizon's employees were tested for lead exposure. 40% of them had blood-lead levels above 3.5 micrograms per deciliter, the level at which the CDC recommends medical treatment. Verizon provided this data to the CWA, which in turn contacted Mount Sinai medical researchers in late 2019 or early 2020. Dr. Khan from Mount Sinai proceeded to test the bone-lead levels of 20 Verizon employees, including 19 cable splicers. 60% of these employees had elevated levels of lead in their tibia, indicating long-term exposure. 50% of them had levels of 10 micrograms per gram of bone, which indicates increased risk of neurological or biological problems. ¶¶ 161, 241.

d. James Gardler, CWA President of Local 13000, testified on September 29, 2016: "Verizon's neglect of its copper network is also resulting in unsafe conditions for CWA members and the public." And "Verizon's poles, cables, batteries, and other facilities are in a sorry state of disrepair . . . ***public and worker safety are threatened, and Verizon does nothing***." ¶ 150.

e. In 2017, the CWA submitted comments to the FCC in connection with a proceeding related to the FCC's regulation of the transition from legacy copper to fiber wires. The CWA's comments described Verizon's copper infrastructure as follows: "lines sagging dangerously below minimum clearance levels, cables that are not properly repaired and replaced; ungrounded, exposed wires used as a work-around because Verizon will not spend the money to replace damaged cables . . . resulting in customer outages and the hazardous exposure of lead cable to the environment." ¶ 153.

f. Dr. Khan was commissioned by the CWA to study bone and blood lead levels in cable splicers. In 2022, she conducted her study, which included 20 Verizon employees. 16 of these participants never used a respirator or PPE. ¶ 159.

g. Testimonies from the following confidential witnesses demonstrate that Verizon did not provide adequate PPE or training and generally disregarded employee safety when it came to lead:

(i) CW1 believes that the Lineman's Union may have raised concerns with Verizon that the lead training and PPE provided to Verizon employees were inadequate.

(ii) CW3 stated that after working with lead cables, his body, tools, tool bag, and inside of his work truck would be covered with lead dust. CW3 also described eating lunch with colleagues while wearing Tyvek suits which were covered with lead dust. ¶ 100.

(iii) CW6, a cable splicer in New York, stated that he ***was not provided a mask, so he resorted to wearing rags over his face to protect himself from the toxic lead dust***. *Id.*

(iv) CW8 who worked at Verizon and its predecessor companies for 28 years and regularly worked with lead cables throughout his tenure reported that Verizon never offered him or any of his coworkers medical screening for lead exposure. Further, "they never taught me anything about lead in all my time." ¶ 121.

(v) CW9, a lineman in the Philadelphia area reported that the workers in his area were not ***provided with proper training on lead safety protocols***. ¶ 100.

(vi) CW10 reported that ***during his 16 years as a field technician cable splicer, he was not provided with ventilation, masks, or other respiratory protective gear. Lead dust would end up on his face***. *Id.*

(vii) CW11 did not receive any lead safety training until 2021, when an outside third-party consultant provided some training in response to a news article. ¶ 121.

(viii) CW12, a member of the CWA, reported that in May or June 2021, he and his coworkers voiced concerns to a Verizon safety representative. They had been tasked with removing thousands of pieces of lead cable and stated they would not remove the lead cable without better training and respirators. These basic requests were not well received by the Verizon safety representative. ¶ 118.

(ix) CW14 worked at Verizon from May 2011 through November 2022 and reported that he personally handled and repaired lead cables with "***zero safety equipment to protect from lead***." ¶ 100.

(x) CW19 reported that he never wore any PPE when working with lead cables and never saw other employees wearing any PPE either. *Id.*

(xi) CW20 was a cable splicer in Texas, who reported that ***he would remove sections of old lead cables, cut them, manually roll them up, and then place the cable on the back of his work truck.*** *Id.*

(xii) CW22 reported that Verizon ***did not provide him with a mask and never offered him health screening for lead exposure***. *Id.*

(xiii) CW29 stated that at that time, the only PPE provided by NYNEX (now owned by Verizon) were gloves and a mask. CW29 reported that at this time he worked at the NYNEX/Bell Atlantic "garage" at 1221 Redfern Avenue in Queens where splicers often handled lead. CW29 reported that people he worked with "were getting sick left and right." *Id.*

(xiv) CW31 worked at Verizon in Construction and Wireline Operations for over 15 years in Pennsylvania, New York and New Jersey. He reported that Verizon provided no formal training in New Jersey. *Id.*

(xv) CW32 was a Verizon Regional Safety Manager in New York for over a decade and through the end of the Class Period. He led a training process based on working with lead cables beginning around the time that fiber optics were introduced. He reported that proper safety equipment was not always readily available for use, including particular bags to dispose of lead waste. CW32 attended meetings with company Directors where the need for training, safety protocols and the exposure risks of working with lead were discussed. *Id.*

(xvi) CW2, CW6, CW7, CW8, CW9, CW10, CW14, CW20, CW21, CW22, CW26, CW29, CW31, and CW32 all worked with lead cables and reported that Verizon did not provide adequate PPE to protect against lead. ¶ 121.

