James E. Cecchi
Kevin G. Cooper
**CARELLA, BYRNE, CECCHI,**
 **BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700

*Liaison Counsel for Lead Plaintiffs
and the Class* [Lead Counsel for Lead
Plaintiffs and the Class Listed Below]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STICHTING PENSIOENFONDS METAAL EN TECHNIEK; STICHTING PME PENSIOENFONDS; STICHTING MN SERVICES AANDELENFONDS NOORD-AMERIKA; AKADEMIKERPENSION; LANNEBO KAPITALFÖRVALTNING AB; and STOREBRAND ASSET MANAGEMENT AS, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiffs,<br>v.<br><br>VERIZON COMMUNICATIONS INC., HANS VESTBERG, MATTHEW ELLIS, KYLE MALADY, JAMES GOWEN and ANTHONY SKIADAS,<br><br>              Defendants. | Case No. 1:23-cv-05218-ESK-AMD<br><br>Hon. Edward S. Kiel<br>United States District Judge<br><br>Hon. Ann Marie Donio<br>United States Magistrate Judge<br><br>Return Date:<br>September 15, 2025 |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ...........................................................................................5

I.     VERIZON'S BUSINESS AND THE IMPORTANCE OF THE FiOS CONVERSION.............................................................................................5

II.    DEFENDANTS MISLED INVESTORS ABOUT VERIZON'S EXTENSIVE LEAD CABLE NETWORK ......................................................5

    A.     Misrepresentations About Removing Copper Wires During Verizon's Transition to FiOS ...............................................................6

    B.     Misrepresentations About E-Waste Disposal Practices .......................7

    C.     Misrepresentations About Commitment to Employee Safety ..............8

III.   DEFENDANTS CONCEALED MATERIAL FACTS THAT RENDERED THEIR STATEMENTS MISLEADING .................................8

    A.     Verizon's Concerted Choice to Abandon Lead Cables in Place Has Been Admitted by Defendants and Is Corroborated by CW Accounts ...........................................................................................9

    B.     Verizon's Lead Cable Network and Related Liabilities Are Massive...........................................................................................11

    C.     Verizon's Systemic Failure to Protect Workers from Lead Exposure........................................................................................12

    D.     Verizon's Lead Cables Were Contaminating the Environment..........13

IV.    THE WSJ'S REVELATIONS SHOCKED THE PUBLIC INCLUDING VERIZON INVESTORS .....................................................14

LEGAL STANDARD..................................................................................................16

ARGUMENT ............................................................................................................16

i

I.      THE SAC ALLEGES MATERIALLY FALSE OR MISLEADING STATEMENTS ...................................................................................16

        A.    Defendants Materially Misled Investors About Removing and Replacing Lead Cables During the FiOS Transition ..........................17

        B.    Defendants Materially Misled Investors About E-Waste Recycling Practices ...............................................................................23

        C.    Defendants Materially Misled Investors About Employee Health and Safety ..................................................................................26

II.     THE SAC PLEADS A STRONG INFERENCE OF SCIENTER ...............28

        A.    Defendants Knew or Recklessly Disregarded Material Risks Related to Verizon's Lead Cable Network .........................................28

        B.    Compensation-Based Motive Further Supports Scienter....................34

        C.    The SAC Adequately Pleads Verizon's Scienter................................35

        D.    Defendants' Nonfraudulent Inference Is Less Compelling than Plaintiffs' Fraudulent Inference ........................................................36

III.    THE SAC ALLEGES SCHEME LIABILITY .............................................39

IV.     THE SAC ALLEGES CONTROL PERSON LIABILITY...........................40

CONCLUSION ...................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Labs. Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008) ......................................................40

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021)................................................................28

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ....................................................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................16

*In re AT&T Inc. Sec. Litig.*,
  2025 WL 1685840 (N.D. Tex. June 16, 2025) ......................................19, 24, 38

*Bucks Cty. Emps. Ret. Sys. v. Norfolk S. Corp.*,
  2025 WL 897540 (N.D. Ga. Mar. 24, 2025) .....................................................29

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) .............................................................................17

*In re Cambrex Corp. Sec. Litig.*,
  2005 WL 2840336 (D.N.J. Oct. 27, 2005) .......................................................32

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) ................................................................. 16-17, 18

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
  2024 WL 3219616 (D.N.J. June 28, 2024).......................................................30

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018).....................................................35, 36

*In re Coinbase Glob., Inc. Sec. Litig.*,
  2024 WL 4053009 (D.N.J. Sep. 5, 2024)....................................................*passim*

*Cont'l Gen. Ins. Co. v. Olafsson*,
  2024 WL 4263211 (D.N.J. Sep. 23, 2024) ...................................................17, 18

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) ...............................................................23

*In re Enzymotec Sec. Litig.*,
  2015 WL 8784065 (D.N.J. Dec. 15, 2015)..........................................20

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019)................................. 20, 24, 25-26, 27

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ..........................................................30

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  620 F. Supp. 3d 167 (D.N.J. 2022)....................................... 20, 33-34

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
  2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ....................................26

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ....................................................*passim*

*In re Kenvue Inc. Sec. Litig.*,
  2025 WL 889640 (D.N.J. Mar. 24, 2025) ..........................................20

*In re Lucent Techs., Inc. Sec. Litig.*,
  217 F. Supp. 2d 529 (D.N.J. 2002)....................................................25

*In re Lumen Techs., Inc. Sec. Litig. II*,
  2025 WL 978229 (W.D. La. Mar. 14, 2025), *R. & R. adopted*,
  2025 WL 971748 (W.D. La. Mar. 31, 2025), *appeal pending*, No.
  25-30264 (5th Cir.) ..............................................................20, 21, 38

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)...........................................................................17

*Martin v. GNC Holdings, Inc.*,
  757 F. App'x 151 (3d Cir. 2018) .......................................................34

*McDermid v. Inovio Pharms., Inc.*,
  520 F. Supp. 3d 652 (E.D. Pa. 2021).............................................21, 23

*In re Mylan N.V. Sec. Litig.*,
  2023 WL 3539371 (W.D. Pa. May 18, 2023) ...................................40

iv

*In re Mylan N.V. Sec. Litig.*,
  2025 WL 1874621 (W.D. Pa. July 8, 2025) ............................................22, 39, 40

*In re Novo Nordisk Sec. Litig.*,
  2018 WL 3913912 (D.N.J. Aug. 16, 2018) .......................................................34

*Ortiz v. Canopy Growth Corp.*,
  537 F. Supp. 3d 621 (D.N.J. 2021) ...................................................................34

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) ................................................................30

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
  2021 WL 4864421 (N.D. Cal. Oct. 19, 2021) ...................................................37

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).........................................................................................28

*In re Teva Sec. Litig.*,
  671 F. Supp. 3d 147 (D. Conn. 2023)................................................................33

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015)................................................................31

*Weiner v. Quaker Oats Co.*,
  129 F.3d 310 (3d Cir. 1997) .............................................................................16

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023)..............................................................32

*Winer Fam. Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) .............................................................................21

*Wu v. GSX Techedu Inc.*,
  738 F. Supp. 3d 527 (D.N.J. 2024)..............................................................32, 33

**Other Authorities**

17 C.F.R. § 240.10b-5(b) ........................................................................................16

**PRELIMINARY STATEMENT**

In July 2023, *The Wall Street Journal* published a series of reports after an 18-month investigation revealing—to the surprise of investors, regulators, and public officials—that Verizon owns a vast web of obsolete telephone cables covered in toxic lead that it had abandoned in place across the country as it installed its new fiber optic network. The investigation revealed that the abandoned lead cables were leaching toxins into the surrounding environment. As investors absorbed the news and the resulting sprawling financial exposure, estimated in the billions of dollars, Verizon's stock price dropped materially.

