**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **STICHTING PENSIOENFONDS METAAL EN TECHNIEK,** *et al.*, | **Case No. 23–cv–05218–ESK–AMD** |
| **Plaintiffs,** | |
| **v.** | **OPINION** |
| **VERIZON COMMUNICATIONS, INC.,** *et al.,* | |
| **Defendants.** | |

**KIEL, U.S.D.J.**

When transitioning from wireline copper to fiber optic cable for broadband internet, Verizon left miles of lead-sheathed copper wire in place.   Plaintiffs claim that the defendants made several false or misleading statements about the leaded cables.   According to plaintiffs, these statements exposed Verizon to significant financial risk and violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.Because plaintiffs have—again—not plausibly alleged an actionable claim for fraudulent misstatements made with *scienter*, the second amended complaint will be DISMISSED.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs filed an amended complaint on April 24, 2024 on behalf of a putative class of persons and entities who purchased or otherwise acquired publicly traded Verizon securities between October 30, 2018 and July 26, 2023. (ECF No. 57 (Am. Compl.).)   Defendants filed a motion to dismiss (ECF No. 58), which I granted on March 31, 2025.   (ECF Nos. 77 (Opinion), 78 (Order).) The dismissal gave plaintiffs leave to file a second amended complaint, which they did on April 21, 2025.   (*See* ECF No. 79 (Sec. Am. Compl.).)   I previously

detailed the facts underlying this action in the Opinion (ECF No. 77) and accordingly will not repeat a full recitation of the facts.

Plaintiffs assert two counts, pleading violations under: (1) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Security Exchange Commission (SEC) Rule 10b–5 (SEC Rule 10b–5)); and (2) Section 20(a) of the Exchange Act. (Sec. Am. Compl. ¶¶ 354–363, 364–374.)   Plaintiffs allege that defendants violated Section 10(b) and SEC Rule 10b–5 by knowingly and/or recklessly concealing that Verizon owned and abandoned hundreds of miles of copper cables encased with lead, which brought enormous risk and financial exposure to Verizon and its shareholders because of the serious health effects to humans of lead exposure.  (*Id.*)   These allegations were born from a series of "bombshell" articles in the Wall Street Journal that were published in July 2023 about Verizon's lead cables.  (*Id.* ¶ 190.)   Following the publication of the articles, the value of Verizon's stock dropped sharply.   (*Id.* ¶ 7.)

Plaintiffs' amended complaint was dismissed primarily because the allegedly misleading statements were not actionable, as plaintiffs failed to plead with the particularity required by the Private Securities Litigation Reform Act (PSLRA) how those statements were misleading. (Opinion p. 13.) Beyond the particularity requirement, the amended complaint failed to establish *scienter* as to each of the alleged misstatements.   (*Id.* p. 22–29.)   I instructed that if plaintiffs filed a further amended complaint they must "assert *all* their allegations as to misrepresentation and *scienter* of the speaker/defendant of a particular statement(s) immediately following the statement(s) plaintiffs allege violate Section 10(b) and Rule 10b-5."   (*Id.* p. 30). Plaintiffs filed the second amended complaint on April 21, 2025.

Defendants move to dismiss the second amended complaint (Motion). (ECF No. 82).  Defendants filed a brief (ECF No. 82–1 (Defs' Br.)) and declaration with exhibits (ECF Nos. 82–2, 82–3) in support of the Motion.

2

Plaintiffs filed an opposition (ECF No. 83 (Opp'n Br.)) to the Motion, to which defendants filed a reply (ECF No. 85 (Reply Br.)).[1]

## II.    LEGAL STANDARD

### A.    <u>Motion to Dismiss</u>

When considering a motion to dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure (Rule) 12(b)(6), courts must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the non-moving party. *Makky v. Chertoff*, 489 F. Supp. 2d 421, 429 (D.N.J. 2007). A motion to dismiss may be granted only if the plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests that make such a claim plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Although Rule 8 does not require "detailed factual allegations," it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Even post-*Twombly*, it has been noted that a plaintiff is not required to establish the elements of a prima facie case but instead, need only put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).