(xvii) CW2, CW3, CW4, CW8, CW9, CW20, CW21, CW26, CW27, and CW31 all stated that Verizon did not provide training on the safe handling of lead cables. *Id.*

296. **Scienter for False Statement No. 11:** Vestberg knew that Verizon was not properly training employees on the safe handling of lead or providing them with sufficient PPE, as required by OSHA. The following facts demonstrate Vestberg's scienter:

a. Historically, telecommunications workers have demonstrated elevated levels of lead in the blood. ¶¶ 101-103.

b. The CWA explains on its website that "[w]orking with and around lead-sheathed cables and other telecom plant, such as old lead splice cases, without proper protections can expose you to lead. . . . Any handling, touching or disturbance of [lead] cables can create lead-containing dust. . . ." ¶ 114. The CWA also submitted a comment in connection with OSHA's lead standard regulations in 1980, stating "the cable splicer will continue to be exposed to hazardous lead dust and fumes produced while performing splicing operations with lead-encased cable," and calls for employers to supply workers with protective equipment. ¶ 115.

c. Hazards to employees working with lead are discussed at EHSCP meetings, which Verizon has been deeply involved with throughout its history. ¶¶ 131-35. In 2018, Verizon's own representative to the EHSCP, Kyle Madden, co-led a session called "Lead in the Communication Industry." ¶ 145. And Verizon's EHSCP members attended presentations led by AT&T's Malone entitled, "Ways lead enters the body," "Exposures during lead cable removal," and proper PPE for handling lead. ¶¶ 139-40.

d. Verizon states in its Forms 10-K that, in connection with its legal department, it analyzes each legal and regulatory proceeding Verizon is involved in. Specifically, Verizon states that, "in the ordinary course of business, ***Verizon is involved in various commercial litigation and regulatory proceedings at the state and federal level. Where it is determined, in consultation with counsel based on litigation and settlement risks, that a loss is probable and estimable in a given matter, the Company establishes an accrual***. . . . ***We continuously monitor these proceedings as they develop*** . . ." ¶ 256. Verizon admits that it monitored commercial and regulatory proceedings that it was involved in, and therefore, Verizon was aware of the regulatory proceeding brought by the CWA to the P-PUC in 2015, which named Verizon as a party, and which noted that Verizon's cables and wires "pose a safety hazard to utility employees and the public." Testimony in connection with the P-PUC proceeding showed that "Verizon's neglect of its copper network is . . . resulting in unsafe conditions for CWA members and the public," and "exposed lead cable all create hazards both for CWA members working on the facilities and for the general public." In sum, due to the "sorry state of disrepair" of Verizon's lead cables, "public and worker safety are threatened, and Verizon does nothing." ¶ 150.

e. Due to Verizon's practice of monitoring legal and regulatory proceedings that pertain to Verizon, Verizon was also aware of comments that the CWA submitted to the FCC in 2017, *In the Matter of Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84. The CWA's comments stated that Verizon's neglect of its lead cables resulted in "the hazardous exposure of lead cable to the environment." On June 2, 2017, Verizon Pennsylvania LLC ("Verizon PA"), the CWA, the PA Office of Consumer Advocate, and the Pennsylvania Offices of Small Business

Advocate entered into a Settlement Agreement providing that Verizon would "conduct an engineering review of all cable replacements for 2015 and 2017." ¶ 155.

f. Verizon tested 208 of its own employees for blood-lead levels from 2007 to 2016 and found that 40% had levels considered dangerous by the CDC. ¶ 156. Verizon itself provided this information to the CWA in or around 2019 or 2020. ¶ 158. The CWA in turn asked researchers at Mount Sinai to do further testing, which resulted in the finding that 60% of Verizon employees, including mostly splicers, had elevated bone-lead levels, indicating long-term exposure to lead. ¶ 161.

**False Statement No. 12**

297. Verizon also misled investors during the Class Period when it affirmed its commitment to employee health. In its ESG Reports, signed by Defendant Vestberg, Verizon stated (or made substantially similar statements) that, "***We are committed to maintaining a safe workplace and environmentally responsible work practices***." Verizon also wrote in its Environmental, Health, and Safety Policy that "Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. ***Our commitment goes beyond maintaining compliance with laws, regulations and policies*** . . . . Verizon will conduct business in an environmentally and socially manner and provide employees with a safe and healthful workplace. We are committed, through our . . . [EHS] management system and supporting programs, to eliminate hazards and reduce EHS risks."

298. **First Reason Why Statement No. 12 Was False and Misleading**: This statement was false and misleading because Verizon was not, in fact, "committed to maintaining a safe workplace and environmentally responsible work practices," as demonstrated by the facts listed in ¶¶ 295(a)-(g).

299. **Second Reason Why Statement No. 12 Was False and Misleading**: This statement was also false and misleading because Verizon stated that its "commitment" to promoting employee health and safety "goes beyond maintaining compliance with laws, regulations and policies." This conveyed to investors that Verizon was compliant with "laws, regulations and policies" regarding employee health and safety. But in fact, Verizon did not comply with such laws. In addition to the facts listed in ¶ 295, above, the following facts confirm that Verizon regularly flouted "laws, regulations and policies," thus rendering false its statement that its "commitment goes beyond maintaining compliance with laws, regulations and policies":

a. OSHA regulations include detailed rules about employee exposure to lead; regular testing of lead in the body for employees who come into contact with lead; provision of PPE; and employee training on the safe handling of lead. ¶¶ 104-113. Verizon did not fulfill those regulations. ¶¶ 120-22.

b. OSHA requires that employers provide protective gear to employees exposed to lead. Section 1926.62(g). This includes "coveralls or similar full body work clothing; gloves, hats and shoes or disposable shoe coverlets; face shields, vented goggles and other PPE." OSHA also has strict regulations about how these clothes must be laundered. The following facts demonstrate that Verizon did not abide by this regulation:

(i) CW2, CW6, CW7, CW8, CW9, CW10, CW14, CW20, CW21, CW22, CW26, CW29, CW31, and CW32 all worked with lead cables, and reported that ***Verizon did not provide them with adequate PPE to protect against lead's toxic properties***. ¶ 121.