Verizon historically provided landline phone services to customers using an extensive network of copper telephone cables inherited from the Bell System, with as much as 90% of this wiring sheathed in lead as of the 1950s. By the 2000s, Verizon was building a replacement network of fiber optic cables—branded as FiOS—to meet growing demand for high-speed wireless services. Between 2004 and 2015 alone, Verizon invested more than $25 billion to deploy its FiOS network.

During this broad conversion to FiOS, Defendants repeatedly assured investors that Verizon was "*eliminating legacy network elements*," "*tak[ing] out the old equipment, the old copper stuff*," and "*pull[ing] out the copper*," while touting the "*cost benefits and green benefits from removing some of the copper network*." These statements were buttressed by Verizon's CEO—who, while

1

claiming to be dedicated to environmental causes and "protect[ing] the planet for future generations," and helping write the United Nation's Sustainable Development Goals—falsely stated that Verizon took active steps to protect the environment and employees, including by recycling and responsibly managing its electronic waste, or "e-waste" and network equipment (including lead) and training employees on "***best practices and working safely***" when "splicing fiber" and "installing fiber."

At the time these statements were made, at least 81,000 miles of Verizon's legacy network in the Mid-Atlantic and Northeast U.S. were sheathed in an estimated 1.5 billion pounds of lead. And, contrary to Defendants' representations, Verizon was systematically abandoning this toxic infrastructure to decay in place when installing FiOS. This ***intentional corporate practice*** of leaving lead in place was unknown to the market until July 2023, when the WSJ revealed it, and constituted an enormous, undisclosed regulatory and financial risk for the Company.

In response to sharp regulator inquiries after the WSJ series, in 2023, Verizon ***admitted*** to its regular practice of conducting "***detailed analysis***" to determine "***[w]hether to remove legacy cables or leave them in place***." In other words, and contrary to its public statements that it was removing the legacy network, Verizon had knowingly and intentionally chosen to abandon toxic lead in U.S. communities. Verizon also admitted that, in New York, while it had deployed 81,750 miles of fiber optic cables, it had only removed 230 miles of copper cables since November 2020.

2

Verizon responded to the furor following the WSJ reports by claiming that the existence of lead telecom cables "has always been widely known," —but it did not, and could not, claim that the public had previously known of its pervasive abandonment of lead infrastructure.

Verizon's practice of "retiring" lead in place exposed frontline workers to severe health issues and communities and surrounding environments to harm, and implicated a variety of severe regulatory and financial risks. The scale of the issue is troublingly large. Verizon has admitted that at least 8,400 miles of its *aerial* cables (leaving aside its underground or submerged cables) are lead-sheathed—meaning that over 146 million pounds of lead hangs exposed above playgrounds and residential areas. Verizon has also admitted that it is now subject to government action that could require it to incur material expenses. The Environmental Protection Agency ("EPA") is conducting a Superfund investigation, the Department of Justice opened a civil inquiry, and multiple state agencies have launched investigations. Analysts estimate Verizon's removal costs at between *$1.48 billion and $14.3 billion*.

Faced with these facts, Defendants' Motion ("Mot.") attempts to cast Plaintiffs' Second Amended Complaint ("SAC")[1] as a mere reprisal of the

---

[1] Unless otherwise noted, cites to "¶" refer to paragraphs in the SAC, capitalized terms have the meanings given in the SAC, all emphasis is added, and internal punctuation, quotations and citations are omitted.

3

Consolidated Amended Complaint. It is not. In the SAC, Plaintiffs "connect their allegations of scienter and misrepresentation with statements made by . . . particular defendant[s]," as called for by the Court in its March 31, 2025 Order. *See* Dkt. No. 77 at 30. The SAC pleads that Defendants misrepresented material facts—e.g., that Verizon was abandoning toxic lead across the country—that rendered false and misleading their public statements to investors who were attempting to assess the merits of investing in Verizon. Defendants' statements—for example, that Verizon was "***eliminating legacy network elements***" and "***tak[ing] out the old equipment, the old copper stuff***"—were materially misleading half-truths (at best) for their failure to disclose that Verizon was abandoning in place thousands of miles of lead as it converted to FiOS, and the resulting exposures to financial and regulatory risk.

Defendants disclaim scienter, arguing they had not forecasted that Verizon would, in fact, incur specific liabilities from its lead cable practices. But it has long been the law that scienter is properly pled when defendants are aware of or recklessly disregard the facts that make their statements misleading. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268 (3d Cir. 2009). Here, Defendants have admitted that they "were aware of the lead-sheathed cables' existence" and told investors they were "eliminating," "taking out," "pulling out," and "removing" those cables. Defendants knew these statements were materially misleading and that Verizon had deliberately chosen to abandon its lead waste during its much-touted FiOS

4

conversion. Scienter is adequately alleged and Defendants' counter-inference is one that the Court cannot credit at the motion to dismiss stage.

## STATEMENT OF FACTS

I. **VERIZON'S BUSINESS AND THE IMPORTANCE OF THE FiOS CONVERSION**

Verizon is a holding company that provides "communications, information, and entertainment products and services." ¶ 61. Its Consumer Group provides wireline and wireless communications services over its FiOS network or its traditional copper-based network. *Id*. In fiscal year ("FY") 2022, the Consumer Group reported revenues of $103.5 billion, constituting approximately 76% of Verizon's consolidated revenues. *Id.*

Verizon is considered the pioneer of FiOS communications, and FiOS is critical to its brand and business. ¶¶ 62, 76. Verizon's widespread marketing campaigns throughout the 2000s made "FiOS" nearly synonymous with "Verizon." ¶¶ 59, 62. Between 2004 and 2015, Verizon invested more than $25 billion to deploy FiOS. ¶ 62. Defendants emphasized Verizon's "*enormous investment in fiber*," with its CEO Defendant Hans Vestberg stating during the Class Period that Verizon was "*going to expand as much as [it] c[ould] on FiOS . . . [Verizon's] really committed to it*." ¶ 63 (alterations added).

II. **DEFENDANTS MISLED INVESTORS ABOUT VERIZON'S EXTENSIVE LEAD CABLE NETWORK**

The launch of FiOS accelerated the obsolescence of Verizon's legacy copper

5

cable infrastructure. ¶ 62. As of the 1950s, roughly 90% of all telecommunications wiring was sheathed with lead. ¶ 73. However, the industry stopped using lead sheathing in the 1950s after the catastrophic health effects of lead exposure became undeniable. ¶¶ 94, 101-03. Numerous health organizations and government agencies have verified that there is *no safe level of lead in a human body*. ¶ 94 (conclusions of EPA, FDA, WHO, CDC, and AMA).

### A. Misrepresentations About Removing Copper Wires During Verizon's Transition to FiOS

During the Class Period, Verizon's senior executives repeatedly stated that as Verizon installed FiOS, it removed and eliminated the historical infrastructure that included lead-sheathed cables. *See* ¶¶ 253, 257, 261, 266, 271, 274, 278. Regarding the Company's FiOS transition, Defendants Vestberg, Matthew Ellis (CFO), and Anthony Skiadas (then-Principal Accounting Officer) claimed in Verizon's FY-2020 Form 10-K "that this new architecture will simplify operations by *eliminating legacy network elements*." ¶ 253.

Ellis spoke authoritatively about the FiOS transition, repeatedly claiming that Verizon was removing legacy copper infrastructure and realizing cost savings by doing so, including in response to analyst questions on that specific point. *See* ¶¶ 253, 257, 261, 266, 271. For example, during Verizon's October 20, 2021 earnings call, a Goldman Sachs analyst asked: "[A]re you going to be at the point where you can finally rip out all this legacy infrastructure?" Ellis replied: "***That's a***

6

*long-term goal for us. . . . [A]s you replace in a certain location copper with fiber, there's a good benefit from a cost standpoint*." ¶ 257; *see also* ¶¶ 261, 266 (stating that Verizon was "*replacing*" and "*pull[ing] out the copper*," and that there are "*cost benefits and green benefits from remov[al]*"); ¶ 271 (stating that "*you get cost savings . . . as you take copper out*").