In reviewing the sufficiency of a complaint, a court must take three steps. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are

---

[1] Plaintiffs also filed a letter (ECF No. 84) bringing to the Court's attention *In re Maiden Holdings, Ltd. Sec. Litig.*, 153 F.4th 354, 357 (3d Cir. 2025) (*Maiden*), *reh'g denied*, 2025 WL 2671744 (3d Cir. Sept. 16, 2025). The Third Circuit in *Maiden* clarified the standards to analyze materiality and falsity in securities fraud claims under Section 10(b).

no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.   Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*   "[A] complaint's allegations of historical fact continue to enjoy a highly favorable standard of review at the motion-to-dismiss stage of proceedings." *Connelly*, 809 F.3d at 790.

### B.   Rule 9(b)

"Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002).   Thus, pursuant to Rule 9(b), "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other condition[s] of a mind of a person may be averred generally."   Fed. R. Civ. P. 9(b).   A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 217).   Accordingly, to satisfy particularity, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).   This heightened standard is designed to "ensure that defendants are placed on notice of the 'precise misconduct with which they are charged, and to safeguard defendants against spurious charges' of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Seville Indus. Mach. Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984)).

### C.    Private Securities Litigation Reform Act

"The PSLRA establishe[s] heightened pleading requirements for a plaintiff to meet in order to plead a cause of action successfully in class actions alleging securities fraud."   *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013).   Pursuant to the PSLRA, a complaint must "state with particularity both the facts constituting the alleged violation, and the facts evidencing *scienter*, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* at 241–42 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).

The provisions of the PSLRA pleading standard echo the requirements set forth in Rule 9(b) and require that facts be pleaded "with particularity."   *Id.* n.3.   Although the "PSLRA replaced [Rule] 9(b) as the pleading standard governing private securities class actions," Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements" of the PSLRA.   *Id.*; *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (noting that this standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story"). Section 78u–4(b)(1) also adds the requirement that where "an allegation regarding [a defendant's] statement or omission is made on information and belief," plaintiffs must "state with particularity all facts on which that belief is formed"; that is, they must describe the sources of information with particularity, including "the who, what, when, where and how of the sources, as well as the who, what, when, where[,] and how of the information those sources convey."   *Id.*; *see* 15 U.S.C. § 78u–4(b)(1).

As to the second element, the PSLRA's approach for pleading *scienter* deviates from Rule 9(b), which allows plaintiffs to plead the *scienter* element generally.   *Avaya, Inc.*, 564 F.3d at 253.   Under the PSLRA, the court must evaluate whether all of the facts in the complaint when taken collectively give

rise to a "strong inference of *scienter*"—not whether any individual allegation viewed in isolation meets that standard. *Tellabs*, 551 U.S. at 323. In determining whether the pleaded facts give rise to a strong inference of *scienter*, the court must "take into account plausible opposing inferences." *Id.* This involves a comparative inquiry that evaluates how likely one conclusion is as compared to others, in light of the pleaded facts. *Id.* Thus, the court must consider plausible, nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. *Id.* at 324. Although the inference that the defendant acted with *scienter* need not be irrefutable, the inference must be more than merely "reasonable" or "permissible." *Id.* A complaint will survive only if a reasonable person would "deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## III. DISCUSSION

### A.   Section 10(b) and SEC Rule 10b-5

Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact" not misleading in the light of the circumstances it was made. 17 C.F.R. § 240.10b–5(b). The Supreme Court has implied a private cause of action from the text and purpose of [S]ection 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). Accordingly, to state a securities fraud claim pursuant to Section 10(b) and SEC Rule 10b–5, a plaintiff "must allege (1) a material misrepresentation or omission, (2) *scienter*, (3) a connection between the misrepresentation or

6

omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council*, 754 F.3d at 167.