(ii) CW2, CW3, CW4, CW8, CW9, CW11, CW20, CW21, CW26, CW27, and CW31 all recounted that ***Verizon did not provide any training specific to safely working with or handling lead cables***. *Id.*

300. **Third Reason Why Statement No. 12 Was False and Misleading**: The statement that Verizon was "committed . . . to maintaining. . . environmentally responsible work practices," and that such "commitment" "goes beyond maintaining compliance with laws, regulations and policies" was also false. Verizon's "work practices" were not "environmentally responsible," and Verizon flouted environmental laws, regulations and policies. Specifically, RCRA, 42 U.S.C. § 6972(a)(1)(B), provides a private cause of action against "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." The following facts demonstrate that Verizon's abandonment of lead cables was creating a "hazardous waste which may present an imminent or substantial endangerment to health or the environment" and thus that Verizon was in violation of RCRA, and that its statement about exceeding environmental laws, regulations and policies was false:

a. Telecom lead cables have "tainted the soil at a popular fishing spot in New Iberia, La., at a playground in Wappingers Falls, N.Y., and in front of a school in suburban New Jersey". ¶ 239.

b. "[L]ead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set ty the U.S. Environmental Protection Agency. At

the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play." *Id.*

c. "In Coal Center, Pa., medical tests independently sought by the mother of 6-year-old twins, Joyanna and Beau Bibby . . . showed they had high levels of lead in their blood. The tests were taken a few days after they played in a lot next to their house under a dropping cable." ¶¶ 204, 239.

d. A researcher at the University of Washington analyzed the chemical fingerprint of lead at cable sites across the U.S. and verified that the lead contaminating the water and soil likely originated from the cable. ¶ 239.

e. "Caravanos found contaminated soil beneath the cable in multiple spots and registered multiple readings far exceeding the EPA guideline for play areas." *Id.*

f. "[L]ead found at one of the locations [in Coal Center, Pa.] measured 7.5 times the amount the EPA says is safe for play areas, according to a soil sample collected by the Journal." ¶¶ 187, 239.

301. **Scienter for Statement No. 12:** Defendant Vestberg knew that Verizon was flouting environmental laws and regulations. In particular, Vestberg knew that Verizon was leaving its lead cables strewn across the country and these cables were depositing lead in violation of RCRA. ¶¶ 256(a), (c)-(p), (r).

# VII. ADDITIONAL ALLEGATIONS OF SCIENTER

## A. Defendants Had Actual Knowledge That Verizon's Extensive Lead Cable Network Posed Toxic Risks to the Environment and Its Workers

### 1. Facts Underlying Defendants' Scheme Outlined Above Demonstrate Their Knowledge

302. Many facts underlying Defendants' scheme evidence their knowledge that Verizon had a vast network of lead-sheathed cables which were decaying in place or otherwise posed an enormous risk to the environment and to Verizon's employees, and that the costs associated with cleaning up the lead cables as well as compensating exposed workers and citizens would be exorbitant. These include:

- Admissions by Verizon to analysts and governmental agencies in the wake of the *WSJ* exposé that Verizon owns thousands of miles of lead cables (¶ 262). This includes an admission to New York State agencies that the existence of lead-sheathed cables "***in the telecommunications industry and in the transportation and power industries, has long been known***."

- Throughout the decades, Verizon has been privy to data demonstrating that its employees have elevated levels of lead in their blood. *See* (V)(G)(3). Most recently, from 2007 to 2016, Verizon tested the lead levels in the blood of 208 of its workers, and ***40%*** had levels of lead in their blood that exceeded the levels where the CDC recommends that a person seek medical attention. ¶¶ 156, 241. Verizon provided the data to the CWA, who commissioned Dr. Khan at Mount Sinai to perform a wider study. ¶ 158.

- Since 2000, Verizon has attended annual EHSCP meetings which discussed in great detail the hazards of lead in the telecommunications industry. *See* (V)(G)(1). For example, delegates have specifically acknowledged at these conferences that: (i) "some older metropolitan areas may still have 50% lead cable" (¶ 138); (ii) "soils retained between 83 and 98 percent of the released lead within 2 inches" (*id.*); and, (iii) lead "is an issue for most member companies." (¶ 144). Verizon's own delegates have led, hosted, or otherwise overseen these discussions in certain years. *See* ¶¶ 137, 145.

- OSHA regulations require Verizon to provide its employees who come into contact with lead with (i) PPE; and (ii) training in the safe handling of lead. ¶ 104. In some cases, Verizon did provide such equipment and training, evidencing that it knew it had hazardous lead cables in its network, that it was obligated to provide this critical safety equipment and training to its workers, and that its workers could be harmed by Verizon's lead cables. ¶¶ 100, 296(g)(ii), (vii). However, the provision of equipment and training was not uniform and rigorous, evidencing that Verizon's dereliction of its duties to protect its workers and

further demonstrating that its statements concerning employee safety were false and misleading.

- There have been at least two federal actions filed against Verizon's chief competitor AT&T concerning AT&T's lead cables. Verizon was aware of these actions. ***First***, on March 1, 2016, AT&T was sued by six Texas landowners for abandoning lead cable on their properties which was in disrepair and was damaging the environment. ¶ 174. The Texas plaintiffs' expert – whom AT&T unsuccessfully tried to exclude – opined that it would cost $33.47 ***per foot*** to remove and remediate the lead cables in the ground. ¶ 176. Based on current estimates of the amount of lead in Verizon's infrastructure (minus any lead acquired from MCI or XO), the cost to remove and remediate Verizon's aerial lead cables would be at a minimum $1.48 billion, and the costs to remove all lead – aerial, underground and underwater – could exceed $14.3 billion. ¶¶ 178, 227-29. ***Second***, on January 14, 2021, AT&T was sued by an environmental group for its abandonment of lead-sheathed cables at the bottom of Lake Tahoe (the "Lake Tahoe" case). ¶ 179. Pursuant to the Amended Final Consent Decree entered in the Lake Tahoe case on November 7, 2024, AT&T was ordered to remove 107,000 pounds of lead cable from the bottom of Lake Tahoe by November 30, 2024, or at least by May 26, 2025. Verizon represents in its annual filings that it regularly reviews all litigation involving Verizon, and assesses any associated risks. ¶ 256.