Defendants Kyle Malady (Chief Technology Officer) and James Gowen (Chief Sustainability Officer) asserted similar half-truths, including: (i) Malady's statement that the FiOS transition "*allows us to take out the old equipment, the old copper stuff, and get people on new things*" (¶ 271); (ii) Gowen's statement that Verizon "*went through . . . the cost to pull that copper out*" during the FiOS transition (¶ 274); and (iii) Malady's statement that Verizon continued to have "a large landline presence" but that Verizon "*can use our wireless asset now to replace some of the old legacy copper*." ¶ 278.

### B. Misrepresentations About E-Waste Disposal Practices

To support their claims about responsibly removing legacy infrastructure during the FiOS transition, Defendants repeatedly assured investors that Verizon properly reused, recycled, and disposed of electronic waste and lead materials. ¶¶ 281, 285, 290. In each Class Period ESG report, Vestberg emphasized Verizon's environmental stewardship, telling investors that "*Our goal is to divert as much e-waste as possible from landfills by reusing or responsibly recycling materials*,"

7

defining "e-waste" as electronic network equipment, including lead, that had reached "the end of [its] useful life." ¶ 281. Vestberg further assured investors that "*We continue to work to reduce the environmental impact of our products through: . . . recycling, refurbishing and/or reusing our products*." ¶ 290. These environmental commitments were backed by specific data that Vestberg personally endorsed in Verizon's annual ESG reports. ¶ 285. In 2022, for example, he stated that "Verizon reused or recycled approximately 35.5 million pounds of e-waste," including "3.4 million pounds of lead-acid batteries." ¶ 285(c).

### C.    Misrepresentations About Commitment to Employee Safety

In ESG Reports, Vestberg also repeatedly affirmed Verizon's commitment to "*employee health and safety*" and "*maintaining a safe workplace*," including training employees on "*best practices and working safely*" while "*splicing fiber*" and "*installing fiber*." ¶¶ 293, 297.

### III.    DEFENDANTS CONCEALED MATERIAL FACTS THAT RENDERED THEIR STATEMENTS MISLEADING

The reality stood in stark contrast to Defendants' representations, as Defendants fraudulently concealed that: (i) rather than removing lead cables during the FiOS transition, Verizon *deliberately abandoned* lead cables in place; (ii) this abandonment generated *substantial costs related to Verizon's undisclosed network of abandoned lead cables*; (iii) Verizon was *knowingly failing* to protect workers from lead's dangers; and (iv) Verizon's lead cables were causing *known*

8

*contamination* because they were in a state of corrosion and disrepair.

> **A.    Verizon's Concerted Choice to Abandon Lead Cables in Place Has Been Admitted by Defendants and Is Corroborated by CW Accounts**

Verizon employed a top-down policy to abandon its lead cables in place during the FiOS transition. ¶ 76. In August 2023, Verizon told New York regulators that it had conducted a "*detailed analysis*" and knowingly decided "*[w]hether to remove legacy cables or leave them in place*." ¶ 211 (alterations in original). And in their motion to dismiss the Consolidated Amended Complaint (Dkt. No. 58-1 at 3, 7), Defendants admitted "[w]hen Verizon installs fiber-optic cable, it sometimes removes the copper cable (whether lead- or plastic-sheathed), *and sometimes leaves it in place*," and that they "were aware of the lead-sheathed cables' existence, but did not believe they presented a material problem." ¶¶ 254(a), 256(a). Verizon's post-Class Period admissions that it deliberately chose to abandon much of this lead infrastructure contrast materially with Defendants' representations that Verizon was "removing" and "replacing" legacy lead material from U.S. communities.

The accounts of several former Verizon employees vividly illustrate that Verizon's corporate preference was to abandon lead cables in place. *See* ¶¶ 79-87. For example, line workers were instructed to cap inoperable legacy cables and make corresponding notations to Verizon's engineering documents, to which Defendants had access. *Id.* (accounts of CW1, CW6, CW7, CW12, CW18, CW21, CW22,

9

CW23, and CW24). These "dead lead cables," sometimes overlaid with FiOS cable, were left to decay over time. ¶ 79. This practice spanned multiple states. *See* ¶ 254(f)(ix) (CW31, manager at the director level covering tri-state area, stating cost to remove lead cables was definitely a factor in decision to abandon them).

Verizon maintained records through proprietary databases noting every cable's location and installation year, and using alphanumeric codes *signifying the type of cable and its sheathing* (e.g., aluminum, lead, or plastic). ¶¶ 90-93 (accounts of CW1, CW3, CW6, CW10, CW12, CW17, CW22, CW26, and CW28). These detailed internal records further establish that Verizon knew the location and magnitude of its lead cable liability. *Id.*

Even when Verizon removed lead infrastructure, its disposal was negligently handled, contradicting public statements hailing Verizon's purported use of responsible e-waste practices. ¶¶ 89, 283(a)-(f). For example, CW14, a network technician from 2011 to 2022, reported: "all waste materials were placed indiscriminately into a dumpster at the garage for the job site." ¶ 283(a); *see also* ¶ 283(d) (CW29 stating that, despite work with lead cables, "all waste from a repair or removal site went into the same dumpster"). In allegations new to the SAC, CW30, a veteran Verizon cable splicer, revealed that Verizon's upper management removed lead disposal bins around 2008 based upon "a lie" that lead cable work had ended and lead recycling was no longer necessary. ¶ 283(f).

10

### B.    Verizon's Lead Cable Network and Related Liabilities Are Massive

The SAC pleads the magnitude of Verizon's lead cable network and estimated remediation costs. With respect to its physical scope, in July 2023, Defendant Skiadas revealed that Verizon's records were "incomplete as to exactly how much of the cable on our network has lead sheathing" but that Verizon's legacy copper network (below and above ground) "is comprised of" approximately "*540,000 miles of cable*." ¶ 210. Based on estimates that approximately 15% to 20% of these legacy cables are lead sheathed, Verizon owns *at least 81,000 miles of lead cables* in its wireline infrastructure. ¶ 74. In March 2025, Skiadas confirmed that Verizon had approximately *8,400 miles of above-ground lead-cables* in its network (leaving aside its underground or submerged legacy cable), which represents 3% of its above-ground cables and equates to over *146 million pounds of lead*. ¶ 75.

The cost to remove and remediate Verizon's recently-revealed lead infrastructure is estimated in the *billions* of dollars. ¶¶ 224-33. In response to the WSJ reports, research firm New Street Research estimated that Verizon's lead cleanup would cost *$5.2 billion*. ¶ 231. Using other estimates that removal would cost $33.43 per foot, it would cost Verizon *at least $1.48 billion* to remove *just its aerial* lead-sheathed cables, and approximately *$14.3 billion* to remove and remediate its lead-sheathed cables that are aerial, underground and underwater. ¶¶ 227, 229. Defendants concealed this potential material cost from investors

11

throughout the Class Period, leading investors to believe that Verizon was incurring these lead remediation and removal costs in the ordinary course as it converted to FiOS.

### C.   Verizon's Systemic Failure to Protect Workers from Lead Exposure

In contrast to Defendants' statements, Verizon knowingly exposed employees to lead without proper protection or warning. ¶¶ 100, 120. Numerous CWs who worked with Verizon's lead infrastructure confirmed that Verizon systemically failed to provide personal protective equipment ("PPE")[2] or training on the safe handling of lead.[3] The SAC provides many examples of Verizon's egregious disregard for worker safety. *See* ¶¶ 100, 120 (reports of eating lunch in Tyvek suits covered with lead dust (CW3); frequent toxic air quality alarms (CW3); lead dust blowing into uncovered faces (CW10); failure to test for lead exposure (CW10, CW22); failure to provide masks (CW22)). New witness accounts attest to Verizon's lack of training and safety protocols related to working with lead. ¶ 295(g)(xv), (xiv) (meetings where director level officials discussed need for lead training (CW32); failure to provide any training on lead safety (CW31)).