Moreover, "the omission of a fact can make a statement of opinion ... even if literally accurate, misleading to an ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187 (2015); *see also City of Warren Police and Fire Ret. Sys. v. Prudential Fin.*, 70 F. 4th 668, 685 (3d Cir. 2023) ("*Omnicare*'s framework for evaluating opinion falsity applies to claims under [Section] 10(b) for violations of [SEC] Rule 10b–5."). This standard does not "allow investors to second-guess inherently subjective and uncertain assessments" nor is it "an invitation to Monday morning quarterback an issuer's opinions." *Omnicare*, 575 U.S. 175, 186. However, an opinion statement is misleading if it (1) "was not sincerely believed when made," (2) "contains an expressly embedded, untrue factual assertion," or (3) "reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police and Fire Ret. Sys.*, 70 F. 4th at 686.

Defendants claim that plaintiffs' Section 10(b) and SEC Rule 10b-5 claims in the second amended complaint still fail because the challenged statements and opinions are not misleading and the complaint fails to sufficiently allege *scienter*. (ECF No. 82.)

### B. Material Misrepresentations or Omissions

#### i. Converting Legacy Copper Cables into Fiber and the Associated Costs

On February 25, 2021, Verizon filed its form 10-K for fiscal year 2020, signed by defendants Vestberg, Ellis, and Skiadas, and containing the following statement:

> To compensate for the shrinking market for traditional copper-based products, we continue to build fiber-based networks supporting data,

7

video and advanced business services—areas where demand for reliable high speed connections is growing.    We are evolving the architecture of our networks to a next generation multi-use platform, providing improved efficiency and virtualization, increased automation and opportunities for edge computing services that will support both our fiber-based and radio access network technologies. We call this the Intelligent Edge Network. *We expect that this new architecture will simplify operations by eliminating legacy network elements*, speed the deployment of 5G wireless technology and *create new opportunities in the business market in a cost efficient manner.*

(Sec. Am. Compl. ¶ 253 (False Statement No. 1)).

During Verizon's third-quarter earnings call on October 20, 2021, Brett Feldman, an analyst at Goldman Sachs, asked Ellis:

If you don't mind as a quick follow-up there around the cost point. Those of us who live in regions that have Fios know that sometimes you can get Fios or maybe down the street, you can't.    Are you kind of completing the communities?    *In other words, are you going to be at the point where you can finally rip out all this legacy infrastructure?*    Is that what you meant by the cost savings?

(*Id.* ¶ 257).    Ellis then replied:

Well, that's absolutely part of it.    Now we're going to be all the way there. That's a long-term goal for us.    But certainly, as you replace in a certain location copper with fiber, there's a good benefit from a cost standpoint.    In addition to the revenue step-up opportunities you get with that customer base.    So it's a win-win on both sides of the P&L there.

(*Id.*)

On November 17, 2021, Ellis stated at the Morgan Stanley European Technology Media & Telecom Conference:

But then also in continuing to—our project of replacing copper in the ILEC footprint with fiber obviously gives us an opportunity to sell Fios into those consumer and business locations, also gives us the opportunity to pull out the copper that is expensive to operate. Certainly not—the equipment on that has—also has higher emissions than some of the newer equipment, too.    So from a green standpoint, it's also a benefit, too.

(*Id.* ¶ 261.)

During the same conference, Ellis further stated:

> But we expect to do north of 400,000 open-for-sale each year for at least the next 2 to 3 years, and then we'll see where it goes from there. So it continues to be an opportunity to expand the Fios footprint within our existing ILEC space and not just get the revenue opportunities from expanding the size of the Fios customer base, but also some cost benefits and green benefits from removing some of the copper network at the same time.

(*Id.* ¶ 266.)