- In 2015, the CWA filed a petition with the Pennsylvania Public Utility Commission to investigate Verizon's abandonment of its lead cables. ¶ 129. Testimony during that proceeding explained that the CWA was concerned about "the hazardous exposure of lead cable to the environment" resulting from Verizon's cables, and that "exposed lead cable[s] . . . create hazards both for CWA members working on the facilities and for the general public." ¶¶ 150. Verizon represents in its annual filings that it regularly reviews all litigation involving Verizon, and assesses any associated risks. ¶ 256.

- During the Class Period, Verizon reported to EPA, consistent with its obligations as a Large Quantity Generator of lead, of generating hazardous lead waste at 16 different sites. ¶ 171.

- In 1978, in connection with impending OSHA regulations, certain Bell companies including several predecessors to Verizon filed a petition seeking to minimize the burden of the regulations. ¶ 110. Among other things, the OSHA Petition stated, "***Petitioners [sic] use of lead products has been primarily in the form of lead-sheathed cables*** and the various lead sleeves and solders necessary to make moisture and airtight the entire cable from end-to-end. Very little new lead-sheathed cable is placed in service today. However, the existing lead-sheathed cables must be maintained. ***Ultimately, these cables will be removed and the metals recycled. The maintenance and on-going removal of these facilities require that technicians work with the lead from time to time as well as work in the vicinity of lead at other times even though the lead-sheathed cable is not actually involved***." ¶ 111.

- Verizon employs a Chief Sustainability Officer (Defendant Gowen), a Chief ESG Officer, and an entire department devoted to ensuring Verizon's commitment to ESG principles is

upheld. *See* (V)(B)(3). Verizon's Code of Conduct requires employees to report to their supervisor any conduct that undermines Verizon's ESG goals. ¶ 256. In addition, Defendants Vestberg and Ellis are centrally involved in the United Nations' sustainability initiatives. *See* ¶¶ 20-21.

### 2. Verizon Submitted Comments to the EPA in 2011 Evidencing Its Knowledge of Lead Cables and Resulting Dangers to Workers

303. On July 22, 2011, the EPA proposed revisions to its 2008 rule defining solid waste, 76 Fed. Reg. 44094, which would, among other things, strengthen the rule's requirements concerning the recycling of hazardous material by requiring generators of waste like Verizon and AT&T to take further measures to ensure compliance. Verizon opposed the EPA's new rule as too burdensome, and the EHSCP submitted a public comment on October 20, 2011, which Verizon incorporated into its own public comment. The EHSCP's public comment noted that certain requirements of the proposed rule would burden its members including Verizon.

304. The EHSCP's comment, which Verizon incorporated by reference, stated that the new rule would impose unnecessary recycling requirements on generators of waste who already have in place recycling management practices for "spent" products such as lead-acid batteries. The EHSCP then ***expressly discussed the difficulties the rule would present as it pertains to lead-sheathed cables***:

> ***An even greater challenge would be posed by regulating lead-sheathed telecommunications cable. Such cable is removed from the ground, for example, when a road-widening project requires a buried cable to be moved, in which case it is replaced with new cable. The removed cable typically is brought back to a company or contractor facility, from which a contracted hauler transports it to a metal reclamation facility.*** Regulating such activity could turn every roadside into a regulated generating site, creating enormous registration and paperwork burdens for no environmental benefit.

305. Verizon submitted its own public comment which "incorporate[d] by reference the comments regarding this draft permit submitted by the Environmental, Health & Safety Communications Panel (EHSCP)." Verizon's comment was signed by Manager of Corporate

Safety and Environmental Compliance, Kathleen Tobin who noted: "Verizon believes that some of the administrative and regulatory burdens created by the proposed rule are unnecessary and easily avoidable by making some simple changes."

### 3. Verizon Is Required to Report Retirement of Copper Cables, Including Lead-Sheathed Cables, to the FCC

306. As the telecommunications industry transitioned from legacy copper lines to wireless communications, the FCC grew concerned that customers still reliant on copper wires for communicating would not be properly serviced by the major carriers.

307. In 2003, the FCC set rules governing the retirement of copper wires. In November 2014, in response to "fiber becoming the preferred choice for new greenfield deployments" and causing the "the pace of copper retirement [to] accelerate[]", the FCC initiated a new rulemaking process "to help guide and accelerate the technological revolutions that are underway." The FCC sought comments from industry participants in crafting its rule.

308. On February 5, 2015, the CWA submitted a comment (the February 5, 2015 Comment"). *See* Comments of Communications Workers of America, *In the Matter of Ensuring Customer Premises Equipment Backup Power for Continuity of Communications*, PS Docket No. 14-174; *Technology Transitions*, GN Docket No. 13-5; *Policies and Rules Governing Retirement of Copper Loops by Incumbent Local Exchange Carriers*, RM-11358; *Special Access for Price Cap Local Exchange Carriers*, WC Docket No. 05-25; *AT&T Corporation Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, RM-10593, dated February 5, 2015.

309. In its February 5, 2015 Comment, the CWA noted the prevalence of "de facto" copper retirement and "de facto" copper service discontinuance whereby local exchange carriers were "neglecting their copper facilities." In particular, the CWA labeled Verizon as the "poster

child for 'de facto' copper discontinuance." The CWA also cited "evidence of Verizon's effective abandonment of copper networks and customers in many regions where it has not deployed its all-fiber network and FairPoint Communications' disinvestment in its copper network."