Verizon's own testing revealed the consequences of its disregard for worker

---

[2] These accounts include: CW2, CW6, CW7, CW8, CW9, CW10, CW14, CW20, CW21, CW22, CW26, CW29, CW31, and CW32. ¶¶ 121, 295(g)(xvi), 299(b)(i).
[3] These accounts include: CW2, CW3, CW4, CW8, CW9, CW14, CW20, CW21, CW26, CW27, and CW31. ¶¶ 121, 295(g)(xvii), 299(b)(ii).

safety. ¶¶ 101-03, 156-61, 296. From 2007 to 2016, Verizon tested 208 employees for lead exposure. ¶ 156. The results were alarming: ***40% had blood-lead levels exceeding CDC guidelines***. *Id*. Verizon informed the CWA, which, in turn, commissioned Dr. Rabeea Khan of Mount Sinai to investigate further. ¶ 158. Dr. Khan's study of 20 Verizon employees revealed ***60%***, mostly cable splicers, had elevated bone-lead levels indicating chronic exposure. ¶¶ 159-61.

### D.    Verizon's Lead Cables Were Contaminating the Environment

In contrast to their statements that the FiOS transition promoted cost or green benefits to Verizon, Defendants knew or recklessly ignored that Verizon's abandoned lead cables were leaching toxic contaminants into the environment. ¶¶ 1, 190-207. For over a decade, internal industry communications have warned that deteriorating lead cables were leaching lead into surrounding areas. ¶¶ 136-46. Verizon attended and presented at industry meetings hosted by the Environmental Health and Safety Communications Panel, which highlighted that "soils retained between 83 and 98 percent of the released lead within 2 inches" of cables. *Id.*

The Communications Workers of America Union ("CWA")—which represents about 30,000 Verizon workers (¶ 97)—accused Verizon of neglecting degrading cables in formal proceedings (¶¶ 147-55). Citing cables that were in an "appalling state of disrepair" and "pose a safety hazard to utility employees and the public," the CWA petitioned regulators in six states and the District of Columbia to

investigate Verizon's deteriorating network of lead-sheathed cables. ¶¶ 147-49. The CWA focused on lead risks to both workers and local communities. ¶ 150. After negotiations, Verizon entered into a settlement with the CWA and the Pennsylvania Offices of Consumer Advocate and Small Business Advocate that required it to review and replace damaged legacy cables in Pennsylvania. ¶ 155.

Residents of Coal Center, PA also began demanding around July 2022 that Verizon remove one mile of lead cable running through the town which was causing elevated lead levels in the nearby soil. ¶¶ 186-89 (lead levels were 7.5 times EPA recommended threshold). Private litigants also sued Verizon's competitors to remove lead-sheathed cables that were causing environmental harm. ¶¶ 174-85.

## IV. THE WSJ'S REVELATIONS SHOCKED THE PUBLIC INCLUDING VERIZON INVESTORS

In July 2023, the WSJ published its series of investigative reports detailing the telecommunications industry's (including Verizon's) use and abandonment of lead-sheathed cables in the U.S. The WSJ's 18-month investigation uncovered thousands of miles of lead-sheathed cables around the country, including near homes, playgrounds and parks (¶ 239); environmental contamination near lead-sheathed cable sites (*id.*); and industry workers, including Verizon line workers, suffering adverse health effects from lead toxicity (¶¶ 241-45).

As a result of the WSJ's revelations, Verizon's stock price suffered a pronounced decline. The market's reaction evinces the novelty of both the

information revealed in the WSJ reports and Verizon's subsequent disclosures about its extensive lead cable network and purported measures to remove and replace its cables. Verizon's stock price fell from $35.90 (price at market close on July 7, 2023) to $31.46 (price at market close on July 27, 2023, the first trading day after the last WSJ article was published). ¶ 238. This overall decline of 12.4% wiped out approximately $18.6 billion in market capitalization. *Id*.

The reaction of alarmed federal and state agencies, which initiated investigations into telecommunications companies' ownership and abandonment of lead cables in the wake of the exposé, underscore that the facts reported by the WSJ had not been publicly known before. ¶¶ 212-18. Through a continuing investigation, the EPA confirmed in January 2024 that lead was leaching into the environment and lead levels were above its safety guidelines for children in 41% of its sample sites. ¶ 214. Additionally, congressional officials demanded that USTelecom and its member companies, including Verizon, take responsibility for and remove lead-sheathed cables that are harming the health and safety of U.S. communities. ¶¶ 219-23. Numerous investigations launched after the WSJ reports remain ongoing.

After the WSJ's exposé, Verizon belatedly acknowledged its vast network of lead, much of which it had abandoned in place. Its October 2023 10-Q added a new risk disclosure admitting that lead cables "may present public health or environmental risks" that could trigger "government investigations, legislative or

regulatory actions, litigation, penalties and other liability" with costs that "cannot be reasonably estimated at this time but could be material." ¶ 237.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint meets this standard if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court considers the entire complaint, takes factual allegations as true, and construes them "in the light most favorable to plaintiffs." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997).

## ARGUMENT

**I.   THE SAC ALLEGES MATERIALLY FALSE OR MISLEADING STATEMENTS**

Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b). The pleading requirements of Rule 9(b) and the PSLRA are satisfied where a complaint "describe[s] the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,

16

70 F.4th 668, 680 (3d Cir. 2023); *Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at *7 (D.N.J. Sep. 23, 2024) (denying motion to dismiss where amended complaint "clearly and in detail sets forth the alleged materially false and misleading statements . . . and provides explanations as to why those statements are misleading"). Falsity allegations must "support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). "Half-truths," which "state the truth only so far as it goes, while omitting critical qualifying information" are actionable under Section 10(b). *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).

### A. Defendants Materially Misled Investors About Removing and Replacing Lead Cables During the FiOS Transition

Throughout the Class Period, Defendants misled investors about Verizon's purported elimination of legacy lead infrastructure during its transition to FiOS. *See* ¶¶ 253-80. For example, Verizon's FY-2020 Form 10-K stated that that FiOS "***will simplify operations by eliminating legacy network elements***." ¶ 253. Ellis also stated during an earnings call that "***as you replace in a certain location copper with fiber, there's a good benefit from a cost standpoint***" (¶ 257) and reiterated during an investor conference that Verizon was "***replacing***" and "***pull[ing] out the copper***" with "***cost benefits and green benefits from remov[al]***." ¶¶ 261, 266. This was a constant refrain. Malady stated that the FiOS transition "***allows us to take out the***

17

*old equipment, the old copper stuff, and get people on new things*" while generating "*cost savings . . . as you take copper out*." ¶ 271. Gowen also assured investors that, during the FiOS conversion, Verizon "*went through . . . the cost to pull that copper out.*" ¶ 274.

Responding to the Court's March 31, 2025 Order (Dkt. No. 77 at 13), the SAC specifically sets forth how each of these misstatements by omission was materially misleading when made. *See* ¶¶ 254-55, 258-59, 262-63, 267-69, 272, 275-76, 279 (providing particularized basis of falsity for Statement Nos. 1-7); *see also Prudential Fin., Inc.*, 70 F.4th at 680 (Rule 9(b) and PSLRA pleading requirements met when complaint pleads "the basis for the statement's falsity"); *Olafsson*, 2024 WL 4263211, at *7 (sustaining complaint that set forth false and misleading statements and provided explanations of why they were misleading).