On March 3, 2022, during Verizon's investor day, attended by Ellis, Vestberg, and Malady, Malady stated:

> But fundamentally, we picked fiber a long, long time ago.   And now we're seeing that we're able to update that and still use the money we sunk in 20 years ago, right, because we can just upgrade the electronics and continue to push the technology up.   So to Matt's point too, it also helps us in 2 ways.   It allows us to drive more revenue, but it also allows us to take out the old equipment, the old copper stuff and get people on new things. So we're going to keep moving.

(*Id.* ¶ 271.)   During the same Investor Day, Ellis stated:

> Yes.   So look, I think absolutely, we'll continue to expand FiOS footprint … .   And in addition to doing that, you get cost savings as well, of course, as you take copper out and—and obviously, the maintenance on that becomes a lot easier on the fiber side.

(*Id.*)[2]

On March 15, 2023, in an interview by Srikrishna Koneru of Infosys, Gowen stated:

> [Y]ou're absolutely right uh the business case for sustainability is incredibly incredibly important and it's looking at uh sustainability from a TCO perspective a total cost of ownership it goes right back to

---

[2] Following Verizon's convention in the second amended complaint, I refer to the statements made at the March 3, 2023 investor day as "False Statement No. 5."

> a supply chain and sourcing and really business case 101. um how do you look at the impacts of any new product any new technology when we went through uh through my time here from a copper to fiber migration what is the cost to pull that copper out what is the absolute home run benefit of putting fiber in not only from a speed resiliency and things like that but it's that it's that long time uh it's that long-term mindset that is so so important when you're looking at business case cases you know it's interesting when you think about what we've been able to do here at Verizon and I think about the way we operate a responsible sourcing you know we think about everything from human rights to ethical conduct to making sure we protect the environment that's through our [request for proposal] RFP process that's through our negotiation process that's where our supplier contracts you know and then we take it to the next step okay how do you take that to the next step and you start to look at the risk because everything we do at Verizon from a supply chain perspective or really from a business perspective looks at the end-to-end risk … .

(*Id.* ¶ 274.)

On May 25, 2023, Malady attended the CTIA 5G Summit during which time he was interviewed and stated:

> Verizon also has a large landline presence.  And we have a lot of copper still out there that people still use.  And we can use our wireless asset now to replace some of the old legacy copper which is very inefficient and in the day of [Environmental, Social, and Governance] (ESG) and trying to save energy and make sure all the resources you have you use them wisely we can move some of those old copper things onto the wireless network at low bandwidth things. There is just a whole range of solutions we're going to be able to bring to the table for old legacy things that are out there that are that are inefficient with uh with this new fixed wireless offer.

(*Id.* ¶ 278.)

Plaintiffs allege that these italicized-statements by Ellis, Malady, and Gowen are misleading for three general reasons (1) that Verizon was not actually ripping out or replacing the legacy copper wire infrastructure, but was instead leaving the copper in place, (2) that the claims related to the cost benefits of the transition failed to acknowledge that the purported cost benefit

was to be realized by "abandoning its copper wires" and thus avoiding the removal costs, arguing that the cost-benefit of the transition would have been eroded had Verizon undergone the expenditure of actually replacing the copper wires, and (3) that the claimed environmental or green benefits of the transition was incomplete because the statements omitted that the legacy copper cables were encased with toxic lead. (Sec. Am. Compl. ¶¶ 258, 259, 269.) Defendants correctly note that many of these statements were also alleged as misstatements in the prior complaint. (Defs' Br. p. 30, n. 11.) I concluded that the alleged false statements in the prior complaint, "fail[ed] to demonstrate with particularity under the PSLRA how the statements [were] misleading." (Opinion p. 13.)