310. In 2015, the FCC issued its final rule on the retirement of copper by incumbent local exchange carriers ("ILEC") called *Technology Transitions, Policies and Rules Governing retirement of Copper Loops by Incumbent Local Exchange Carriers and Special Access for Price Cap Local Exchange Carriers.* The Final Rule, § 51.332, governs the "removal or disabling of copper loops, subloops or the feeder portion of such loops or subloops; the replacement of such loops with fiber-to-the-home loops or fiber-to-the-curb loops . . .; the failure to maintain copper loops, subloops, or the feeder portion of such loops or subloops that is the functional equivalent of removal or disabling."

311. The Final Rule, § 51.332, states that ILECs such as Verizon must provide notice to the FCC and in some instances, to retail customers, with detailed information concerning the location of the copper wires. In accordance with Rule 51.333, Verizon has issued a public notice each time it formally retires its copper wires.

312. In addition, as explained by CW1, CW3, CW6, CW10, CW12, CW17, CW22, CW26 and CW28, Verizon is able to tell which of its copper cables are sheathed in lead based on internal engineering records. Therefore, as Verizon retires copper cables, and provides public notice thereof, pursuant to the FCC's requirements, Verizon must confront and acknowledge the extent of its copper cable network which is sheathed in lead.

### 4. Due Diligence Performed in Connection with Verizon's Corporate Reorganizations Revealed Its Extensive Lead Cable Network

313. Since its corporate formation, Verizon has made several acquisitions in the U.S. When companies enter into major corporate transactions such as these, conducting a comprehensive due diligence audit is standard operating procedure.

314. With the merger of Bell Atlantic and GTE, Verizon was formed on June 30, 2000. Notably, in the merger agreement dated July 27, 1998, GTE and Bell Atlantic both represented that their properties were not contaminated with any Hazardous Substances in violation of any environmental law. As defined in the merger agreement, hazardous substances include lead. The inclusion of such representations and warranties in the merger agreement indicates awareness of the risk posed by hazardous substances such as lead to the overall business. Neither Bell Atlantic nor GTE, both of which had thousands of miles of lead cables in their infrastructure, could have made these representations and warranties without a thorough investigation of whether their cables contained lead and/or were leaching lead into the environment.

315. Likewise, the merger agreement between Verizon and MCI dated February 14, 2005, and amended on March 4, 2005, March 29, 2005 and May 1, 2005 contained the following representation:

> (c) ***No Hazardous Substances are or were located and no disposal or Releases of Hazardous Substances have occurred at, on, above, under or from any properties currently or, to the knowledge of the Company at the time of the cessation of such ownership, lease, operation or use, formerly owned, leased, operated or used by the Company, any Company Subsidiary or any predecessors in interest that, in each case, has resulted in or would reasonably be expected to result in any material cost, liability or obligation of the Company or any Company Subsidiary under any Environmental Law.***

316. Finally, when later partially spinning off Verizon's business in certain states, Verizon made similar representations and warranties. For example, in 2015, Verizon announced a securities purchase agreement whereby its assets, books and records, as well as local exchange

business and related wireline activities in California, Florida and Texas were transferred to Frontier. The securities purchase agreement dated February 5, 2015, also represented that Verizon's spinoff businesses did not have properties with Hazardous Material, which was defined to include lead.

317. At a minimum, the inclusion of these provisions indicates that Verizon recognized the potential risk that assets containing lead posed to its overall business. Otherwise, there would be no need to make such representations and warranties, disclaim liability, or shift the burden to counterparties to the respective transactions.

318. Indeed, any reasonable due diligence audit conducted in the furtherance of major corporate transactions like these would have brought to the attention of Verizon and those executing such transactions, the existence of these assets and lead-based risks.

### 5. Defendants Claim to Be Focused on Sustainability, the Environment, and Employee and Community Health

319. Defendants Vestberg and Ellis are actively involved with the United Nation's sustainability initiatives. Vestberg is a member of the Leadership Council of the UN's Sustainable Development Solutions Network and serves on the board of the UN Foundation and the Whitaker Peace & Development Initiative. He is also a member of the Leadership Council of the UN's Sustainable Development Solutions Network and a member of the boards of the UN Foundation and the Whitaker Peace and Development Initiative.

320. On July 7, 2021, The UN's website published an interview of Vestberg. It focused on the UN's sustainable development goals ("SDGs"). Vestberg noted that Verizon has "four stakeholders . . . . our shareholders, our customers, our employees, and our society." Vestberg continued, "the SDGs are very much connected to how we do business, how we act in society, and how we show our employees that we have a purpose and we're actually doing right for our society.

All that is for us, a cycle of interconnections: If we do right for employees, for our customers, in our society, ultimately our shareholders are going to benefit as well."

321. In an article dated May 6, 2022, appearing on broadbandcommission.com, Vestberg is quoted as saying, "As we execute on our strategy we consider how our core business can benefit the communities where we operate and how we can mitigate adverse impacts to create long-term measurable value for a broad set of stakeholders – our shareholders, customers, employees and society. Our ESG strategy supports these objectives."

322. In April or May, 2023, Vestberg posted on his LinkedIn Account: "At Verizon, we are mobilizing our resources, partnerships and people to help protect the planet for future generations. I am proud to announce that we issued our fifth $1 billion green bond, another step we're taking to deliver critical solutions for a sustainable future."

323. On June 22, 2023, Vestberg wrote on Twitter that he "had the privilege of serving as a member of the Leadership Council for the @UN Sustainable development Solutions Network where I helped write the #UNSDGs . . ."

324. Similarly, on September 23, 2021, then-CFO of Verizon Ellis was featured on the UN Global Compact series *Financing a Sustainable Future CFO Insights* during which he discussed how sustainability and ESG is at the "heart of what we do."