Defendants' statements about "eliminating" and "remov[ing]" legacy infrastructure were not true; Verizon was, in fact, abandoning much of its lead infrastructure in place when installing FiOS. ¶ 254. Defendants have *admitted* to this practice, telling New York regulators in August 2023 that the Company conducted a "*detailed analysis*" when determining "*[w]hether to remove legacy cables or leave them in place*." ¶ 211 (alterations in original). Former employees corroborate Verizon's routine abandonment of lead cables. ¶¶ 79-88. Far from contesting this practice, Defendants acknowledge their intentional decision to "*sometimes leave[]*

18

*it in place*" when installing FiOS. ¶ 254(a) (quoting Dkt. No. 58-1 at 7).

Defendants' references to "cost efficien[cies]" associated with the FiOS transition are materially misleading, because they concealed the massive potential liability resulting from abandoning a legacy toxic infrastructure during the course of the conversion. *See, e.g.*, ¶ 255. The SAC alleges the materiality of this omission, detailing for example: (i) that Verizon owns an estimated *81,000 miles* of lead cables in its wireline infrastructure (¶ 224); and (ii) that after the WSJ reports, industry analysts and experts placed Verizon's cost to remove and remediate its lead infrastructure *in the billions of dollars*, including estimates by New Street ($5.2 billion) and Evercore ($2.1 billion) (¶¶ 230-33).

Based on these facts, Defendants' statements "repeatedly tout[ing] that their initiatives for retiring, replacing, or reclaiming copper wireline would help reduce [Verizon]'s overall cost burden" are actionable. *In re AT&T Inc. Sec. Litig.*, 2025 WL 1685840, at *9 (N.D. Tex. June 16, 2025) (sustaining similar statements under similar circumstances); *see also In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *10 (D.N.J. Sep. 5, 2024) (company's statements about "the need to safeguard customers' assets" failed to specify all known risks, including "the bankruptcy risk to customers' assets").

**Defendants' Statements Created a Duty to Disclose**. Defendants argue they had no duty to disclose any information about lead cables (Mot. at 30-31), but this

19

argument fails because Defendants themselves created such a duty. Defendants "may not describe a favorable picture of [a] material issue without including the details that would have presented a complete and less favorable one." *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022).

Here, Verizon presented a favorable picture of its FiOS transition while failing to disclose its widespread practice of abandoning lead-sheathed infrastructure—a material fact directly relevant to the transition. This omission rendered Defendants' statements misleading, even without explicitly mentioning lead (Mot. at 31). *See In re Kenvue Inc. Sec. Litig.*, 2025 WL 889640, at *11 (D.N.J. Mar. 24, 2025) (holding statements misleading and stating "[i]t is immaterial that the statements did not specifically mention" the product by name); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) (statements held actionable "although they did not specifically reference the Talc Products"). Moreover, "whether disclosure was required is best left to the trier of fact," making Defendants' argument inappropriate for resolution on a motion to dismiss. *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *15 (D.N.J. Dec. 15, 2015).

Defendants' reliance on *Lumen* is misplaced (Mot. at 30-31). *In re Lumen Techs., Inc. Sec. Litig. II*, 2025 WL 978229, at *23 (W.D. La. Mar. 14, 2025), *R. & R. adopted*, 2025 WL 971748 (W.D. La. Mar. 31, 2025), *appeal pending*, No.

20

25-30264 (5th Cir.). Unlike here, in *Lumen*, the defendants made no affirmative representation about removing or replacing legacy infrastructure. *See id.* at *25-32 (discussing fiber-related statements). Because the defendants made no affirmative representation about removing legacy infrastructure, they had no duty to disclose details about lead removal or abandonment. Defendants' citation to *Winer Family Trust v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) (Mot. at 29-30) is similarly distinguishable. *See id.* at 324, 330 (statements about estimating costs of new manufacturing facility, "between $10.5 million and $15 million," did not create duty to disclose that the company was not handling renovation internally). In contrast to *Lumen* and *Winer*, Defendants' statements here addressed the very subject matter at issue—namely, the removal of the obsolete legacy infrastructure.

**How Investors Interpreted the Statements Is a Fact Question**. Defendants next argue that they did not state that Verizon removed *all* lead-sheathed cables, such that, by extension, they did not "materially mislead the market into thinking that no lead-sheathed cables remained in place" (Mot. at 31-32). But Defendants' argument turns on "how investors . . . interpreted [Defendants'] statements," which is a "question[] of fact inappropriate for resolution at the motion to dismiss stage of the litigation." *McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 662 (E.D. Pa. 2021). And, the SAC alleges how a reasonable investor would have interpreted Defendants' statements to mean that Verizon was removing legacy infrastructure in

21

the ordinary course of the FiOS transition rather than routinely abandoning toxic materials in place. Defendants' alternative reading of their alleged misstatements and how the market understood them also clashes with Plaintiffs' allegations of market surprise at the revelation of Verizon's massive lead exposure, ¶¶ 240, 246, 248, and cannot be credited at this stage. *See Coinbase*, 2024 WL 4053009, at \*10 ("the materiality of this information was evidenced by the disclosure's significant impact on the market."). !

Defendants' argument also misconstrues the allegations. The SAC does not allege that investors were misled about the mere existence of lead, but rather by Defendants' undisclosed, now-admitted practice of routinely abandoning lead during the FiOS transition. *See, e.g.*, ¶¶ 254-55. Defendants' suggestion that lead's use "was well known and publicly observable" (Mot. at 32) is therefore beside the point. Moreover, consistent with Plaintiffs' allegations, whatever the understanding or "inference that the market may have drawn about" Verizon's historic use of lead cables may once have been, Defendants' alleged misrepresentations about removing and eliminating legacy infrastructure "wiped the slate clean." *In re Mylan N.V. Sec. Litig.*, 2025 WL 1874621, at \*6 (W.D. Pa. July 8, 2025).

**The Billions of Dollars in Potential Costs Are Material**. Defendants argue that the SAC fails to compare "the supposed costs of removal or environmental downsides to the undisputed financial and environmental benefits of the transition."

Mot. at 33. This is simply not true. The SAC provides numerous estimates by industry experts related to remediation and removal that place Verizon's costs *in the billions*. ¶¶ 226-33. Moreover, Plaintiffs need not "attempt to quantify [the] savings" associated with FiOS (Mot. at 33) because by touting cost savings from legacy infrastructure removal, Defendants implicitly suggested that Verizon handled any remediation cost associated with the FiOS transition in the ordinary course when installing new cable, when this was untrue. *See McDermid*, 520 F. Supp. 3d at 662.[4]

## B.   Defendants Materially Misled Investors About E-Waste Recycling Practices

Defendants' statements that they responsibly reused or recycled e-waste and properly disposed of lead batteries were also false and misleading. ¶¶ 281, 285, 290. For example, in Verizon's annual ESG Reports, Vestberg stated, "***Our goal is to divert as much e-waste as possible from landfills by reusing or responsibly recycling materials***" which included "***network equipment*** and batteries, that are at the end of their useful life" including those made of lead. ¶ 281. Vestberg also stated, "***We continue to work to reduce the environmental impact of our products through: . . . recycling, refurbishing and/or reusing our products, including the***

---

[4] Defendants challenge the SAC's estimates as "speculative" (Mot. at 33), but this gets them nowhere. Courts routinely credit such estimates, particularly where, as here, they are prepared by knowledgeable professionals using detailed analysis. *See, e.g.*, *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 930-32 (9th Cir. 2023) (revenue estimates were sufficiently reliable and supported falsity).

*responsible management of out-of-service lead batteries*." ¶ 290. Vestberg backed up these statements by citing specific data about Verizon's e-waste and lead-acid battery recycling and reuse figures. ¶ 285.