The only statements in the second amended complaint not included in the amended complaint are alleged False Statement No. 1 (Sec. Am. Compl. ¶ 253) from Verizon's 10-K and Ellis's statement from Verizon's March 3, 2022 investor day, which appears in alleged False Statement No. 5. (Sec. Am. Compl. ¶ 271.) The second amended complaint replaces a second statement from Malady with this statement from Ellis. (*Compare* Am. Compl. ¶ 320, *with* Sec. Am. Compl. ¶ 271.) Plaintiffs argue that that statement by Ellis was misleading, again arguing that Verizon was not actually "taking copper out." (Sec. Am. Compl. ¶ 272.) Plaintiffs further argue that Ellis's statement was misleading because it "gave the impression that there was no copper wire left to maintain." (*Id.*)

Ellis's False Statement No. 5 (Sec. Am. Compl. ¶ 271) fails to meet the PSLRA's particularity requirement. Plaintiffs only allege that Ellis's statement gave the erroneous implication that all copper wire was being removed and that Verizon had the practice of "leaving the copper wires, including lead-sheathed copper wires, in place." (*Id.*) In other words, plaintiffs allege that the statement was misleading because it omitted critical

information, which led investors to an incorrect assumption about the leaded wire.   But plaintiffs again fail to allege with particularity "how" that omission was misleading.   *See Avaya, Inc.*, 564 F.3d at 253; 15 U.S.C. §78u–4(b)(1).

Simply asserting that statements are incomplete is insufficient to plausibly assert a claim under SEC Rule 10b–5.   *See Winer Family Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) (finding that a corporation's press release announcing a new business venture with another entity was not misleading, even though the press release omitted that their prior business venture was "disastrous"); *see also Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*, No. 12–00509, 2013 WL 3087078, at *16 (D.N.J. June 14, 2013) (dismissing with prejudice claims arising from defendant-corporation's cautiously unoptimistic statements to investors concerning the corporation's short term future because the statements were not actionable because defendant-corporation was "under no duty to provide more dire specifics while disclosing their true, generally positive, fiscal year 2009 results"); SEC Rule 10–b(5) (limiting omission liability to "a material fact necessary in order to make the statements made … not misleading").

Plaintiffs also fail to meet the PSLRA's particularity requirement with regard to the sole allegedly false and misleading statement not included in the amended complaint.   Specifically, plaintiffs allege that False Statement No. 1 is false and misleading because (1) Verizon was not actually "eliminating legacy network elements[,]" but was leaving the copper cables in place and (2) the referenced cost savings from the transition were only achievable by leaving the legacy copper wire in place.   (Sec. Am. Compl. ¶¶ 254, 255.)   These arguments are not new, and I have already responded to them as to plaintiffs' amended complaint in the prior dismissal.   (Opinion pp. 13, 14.)

Plaintiffs' claims regarding the potential liability related to the lead in the cables are not new and were addressed when the first amended complaint was

12

dismissed. (*Id.* pp. 13, 14.) As explained, plaintiffs have failed to demonstrate "how" the alleged liability of Verizon's legacy copper cables was so overwhelming that simply omitting reference to that information when mentioning the cost savings of the conversion was misleading. *See Avaya, Inc.,* 564 F.3d at 253.

### ii.    Employee Health and Safety

Each of Verizon's ESG Reports filed between March 18, 2019 and July 26, 2023 includes this statement: "We *regularly update our employee health and safety programs*, including online and instructor-led training to educate employees about best practices and working safely.   Topics include operating aerial lifts, *splicing fiber*, climbing poles, handling ladders and *installing fiber*." (Sec. Am. Compl. ¶ 293.)

These ESG Reports also stated (or made substantially similar statements) that, "*[w]e are committed to maintaining a safe workplace and environmentally responsible work practices*."   Verizon further wrote in its Environmental, Health, and Safety (EHS) Policy that:

> Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. *Our commitment goes beyond maintaining compliance with laws, regulations and policies.* … Verizon will conduct business in an environmentally and socially responsible manner and provide employees with a safe and healthful workplace. We are committed, through our … []EHS[] management system and supporting programs, to eliminate hazards and reduce EHS risks.

(*Id.* ¶ 297.)   Verizon also stated in its proxy statements for fiscal years 2022 and 2023 that it was "*committed to maintaining a safe workplace and environmentally responsible work practices,*" and further stated in its Form 10–Q for the first quarter of 2023 that it is "limiting [its] environmental impact."   (*Id.* ¶ 70.)