325. Verizon also has a "Shared Success Council" that provides direction and oversight, establishes benchmarks and goals, assigns and enforces accountability and tracks results for corporate responsibility initiatives across Verizon through six working committees: Accessible Products & Services, ***Environmental Sustainability***, Online Safety, Wireless Safety, Human Rights and Supply Chain.

326. The Shared Success Council – which is ordinarily chaired by a senior executive of the Company, and includes senior leaders from all operating units and several corporate officers – reports directly to Vestberg, who in turn, is overseen by the Corporate Governance and Policy Committee of Verizon's Board.

#### 6. The Lead Cables Concerned Defendants' Core Operations

327. The alleged fraud concerns a critical component of Verizon's business: its FiOS products and services. The conversion of its Legacy Network to fiber optic wires is the predominant source of its present-day success, and "Verizon" and "FiOS" have become nearly synonymous. *See* Section VI(A). In fiscal year 2022, Verizon Consumer Group accounted for $103.5 billion or 76% of the Company's consolidated revenues. *See* ¶ 61.

#### 7. Defendants Spoke Regularly About the Issues They Misled Investors About

328. During the Class Period, the Individual Defendants, as the Company's highest-ranking executives, issued numerous statements about environmental, health, and safety; recycling initiatives; and cost savings associated with transitioning from copper to fiber cables, that rendered false or misleading the true nature of Verizon's wireline operations. The Individual Defendants knew that: the market was relying on the veracity of those statements; much of Verizon's legacy copper cable network was still encased in lead; the lead was decaying, abandoned and improperly maintained or disposed of; lead poses environmental, health, and safety hazards to communities, employees, and the environment; and to remove, let alone maintain, the lead cables was costly.

### B. Defendants Had Motive and Opportunity to Mislead Investors About Verizon's Lead Cables

329. During the Class Period, Defendants Vestberg, Ellis, Malady, and Skiadas had motive and opportunity to conceal from investors the following facts: (i) the vast extent of Verizon's lead cables left decaying in place across the country; (ii) the costs associated with

removing or remediating those lead cables; (iii) Verizon's failure to protect its cable splicers, linemen, and other technicians who worked on Verizon's Legacy Network with training and PPE adequately, which resulted in Verizon workers developing dangerous levels of lead in their blood and bones, and resulting lead-based illnesses; and (iv) Verizon's statements concerning environmental stewardship and recycling were nothing more than green-washing in light of its failure to remove its extensive lead cable network.

330. Vestberg's and Ellis's, and later Malady's and Skiadas's compensation schemes throughout the Class Period gave them a motive and opportunity to hide these facts from investors. There were three components to each of the Individual Defendants' compensation packages: base salary; short-term incentive annual bonus; and long-term incentive award in PSUs and RSUs, each equal to 1 share of Verizon common stock. The vast majority of these defendants' annual compensation was derived from their short- and long-term incentive awards.

331. The following charts summarize the components of Vestberg's, Ellis's, Malady's, and Skiadas's compensation plans during the Class Period, and indicate what percentage was derived from incentive plans tied to performance goals:

**<u>Vestberg</u>**

| Year | Base Salary | Short-Term Compensation | Long-Term Target Compensation | Total Compensation | % from Incentive |
|---|---|---|---|---|---|
| 2019 | $1,500,000 | $4,125,000 | $12,000,000 | $17,625,000 | 91.5% |
| 2020 | $1,500,000 | $3,637,500 | $13,300,000 | $18,437,500 | 91.9% |
| 2021 | $1,500,000 | $3,825,000 | $14,500,000 | $19,825,000 | 92.4% |
| 2022 | $1,500,000 | $3,262,500 | $14,500,000 | $19,262,500 | 92.2% |
| 2023 | $1,500,000 | $4,087,500 | $18,000,000 | $23,587,500 | 93.6% |
| **Total Incentive Compensation** | | **$91,237,500** | | **$98,737,500** | **92.4%** |

**Ellis**

| Year | Base Salary | Short-Term Compensation | Long-Term Target Compensation | Total Compensation | % from Incentive |
|---|---|---|---|---|---|
| 2019 | $950,000 | $1,567,500 | $5,700,000 | $8,217,500 | 88.4% |
| 2020 | $950,000 | $1,382,250 | $6,250,000 | $8,582,250 | 88.9% |
| 2021 | $950,000 | $1,453,500 | $6,525,000 | $8,928,500 | 89.4% |
| 2022 | $950,000 | $1,239,750 | $7,000,000 | $9,189,750 | 89.7% |
| 2023[5] | $444,551 | $517,750 | $7,000,000 | $7,962,301 | 94.4% |
| **Total Incentive Compensation** | | **$38,360,750** | | **$42,880,301** | **89.4%** |

**Malady**

| Year | Base Salary | Short-Term Compensation | Long-Term Target Compensation | Total Compensation | % from Incentive |
|---|---|---|---|---|---|
| 2021 | $850,000 | $1,402,500 | $5,250,000 | $7,502,500 | 88.7% |
| 2022 | $900,000 | $1,174,500 | $6,500,000 | $8,574,500 | 89.5% |
| 2023 | $983,333 | $1,635,000 | $8,000,000 | $10,618,333 | 90.7% |
| **Total Incentive Compensation** | | **$23,962,000** | | **$26,695,333** | **89.8%** |

**Skiadas**

| Year | Base Salary | Short-Term Compensation | Long-Term Target Compensation | Total Compensation | % from Incentive |
|---|---|---|---|---|---|
| 2023 | $741,667 | $1,076,375 | $7,000,000 | $8,818,042 | 91.6% |

332. The short- and long-term incentive awards were tied to performance. Specifically, the short-term incentive award was premised on the Company's ability to reach certain targets in the following metrics, with the indicated weights: cash flow from operations (30%); service and other revenue (30%); adjusted operating income (25%) and diversity and sustainability (10%).

[5] Defendant Ellis departed Verizon on April 29, 2023 and thus his compensation in 2023 was lower than in previous years.