Plaintiffs demonstrate how investors were misled (Dkt. No. 77 at 20): Verizon was not recycling its "network equipment," which included lead-sheathed copper cables, but instead leaving lead-sheathed cables in place, at times simply laying fiber optic cables on top of them. ¶¶ 282-83, 286-88, 291. In rare instances when the lead-sheathed cables were removed, they were improperly disposed-of. ¶¶ 283(a)-(f) (e.g., CW8 and CW29 recounting the disposal of lead cables in garbage bins with non-lead materials).

Defendants' statements "are plausibly alleged to be false" because Verizon would "vacate wirelines (by ceasing to use them) but instead of removing lead (a regulated material)," Verizon "would simply leave the wires in place while knowing they were likely to leach lead into the environment." *AT&T*, 2025 WL 1685840, at *11 (deeming actionable statements that "[h]azardous waste is disposed in landfills, incinerated and recycled"). In other words, Defendants' statements "emphasizing the strength of [their e-waste recycling]" are actionable because "those operations [we]re in reality deficient." *Hall*, 2019 WL 7207491, at *16.

**Defendants' Statements Created a Duty to Disclose**. Defendants again argue that they had no duty to disclose Verizon's abandoning lead cables in place

24

because "[n]one of these alleged misstatements specifically mention" lead cables. Mot. at 37. But, as discussed above, Defendants cannot provide an incomplete picture of material facts, *see supra* at pp. 19-21, which they did by stating they "divert[ed] . . . e-waste" (¶ 281) and were "reduc[ing] the environmental impact of [their] products" (¶ 290), when in reality, they concertedly abandoned lead in place across U.S. communities. ¶¶ 76-89. To this end, Defendants again mischaracterize the omitted facts. Investors were not misled about "whether Verizon owns lead-sheathed cables" (Mot. at 37). Investors were misled because Verizon ***deliberately abandoned*** lead infrastructure in place, contradicting its claim to be recycling and disposing of retired e-waste. *Coinbase*, 2024 WL 4053009, at *10 (rejecting the defendants' attempt to reframe the plaintiff's theory).

**Defendants' Statements Were Material**. Defendants argue the challenged statements concerning Verizon's definition of e-waste and recycling efforts (*see* ¶¶ 281, 290) are puffery, Mot. at 38, but these arguments fail because the Court has already rejected this characterization, holding that these statements are "material." Dkt. No. 77 at 20 (citing *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 543 (D.N.J. 2002)). Moreover, Defendants' statements are not puffery because "[r]ather than acknowledge internal problems" regarding abandoning lead in place instead of recycling or reusing it, "Defendants made statements suggesting that no such problems existed." *Lucent*, 217 F. Supp. 2d at 556; *see also Hall*, 2019 WL

25

7207491, at *16 (company's statement that it was "focusing on research and development" held material when it was "knowingly hiding" issue). That Defendants reported statistics of their disposal of e-waste other than lead-sheathed wires (¶ 285) reinforces the materiality of their e-waste statements.[5]

## C.    Defendants Materially Misled Investors About Employee Health and Safety

Throughout the Class Period, Defendants also touted Verizon's commitment to employee health and safety. In each of Verizon's Class Period annual ESG Reports, Vestberg represented that "We *regularly update our employee health and safety programs*," including those regarding "*splicing fiber*" and "*installing fiber*." ¶ 293. Similarly, Vestberg claimed "*We are committed to maintaining a safe workplace and environmentally responsible work practices*," and that "Verizon is committed to protecting the environment and the safety and health of its employees . . . *beyond maintaining compliance with laws, regulations and policies*." ¶ 297.

These statements were materially false and misleading. The SAC establishes through nearly a dozen CW accounts that Verizon systemically failed to protect workers, including by failing to provide PPE, or any training specific to the safe-

---

[5] Defendants' other arguments as to the recycling statistics (Mot. at 38-39) "inappropriately focus on the literal accuracy of the statements instead of whether the statements accurately informed rather than misled prospective buyers." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *16 (E.D. Pa. Mar. 25, 2020). Even if the statistics were literally correct, they misled investors by omitting that Verizon was abandoning millions of pounds of lead cable. ¶¶286-87.

26

handling of lead.[6] The SAC further includes new CW allegations that underscore the pervasiveness of Verizon's dereliction of responsibility—including new facts about meetings where Company officials, including at the director level, discussed the need for, but absence of, training, safety protocols, and the exposure risks of working with lead. ¶¶ 295(g)(xiv)-(xv), 299(b)(i)-(ii) (accounts of CW31 and CW32).

**Defendants' Statements Were Misleading Half-Truths**. The Court previously held that Defendants' statement that they "*regularly update our employee health and safety programs*," including related to "*splicing* . . . and *installing fiber*" (¶ 293), are "more specific because they refer to the steps Verizon used to advance its goals." See Dkt. No. 77 at 18 (citing *Hall*, 2019 WL 7207491, at *16). Given the specificity of these statements, Defendants' argument that the statements were not materially misleading (Mot. at 34-36) fail because Defendants were "bound to speak truthfully" and disclose all material facts about Verizon's lead cable infrastructure and the hazardous conditions to which the Company subjected its employees. *Coinbase*, 2024 WL 4053009, at *10.

**Defendants' Statements Are Not Puffery**. Defendants argue that the statement emphasizing Verizon's "commit[ment] to maintaining a safe workplace and environmentally responsible work practices" was puffery. Mot. at 34 (quoting

---

[6] These accounts include: CW2, CW3, CW4, CW8, CW9, CW14, CW20, CW21, CW26, CW27, and CW31. ¶¶ 121, 295(g)(xvii), 299(b)(ii).

¶ 297). But these statements were "specific assertions of the priority of safety" or "implied an underlying prioritization of resources and attention" when in fact critical safety operations were deficient—which is not puffery. *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 218-19 (E.D. Pa. 2021).

## II.    THE SAC PLEADS A STRONG INFERENCE OF SCIENTER

In assessing scienter, "courts must . . . accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). The scienter inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. Rather, the question is "whether, accepting the whole factual picture painted by the [SAC], it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.

### A.    Defendants Knew or Recklessly Disregarded Material Risks Related to Verizon's Lead Cable Network

The SAC adequately pleads scienter by alleging that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Coinbase*, 2024 WL 4053009, at *15.

**Corporate Admissions**. Defendants admit that they *knew* about Verizon's practice of abandoning lead cables in place, and about Verizon's continued

28

ownership of lead infrastructure. ¶¶ 211, 256(a). Defendants wrote to New York regulators in August 2023 that it "has always been widely known that lead was used to protect some cables," and further conceded in this action that they "***were aware of the lead-sheathed cables' existence***." *Id*. Crucially, Verizon has also acknowledged that routinely leaving lead infrastructure in place was a calculated corporate decision and practice, telling New York regulators that the Company conducted a "detailed analysis" when determining "***[w]hether to remove legacy cables or leave them in place***." ¶ 211; *see also* ¶¶ 254(a), 256(a).

Courts have held that such post-class period admissions of knowledge and intentional conduct are "smoking-gun" type scienter allegations. *See Bucks Cty. Emps. Ret. Sys. v. Norfolk S. Corp.*, 2025 WL 897540, at *9 (N.D. Ga. Mar. 24, 2025) (finding scienter met where CEO "speaking under oath in the months after" a high-profile train derailment "stated that Norfolk's pre-derailment operational posture was a "near-term focus . . . *solely on profits*") (emphasis in original); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020) ("The statement here satisfies that standard and constitutes an 'I knew it all along' type of admission."). As in *Norfolk*, Defendants' concession that they knew about the existence of Verizon's lead cables and intentionally abandoned them in place during the FiOS transition "sounds much like an admission" that Defendants' statements about removing and eliminating legacy infrastructure "were knowingly false." 2025

29

WL 897540, at *9; *see also Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1262 (10th Cir. 2022) (finding scienter where CEO "never claimed he was previously unaware of the shortage" and rejecting defendants' argument that this admission pertained only to "a hindsight review").