Plaintiffs allege that the italicized statements about Verizon's concerns for its employees' health and safety were materially false and/or misleading

13

because Verizon abandoned thousands of miles of lead-sheathed cables that harmed its employees while failing to provide protective equipment to those employees exposed to the lead-sheathed cables. (*See id.* ¶¶ 294, 298–300.) Verizon argues that these statements are not false or misleading because the first statement (*see id.* ¶ 293) never claims that Verizon's employee safety programs are foolproof and because the second statement (*see id.* ¶ 297) is inactionable puffery. (Defs' Br. pp. 41–42.) In other words, "statements about goals and commitments are not false or misleading simply because the goal is not fully met or achieved." (Reply Br. p. 19.) Plaintiffs counter that the second amended complaint added new confidential witness (CW) accounts, that these employee health and safety statements were "half-truths," and that the statements were not puffery but "specific assertions of the priority of safety." (Opp'n Br. pp. 32–34.)

I addressed both statements before, noting that "plaintiffs fail[ed] to assert any facts demonstrating that the statements are misleading," and that these general statements of optimism about a particular program are merely puffery. (Opinion pp. 17–18 n. 2.) Although plaintiffs bolstered their argument with CW accounts, they do not compel me to change my conclusion that the statements in the ESG Reports are false or misleading.

### iii.    Disposal of E-Waste

Plaintiffs allege every ESG Report filed by Verizon during the relevant period contained a substantially similar definition of e-waste:

> *Our goal is to divert as much e-waste as possible from landfills by reusing or responsibly recycling materials.* Our priority is to reuse electronics internally. When that is not possible, we market these materials for reuse through approved vendors or work with partners to recycle them responsibly. *Verizon defines e-waste as electronic products and parts*, such as cell phones, chargers, set-top boxes, *network equipment* and batteries, *that are at the end of their useful life* and/or have been returned by customers.

(*Id.* ¶ 281.)

14

Verizon also made the following statements about recycling of e-waste in itsESG reports:

> In Verizon's 2019 ESG Report, Verizon stated: "In 2019, we recycled more than 84.8 million pounds of telecommunications equipment, metal, batteries, paper, cardboard and other items.  This included more than 43.3 million pounds of e-waste and over 2.3 million pounds of plastic.  Verizon also recycled nearly 5.2 million pounds of lead acid batteries."

> In Verizon's 2020 ESG Report, signed by [d]efendant Vestberg and Verizon reported the following in its ESG Report:  "In 2020, Verizon recycled or reused more than 38.3 million pounds of telecommunications equipment, electronic products, batteries, paper, cardboard and other items. We recycled more than 33 million pounds—and reused nearly 2.6 million pounds—of e-waste. Recycled e-waste included over 1.2 million pounds of associated plastic and nearly 3.5 million pounds of lead-acid batteries."

> In Verizon's 2021 ESG Report, Verizon stated: "In 2021, Verizon reused or recycled approximately 35.5 million pounds of e-waste, including 1.79 million pounds of plastic and 3.4 million pounds of lead-acid batteries."

> And in Verizon's 2022 ESG Report, Verizon stated: "In 2022, Verizon reused or recycled approximately 43.4 million pounds of e-waste, including 1.6 million pounds of plastic and 2.7 million pounds of lead-acid batteries."

(Sec. Am. Compl. ¶ 285.)

And in its fiscal year 2019 proxy statement, Verizon stated: "We continue to work to reduce the environmental impact of our products through: … recycling, refurbishing and/or reusing our products, including the responsible management of out-of-service lead batteries." (*Id.* ¶ 290.)  Plaintiffs allege these statements are false and misleading because they highlight Verizon's recycling achievements but omit that Verizon has left lead cables in place.  (*See id.* ¶¶ 282, 286, 287, 291.)  Verizon argues that by not mentioning lead-sheathed cables (or cables in general), "none of these statements create any duty to disclose" Verizon's ownership of lead-sheathed cables, some of which remain

in place. (Def's Br. p.43.) Plaintiffs counter that these statements "provide[d] an incomplete picture of material facts." (Opp'n Br. p.31.)