333. Because the vast majority of the Vestberg's, Ellis's, Malady's, and Skiadas's annual compensation was derived from short- and long-term incentive plans, which in turn required Vestberg, Ellis, Malady, and Skiadas to achieve certain performance targets, they were heavily incentivized to conceal any information that would prevent them from achieving those targets. Disclosing that Verizon left a vast network of decaying cables in place, that was harming Verizon workers and the environment, would have jeopardized their ability to achieve the metrics Verizon had set. For example, given that the estimates to remove Verizon's lead cables range could be has high as $14.3 billion, ¶¶ 178, 227, 229, engaging in this process would have seriously diminished Verizon's adjusted operating income, and it would have been unlikely that Vestberg, Ellis, Malady, and Skiadas would have received their incentive awards.

### C. The Individual Defendants Were Verizon's Top Executives

334. The Individual Defendants, by virtue of their association with and control of confidential internal information regarding Verizon's legacy lead-sheathed copper cables which were ailing its employees, the environment, and the communities where they remained, participated in the fraudulent scheme to hide the true status of the Company's hazardous lead cable infrastructure.

#### 1. Vestberg

335. Vestberg held the highest-level position in the Company and controlled the contents of Verizon's public statements. Because of his position, Vestberg was provided, or had access to, copies of the documents, interview and conference transcripts, and other publicly disseminated statements, alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Vestberg knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were

being concealed from the public, and that the representations that were being made to investors about Verizon's commitment to the safety of its employees, the cost savings associated with it moving on from its legacy copper cables, and its e-waste recycling efforts which focused on lead-acid batteries while ignoring the lead-encased cables strewn throughout the country, were materially false, misleading, and or incomplete. As the Company's senior-most executive, Vestberg was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

**2. Ellis**

336. As the CFO of Verizon from November 1, 2016 through May 1, 2023, Ellis held one of the highest-level positions at the Company, controlled the contents of Verizon's public statements, and had access to material, adverse, nonpublic information concerning Verizon's lead-sheathed copper cables. Because of his position, Ellis was provided to, or had access to, copies of the documents, interview and conference transcripts, and other publicly disseminated statements alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Ellis knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. As the Company's second senior-most executive, Ellis was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

**3. Malady**

337. As the EVP and CTO of Verizon's Global Networks & Technology Group during most of the Class Period, and EVP and CEO of VBG since March 2, 2023, Malady held one of the

highest-level positions at the Company, controlled the contents of Verizon's public statements, and had access to material, adverse, nonpublic information concerning Verizon's lead-sheathed copper cables. Because of his position, Malady was provided, or had access to, copies of the documents, interview and conference transcripts and other publicly available statements made during the Class Period alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Malady knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. Malady was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

**4. Gowen**

338. Defendant Gowen is – and was during the Class Period – Verizon's Chief Sustainability Officer. As such, Gowen was responsible for overseeing Verizon's green initiatives throughout the Company including expanding recycling and waste reduction and the management of end of life material recovery. Because of his high-level position, Gowen was provided, or had access to, copies of the documents, interview and conference transcripts, and other publicly available statements issued during the Class Period alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Gowen knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. As one of the

Company's senior-most executives, who was specifically responsible for overseeing Verizon's green initiatives Gowen was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

### 5. Skiadas

339. Defendant Skiadas was the SVP and Controller and Principal Accounting Officer of Verizon during the Class Period. On May 1, 2023, Defendant Skiadas replaced Defendant Ellis as the EVP and CFO of Verizon, which role he presently occupies. Skiadas was responsible for Verizon's accounting and finance operations, compliance, financial policies, and SEC reporting. Because of his high-level position, Skiadas was provided, or had access to, copies of the documents, interview and conference transcripts, and other publicly available statements issued during the Class Period alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Verizon, Skiadas knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. As one of the Company's senior-most executives, who was specifically responsible for overseeing Verizon's finance and accounting, Skiadas was responsible for the accuracy of Verizon's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

## VIII. LOSS CAUSATION

340. During the Class Period, as alleged herein, Defendants made materially false and/or misleading statements and omissions, and engaged in a scheme to deceive the market. Defendants knowingly and/or recklessly misstated the true nature of the Company's business in order to inflate the market's perception of Verizon's securities' value. This resulted in the prices of Verizon's

securities becoming artificially inflated and operated as a fraud or deceit on the Class (as defined below). Subsequently, the truth concealed by Defendants' previous misrepresentations and omissions was disclosed to the market and from July 10 through July 27, 2023, the price of Verizon common stock fell more than 12%. *See* Sections (V)(H)-(V)(J). As a result of Defendants' material misstatements and omissions, Lead Plaintiffs and other members of the Class have suffered economic loss, i.e., damages, under the federal securities laws.

## IX. CLASS ACTION ALLEGATIONS

341. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Verizon securities during the Class Period. Excluded from the Class are Defendants, officers and directors of Verizon, and their families and affiliates, i.e., legal representatives, heirs, successor or assigns and any entity in which Defendants have or had a controlling interest.

342. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims as a class action will provide substantial benefits to the parties and the Court. As of the date of this Amended Complaint, Verizon had approximately 4.2 billion shares of common stock outstanding owned by millions of investors.

343. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

- Whether Defendants violated the Exchange Act;
- Whether Defendants omitted and/or misrepresented material facts;

- Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;
- Whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;
- Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;
- Whether Defendants' conduct impacted the price of Verizon's securities;
- Whether Defendants' conduct caused the members of the Class to sustain damages; and
- The extent of damages sustained by Class members and the appropriate measure of damages.

344. Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

345. Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiffs have no interests which conflict with those of the Class.

346. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

347. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and/or misleading statements pleaded in this Complaint. None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of

purportedly current facts and conditions at the time the statements were made, including statements about Verizon's commitments to employee safety, management and maintenance of its Legacy Network, and waste recycling efforts.

348. Verizon's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Verizon's recycling programs for electronic waste, its commitment to employee safety, and costs associated with removing its Legacy Network. Given the then-existing facts contradicting Defendants' statements, any risk disclosures made by Verizon were not sufficient to insulate Defendants from liability for their materially false and misleading statements

349. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and/or approved by an executive officer of Verizon who knew that the statement was false when made.

350. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Verizon who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement

of future economic performance, as they were not stated to be such assumptions when they were made, nor were any of the projections or forecasts made by Defendant expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI. PRESUMPTION OF RELIANCE

351. At all relevant times, the market for Verizon's securities was an efficient market for the following reasons, among others:

(a) Verizon's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) Verizon filed periodic public reports with the SEC and the NYSE;

(c) Verizon regularly and publicly communicated with investors via established market communications mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Verizon was followed by securities analysts employed by numerous major brokerage firms, including Goldman Sachs, JP Morgan, Wells Fargo, and Oppenheimer, who wrote reports which were distributed to the certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace.

352. Based on the foregoing, the market for Verizon's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Verizon's securities. Under these circumstances, all purchasers of Verizon securities during the Class Period suffered similar injury through their purchase of Verizon securities at artificially inflated prices and the presumption of reliance applies.

353. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because certain of the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose the true, material, negative financial impact of its legacy lead-sheathed copper cables – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## XII. CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

354. Lead Plaintiffs repeat, incorporate, and reallege every allegation contained above as if fully set forth herein.

355. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule -5 promulgated thereunder by the SEC.

356. During the Class Period, Defendant Verizon and the Individual Defendants – Vestberg, Ellis, Malady, Gowen, and Skiadas – carried out a plan, scheme, and course of conduct which intended to and, throughout the Class Period, did (i) deceive the investing public, including Lead Plaintiffs and other Class Members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Verizon's securities at artificially inflated prices.

357. During the Class Period, Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common

stock in an effort to maintain artificially high market prices for Verizon common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

358. During the Class Period, Defendants, individually and in concert, directly or indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's Legacy Network, business prospects, and finances.

359. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. In particular:

(a) **Vestberg**: Defendant Vestberg made, or caused Verizon to make the statements alleged in ¶¶ 253, 281, 285, 293, 297, *supra.*

(b) **Ellis**: Defendant Ellis made, or caused Verizon to make the statements alleged in ¶¶ 253, 257, 261, 266, 271, *supra.*

(c) **Malady:** Defendant Malady made, or caused Verizon to make the statements alleged in ¶¶ 271, 278, *supra.*

(d) **Gowen:** Defendant Gowen made, or caused Verizon to make the statements alleged in ¶ 274, *supra.*

(e) **Skiadas:** Defendant Skiadas made, or caused Verizon to make the statements alleged in ¶ 253, *supra*.

(f) **Verizon:** Defendant Verizon is responsible for all of the statements set forth in ¶¶ 253, 257, 261, 266, 271, 274, 278, 281, 285, 290, 293, 297, *supra.*

360. As set forth in Section (VIII)(A), these Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Verizon's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

361. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Verizon's securities. Lead Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

362. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class have suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

363. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

364. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

365. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

366. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

367. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they culpably participated in the unlawful conduct alleged, which artificially inflated the market price of Company securities.

368. Defendant Vestberg controlled Verizon by virtue of the fact that: (i) at all relevant times, was the Chief Executive Officer; and (ii) he issued public statements to investors and analysts.

369. Defendant Ellis controlled Verizon by virtue of the following facts: (i) he was the Chief Financial Officer from November 1, 2016 through May 1, 2023; and (ii) he issued public statements to investors and analysts.

370. Defendant Malady controlled Verizon by virtue of the following facts: (i) he was the CTO from 2019 to March 2, 2023 and EVP and CEO of Verizon Business Group from March 2, 2023 through present; and (ii) he issued public statements to investors and analysts.

371. Defendant Gowen controlled Verizon by virtue of the following facts: (i) he was the Chief Sustainability Officer and SVP of Global Supply Chain at all relevant times throughout the Class Period; and (ii) he issued public statements to investors and analysts.

372. Defendant Skiadas controlled Verizon by virtue of the following facts: (i) he was the SVP and Controller and Principal Accounting Officer of Verizon from the beginning of the Class Period until May 1, 2023, when he became the Company's Chief Financial Officer; and (ii) he issued public statements to investors and analysts.

373. The Individual Defendants are culpable for participation in the matters alleged herein because they did not act in good faith in connection with the conduct at issue, acted with knowledge that Verizon's public statements were materially false or misleading, or omitted material information, and/or or they acted with reckless disregard for the truth.

374. By virtue of their positions as controlling persons of Verizon, and their culpable participation in the Defendants' violation of Section 10(b) and Rule 10b-5(b) as alleged herein, the Individual Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act.

## XIII. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiffs, and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

(d) awarding Lead Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: April 21, 2025

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**

*/s/ James E. Cecchi*
James E. Cecchi
Kevin Cooper
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrbe.com

*Local Counsel for Lead Plaintiffs and the Class*

**GRANT & EISENHOFER**

*/s/ Caitlin M. Moyna*
Caitlin M. Moyna (admitted *pro hac vice*)
Mica A. Cocco (admitted *pro hac vice*)
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
cmoyna@gelaw.com
mcocco@gelaw.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Gregory M. Castaldo*
Gregory M. Castaldo
Joshua E. D'Ancona
David A. Bocian

Nathaniel C. Simon (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jdancona@ktmc.com
dbocian@ktmc.com
nsimon@ktmc.com

*Lead Counsel for Lead Plaintiffs and the Class*