**Defendants' Public Assurances**. Defendants' own statements—"the most powerful evidence of scienter," *Avaya*, 564 F.3d at 269—also show each Defendant's in-depth knowledge of the material risks posed by Verizon's abandoned lead cable network and their deliberate concealment of those risks through misleading public assurances. *See City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *14 (D.N.J. June 28, 2024) (scienter pled where executives "spoke frequently about how involved they were" in company operations).

**Vestberg** stated during the Class Period that Verizon was "really committed" to "expand[ing] . . . FiOS" (¶ 63) and that, in expanding FiOS, Verizon was "eliminating legacy network elements" (¶ 253), demonstrating his deep involvement in the infrastructure transition that required decisions about disposing of legacy lead cables. *See SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (scienter alleged where "officers were speaking as authoritative sources who possessed the information to support their statements"). Moreover, Vestberg's detailed statements about e-waste recycling practices, including his personal endorsement of precise figures documenting the millions of pounds of e-waste the

30

Company recycled or reused each year (¶ 285), establish that despite possessing granular knowledge of Verizon's actual disposal practices, Vestberg selectively concealed that Verizon was abandoning in place millions of pounds of lead e-waste.

**Ellis** repeatedly and authoritatively spoke about the FiOS transition during earnings calls and investor presentations, claiming again and again that Verizon was removing legacy infrastructure and realizing cost savings by doing so. ¶¶ 253, 257, 261, 266, 271; *see also* ¶ 256(b) (stating Verizon had made "good progress" in terms of "bringing fiber into the footprint and not being 100% copper"). When a Goldman Sachs analyst specifically asked whether Verizon could "finally rip out all this legacy infrastructure?" Ellis responded definitively about the "good benefit from a cost standpoint" of "replac[ing]" copper with fiber. ¶ 257. This exchange—and Ellis's consistent messaging across multiple investor events about "pulling out the copper" and realizing "green benefits from remov[al]" (¶¶ 261, 266, 271)— constitutes "powerful evidence" of his scienter. *See Avaya*, 564 F.3d at 270; *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("[M]aybe the most powerful evidence of scienter is the content and context of the statements made by [defendants], which were made in response to . . . analysts' questions.").

**Malady**, as Chief Technology Officer, spoke with technical authority about Verizon's ability to "take out the old equipment, the old copper stuff" and the

resulting cost savings, while **Gowen**, as Chief Sustainability Officer, assured investors that Verizon had "went through . . . the cost to pull that copper out"—suggesting their first-hand knowledge of the infrastructure transition's financial impacts. ¶¶ 271, 274. **Skiadas** joined the other executives in SEC filings claiming the FiOS architecture would "simplify operations by eliminating legacy network elements." ¶ 253.

**Defendants' Access to Information**. Defendants' "access to information that contradict[ed] their statements" further supports an inference of scienter. *See In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005). The Individual Defendants had access to Verizon's proprietary network of engineering blueprints, which were available in both electronic and hard copy form, and provided minute, street-level detail on the location of every lead-sheathed telephone cable—*live and abandoned*—in Verizon's network. ¶¶ 90-93; *see Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 883-85 (N.D. Cal. 2023) (finding scienter where CW statements established executives' access to databases containing customer data). These were the cables the Defendants repeatedly discussed "replacing," "removing," and "retiring," to Verizon's purported financial and green benefit.

**Magnitude of Financial Impact**. The massive scope of Verizon's potential liability also supports an inference of scienter. *See Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 563, 564 (D.N.J. 2024) (in assessing scienter, courts examine whether

32

misstatements "are especially large" because management is "more likely to be focused on . . . any serious, large-scale problems that are eating at the company"). Here, the SAC alleges that (i) Verizon owns an estimated **81,000 miles** of lead cables in its wireline infrastructure (¶ 74), with Skiadas confirming Verizon's ownership of at least **8,400 miles of above-ground lead cables alone** (¶ 75); and (ii) the consensus among analysts and experts places Verizon's cost to remove and remediate this lead infrastructure **in the billions of dollars** (¶¶ 226-33). That analysts could "rapid[ly] discover[]" Verizon's estimated remediation costs within weeks of the WSJ reports (¶¶ 230-31) further supports the scienter inference because it supports Defendants' recklessness. *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 210 (D. Conn. 2023).

**Core Segment**. Verizon's FiOS transition is a "critical part[] of [the] company's operations," *GSX Techedu Inc.*, 738 F. Supp. 3d at 563, that involved billions in capital expenditures, as described by Vestberg as an "enormous investment in fiber." ¶ 63.[7] Based on the FiOS transition's core importance, and coupled with the other scienter facts, "knowledge of the fraud may be imputed to the individual defendants." *Coinbase*, 2024 WL 4053009, at *16 (quoting *In re Cell Pathways, Inc., Sec. Litig.*, 2000 WL 805221, at *7 (E.D. Pa. June 20, 2000)).[8]

---

[7] Defendants' assertion that the lead-sheathed cable issue is unrelated to a core operation because the cables "are believed to be a small portion of [its] legacy network" (Mot. at 24) misses the point that such cables were routinely abandoned during Verizon's flagship FiOS expansion, a core operation.

[8] The reputational risk associated with health and environmental harms from lead

33

## B.    Compensation-Based Motive Further Supports Scienter

The "absence of a motive allegation is not fatal" when the overall factual context supports fraudulent intent. *Avaya*, 564 F.3d at 277. Nevertheless, the SAC alleges that Defendants were incentivized to conceal information that would have impeded their ability to achieve the performance targets at the heart of their incentive compensation plans. ¶¶ 329-33. For example, removing Verizon's lead cables would have seriously diminished Verizon's adjusted operating income in light of the $14.3 billion estimated price tag (¶¶ 227, 229), making it unlikely that these executives would have received their incentive awards. These allegations support the scienter inference.[9] *See In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *8 (D.N.J. Aug. 16, 2018) (scienter inference met based on specific facts as to the significance of the defendants' incentive compensation as compared to their normal salary); *cf. Coinbase*, 2024 WL 4053009, at *2 (motivation to inflate stock price to unlock

---

also belies claims that Defendants were somehow unaware of Verizon's exposures to those harms. *Becton*, 620 F. Supp. 3d at 196 (issues with "products that present substantial reputational risk may suffice" to plead scienter based on core operations doctrine). *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018) (Mot. at 24) is distinguishable because there, unlike here, the defendants did not admit to their knowledge of the omitted information—the existence of banned substances in the company's products. *Id.* at 154.

[9] Defendants' argument that they increased their stock holdings (Mot. at 17-18) does not undermine scienter because this is not a case—as in Defendants' authorities— where Defendants knew when bad news would be revealed. *See, e.g., Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 632 (D.N.J. 2021) (truth about demand would be revealed in forthcoming earnings results). Defendants could have conceivably carried out this scheme indefinitely without detection.

shares supported scienter inference).

### C.    The SAC Adequately Pleads Verizon's Scienter

The SAC adequately alleges Verizon's scienter. *First*, the Court may impute each Individual Defendant's scienter, addressed above, to Verizon, because each is a "high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *32 (D.N.J. Aug. 8, 2018).

*Second*, the Court may also find Verizon's scienter based on the "pervasiveness of the fraud, the conscious misbehavior of the particular corporate employees, and the complicity of the corporate entities. . . ." *Id.* (citing *In re Marsh & McLellan Co., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006)); *see Lewandowski v. TAL Education Group*, 2:23-cv-1769-MEF, Dkt. No. 52 at 44:2-11 (D.N.J. Dec. 27, 2024) (sustaining complaint on corporate scienter grounds because "this was such a big part of their business," and "the company could not have missed [what] was not being done"). Under this theory, the Court does not need to find that any of the Individual Defendants acted with scienter to hold that the corporate entity acted with fraudulent intent. *See Lewandowski*, Dkt. No. 52 at 44:12-14.