As an initial matter, the statements at paragraphs 281 and 290 of the second amended complaint are virtually identical to statements I already determined are not actionable. (Opinion pp.18–19.) The second amended complaint does not cure the deficiencies outlined in the Opinion, namely that "plaintiffs … failed to present any arguments demonstrating that these statements/opinions are misleading." (*Id.* p.20.)

With respect to the statements concerning Verizon's recycling of e-waste at paragraph 285 of the second amended complaint, plaintiffs argue that these statistics "mislead investors by omitting that Verizon was abandoning millions of pounds of lead cable." (Opp'n Br. p.32 n.5.) But I have already considered and rejected a similar argument. (Opinion p.20 (finding that plaintiffs' argument of misleading by omission of lead-sheathed cables in e-waste was not actionable).) Plaintiffs have pleaded nothing new that compels me to find these statements actionable as false and misleading.

## C.    <u>*Scienter*</u>

"*Scienter* is a 'mental state embracing intent to deceive, manipulate, or defraud,' and requires a knowing or reckless state of mind." *Avaya, Inc.*, 564 F.3d at 252 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). The PSLRA's scienter standard "requires plaintiffs to allege facts giving rise to a strong inference of either reckless or conscious behavior." *Id.* at 267 (internal quotation marks omitted). A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (*Advanta*). "'[C]laims essentially

16

grounded on corporate mismanagement' do not adequately plead recklessness." *Avaya Inc.*, 564 F.3d at 267 (quoting *Advanta*, 180 F.3d at 540).

A "strong inference" of *scienter* is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 267 (quoting *Tellabs*, 551 U.S. at 324).  It is more than "merely 'reasonable' or 'permissible.'"  *Tellabs*, 551 U.S. at 324.  To make this determination, a court must "weigh the 'plausible nonculpable explanations for the defendant's conduct' against the 'inferences favoring the plaintiff.'"  *Avaya, Inc.*, 564 F.3d at 267 (quoting *Tellabs*, 551 U.S. at 324).  But "[t]he inference that the defendant acted with *scienter* need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences."  *Tellabs*, 551 U.S. at 324 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (2004)).  "The pertinent question is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of *scienter*, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Avaya, Inc.*, 564 F.3d at 267–68 (quoting *Tellabs*, 551 U.S. at 323).  "Omissions and ambiguities 'count against inferring *scienter*.'"  *Id.* at 268 (quoting *Tellabs*, 551 U.S. at 326).  "Motive and an opportunity to commit fraud" are just a factor in this analysis.  *Advanta*, 180 F.3d at 534–35.  In sum, "[a] complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 323.

Plaintiffs, as directed in the Opinion, allege *scienter* separately for each alleged misstatement and as a general matter.  ( Sec. Am. Compl. ¶¶ 256, 260, 265, 270, 273, 277, 280, 284, 289, 292, 296, 301; *see also id.* ¶¶ 302–339 (compiling "additional allegations of *scienter*").)  Additionally, the second amended complaint connects executives to databases tracking lead (*id.* ¶¶ 90–

17

93), links job duties to environmental oversight (*id.* ¶ 10), and pleads a systematic practice (*id.* ¶¶ 76–84).

Verizon argues that plaintiffs' misstatement claims fail for lack of *scienter* because (1) plaintiffs fail to allege motive, (2) plaintiffs fail to plead facts supporting an inference of knowing fraud or extreme recklessness, and (3) it is more cogent and compelling to infer that Verizon and the individual defendants lacked *scienter*. (Def's Br. pp. 20–34.) Verizon argues that plaintiffs have not shown any "connective tissue" between a misstatement and a corporate agent with *scienter*. (*Id.* p. 32.) Plaintiffs counter that (1) defendants knew or recklessly disregarded material risks associated with the lead cables, (2) defendants had a compensation-based motive, and (3) plaintiffs' fraudulent inference is more compelling. (Opp'n Br. pp. 34–45.)