Here, Verizon's scheme to abandon lead cables in place and deceive investors about the concomitant risks "did not involve a limited group of rogue employees perpetuating fraud and concealing it from corporate management, but instead was a

35

pervasive operation extending from senior management itself." *Cognizant*, 2018 WL 3772675, at *33. The SAC pleads myriad ways that Verizon employees learned of the detrimental impact and material risks associated with lead cables, including that Verizon employees participated in industry conferences during which they presented on the harms of lead cables, ¶¶ 130-46; that the CWA filed grievances with regulators about the harms of lead cables, ¶¶ 147-155; that Verizon received blood sampling demonstrating high lead levels in cableworkers' blood, ¶¶ 156-162; that Verizon employees internally complained about lead exposure, ¶¶ 163-167; that Verizon filed RCRA notices about lead infrastructure, ¶¶ 168-172; and that AT&T was sued on multiple occasions for its abandonment of lead cables, ¶¶ 173-185.

### D. Defendants' Nonfraudulent Inference Is Less Compelling than Plaintiffs' Fraudulent Inference

"[I]nference is not arithmetic. The inferential significance of any single allegation can be determined only by reference to all other allegations." *Avaya*, 564 F.3d at 273. The court assesses scienter "with a practical and common-sense perspective." *Id.* at 272-73. The SAC alleges Defendants knew that: (i) Verizon's wireline network was laden with lead; (ii) Verizon concertedly abandoned in place its toxic lead-sheathed infrastructure during the FiOS transition; and (iii) Verizon was not, contrary to their Defendants' public statements, removing legacy infrastructure in the transition process to FiOS. These facts present a "cogent" inference of fraud. *Id.* at 267.

36

In contrast, Defendants argue that "the obvious" inference to be drawn is that "Defendants, like the public and the telecommunications industry at large, were aware of the lead-sheathed cables' existence, but did not believe they presented a material problem, let alone a material problem not already priced in to Verizon's stock." Mot. at 2. This argument is neither obvious nor compelling.

*First*, the market's reaction to the WSJ revelations—a 12.4% stock price decline erasing billions in market value (¶ 238)—refutes any claim that all material lead cable risks were already known. Instead, the magnitude of this reaction raises an "inference that Defendants knew their statements were misleading, or were deliberately reckless to the possibility." *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *5 (N.D. Cal. Oct. 19, 2021).

*Second*, Defendants' proposed inference ignores their own admissions that they conducted "***detailed analysis***" about "***[w]hether to remove legacy cables or leave them in place***" (¶ 211). Because these admissions establish knowledge, Defendants' argument that there is no "document, meeting, or conversation that contradicted [the] statement[s]" (Mot. at 15) misses the point—and is directly contrary to Third Circuit precedent. *See Avaya*, 564 F.3d at 268-69 (scienter pled even though plaintiffs "d[id] not point to any particular document or conversation" establishing knowledge of contrary facts). Defendants' knowledge surpassed abstract awareness—they knew that 40% of tested workers had dangerous blood-

37

lead levels (¶ 156), that union representatives had filed regulatory petitions about the "appalling state of disrepair" of lead cables (¶¶ 147-49), and that Verizon had entered into settlements requiring review of damaged cables (¶ 155).

*Third*, Defendants' asserted inference fails to address Defendants' own public statements about "eliminating," "removing," and "tak[ing] out" copper infrastructure, which they knew Verizon was systematically abandoning in place, including in response to analyst questions. *See, e.g.*, ¶¶ 253-54, 257. These pointed statements defeat Defendants' arguments that the SAC provides "[g]eneralized imputations" of knowledge (Mot. at 19) (alteration in original). *Avaya*, 564 F.3d at 270 (inferring scienter where CFO was "asked, directly and repeatedly" about issue and "flatly denied" its existence). The SAC's detailed, Defendant-specific scienter allegations supported by Defendants' own admissions distinguish this case from *AT&T*, where the court found scienter lacking (with leave to replead) due to improper group pleading and insufficient individualized allegations, 2025 WL 1685840, at *4-6, and *Lumen*, 2025 WL 978229, at *24, where the court also concluded scienter was not pled.

In sum, Defendants' argument that there is "no reason to think that *any* defendant was trying to swindle shareholders" (Mot. at 15 (emphasis in original)) first misstates the standard for alleging scienter and then asks the Court to disregard the SAC's allegations and draw inferences in Defendants' favor. Indeed,

Defendants' inference would require the Court to conclude that executives who (i) knew workers were suffering from lead poisoning; (ii) faced regulatory pressure about deteriorating cables; (iii) conducted "detailed analysis" about lead disposal options; and (iv) had access to records showing the precise location of every lead cable in Verizon's wireline network, somehow genuinely believed that none of the foregoing posed a material risk worth disclosing while simultaneously making emphatic public statements about removing the very infrastructure they were abandoning in place. To the contrary, the facts alleged create a strong inference that Defendants made statements knowing they were false.

## III.    THE SAC ALLEGES SCHEME LIABILITY

The SAC also alleges that Defendants engaged in a fraudulent scheme by deceiving investors about the material risk lead cables posed to the business. "To state a claim based on conduct violating Rule 10b-5(a) and (c), a private plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Mylan*, 2025 WL 1874621, at *6. Here, separate and apart from Defendants' representations, the SAC alleges Verizon engaged in a deceptive course of conduct by abandoning lead cables in place and concealing the associated risks of financial losses from investors. ¶¶ 76-88; *see Mylan*, 2025 WL 1874621, at *8 (sustaining scheme claim based on deceptive practices such as "disguising drug impurities" and

39

"ignoring testing results""). Defendants' contrary arguments (Mot. at 39) fail because the SAC pleads Defendants' deceptive conduct with particularity (indeed, Verizon admitted to engaging in this conduct), and scienter is alleged.

## IV.  THE SAC ALLEGES CONTROL PERSON LIABILITY

Because Plaintiffs allege a Section 10(b) claim, they also allege a Section 20(a) claim for control person liability against the Individual Defendants. The Individual Defendants do not dispute that they controlled Verizon. *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *20 (W.D. Pa. May 18, 2023) (plaintiff alleged control person liability where Section 10(b) claims were sustained and defendants did not dispute the individual defendants' control). Moreover, contrary to Defendants' contention, "the Third Circuit does not require that culpable participation be pled," and even so, Plaintiffs plead the Individual Defendants' culpable participation in Verizon's violations. *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *29 (D.N.J. Mar. 24, 2008); *see* ¶¶ 364-74.

## CONCLUSION

Plaintiffs respectfully request that Defendants' Motion to Dismiss be denied in its entirety. If the Court dismisses the SAC in any respect, Plaintiffs respectfully request leave to amend.

40

Dated: July 31, 2025

Respectfully submitted,

**CARELLA, BYRNE, CECCHI,**
 **BRODY & AGNELLO, P. C.**

*/s/ James E. Cecchi*
James E. Cecchi
Kevin G. Cooper
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs
and the Class*

**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**
Gregory M. Castaldo
Joshua E. D'Ancona
David A. Bocian
Nathaniel C. Simon (admitted *pro hac
vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jdancona@ktmc.com
dbocian@ktmc.com
nsimon@ktmc.com

**GRANT & EISENHOFER**
Caitlin M. Moyna (admitted *pro hac
vice*)
Mica A. Cocco (admitted *pro hac vice*)
485 Lexington Avenue
New York, NY 10017

41

Telephone: (646) 722-8500
Facsimile: (646) 722-8501
cmoyna@gelaw.com
mcocco@gelaw.com

*Lead Counsel for Lead Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, James E. Cecchi, hereby certify that on July 31, 2025, I caused a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 31, 2025

*/s/ James E. Cecchi*
**CARELLA, BYRNE, CECCHI,
  BRODY & AGNELLO, PC**
James E. Cecchi
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs
and the Class*