I agree with Verizon. Although plaintiffs make some additional arguments on *scienter* from the amended complaint—such as the databases of the lead-sheathed cables—they have not raised any new argument sufficient to now conclude that *scienter* is plausibly alleged. (*Compare* Opinion pp. 23–29 (finding "all five of plaintiffs' arguments [to be] meritless"), *with* Opp'n Br. pp. 34–45 (making substantially the same arguments).) And I find the inference of *no scienter* more cogent and compelling than the inference of scienter. *See Tellabs*, 551 U.S. at 323.

### D.   Scheme Liability

Plaintiffs next allege that defendants "engaged in a fraudulent scheme by deceiving investors about the material risk lead cables posed to the business." (Opp'n Br. p. 45.) "To state a claim based on conduct violating Rule 10b-5(a) and (c), a private plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." But "scheme liability must be premised on misconduct separate from misrepresentations and omissions

18

violating Rule 10b-5(b)." *Nash v. Qualtrics Int'l Inc.*, No. 23–596, 2024 WL 231870, at \*6 (D. Del. Jan. 22, 2024) (internal quotation marks omitted), *report and recommendation adopted* 2024 WL 2505911 (D. Del. May 24, 2024). Here, not only has there been no *scienter* plausibly alleged, but plaintiffs fall short of alleging separate misrepresentations or omissions by arguing that "Verizon engaged in a deceptive course of conduct by abandoning lead cables in place and concealing the associated risks of financial losses from investors." (Opp'n Br. p. 45.) Abandoning lead cables and concealing the financial risks of doing so is precisely what plaintiffs allege violated Rule 10b-5(b) in the first place.

### E.    20(a) Claims

Plaintiffs also assert claims for control person liability under Section 20(b) against Vestberg, Ellis, Malady, Gowen, and Skiadas. (Sec. Am. Compl. ¶¶ 364–374.) "Section 20(a) … imposes joint and several liability on any individual who exercises control over a 'controlled person' who violates Section 10(b)." *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (quoting 15 U.S.C. §78t(a)). The three elements to this claim are "(1) the defendant controlled another person or entity[,] (2) the controlled person or entity committed a primary violation of the securities laws[,] and (3) the defendant was a culpable participant in the fraud." *Id.* Thus, "liability under Section 20(a) is contingent upon sufficiently pleading an underlying violation of Section 10(b) by the controlled person." *Id.*

As before (Opinion p. 29), because plaintiffs have failed to sufficiently plead a violation of Section 10(b) against defendants, plaintiffs' Section 20(a) claim cannot survive. *See Carmack*, 258 F. Supp. 3d at 466.

## IV.  CONCLUSION

Verizon's Motion (ECF No. 82) is **GRANTED**.  The second amended complaint (ECF No. 79) will be dismissed as to all defendants.

Plaintiffs have had three chances to file an operative complaint that plausibly states a claim.   Accordingly, this dismissal will be with prejudice as further amendment would be futile.   *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 112–13 (3d Cir. 2002) (holding that futility of amendment is a proper reason to deny leave to amend); *Velazquez v. Zickerfoose*, No. 11–2459, 2014 WL 6611058, at * 7 (D.N.J. Nov. 21, 2014) (dismissing claim with prejudice after having afforded plaintiff three opportunities to plead valid claim); *Donnelly v. Option One Mortg. Corp.*, No. 11–7019, 2014 WL 1266209, at *18 (D.N.J. Mar. 26, 2014) (dismissing claims with prejudice after three opportunities to adhere to the applicable pleading standards).

   */s/ Edward S. Kiel*     

**EDWARD S. KIEL**

**UNITED STATES DISTRICT JUDGE**

Dated:  May 29, 2026

20